Gmail

David Noble <dwnoble@gmall.com>

---

## Postal Record ads

6 messages

---

**David Noble <dwnoble@gmall.com>**                      Sat, Dec 18, 2021 at 1:13 PM
To: rolando@nalc.org, "Peter D. DeChiara" <pdechiara@cwsny.com>

I want to begin running political ads in the Postal Record beginning with the February issue.

Please tell me the per-page cost and the monthly deadline.

David Noble

## Exhibit A

---

Peter D. DeChiara <pdechiara@cwsny.com>
To: David Noble <dwnoble@gmall.com>, Fred Rolando <rolando@nalc.org>

Mr. Noble:

NALC has authorized me to provide the following response to your email.

In accordance with longstanding NALC policy, NALC does not run political ads in the *Postal Record*, with the exception of one issue every four years, preceding the NALC national officer elections. The rates and deadline for political ads for that issue have not yet been determined. NALC plans to announce the rates and deadline in the June 2022 issue of the *Postal Record*. If you have additional questions regarding ads in the *Postal Record*, please contact Mike Shea at NALC.

Peter DeChiara


Peter D. DeChiara
900 Third Avenue, Suite 2100
New York, NY 10022-4869
Tel: 212.356.0216
Fax: 646.473.8216
Cell: 917.868.9007

## Exhibit B

pdechiara@cwsny.com | www.cwsny.com | Bio

[Quoted text hidden]

Under applicable Treasury Regulations, we are required to inform you that no U.S. tax advice in this email or an attachment to this email is intended or written to be used, nor can it be used, to avoid a penalty under the Internal Revenue Code, or to promote, market or recommend to another party a transaction or matter addressed in this email or attachment.

This E-Mail and any attachments may contain material that is protected by an attorney-client privilege or that is otherwise confidential. Please do not permit anyone other than an addressee or an employee or other authorized agent of an addressee to read this e-mail or any of its attachments without the consent of Cohen, Weiss and Simon LLP. If you are not one of the people specified in the previous sentence, please delete this e-mail and its attachments and notify me.

---

**David Noble <dwnoble@gmall.com>**                      Wed, Dec 29, 2021 at 2:36 PM



NALC Alamo Branch 421 · 6218 Krempen Ave. · San Antonio, Texas 78233-4579
Phone: 210-227-0128 · Fax: 210-226-8119

March 4, 2022

Dear Brother Noble:

Please find enclosed the ad you submitted to us and the money order you provided. As President Gould explained in his email, the branch membership voted that we are not going to open our newsletter to any campaign ads outside of our own branch elections.

Thanks again.

*Louise H. Jordan*

Louise Jordan, Vice President
NALC Branch 421

# Exhibit C



## ROLANDO WORST PRESIDENT IN NALC HISTORY

History will record Fred Rolando as NALC's worst president. Here's why:

*A couple of years before he became president in 2009 USPS paid 88.75% of each letter carrier's health benefits. In 2022 USPS pays 72%.

*In 2009 almost all new-hires came in as career employees. In 2022 no new-hires come in as career employees and all new-hires are required to spend up to two years in non-career status as CCAs before converting to career.

*In 2009 the letter carrier workforce was 90% career. In 2022 the letter carrier workforce is 75% career.

*In 2009 all letter carriers got 13 days of sick leave per year. In 2022 25% of the letter carrier workforce gets no sick leave at all.

*In 2009 letter carriers at all steps of the pay schedule got the full COLA. In 2022 only the top step gets the full COLA. The lower steps get less. CCAs get no COLA at all.

*In 2009 all letter carriers got ten holidays. In 2022 only career letter carriers get ten holidays. The 25% of the workforce that is non-career get six holidays, and some of those are for partial days.

*In 2009 a starting career full-time letter carrier made $42,610. In 2022 a starting career full-time makes $43,062. The reason these numbers are almost the same is because Fred Rolando decided in 2013 to cut the starting pay for career employees by more than $12,000. If Rolando had not made that concession, starting full-time career letter carriers would now be making $57,397. As a result of Rolando's cut letter carriers are now divided into Table A pay – for those hired before 2013, and Table B pay – for those hired in 2013 and after. Letter carriers in the Table B schedule end up in the same place as Table A carriers, but the Table B carriers make over $100,000 less while getting to the top step.

In thirteen years as president, Fred Rolando has turned the letter carrier craft into a pale shadow of what it was when he took over. The next round of collective bargaining for NALC takes place in 2023. We can't let Rolando and Renfroe make any more concessions. We have to replace the current crop of do-nothing officers with Clean Sweep 2022 – a team of fighters. The next NALC election of national officers is scheduled for October.  –David Noble



# National Association of
# Letter Carriers

**Fredric V. Rolando**
President

100 Indiana Ave., NW
Washington, DC
20001-2144
202.393.4695
www.nalc.org

**Brian Renfroe**
Executive Vice President

**Lew Drass**
Vice President

**Nicole Rhine**
Secretary-Treasurer

**Judy Willoughby**
Asst. Secretary-Treasurer

**Christopher Jackson**
Director, City Delivery

**Manuel L. Peralta Jr.**
Director, Safety & Health

**Myra Warren**
Director, Life Insurance

**Brian E. Hellman**
Director, Health Insurance

**Ron Watson**
Director, Retired Members

**Board of Trustees:**
**Larry Brown Jr.**
Chairman
**Randall L. Keller**
**Michael J. Gill**

Affiliated with the AFL-CIO &
Union Network International

November 30, 2018

David W. Noble, Jr.
1 Fenceline Drive
Gaithersburg, MD 20878

Dear Brother Noble:

I enclose the decision of the National Election Committee on your appeal of the 2018 election of NALC National Officers.

Sincerely,

Barbara Stickler
Chairman, National Election Committee

Enclosure

cc:  Fredric Rolando, President
     Nicole Rhine, Secretary-Treasurer

Exhibit D

**NATIONAL ASSOCIATION OF LETTER CARRIERS**

**NATIONAL ELECTION COMMITTEE**

Appeal of the 2018 Election of National Officers
By David Noble

## DECISION

On November 20, 2018, NALC member David Noble submitted an affidavit appealing the results of the 2018 election of national officers.  In accordance with Article 6, Section 14 of the NALC Constitution, we hereby issue the following decision.  For the reasons set forth below the election committee denies the appeal.

David Noble was nominated for the office of President in the 2018 election.  He was defeated by Fredric Rolando by a vote of 48,977 to 11,099.  Brother Noble's appeal enumerates eleven separate objections to the conduct of the election which we will address separately in the discussion which follows.

1.  No observation of the tallying process was permitted.  We find this objection to be without merit.

    All observers were given the same access to the facility where the tallying of the ballots was being conducted.  Observers were allowed to walk through the rooms, ask questions of the election committee or Hartfield Resolution Group representatives on the process and stop and observe any work area they wanted to.

2.  No observation of the box section of the Greenbelt Post Office was permitted.  We find this objection to be without merit.

