June 15, 2022 Declaration of David W. Noble

I, David W. Noble, make this declaration based on personal knowledge.

1. The National Association of Letter Carriers, AFL-CIO ("NALC") is a labor union that represents city letter carriers employed by the United States Postal Service ("USPS"). Members pay dues to belong to the union that are used to pay officer's wages and expenses, and for other pursuits, including publications.

2. I was hired by the United States Postal Service as a city letter carrier in 1975 and joined the NALC at that time.

3. Since 1971 USPS and NALC have periodically negotiated collective bargaining agreements, which set the pay, benefits, and working conditions of city letter carriers.

4. I took leave from postal employment for fifteen years to work for NALC. I worked in NALC's Minneapolis regional office in 1979 and 1980. I worked at NALC headquarters in Washington, DC from 1981 to 1993. I was appointed to both positions by Vincent R. Sombrotto, who was then the president of NALC.

5. NALC is governed by a constitution, which was adopted by the membership in convention. It is amended at conventions from time to time.

6. Day to day operation of NALC falls to a 28-member executive council, led by a president. The president and the other members of the executive council are officers, and are chosen by the membership in mail-in elections held every four years.

7. In 1993 Sombrotto and I had a disagreement we could not resolve: He thought that it was okay for the union's officers to make under-the-table payments to themselves and I didn't. I notified the membership of the payments and Sombrotto suspended me from my headquarters position.

8. I filed a charge concerning my suspension with the National Labor Relations Board ("NLRB"). A true and accurate copy of NLRB's consideration of my charge is attached as Exhibit H.

9. In 1994 CNN ran a six-minute story about the under-the-table payments to NALC's officers. The CNN video may be viewed by searching Facebook for: https://l.facebook.com/l.php?u=https%3A%2F%2Fyoutu.be%2FFJ8XHk6Ox1o%3Ffbclid%3DI wAR1idP40UVMYuDVJr_HgsZ7fRX8kn5tg6tlRUKv0XiQH2VI_Nc_NqTP9esw&h=AT1BX7 TzLpSyAi2-_R2eO1hkNilR8Lf0tS6JTpyg2rB2A5WI4BgKoERRIZlDlscnRewRTc5gyv1D_CQK k0S6bYh1TwPn8Y1yliGci1lycd3jQWX_Z-tWphQ9I7a1tK9VKrH9q_OAv5tAveZtmJVdyw

10. In 1994 I filed a suit in federal court about the under-the-table payments. The suit lasted for 24 years before it was dismissed. Along the way I won some rulings and lost some rulings. The

suit was named *Noble v. Sombrotto*.

11. In the 134-year history of NALC only once has an incumbent president been ousted by a challenger. That happened in 1978.

12. There has been only one successful challenge in NALC history because incumbents have several advantages over challengers.

13. The incumbents have large NALC salaries and often take their postal retirements on top of them. The incumbent NALC president is Fred Rolando. In 2021 his NALC salary was $218,000, which is higher than any state governor's salary. Rolando takes his postal retirement on top of that, which adds $40,000 – $50,000 more. Challengers are working or retired letter carriers and make about one-quarter of Rolando's take. The 28 executive council members customarily run for election as a team and pool their resources. The incumbents have so much money that they can afford to make a political mailing to all members. No challenger has ever been able to raise enough money to make a full mailing.

14. The president controls a large patronage system. Rolando makes hundreds of appointments to well-paid positions in NALC headquarters and in NALC's fifteen regional offices. Those appointees talk up the incumbents to the working letter carriers with whom they come into contact. The appointees also make contributions to the incumbents' election war-chest.

15. The incumbents are allowed by USPS management to enter postal facilities and talk with letter carriers. The challengers aren't allowed to enter postal facilities other than the ones they work in.

16. NALC publishes a monthly magazine, the *Postal Record*, which is mailed to every member. NALC also publishes the *NALC Bulletin*, which is mailed two or three times a month to every facility in which letter carriers are employed. Both publications make numerous references to Fred Rolando and include photos of him.

17. I ran for president of NALC in 2014 and 2018. When I ran in 2014 I was the first person to run against an incumbent president in 20 years. I am running for president again this year. I am running as a member of the "Clean Sweep Slate," whose platform includes ridding the union of corrupt and incompetent officers. The ballots will be mailed in September.

18. NALC elections are conducted by an election committee appointed by Fred Rolando. Federal law requires that unions provide "adequate safeguards" for elections. One of the required safeguards is allowing challengers to observe the counting and tallying of ballots.

19. In both 2014 and 2018 Rolando's election committee had me arrested to prevent me from observing their counting and tallying. The election committee then reported that Rolando had won the elections by about 48,000 to 12,000 margins. When my cases came up in court months after the election, the charges against me were dismissed. I am suing the police involved in 2018 for false arrest and false imprisonment. Maryland General Rules require that a warrantless

arrest may be made only for conduct witnessed by the police. In discovery in my suit, the police have admitted that they witnessed nothing. Instead, they based their arrest on after-the-arrest statements by election committee members.