    The Post Office is a federal facility.  The election committee does not have the ability to require the Post Office to allow observers into the secure work areas.  The election committee found no evidence of tampering with the ballots throughout the election process.

3.  No observation was permitted between the hours of 10 pm and 8 am.  We find this objection to be without merit.

    The LMRDA gives the observers the right to observe the counting and tallying process. There was no counting and tallying being done between the hours of 10 pm and 8 am.  No one was allowed to stay overnight in the room with the ballots.  The NALC went to extra lengths to ensure the ballots were secure overnight when the only requirement was that we lock the door.  There was motion activated cameras placed in each room at the farthest corner of the room facing the doors.  There was a police officer at the facility. There was tape over the door seam, with signatures of two election personnel.  The signatures were partially on the tape and partially on the door and frame.  The key to the room went home with a representative of the Hartfield Resolution Group.  David Noble's son attempted to open the door to the counting area with his room key for the Wyndham

Hotel, but it did not unlock the door.  Any candidate or observer, including David Noble, had the right and ability to sit in the hallway out side the room doors.  He also could have sat in the parking lot and observed the doors thru the glass hotel door.

4.  No verification of ballots was performed.  We find this objection to be without merit.

      The NALC constitution, Article 6 section 8, states that "the National Secretary-Treasurer will furnish to the National Election Committee a list of all members eligible to vote. To be so eligible, a member must be in good standing as of June 1 of the election year". There was an appeal of the 2014 National Officers Election. The alleged failure of the election committee to verify the eligibility of members was raised in that appeal.  The DOL ruled that eligibility was established when the member was listed on the June 1st voter list. The eligible members information and unique identifier was placed on the return envelope for the ballot.  The election committee checked the eligibility of a returned ballot if the member identification information on the return envelope was not legible. If the sender's member identification could not be established the ballot was voided.

5.  Not permitted to note the names of the voters.  We find this objection to be without merit.

      David Noble requested to write down all the names of the members that voted prior to the return envelopes being opened. We asked David Noble if he had names of any voters that he felt were not eligible to vote for us to look up. He did not. While our belief is that the section of the observer's rules David Noble referred to dealt with voting at a polling place and not a mail in ballot election, we offered an accommodation. David Noble was offered the opportunity to sit at any table and have the names of the voters read to him. He chose not to have any of the names read to him.  It must be noted that 60,709 ballots were returned.  It was not reasonable to delay the counting and tally of the ballots while 60,709 names were read to one observer.  The process of tallying the ballots took 8 days.  We opened return envelopes and extracted secret ballot envelopes as we were ready to tally those ballots.  There were multiple days for David Noble to acquire the names of voters, and he chose not to have them read to him.

6.  Not being permitted to count the ballots.  We find this objection to be without merit.

      No observer is permitted to touch the ballots. After the ballots are picked up from the Post Office the returned ballots are hand counted by the election company. The Post Office missorts mail. During every election mail that does not belong to the NALC election is found mixed in with the returns. Accordingly, the total number of returns which may be reported by the Post Office is never used as the official number of returns. The ballots are always hand counted by the election company prior to beginning the tally. The ballots were counted by the count team into bundles of 100, 400 to a tray. David Noble could have counted the number of trays/bundles to get the number of returns. Additionally, notes of the counts were placed on the top of the trays. As soon as the total number of returns was known, that number was shared.

7.  Delaying the distribution of campaign material.  We find this objection to be without merit.

The rules for distributing campaign materials as established by the NALC were published in the May Postal Record. The Postal Record does not accept advertising. The exception is during NALC elections. Campaign ads are accepted for this one issue. For the 2018 National Officers Election campaign ads were accepted for the August/September edition of the Postal Record. All candidate campaign ads submitted were published.

There is/was litigation regarding the ability to send emails. In preparation for the 2018 officer's election the NALC signed with Kelly Press to send email campaign materials. David Noble emailed the NALC on April 17, 2018 that he could not afford the rates of Kelly Press and requested that the NALC email member list be sent to a different company. This along with other issues had the NALC find another email company. Blue Bulldog Digital was hired on June 12th. Campaign emails were sent timely by Blue Bulldog Digital.

8. Incumbent officers improperly used union funds to protect a campaign video. We find this objection to be without merit.

The funds in question were actually expended for attorney's fees to defend former President William Young in a defamation law suit brought against him by David Noble. The video material at issue was from 2014. Neither the video nor the expenditure of funds had any connection to the 2018 officer's election.

9. Fred Rolando refused to recognize David Noble at the 2018 national convention. We find this objection to be without merit.

David Noble was recognized to nominate candidates on his slate. President Rolando's alleged refusal to recognize him on other occasions is irrelevant to the election. Moreover, there is no evidence of discriminatory treatment. At every convention there are delegates at microphones that are never called on due to timing.

10. The election committee arrived at implausible totals. We find this objection to be without merit.

There was no ballot tampering. There were numerous safeguards in place to ensure that all valid ballots were counted. Members had the right to vote only one race, only for the people they knew, for every other position on the ballot or any way they wanted to. The only rule was that they did not over vote a particular race or have write in candidates. If they did violate one of these rules the remaining valid votes were still counted.

11. The Hartfield Resolution Group and the election committee used the police to violate his rights. Moreover, after his arrest a camera trained on a cabinet where extra ballots were stored was turned off. We find this objection to be without merit.

The OLMS states in their Observer Responsibilities "Observers should conduct themselves in a professional manner and should not interfere with or disrupt the conduct of the election or tally". Based on the OLMS regulations the Election Committee included the conduct clause in their Observer rules and provided every observer a copy of the Observer rules. David Noble's rights to observe the tally of the election were not violated. David Noble was interfering with the count and tallying process. He was arguing with a member of the election committee and would not move out the member's personal space. David Noble

should have moved out of the way and he still would have been able to see and hear the tallies being recorded. David Noble was removed by the police for interfering with the election process. David Noble returned and observed the count and tally the next day.

There were extra ballots printed per the Department of Labor regulations. They were securely stored. They are all accounted for and in storage at the printers.

## CONCLUSION

The appeal submitted by David Noble is hereby denied.

Dated: November 30, 2018

_Barbara Stickler_

Chairman: Barbara Stickler


Antonia Shields                          Paul Roznowski


Ethel Ford                               Delano Wilson


Rod Holub                                Margaret Parker


Michael O'Neill                          Tom Dlugolenski


Brian Wiggins

**U.S. Department of Labor**　　　Office of Labor-Management Standards
Division of Enforcement
Washington, DC  20210
(202) 693-0143  Fax: (202) 693-1343



June 6, 2019

Mr. David Noble
1 Fenceline Drive
Gaithersburg, Maryland 20878

Dear Mr. Noble:

This Statement of Reasons is in response to the complaint you filed with the
Department of Labor on January 3, 2019, alleging that violations of Title IV of the Labor-
Management Reporting and Disclosure Act (LMRDA) occurred in connection with the
October 2018 election of union officers conducted by the National Association of Letter
Carriers (NALC).

The Department conducted an investigation of your allegations.  As a result of the
investigation, the Department has concluded, with respect to the specific allegations,
that there was no violation of the LMRDA that may have affected the outcome of the
election.