20. I do most of my campaigning on-line. I administer groups on Facebook called National Association of Letter Carriers, AFL-CIO (17,600 members), the NALC Truth Page (23,000 members), Clean Sweep 2022 (2,200 members), and USPS Non-Career Employees (13,000 members). I estimate that I can reach about 10% of NALC's 280,000 members on-line.

21. I do not believe that I can win the election if I reach only 10% of the members. I cannot afford the about $350,000 it would cost to make a nation-wide political mailing. Therefore, on December 18, 2021 I emailed Fred Rolando and told him that I wanted to begin running political ads in the February 2022 issue of the union magazine. The ads were to be campaign literature that explained my views on the issues facing NALC members.

22. On December 29, 2021 lawyer Peter DeChiara replied, stating that in accordance with longstanding NALC policy, NALC does not run political ads in the union magazine, with the exception of one issue every four years, preceding the NALC national officer elections. True and accurate copies of my email to Rolando and DeChiara's email to me are attached as Exhibits A and B. As of June 2022 the policy described by DeChiara has prevented me from distributing my campaign literature in the union magazine in the February, March, April, May, and June issues.

23. The policy described by DeChiara has never been published to the membership. No such policy is contained in the NALC Constitution. No such policy has ever been considered or discussed by the membership. To the extent that the policy exists at all, it is Fred Rolando's personal policy.

24. All issues of the union magazine run ads submitted by individual members who seek mutual trades of their positions with carriers in other locations.

25. I would pay NALC for all of the costs of printing my campaign literature in the union magazine. In 2022 the cost of advertising is $2,750 per page, which is about 1/100th of the cost of making a first-class mailing.

26. NALC uses its monthly magazine to disseminate information to its members. Copies of the *Postal Record* may be viewed at NALC.org.

27. My campaign literature is an intellectual response to the viewpoints expressed in the *Postal Record* by the incumbent officers. My campaign literature represents one side of a debate, the outcome of which will greatly affect the wages, hours, and working conditions of all city letter carriers. True and accurate copies of some of my campaign literature are attached as Exhibits F and G.

28. Because mail service has deteriorated it is possible that the only issue of the *Postal Record*

in which the incumbents presently agree to distribute my campaign material – the September issue – will not even be delivered to letter carriers until the deadline for returning ballots has passed. I received my copy of the April *Postal Record* on May 7, 2022.

29. NALC Branch 421 is NALC's local affiliate in San Antonio, Texas. In January 2022 I asked the branch leadership to distribute my campaign literature by printing an ad in the branch newsletter. I sent them payment for the ad as well as a copy of the literature I wanted distributed. They refused to distribute my literature and returned my money order. They said that a small portion of the branch membership voted 22-3 against distributing my literature. True and accurate copies of my email correspondence concerning my request are attached as Exhibit C. I also emailed Branch 9 and asked that they distribute my campaign literature as an ad in the branch newsletter. Branch 9 did not respond to my request.

30. I appealed the outcome of the 2018 election to the Rolando-appointed election committee. I objected, *inter alia*, to the union's refusal to distribute my campaign literature in the *Postal Record*, except in the September issue.

31. On or about November 30, 2018 the election committee denied my appeal. As to my objection regarding the *Postal Record*, the committee falsely stated, "The *Postal Record* does not accept advertising." A true and accurate copy of the election committee's denial of my appeal is attached as Exhibit D.

32. On or about January 3, 2019 I appealed the election committee's denial of my appeal of the election to the department of labor ("DOL"). I objected, *inter alia*, to the union's refusal to distribute my campaign literature in the *Postal Record*, except in the September issue.

33. On or about June 6, 2019 DOL denied my appeal. As to my objection regarding the *Postal Record*, the DOL falsely stated, "[T]he Postal Record normally does not accept advertising . . .." The DOL also falsely stated that it had been the union's long-standing "practice" not to accept advertising, except in the September issue. But the union does not claim that it has a "practice." It merely claims that it has a policy. *See* Exhibit B. The DOL denial also ignores the legal requirement that NALC comply with my reasonable request to distribute campaign literature. A true and accurate copy of DOL's denial of my appeal is attached as Exhibit E.

34. The 2019 DOL denial does not address the 2018 arrest that prevented me from acting as an observer during a several hour period of counting and tallying.

35. I have a legal right to appeal DOL's denial of my election appeal to federal court. I plan to exercise that right in October 2022.

36. I challenged Fred Rolando, the incumbent president, to debate in 2014, 2018, and 2022. Rolando did not accept any of my challenges.

37. At the 2018 convention Rolando called on two of his supporters, who made critical comments about me. When I went to the microphone to reply, Rolando would not recognize me.

38. At the 2014 convention Rolando called retired NALC officer Dale Hart to the podium, where Hart repeatedly referred to me as an "internet asshole." Rolando would not allow me to respond to Hart's comments.

    I declare under penalty of perjury that the foregoing is true and correct. Executed on June 15, 2022.

*/s/ David W. Noble*

David W. Noble