You raised several allegations related to restrictions on observers, which are grouped
into the five sets of allegations addressed below.  Section 401(c) of the LMRDA requires
a union to provide adequate safeguards to ensure a fair election, including the right of
any candidate to have an observer at the polls and at the counting of the ballots. 29
U.S.C. § 481(c).  Department of Labor regulations provide that this right encompasses
every phase and level of the counting and tallying process, including the counting and
tallying of the ballots and the totaling, recording, and reporting of the tally sheets. 29
C.F.R. § 452.107.

First, you alleged that you were not permitted to count the number of ballot envelopes
returned to the Post Office box.  You also alleged that members of the election
committee, balloting company representative Tom Patterson, and postal management
refused to tell you what the postal service's count was.

You and your observers observed the collection of the voted ballots from the box
section at the post office on October 4, 2018.  The investigation established that no voted
ballots were picked up from the post office prior to that date.  The investigation

Exhibit E

determined that at the ballot tally location, approximately twenty-eight election officials sat at multiple tables to count the return ballot envelopes, resulting in a total count of 60,709. The postal service did not provide a count of the return ballot envelopes. The investigation determined that NALC properly did not allow you or any observer to count or handle the return ballot envelopes or ballots. You were present to observe but did not have enough observers to observe the entire counting process. You and your observers were permitted to walk around the room and watch the returned ballot count. The investigation established that you did not ask the election committee chairperson how many people you would need to observe the count, and you were not prohibited from bringing additional observers. You and your observers were also present when the election committee reported the number of ballots returned. Furthermore, the Department's examination of the election records did not reveal any signs of ballot tampering or fraud. There was no violation.

Second, you alleged that you were not permitted to note the names of voters. You alleged that the election committee chairperson and a representative of the Hartfield Group, the private dispute resolution group hired to oversee the election, informed you on October 4, 2018, that you could sit at one of the tables at which ballots were being counted and one of the counters would hold up the envelope being counted so you could note the name. You alleged that if you had been notified prior to October 4 of this procedure, you would have attempted to bring thirty or more people as observers to make the proposed procedure meaningful.

During the investigation, you acknowledged that you were given the opportunity to sit at one of the tables set up for counting the unopened ballots and that the names would be read to you from the return ballot envelopes. You declined to participate in that process because that would have allowed you to observe only a fraction of the voters' names. You also acknowledged that you did not have the names of any voters whose ballots you wished to challenge.

The investigation revealed that the NALC information technology department created the eligibility list used to mail the ballots in the October 2018 officer election under Secretary-Treasurer Nicole Rhine's direction. The list contained only the names and addresses of members who were eligible to vote as of June 1, 2018, the cut-off date established by article 6 section 8 of the NALC constitution. Rhine reviewed the list to ensure that supervisors and members who joined after the cut-off date were not on the list. There was no violation.

Third, you alleged that no observation of the tallying process was permitted. You alleged that you tried to observe the tallying process beginning on October 5, 2018, but were blocked by the election committee, the Hartfield Group, and Patterson and his workers.

The investigation established that some ballots — primarily the ballots from branches with fewer than twenty-five members — were counted by hand, but most ballots were counted by scanner. The investigation determined that observers were able to see the marks on the ballots that were hand counted. However, the investigation established that observers were not able to see the votes on ballots that were fed through the scanner, and the ballots were not projected onto a screen. The union acknowledged that observers were not able to observe the marks on the ballots that were counted by the scanner. The LMRDA's adequate safeguards provision was violated when observers were denied the right to observe the votes on ballots that were fed through the scanner.

However, the observers' inability to see the marks on the scanned ballots did not affect the outcome of the election. As part of its investigation, the Department conducted a partial recount of ballots. The recount of 15,502 ballots in the president's race, which was approximately 25 percent of the total ballots cast, revealed only minor differences with the union's count. The Department's count resulted in 51 additional votes for your opponent, Fredric Rolando, and 3 fewer votes for you. Rolando's margin of victory was 37,878. Department investigators also recounted all of the ballots in the race with the smallest margin, the Region 2 national business agent (NBA) race, which resulted in 14 additional votes for Nick Vafiades and 3 additional votes for Michael Wahlquist. Vafiades's margin of victory, per the Department's recount, was 227. The differences in the counts appeared to be caused by the ballot scanner's failure to read the votes when a member incorrectly marked the ballot. The margins in every race were too large for these small differences to affect the outcome of the election.

With regard to the tally sheets, the investigation revealed that observers were able to see the tally sheets after they were taped to the envelopes and waiting to be entered into the master tally sheet. The investigation further established that observers were allowed to listen as the results were entered into the master tally sheet and confirm that the numbers entered were the numbers that appeared on the tally sheets. With regard to this aspect of your allegation, there was no violation.

Fourth, you alleged that the union refused your request to allow you to observe the sorting of ballots and the daily withdrawal of ballots in the box section of the post office where voted and undeliverable ballots were received. This allegation is within the scope of Title IV of the LMRDA only to the extent that it involves alleged action by the union (as opposed to the post office) to limit your right to observe.

The investigation established that only undeliverable ballot packages, not voted ballots, were retrieved from the post office prior to the day of the tally. The investigation revealed that, once you requested to observe the pickup, the election committee chairperson informed you of the time the representative from the Hartfield Group

regularly picked up the undeliverable ballot packages from the post office. There was conflicting evidence as to how you and the Hartfield Group representative missed each other on September 21, 2018. You claimed that you were there at the time recommended by the local election committee chairperson, but the union advised that you left the post office prior to the stated time. There is no evidence that you attempted to go to the post office to observe the pickup of undeliverable ballot packages on any other day. You were not denied the opportunity to observe the returned undeliverable ballot pickup. Furthermore, there was no evidence of ballot tampering or ballot fraud. There was no evidence that anyone removed voted ballots prior to the day of the election or attempted to use extra ballots to vote. There was no violation.

Fifth, you alleged that the election committee chairperson refused your request to observe the ballots from 10 p.m. to 8 a.m. every day. You also alleged that the safeguards used to protect the ballots at night were inadequate. You further alleged that the election committee arrived at implausible totals. You argued that it was implausible that you got only 11,000 votes, several thousand votes fewer than your opponent, based on your blog following and on the number of votes that other members of your opponent's slate and your slate received.

The investigation established that the union employed adequate safeguards to secure the ballots overnight. The Hartfield Group, the election committee, and election vendor Mosaic set up motion-activated cameras in the tally room overnight. They locked the doors each evening, and a Hartfield Group representative kept the key. The election committee also taped across the door frames and members signed the tape. No one stayed with the ballots in the room overnight. Any observer, including you, was allowed to keep watch on the tally room overnight from the hotel parking lot. There was no evidence that anyone entered the room overnight. In addition, safeguards were used in the printing process — including non-standard-size paper, tic marks along the side of each ballot, and red ink that could not be copied exactly using a color copier — that would have made it very difficult to create fraudulent ballots. Department investigators examined 25 percent of the voted ballots and found no evidence of fraud, tampering, or other irregularities. There was no violation.

Next, you alleged that essentially no verification of ballots was performed by those conducting the election. You stated that on October 4, 2018, the election committee chairperson told you that only ballots from which the voter had removed all identifying information would be verified. During the investigation, you alleged that there was no process in place to ensure that someone did not vote the original ballot and a duplicate ballot. As noted above, section 401(c) of the LMRDA requires a union to provide adequate safeguards to ensure a fair election. 29 U.S.C. § 481(c). In addition, section 401(e) provides that each member in good standing is entitled to one vote. 29 U.S.C. § 481(e).

As explained above, the eligibility list used to mail the ballots in the October 2018 officer election contained only the names and addresses of members who were eligible to vote. Therefore, the union was not required to check voter eligibility at the ballot tally. There was no violation with regard to this aspect of your allegation.

With regard to duplicate ballots, the investigation established that the election committee had a process in place to ensure that members did not vote twice. Duplicate ballots were identified by purple return ballot envelopes that were returned to a separate post office box. The election committee compared the purple envelopes to the other ballots from that branch. If a member returned both ballots, only the duplicate ballot was counted. The Department's review of election records showed that 88 duplicate ballots were returned. Department investigators conducted a review of 20 purple return ballot envelopes from five large branches. The review found that one member returned a duplicate ballot and an original ballot and both were counted. This was a violation of the LMRDA. The other 19 members who returned duplicate ballots that the Department reviewed did not return their original ballots. The maximum number of votes that could have been affected if both the original and the duplicate were returned and counted (in both that instance and the other instances that Department investigators did not review) was 69. As noted above, the smallest margin in this election was 227. Therefore, this violation could not have affected the outcome of any race.

Next, you alleged that the union unfairly delayed your requests to distribute campaign material by email. You alleged that you requested distribution of your campaign emails beginning in August 2017. You stated that you wanted to send campaign emails once a month from then until the election to give you better exposure and contact with the members about the issues you were running on. You acknowledged that you were able to send emails beginning in June or July 2018 and that you ultimately sent three campaign emails.

Section 401(c) of the LMRDA requires the union to comply with a candidate's reasonable request for the distribution of his or her campaign material. 29 U.S.C. § 481(c). The Department's interpretive regulations state that unions must provide candidates and their supporters a reasonable period of time to campaign prior to the election. What is a reasonable campaign period depends on the circumstances, including the method of nominations and the union's size, in terms of both membership and geographic area. 29 C.F.R. § 452.79.

The investigation revealed that, prior to requesting distribution of your campaign emails beginning in August 2017, you had filed a lawsuit against NALC in federal district court seeking relief related to a collective bargaining agreement (CBA)

ratification vote, including permission to use NALC's list of members' email addresses to contact the membership. You advised the court in that case that the literature you wanted to send was not directly related to your candidacy for NALC president but was intended to influence the ratification vote. In denying your request for a preliminary injunction on July 28, 2017, the court ruled that it was "manifestly unreasonable" to request to distribute such literature, aimed not at any candidacy but at the contents of the proposed CBA, more than a year prior to the election.

The investigation established that you subsequently requested that NALC distribute emails specifically in aid of your candidacy but that the union continued to deny your requests based on the court's ruling in July 2017. In August 2017, the union informed you that it would not comply with requests until "sometime in 2018." The investigation established that NALC did not have a campaign email vendor in place for candidates to use until April 2018. After you learned the prices that the selected vendor would charge, you amended your federal district court complaint against NALC to object to the high cost of sending emails through that vendor. NALC ultimately arranged to use a different vendor with a lower cost. The lower-cost option was made available to candidates beginning on June 15, 2018. Nominations took place at the NALC national convention on July 18, 2018; ballots were mailed September 11–14, 2018; and ballots were due on October 4, 2018.

The investigation established that NALC initially denied your reasonable requests to distribute your campaign literature by email. Under the circumstances, including that NALC is a national union with approximately 291,000 members, NALC should have been responsive to your request to distribute campaign literature beginning in August 2017, when you requested that NALC distribute emails in aid of your candidacy, instead of putting off any preparations until 2018. Your reasonable request should have been the catalyst for NALC to secure an email vendor and establish procedures for you and other bona fide candidates to distribute campaign literature by email. It was not until April 2018 that NALC announced a vendor for candidates to contact for distribution of their campaign literature by email. This initial denial of your reasonable requests for campaign email distribution violated the LMRDA.

However, the investigation established that you were able to send campaign emails to members on July 30, August 21, and September 13, 2018. Therefore, at least two of your campaign emails were distributed before the ballots were mailed. Under these circumstances, the effect of the violation was mitigated, and therefore this violation did not affect the outcome of the election.

You also alleged that NALC President Fredric Rolando unfairly delayed your request to place campaign advertisements in the union's monthly magazine, the *Postal Record*. You stated that you requested to buy advertising space in the magazine several months

before the mailing of the ballots. You alleged that NALC did not allow a *Postal Record* campaign advertisement until the September 2018 issue, which came out only days before the ballots were mailed. You alleged that this was unfair because Rolando and the other incumbents are in continuous contact with the entire membership through the *Postal Record* and other publications.

Section 401(c) of the LMRDA prohibits disparate candidate treatment. 29 U.S.C. § 481(c). When a union or its officers authorize distribution of campaign literature on behalf of any candidate, similar distribution under the same conditions must be made for any other candidate who requests it. 29 C.F.R. § 452.67.

The investigation revealed that the *Postal Record* normally does not accept advertising but that it makes an exception, during election years, to allow campaign advertisements in the August-September issue. This has been the union's long-standing practice. In addition, NALC provided notice to all candidates of this practice in the May 2018 issue of the *Postal Record*. All candidates were treated equally with respect to the terms and expenses associated with distribution of the campaign advertisements in the *Postal Record*. You and the incumbent slate both placed advertisements in the August-September issue, and no candidate was allowed to place an advertisement in any other issue. There was no violation.

Next, you alleged that Rolando unfairly refused to recognize you at the NALC national convention held in Detroit in July 2018, where you were a delegate. You alleged that Rolando recognized members Matty Rose and Barry Weiner, both of whom made campaign-like speeches against you. You alleged that Rolando did not call on you at the microphone and therefore you were denied the opportunity to reply to Rose's and Weiner's remarks.

As noted above, section 401(c) of the LMRDA prohibits disparate candidate treatment. 29 U.S.C. § 481(c). In addition, section 401(g) prohibits the use of union resources to promote any candidate for union office. 29 U.S.C. § 481(g).

The investigation established that Rose's and Weiner's comments did not constitute campaigning. The investigation revealed that Rose and Weiner spoke on July 19, 2018, concerning an appeals court decision issued two days prior in a lawsuit you had filed against the former NALC leadership. They spoke during a break in business when delegates had the opportunity to address the convention about any topic they wished. Rose spoke first and talked about the lawsuit for less than two minutes. Rose did not mention your name or identify you in any way as connected to the lawsuit. More than half an hour later, Weiner spoke and thanked Rose for bringing up the news about the lawsuit. Weiner mentioned your name as one of the parties to the lawsuit. Weiner spoke for approximately three minutes. Neither delegate personally attacked you or

disparaged your candidacy. They discussed timely news regarding the union. The investigation did not establish whether Rolando would not allow you the opportunity to respond to Rose and Weiner. However, Rolando was permitted to choose which delegates were allotted time to address the convention, and he was not required by the LMRDA to allow you to respond to Rose's and Weiner's comments because their statements were not campaigning. There was no violation.

Finally, you raised other allegations that, even if true, would not constitute violations of Title IV of the LMRDA.

For the reasons set forth above, the Department of Labor concludes that there was no violation of the LMRDA that may have affected the outcome of the election. Accordingly, I have closed the file on this matter.

Sincerely,

Brian A. Pifer
Chief, Division of Enforcement

cc:     Fredric V. Rolando, President
        National Association of Letter Carriers
        100 Indiana Avenue NW
        Washington, DC 20001-2144

        Beverly Dankowitz, Associate Solicitor for Civil Rights and Labor-Management

# Vote for Clean Sweep 2022

Fred Rolando's salary last year was $218,378.  It will be much higher this year because of inflation.  Rolando adds $50,000 or so by taking his postal retirement on top of his NALC salary. NALC has a membership of 280,000.  To earn that salary Rolando has spent his entire thirteen year career making cuts to letter carrier pay and benefits.  Rolando thinks CCAs should be paid under $19 per hour, earn no credit toward retirement, and get no sick leave.

California's governor's salary last year was $201,680, the highest governor's salary of any of the fifty states.  The California governor is the chief executive of a state with 39,557,045 citizens.

Executive vice president Brian Renfroe's salary last year was $183,693, higher than all but five state governors.  In his six years as EVP Renfroe has no accomplishments to point to.  As head of NALC's contract administration unit he has allowed a five-year backlog of grievances awaiting arbitration to develop.

Clean Sweep is putting together a slate of candidates to run against the Rolando/Renfroe led incumbents.  Clean Sweep wants to cut the sky-high salaries paid to NALC's national officers.  Clean Sweep also wants to undo all of the concessions made by Fred Rolando since 2009.  To join Clean Sweep go to "Clean Sweep 2022" on Facebook. –David Noble

Exhibit F

Vote Clean Sweep 2022

How would you like a raise of 7.65%?  That would beat the bojangles out of the present contract, which provides for raises of 1.1%, 1.1%, 1.3%, and 1.3% over a four-year period.

A raise of 7.65% is what letter carriers would get if the Postal Service reimbursed them for their Social Security and Medicare taxes.  For the highest paid career employees that would amount to a raise of $2.62 per hour.  For the lowest paid CCA employees that would amount to $1.45 per hour.  Those amounts wouldn't make letter carriers rich by any means.  But 7.65% all at once is far better than 4.8% spread over four years.

The idea of a 7.65% raise is relevant because NALC's national officers secretly voted to give themselves a 7.65% raise by having NALC reimburse them for Social Security and Medicare taxes.  For Fred Rolando that amounts to more than $10,000 per year.  The officers didn't report their raise to the membership, although the NALC Constitution requires them to do so.

If NALC's officers are reimbursed for their Social Security and Medicare taxes so too should be the letter carriers whose dues pay the officers' heavy freight.  When you see a national officer make sure you tell him or her that you want reimbursements for letter carriers up front in the next contract.  And tell the officers that if they can't get reimbursements for you they should stop taking it themselves.

Exhibit G

National Labor Relations Board
OFFICE OF THE GENERAL COUNSEL
Advice Memorandum

DATE: May 19, 1994

TO:: Louis J. D'Amico, Regional Director, Region 5

FROM: Robert E. Allen, Associate General Counsel, Division of Advice

SUBJECT: National Association of Letter Carriers, Case 5-CA-23892

506-0170, 506-2001-5000, 506-2017-2500, 506-4033-4100 506-4033-9200, 506-4067-9500,
506-6070-2500, 506-6070-2550, 506-6070-5000, 506-6090-0500, 506-6090-1900,
506-6090-5450, 506-6090-6300, 506-6090-6800, 512-7550-0143, 512-7550-5000,
512-7550-6000

This Section 8(a)(1) and (3) case was submitted for advice on whether the Charging Party, an
employee and member of a labor union-employer, was engaged in protected concerted activity
when he disseminated information as to the employer's officials' financial practices which
allegedly breached the employer's constitution. [FOIA EXEMPTIONS 2 & 5

FACTS

Charging Party David Noble was hired by the United States Postal Service (USPS) as a letter
carrier in May 1975. He has been a member of the National Association of Letter Carriers
(NALC) since 1975. In January 1979, he took a leave of absence from the USPS to work for the
NALC, where he was assigned to a staff position in the Minneapolis regional office. In January
1981, Noble was appointed by NALC president, Vincent Sombrotto, to the position of Assistant
to the President for arbitration at the NALC headquarters in Washington, D.C. In this capacity,
he designed NALC's computer arbitration system and read and coded for entry the USPS' 25,000
arbitration decisions. He also met twice a month with the Contract Administration Unit to
discuss pending grievances and arbitrations, represented the Union at fourth step grievance
meetings with the Postal Service, and was the Union's witness in contract interpretation disputes.
Noble also drafted all the non-economic bargaining proposals which the Union presented at
contract negotiations in 1981, 1984, 1987, and 1990.

Sometime in November 1992, while working at NALC headquarters, Noble was told by two
NALC employees who attended a 1992 convention, that during the convention, one of the
business agents (Matthew Rose) had raised the issue of whether officers should receive
compensation for time spent at the convention in addition to receiving a full salary for that time.
Noble told them he would investigate this matter.

Another NALC employee told Noble that the entire executive council was secretly reimbursing
itself for social security tax payments and that NALC's 10 resident officers were drawing about

Exhibit H

$500 per month in a phony "in-town entertainment" scheme. Noble began investigating this allegation also. He conferred with another NALC employee, in the computer department, who furnished Noble with a software package that Noble used over the course of several months to access NALC files. Using this software package he was able to obtain information which showed that NALC was making monthly payments to the property management company that managed the Washington, D.C. apartments of President Sombrotto and Secretary-Treasurer O'Connell. Noble asserts that these payments were not authorized by the NALC constitution. During this period, Noble also obtained documents and records that were allegedly slid under the locked door to his office overnight by unknown persons.

In March, 1993 Noble shared the information he had gathered with full time letter carrier John Hilsman, who is also steward for NALC Branch 142. Together, they searched the transcript proceedings of the NALC conventions dating back to 1968, but found no evidence to indicate that the NALC membership had authorized such payments. They found instead, that in the 1986 proceedings officers were denied reimbursement for unitemized expenses. They then decided to file internal charges against the NALC officers. Noble first spoke with Bruce Simon, the General Counsel for NALC on August 12 and apprised him of the internal charges that he had prepared and requested to meet with Sombrotto and Simon. Simon told Noble that he would talk to him the following week, but Noble told him that he could not wait that long. Noble filed internal union charges on August 13 against 23 of NALC's 28 national officers. He filed charges against the remaining five national officers on August 16.

On August 14, 1993, Noble distributed letters exposing the alleged corruption and explaining his internal charges to several hundred NALC branches throughout the country. In this letter Noble states: "[T]he cost to the membership of these rip-offs is almost $200,000 per year". The letter also states:

....To this point, the Executive Council's stain extends only to the honor of the resident officers, national business agents and trustees who put their personal profit before the interests of the membership. That stain will spread, however, to discolor NALC unless we act quickly and decisively. You and I are now on trial--by our actions we will determine whether history will see NALC as a clean union, with a proud membership that would not tolerate corruption at the top, or whether we will replace the old Teamsters as the disgrace of the labor movement.

The letter closes by asking NALC members to call or write and join Noble in his effort to "take our union back".

On August 17, 1993, Noble attended a Minneapolis Branch 9 meeting where he explained the charges he filed against the NALC officers and answered questions from members. He spoke to the members about the evidence he had gathered in support of his charges, and spoke to some members of the Minneapolis office to rally support for a movement he wished to found, the Letter Carrier Reform Movement.

On August 18, 1993, an article about the charges that Noble filed appeared in the Minneapolis Tribune and the New York Newsday. Noble stated that the information which he gave to those

newspapers consisted of copies of the charges he had filed, and the circumstances surrounding the charges. After the New York Newsday printed the article, Noble says he mailed it copies of the actual vouchers.

On August 22, 1993, Noble and Hilsman attended a NALC rap session in North Carolina. There, Noble and Hilsman set up a table in the back of the room and disseminated letters to NALC members which contained information on the charges. They also spoke with several NALC members about the charges. It was at this meeting that Noble conversed with national business agent Matthew Rose. Rose was one of the officers charged, and the person who had allegedly raised the question about the propriety of the compensation to officers for time they spent at conventions in addition to their regular salary. Noble told Rose that he would withdraw the charges if Rose agreed to stop taking the payments and repay the Union. Rose refused.

By letter dated August 26, 1993, Sombrotto notified Noble that "effective August 30, 1993, you are suspended indefinitely from your employment with NALC, without pay, until further notice". No reason was given for the suspension in the letter. As late as September 27, 1993, Noble had not been given a reason for his suspension.

On September 1, 1993, Noble mailed to the same NALC branches, copies of another letter in which he updated members on what had happened since he filed the charges. In that letter, Noble stated that the officers "now admit taking nearly $190,000 each year in previously undisclosed FICA and Medicare tax reimbursements, 'in-town entertainment' allotments and lost time payments at conventions." Noble further stated that the officers "will claim that the payments were authorized in some cases, apparently, because they passed secret resolutions in closed Executive Council meetings". Noble stated that he received anonymously mailed copies of what appear to be Executive Council resolutions, one authorizing FICA reimbursements and the other authorizing payment of "in-town entertainment expenses" without itemization. Both resolutions are dated December 8, 1980, the first day that "Sombrotto loyalist Richard P. O'Connell served as secretary-treasurer, having been installed the night before to replace Gus Johnson, with whom Sombrotto had been feuding." Noble asserted that the executive council lacks the authority to approve such secret payments to itself. Noble quoted the section of the NALC constitution which he asserts has been violated and stated "[a] thousand Executive Council resolutions, passed by officers behind closed doors, could not supercede the constitution's express rule." Included in the letter were three letter vouchers submitted by Sombrotto and two by Bill Young, the assistant secretary treasurer, for "in-town expenses." The vouchers showed payments of $500 each month to Sombrotto for October, November and December, 1992 and to Young for September and November, 1992. The vouchers showed NALC accounting codes which designated payments of $69, $11, and $31 to Sombrotto, and payments of $13.40 and $8.90 to Young as reimbursements. The remaining payments were designated as income.

Noble's letter went on to state that all the locks and computer passwords were changed at NALC headquarters and officers told the staff that anyone who helped Noble make his case would be fired. He told the members that he had been suspended without pay with no reason given but stated:

....I was prepared to lose my job as the price I would have to pay for alerting the membership. What matters now is what happens to NALC, not what happens to my job. But those are hardly the actions that would be expected of people who have done nothing wrong and who have nothing to hide.

Noble further stated that he received a strong response to his first letter from the membership, making clear that "there are many people of conscience in the NALC who are unwilling to have the clean image of NALC sullied by officers whose desire for personal enrichment exceeds their sense of service to the membership." He told the members about the Letter Carrier Reform Movement which he founded with Hilsman and Jim Draper in order to establish an Education and Legal Defense Committee. Among the first reform activities of the Committee would be "spearheading an effort to open NALC's books for membership inspection and ferreting out corruption in NALC at all levels." Noble closed the letter by stating: "NALC needs your help in this effort. Please call or write and join us."

In its position statement to the Region dated October 21, 1993, the NALC contended that it placed Noble on suspension because: (1) it learned that Noble had distributed or was distributing "false and defamatory" allegations to the media (NY Newsday and Minnesota Star Tribune); (2) he had passed out confidential company records, i.e., copies of officers' personal expense vouchers, obtainable only by pilfering from the NALC files, and (3) Noble had "acknowledged political motivations for his action."1 In the eyes of the NALC, this constituted theft, and all these acts together warranted the NALC's placing Noble on suspension while the Vice President reviewed the case to determine Noble's employment status. The NALC maintained that Noble had not been permanently discharged.

Noble has been working as a city letter carrier in Washington, D.C. since his suspension. In March, 1994 Noble announced his candidacy for president of the NALC.

ACTION

We conclude that complaint should issue, absent settlement, alleging that NALC violated Section 8(a)(1) by indefinitely suspending Noble for his protected concerted intraunion activities and also Section 8(a)(3) for engaging in these union activities as a union member. [FOIA EXEMPTIONS 2 & 5

]

In Welfare and Pension Funds, 251 NLRB 1241, n.2 (1980), the Board expressly agreed with the Administrative Law Judge's finding that an administrator of union welfare and pension funds was unlawfully discharged in retaliation for protected concerted intraunion activities that he engaged in as secretary-treasurer of the Union. These activities included: assisting a union member in filing a complaint with the Department of Labor (DOL) over election irregularities; providing a union member with information pertaining to union finances; advocating that the union actively press employers to abide by the terms of the agreement between the union and the employer association and to make the required payments into the funds for covered employees; and

supporting certain claimants' efforts to obtain benefits from the funds. The Board held that such intraunion activity fell within the protection of Section 7 of the Act. Accordingly, the Board agreed with the Administrative Law Judge's conclusion that the employer violated Section 8(a)(1) of the Act by discharging the union official for engaging in such activity. However, unlike the Administrative Law Judge who found that the employer's conduct also violated Section 8(a)(3) because the discriminatee was engaged in union activities, the Board found it unnecessary to pass upon the Section 8(a)(3) issue because the remedy for that violation would be the same as for the independent Section 8(a)(1) violation.

In Carpenters Local Union No. 35,2 relying on Welfare and Pension Funds, the Board found that two employees of a union were engaged in intraunion activity protected by Section 7 of the Act when, acting in their capacity as union members, and, with regard to one, acting as a trustee of the Union, they complained to DOL and/or the Marin County Credit Association of alleged irregularities in election procedures and alleged misuse of funds. In Carpenters, assistant union business representatives Martin and Prescott,3 examined the union's books and records for several months and uncovered what they believed to be evidence of financial improprieties. Based on their investigation, they believed that the union's financial secretary (Wilson) was improperly arranging to have dues of retired members paid out of union funds, that checks were surreptitiously being written for that purpose, that an improper reimbursement had been made to an individual and that documents were forged on his behalf. Martin was also concerned about Wilson's handling of a $1200 check which had been donated to the union. Martin spoke to Wilson and the president of the union as well as to the executive board and general membership about these issues. Over several months Martin, at times accompanied by Prescott and at other times by one or two other union members, made several trips to DOL and complained about irregularities in the election process and the mishandling of union funds. Martin also sought to obtain information from the Marin County Credit Association, in which the union had an account, in an effort to document his allegation of misuse of union funds by Wilson. Wilson successfully sought to have Martin and Prescott terminated.

In holding that the discharges violated Section 8(a)(1), the Board in Carpenters found that the discharges were clearly motivated, not by employee misconduct, but rather by the employees' protected intraunion activities.4 Thus, the Board rejected the ALJ's conclusion that Prescott's and Martin's conduct was unprotected as being similar to that of corporate employees attempting to effectuate changes in the management hierarchy.5

In the instant case, following Carpenters and Welfare and Pension Funds, we conclude that the Employer violated Section 8(a)(1) by indefinitely suspending Noble for engaging in the protected concerted intraunion activity of investigating whether officers of the NALC were engaged in financial improprieties by being paid amounts not authorized by the NALC constitution and disseminating this information.

We conclude that Noble's activities were concerted in that they were engaged in with, and on behalf of other employees and Union members.6 Three other NALC employees told Noble about the compensation and "in town entertainment" issues and asked him to investigate those issues. Noble then conferred with another NALC employee who furnished him with the software

package which he used to access NALC files to obtain information concerning NALC's payments for the Washington, D.C. apartments of the President and Secretary/Treasurer. Noble shared this information with NALC member and USPS employee Hilsman, and both searched convention transcripts dating back to 1968 seeking to discover whether the NALC membership ever authorized these payments. After their investigation revealed no such authorization, Noble filed the internal union charges. Noble sent letters apprising NALC members employed by USPS of their officers' conduct and seeking support from them to require the Union leadership to abide by the Union constitution. Based upon these facts, we conclude that Noble's conduct was concerted.

Consequently, under the rationale of Carpenters and Welfare and Pension Funds, we conclude that Noble's activities were protected in that they were intraunion activities on behalf of, and in concert with, other union members who were represented by the NALC as a labor organization.

The Region should also argue that the Employer's indefinite suspension of Noble violated Section 8(a)(3) because it was based on his union activity of investigating and disseminating information as to conduct of officers of the union of which he was a member.7 Thus, Nobel acted in his capacity as a member of NALC when he engaged in this conduct. We realize that the Board did not reach this Section 8(a)(3) issue in Welfare and Pension Funds even though the General Counsel had argued this theory, and that as in Welfare and Pension Funds, the remedy for the Section 8(a)(3) violation as to Noble would be the same as for the Section 8(a)(1) violation.8 However, the Region should also argue the Section 8(a)(3) theory of violation because this legal area is unusual and difficult due to the peculiar problems resulting from a union acting as an employer. Consequently, the Board should have before it both possible theories of violation.

Retail Clerks, supra,9 and Ernest S. Cerelli, supra,10 are distinguishable from the instant case. In this case, Noble, was not engaged in activities seeking to influence or change the NALC hierarchy at the time of his suspension.11 Rather, he was seeking to have the NALC officers abide by the NALC constitution. We would further distinguish Retail Clerks and Ernest S. Cerelli in that, at the time of his suspension, NALC did not give as a reason his attempting to change management or his running for NALC office. NALC's contention to the Region after the charge was filed that it indefinitely suspended Noble because of his "political motivations" is merely a rationalization offered months after the suspension.

We further conclude that Noble's actions did not lose the protection of the Act under any of the defenses raised by the NALC. First, the NALC claims that Noble distributed "false and defamatory" allegations to the media and passed out confidential company records obtainable only by pilfering from the NALC files. The Region found that even though Noble was not the custodian of the information, there is no evidence that the officers' expense vouchers were confidential. Moreover, although he had to use a computer program to retrieve the records, there is no evidence that the information which he was able to gather from the computer was considered confidential prior to his publicizing the information. Thus, there is no evidence that Noble was ever told that the information was confidential and not to be disseminated.12

Second, the NALC asserts that it was justified in suspending Noble because he made "false and

defamatory allegations." The Board has held, however, that the Act protects statements which are false, misleading, or inaccurate, while it does not protect the dissemination of information that is "deliberately or maliciously false or made with reckless disregard for the truth".13 Affirmative evidence of malice is necessary in order for conduct to lose the Act's protection.14 Thus, the Board in Phoenix Newspapers, Inc., held that an article in an internal union newsletter which indicated bias or contained hyperbole, was not so reckless or maliciously untrue as to lose the Act's protection.15

In the instant case, there is no evidence that Noble's charges, letters to Union members, or statements to the newspapers were either untrue or malicious. Rather, Noble stated his belief that the NALC constitution had been violated and supported that contention with evidence that the payments in question were not authorized by the NALC membership. Noble and Hilsman researched NALC convention records going back over twenty-five years to ascertain the accuracy of their charges. Certainly these statements cannot be said to be "deliberately or maliciously false or made with reckless disregard of the truth". Even though the NALC asserts that the payments were authorized, it does not challenge the truth of the statement that the membership had not authorized the payments. Thus, there is no merit to this defense by the NALC.

Finally, we conclude that Noble's charges, letters and statements did not constitute disparagement of the employer which would cause his activities to lose the protection of the Act. The Board and Supreme Court have held that where employees' concerted activities involved a "malicious attack on the products, services or reputation of their employer without reference to an ongoing labor dispute," their activity will lose the protection of Section 7 and provide the employer with just cause for their discharge.16 More recently, in Allied Aviation Service Co. of New Jersey,17 the Board held that communications of employees to third parties do not lose their protection as long as they are related to a legitimate ongoing labor dispute and do not constitute a "disparagement or vilification of the Employer's product or reputation." The Board also noted that "great care must be taken to distinguish between disparagement and the airing of what may be highly sensitive issues." The Board held that the latter may be protected when related to an ongoing labor dispute, but the former is not.

In Firehouse Restaurant,18 the Board held that such disparagement may be a reason to deny reinstatement even where the original conduct or statement which precipitated the discharge was protected. In that case, the Board affirmed the Administrative Law Judge's decision finding that the employer violated Section 8(a)(3) and (1) by failing to return one waiter to his job when he returned from vacation, and discharging two other waiters who retained an attorney to enforce a contract provision requiring the employer to provide meals for the waiters. The Board however, also affirmed the ALJ's refusal to order reinstatement because the three waiters "engaged in egregious conduct toward their employer by disparaging the quality of the food served" in the restaurant and publicizing this information in the press.19 Following this rationale, the Division of Advice concluded in another case that a union did not have to reinstate an employee whom it had discharged for leading an organizing campaign among its employees, because the employee, after his discharge, in letters to various labor and civil rights officials, Senators, and Congressmen, accused the union president of racism and other misconduct.20 The employer asserted that these letters were intended to unseat the union president through the internal union

political process.

In Firehouse and Carpenters, the employees, after their discharge, disparaged the employer's product and reputation. This activity was unprotected and terminated their right to backpay and reinstatement. However, both of these cases are distinguishable from the instant case, because Noble's conduct was protected in that he did not disparage the Employer's product or reputation.21

While Noble questioned the propriety of several financial practices of the NALC's officers, he never attacked the product, services, or reputation of the NALC. His charges, letters and statements in fact emphasize the need for members to preserve the good reputation that the NALC has heretofore retained. While the officers of the NALC may feel that they have been disparaged, we conclude rather that this conduct merely raises a highly sensitive issue because it questions the officers' financial integrity, without disparaging the union itself or its representation function. The intraunion charges and the letters and statements are couched in specific terms which explain the dispute without attacking the NALC or Sombrotto or other officers.22 These statements are neither a malicious attack on the products, services or reputation of the NALC without reference to a labor dispute, nor a villification of the NALC. In the instant case, Noble's statements in his letters and charges voiced bona fide complaints that related to the NALC constitution.

Further, although Noble provided information to the newspapers, we conclude that this was a reasonable way of getting the information out to the members, considering the size of the membership and the fact that the membership is nationwide. The publication of the charges did not disparage the employer and therefore are within the protection of Section 7.

[FOIA EXEMPTIONS 2 & 5

]

[FOIA EXEMPTIONS 2 & 5

]

CONCLUSION

In sum, we conclude that Noble was engaged in protected concerted activity and that the NALC violated Sections 8(a)(1) and (3) when it suspended him indefinitely. [FOIA EXEMPTIONS 2 & 5

]

R.E.A.

[FOIA EXEMPTIONS 2 & 5] [FOIA EXEMPTIONS 2 & 5]

1 The NALC, in its position statement, asserts that Noble told business agent Matthew Rose at the August 22nd meeting that Noble was organizing a rival slate to run against incumbent NALC officers.

Noble denies telling Rose or any NALC officers that he intended to run for union office.

2 264 NLRB 795, 797 (1982).

3 Martin also served as a trustee of the union's executive board.

4 The Board, at note 2, noted that the complaint did not allege a violation of Section 8(a)(3), and consequently found it unnecessary to determine whether the discharge violated Section 8(a)(3).

5 The ALJ relied on Butchers Union Local 115 (Ernest S. Cerelli), 209 NLRB 806 (1974). In Ernest S. Cerelli, the Board adopted the ALJ's decision that the employer, a labor union, did not violate Section 8(a)(3) and (1), by discharging an employee because the employer thought the employee was going to run for union office. The Board in Ernest S. Cerelli, at n.1, relied on Retail Clerks Union, Local 770 Retail Clerks International Association, 208 NLRB 356 (1974).

6 See Meyers Industries (Meyers II) 281 NLRB 882, 885 (1986).

7 See Penn Yan Express, Inc., 274 NLRB 449, 456-457 (1985). Concert is not a necessary element of Section 8(a)(3). Consequently, even if Noble had been acting alone, the Employer's conduct would have violated Section 8(a)(3).

8 This Section 8(a)(3) theory was not alleged in the complaint in Carpenters.

9 In Retail Clerks, the Board found that an employer which was a labor union was privileged to discharge employees who had been active in the election campaign of the president's opponent in an intraunion election, because the employees sought to "effect a change in the top management of their Employer Union."

10 In Ernest S. Cerelli, the Board applied Retail Clerks to find privileged the discharge of an employee because the employer, a labor union, thought the employee was going to run for union office. The employee in Cerelli was not engaging in any other activity that might be protected. Consequently, Cerelli is also distinguished on that basis.

11 Noble founded the Letter Carrier Reform Movement along with USPS employees Hilsman and Draper prior to his suspension. However, the purpose of that Movement was to establish an Education and Legal Defense Committee which would engage in several reform activities. Among the first of the reform activities was spearheading an effort to open NALC's books for membership inspection and ferreting out corruption in the NALC at all levels. The Letter Carrier Reform Movement did not support any slate of candidates for NALC office. Nor did Noble announce his intention to run for office in the NALC at the time that this reform movement was founded.

12 The instant case is distinguishable from one where an employee knowingly disseminates material that he knows is confidential and knowingly violates the employer's rule prohibiting dissemination of such material. See International Business Machines Corp. 265 NLRB 638 (1982). (where the Board held it was not unlawful for an employer to discharge an employee who knowingly disseminated confidential information in violation of company policy).

13 El San Juan Hotel 289 NLRB 1453, 1455 (1988). See also New York University Medical Center 261 NLRB 822, 824 (1982), and Great Lakes Steel 236 NLRB 1033, 1035-1037 (1978) enfd. 625 F.2d 131 (6th Cir. 1980).

14 Cincinnati Suburban Press, Inc., 289 NLRB 966, 967-968 (1988).

15 294 NLRB 47, 50 (1989).

16 Jefferson Standard Broadcasting, 346 US 464, 477 (1953).

17 248 NLRB 229, 230-231 (1980).

18 220 NLRB 818 (1975).

19 Id. at 825.

20 United Brotherhood of Carpenters, Case 5-CA-20172, Advice Memorandum dated May 24, 1989.

21 Also, Carpenters apparently involved unprotected Retail Clerks conduct of trying to unseat the union president. As discussed above, Noble was not engaged in Retail Clerk's type conduct at the time of his suspension.

22 Charge No. 1 states: Without authorization by the membership and in contravention of the Constitution, in concert with some or all of the NALC's Executive Council members, and with the acquiescence of the NALC's Trustees, Vincent R. Sombrotto knowingly accepted income above the constitutionally authorized amount by having NALC pay him up to $500.00 per month under the guise of "in-town expenses." Charges 2 through 4 used this same language in referring to the payments for FICA and Medicare tax payments, double compensation for time spent at national conventions, and payment of Washington housing costs. Charge 5 states: Vincent R. Sombrotto violated his fiduciary duties to the membership by failing to disclose his participation in the violations described in Charges 1 through 4, above. Charges 6 and 7 also state that Sombrotto violated his fiduciary duties to the membership by failing to investigate breaches of fiduciary duties, and by failing to disclose and prevent Constitutional violations committed by the NALC Executive Council and