# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ ) | | |
| | ) | Civil Action No. 1:22-cv-01613-DLF |
| David W. Noble, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| National Association of Letter | ) | |
| Carriers, AFL-CIO, *et al.* | ) | |
| | ) | |
| *Defendants.* | ) | |
| _____ ) | | |

## DEFENDANTS' MEMORANDUM IN OPPOSITION
## TO PRELIMINARY INJUNCTION MOTION

Peter D. DeChiara (admitted *pro hac vice*)
Kate M. Swearengen (admitted *pro hac vice*)
Matthew E. Stolz (admitted *pro hac vice*)
COHEN, WEISS AND SIMON LLP
900 Third Avenue, Suite 2100
New York, New York 10022-4869
(212) 356-0216

Lucas R. Aubrey (D.C. Bar No. 982849)
SHERMAN DUNN P.C.
900 Seventh Avenue, N.W., Suite 1000
Washington, D.C. 20001
(202) 785-9300

*Attorneys for Defendants National Association of
Letter Carriers, AFL-CIO and NALC Branches 9
and 421*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND ........................................................................................................... 4

ARGUMENT ................................................................................................................ 8

I.     Applicable Preliminary Injunction Standard ...................................................... 8

II.    Noble Fails to Show that He Is Likely to Succeed on the Merits ....................... 9

     A.    Noble's Section 401(c) Claims Fail Against the Branches.................... 9

     B.    Noble's Section 401(c) Claims Fail Because the Statute Does Not Require
           a Union to Publish Candidate Campaign Ads...................................... 10

           1.    Section 401(c) Contains No Publication Requirement ............ 10

           2.    Reading a Publication Requirement into Section 401(c) Would
                Violate the First Amendment................................................. 13

III.    Noble Fails to Show a Likelihood of Irreparable Harm ................................... 15

IV.    The Balance of Equities Does Not Tip in Noble's Favor ................................. 18

V.    An Injunction Violating Defendants' First Amendment Rights Would Not Be in
     the Public Interest ........................................................................................... 19

CONCLUSION............................................................................................................. 20

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bauman v. Presser*,
No. CIV.A. 84-2699, 1984 WL 3255 (D.D.C. Sept. 19, 1984) ...............................................18

*Brown v. Lowen*,
857 F.2d 216 (4th Cir. 1988) ...............................................................................................12

*Camarata v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*,
478 F. Supp. 321 (D.D.C. 1979) ..................................................................................... *passim*

*Church v. Biden*,
No. CV 21-2815 (CKK), 2021 WL 5179215 (D.D.C. Nov. 8, 2021) ......................................9

*Dallas Safari Club v. Bernhardt*,
453 F. Supp. 3d 391 (D.D.C. 2020) .........................................................................................9

*Dimondstein v. Am. Postal Workers Union*,
964 F. Supp. 2d 37 (D.D.C. 2013) ......................................................................8, 11, 12, 17

*Dunlop v. Bachowski*,
421 U.S. 560 (1975) ................................................................................................................7

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades
Council*,
485 U.S. 568 (1988) ..............................................................................................................13

*Fund for Animals v. Frizzell*,
530 F.2d 982 (D.C. Cir. 1976) ..............................................................................................16

*Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Bos., Inc.*,
515 U.S. 557 (1995) .........................................................................................................14, 18

*Int'l Org. of Masters, Mates & Pilots v. Brown*,
498 U.S. 466 (1991) .........................................................................................................12, 13

*Janus v. Am. Fed'n of State, Cty. & Mun. Emps., Council 31*,
138 S. Ct. 2448 (2018) .....................................................................................................14, 19

*Lewis v. Becerra*,
Civ. Action No. 18-2929 (RBW), 2022 WL 123909 (D.D.C. Jan. 13, 2022) ........................15

*Local No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen & Packers v. Crowley*,
467 U.S. 526 (1984) ...........................................................................................................7

*Maldonado v. Dist. of Columbia*,
No. CV 10-1511 (RJL), 2019 WL 6877913 (D.D.C. Dec. 16, 2019)................................15, 16

*Mazurek v. Armstrong*,
520 U.S. 968 (1997)..........................................................................................................9

*Miami Herald Publ'g Co. v. Tornillo*,
418 U.S. 241 (1974)........................................................................................................14

*Nat'l Ass'n of Mfgs. v. NLRB*,
717 F.3d 947 (D.C. Cir. 2013) .........................................................................................14

*NetChoice, LLC v. Att'y Gen. Fla.*,
34 F.4th 1196 (11th Cir. 2022)....................................................................................14, 18

*Newdow v. Bush*,
355 F. Supp. 2d 265 (D.D.C. 2005) ........................................................................9, 15, 16

*Noble v. Dunn*,
895 F.3d 807 (D.C. Cir. 2018) ...........................................................................................3

*Noble v. NALC*,
285 F. Supp. 3d 128 (D.D.C. 2018) .................................................................................3, 4

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Calif.*,
475 U.S. 1 (1986)...........................................................................................................14

*Shelley v. Am. Postal Workers Union*,
775 F. Supp. 2d 197 (D.D.C. 2011) ..............................................................................11, 18

*Singh v. Carter*,
185 F. Supp. 3d 11 (D.D.C. 2016) .....................................................................................9

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944)........................................................................................................11

*W. Watersheds Project v. Bernhardt*,
468 F. Supp. 3d 29 (D.D.C. 2020) ....................................................................................15

*Wemhoff v. Bush*,
31 Fed. Appx. 204 (D.C. Cir. 2002) ..................................................................................16

*Yablonski v. United Mine Workers of Am.*,
305 F. Supp. 868 (D.D.C. 1969) .......................................................................10, 13, 14, 19

Defendants National Association of Letter Carriers, AFL-CIO ("NALC") and NALC Branches 9 and 421 (together, "Defendants") submit this opposition to the June 17, 2022 preliminary injunction motion ("Motion") [ECF No. 5] of Plaintiff David Noble ("Noble").

## PRELIMINARY STATEMENT

Noble, who is running for NALC's presidency, seeks to compel NALC and two of its local affiliates to allow him to place his campaign ads in their publications. He bases his request entirely on a statute -- Section 401(c) of the Labor-Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. §481(c) -- that requires unions to distribute candidates' campaign literature at the candidates' expense. Section 401(c) says nothing about obligating a union to *publish* a candidates' campaign material, and no court, as far as we know, has ever held that it imposes such a publication obligation. Noble certainly cites no such case.

Indeed, on two separate occasions, this Court has held that Section 401(c) does *not* require a union to include candidate campaign material in its publication. In addition, the United States Department of Labor ("DOL"), in ruling on Noble's challenges to NALC's 2018 election, specifically found that the union committed "no violation" of Section 401(c) by not allowing Noble to place his ads in NALC's magazine, the *Postal Record*, months before the union's election.

Noble's Section 401(c) claims against the two local affiliates are easily dismissed on additional grounds. Section 401(c) only obligates a union to allow distribution of the campaign material of candidates seeking office in *that union*. Noble is not a candidate for office in either of the two locals. Moreover, the statute only allows suit in the federal district where the union has its principal office. Neither local has an office in this District.

In addition to the insurmountable statutory hurdles that Noble faces in this case, there is a critical constitutional dimension that precludes the relief he seeks. Specifically, if

1

granted, the preliminary injunction he requests would constitute a clear violation of the Defendants' First Amendment right against compelled speech.  Supreme Court and D.C. Circuit precedent make clear that the right not to speak includes the right not to publish content created by someone else.  Moreover, if a private party, like a union, chooses to publish someone else's content, it has the right to choose when, and in what manner, to do so.

Noble faces no irreparable harm absent the preliminary injunction he seeks.  He, like all candidates, will have the opportunity to place a campaign ad in the September/October 2022 issue of the *Postal Record*, which will be mailed to the membership well before ballots for NALC's 2022 election are mailed to the membership.  In addition, if Noble wants to get his campaign literature out to the NALC membership earlier, he has a Section 401(c) right at any time to pay to have his campaign literature mailed to the NALC membership, or to any segment of the membership that he chooses.

Noble's delay in seeking judicial relief further undermines his claim of irreparable harm.  It was in December 2021 that NALC denied Noble's request to place campaign ads in pre-election issues of the *Postal Record*.  Yet Noble waited until mid-June 2022 to file his preliminary injunction motion.  During his unexplained delay in seeking relief, the February, March, April, May and June issues of the *Postal Record* issued, and the deadline for submissions to the July issue passed as well.  If the exclusion of his ads from the pre-election issues of the *Postal Record* really caused him irreparable harm, Noble would not have stood idly by month after month.  Case law in this Circuit makes clear that a movant's delay in seeking relief undermines a claim of irreparable harm.

Questions of equity and the public interest also weigh against Noble's request.  In crafting the LMRDA, Congress carefully balanced the interests of union democracy against the

strong policy of judicial respect for unions' autonomy over their own affairs.  Section 401(c) reflects Congress' determination that the appropriate counterweight to control of a union's publication by its incumbent officers would be challengers' right to distribute their campaign literature directly to the union's membership, giving them an unfiltered means of expressing their views to the voters.  Even though a mailing to the membership of a large union might be costly, Congress never gave candidates the right to force the union to publish their material, especially since such forced publication would be clearly unconstitutional.

For all these reasons, Noble's request here is baseless.

That Noble has filed a baseless lawsuit against NALC is not a surprise, given that Noble is no stranger to baseless litigation against NALC.  In *Noble v. Dunn*, 895 F.3d 807 (D.C. Cir. 2018), he tried for years to tar NALC and its national officers with corruption charges, but in the end the Court of Appeals found that "[o]ver the 23 years of this litigation, Noble has failed to adduce *any evidence of wrongdoing* by defendants." *Id.* at 813 (emphasis added); *see also id.* at 808 (comparing Noble's suit to the ancient Greek saga the Odyssey, and noting that "Noble's arguments, like Penelope's tapestry, have tended to unravel").

In *Noble v. NALC*, 285 F. Supp. 3d 128 (D.D.C. 2018), Noble tried to block NALC's membership from voting on its newly negotiated collective bargaining agreement. Judge Ketanji Brown Jackson found no basis for the preliminary injunction he requested.  *See* June 22, 2022, Declaration of Brian Renfroe ("Renfroe Dec."), filed herewith, at Exhibit C, at 114-45 (July 28, 2017, hearing transcript in Case No. 17-1255); *see also Noble*, 285 F. Supp. 3d at 131.  Once freed from Noble's effort to interfere, NALC's membership went on to overwhelmingly approve the contract, with a vote of 78,935 to 4,732.  *See Noble,* 285 F. Supp. 3d at 131.  Even after that, Noble tried to continue to press his claims of wrongdoing against

NALC, but Judge Dabney Friedrich dismissed them.  *See id*. at 135.  We mention these earlier

suits to put in context Noble's current foray into federal court to advance his political ambitions.

## **BACKGROUND**

NALC and the Branches

NALC is a national labor union with approximately 280,000 members.  *See*

Renfroe Dec. ¶2.  It serves as the collective bargaining representative of city letter carriers

employed by the United States Postal Service in every state and territory of the country.  *See id*.

NALC Branches 9 and 421 are local labor organizations affiliated with, but

separate from, NALC.  *See id*. ¶3; *see also* Noble's *First Amended Complaint* ("Am. Compl."),

[ECF No. 4], at ¶3 (identifying the branches as separate labor organizations).  Branch 9

represents city letter carriers in certain areas of Minnesota, and Branch 421 represents city letter

carriers in certain areas of Texas.  *See* Renfroe Decl. ¶3.  Neither local union maintains an office

in this District.  *See id*.

NALC Elections

Every four years, NALC holds elections for its national officers, including for its

President.  *See Renfroe Dec*. ¶4.  The nomination of candidates takes place at NALC's

convention in the summer of an election year.  *See id*.  In the fall, NALC's membership votes on

the candidates by mail ballot.  *See id*.  This year, NALC's convention will be in August.  *See id*.

Ballots are scheduled to be mailed to NALC's members between September 26 and September

30.  *See id*.  The deadline for members to return their completed ballots is scheduled for October

21.  *See id*.

NALC's local branches, including Branches 9 and 421, hold their own elections

for their own Branch officers.  *See* Renfroe Dec. ¶5.  Only members of the Branch are allowed to

vote in, and run for office in, a Branch election.  *See id*.

The *Postal Record*

NALC has for many years published a magazine called the *Postal Record*. *See* Renfroe Dec. ¶6. The *Postal Record*, which is usually about 64 pages long, contains news and information for NALC's members. *See id.* NALC mails copies of the *Postal Record* to each of its members. *See id.*

NALC publishes the *Postal Record* monthly, except that sometimes it publishes a combined two-month issue for the two-month period following NALC's biennial convention. *See id*. ¶7. In 2022, to date, the *Postal Record* has appeared in January, February, March, April, May and June. *See id.* For a normal monthly issue, NALC has a deadline of the 15th day of the preceding month to send the final content of the magazine to the company that does the "pre-print" work of preparing the digital files for the printer. *See id.* ¶8. Thus, while the July issue has not yet appeared, the deadline for additional content has now passed. *See id.*

NALC pays for the cost of printing and mailing the *Postal Record*. *See* Renfroe Dec. ¶9.

For decades, NALC has, in general, allowed no paid advertisements in the *Postal Record*. *See* Renfroe Dec. ¶10. There are two narrow exceptions. *See id.* First, the *Postal Record* has a section called "Mutual Exchanges," which contains paid advertisements by letter carriers seeking to swap jobs with a letter carrier in a different part of the country. *See id.* & Exhibit A, at 60.

Also, once every four years, NALC allows candidates in its quadrennial national officer election to place paid advertisements in the "election" issue of the *Postal Record* that appears before the ballots are mailed to the membership. *See* Renfroe Dec. ¶11. For example, the June 2022 issue of the *Postal Record* announced that, subject to convention action,

5

candidates' paid campaign advertisements would be printed in the combined September/October 2022 *Postal Record*.  *See id*. & Exhibit A at 21.

NALC takes care to time the mailing of the "election" issue of the *Postal Record* so that it arrives at members' homes before the election ballots.  *See* Renfroe Dec. ¶12.  The printer is scheduled to put the September/October issue of the *Postal Record* in the mail on September 9.  *See id*.  That should leave plenty of time for the Postal Service to deliver it prior to the mailing of the ballots beginning on September 26.  *See id*.

Rates for candidate ads are $2,750 per page.  *See* Renfroe Dec. ¶13 & Exhibit 14, at 21.

The page of the June 2022 *Postal Record* announcing the opportunity for candidates to place campaign ads in the September/October issue also explains that "[u]pon request, candidates may make arrangement for distribution of campaign literature by mail, at the candidate's expense."  *See* Renfroe Dec., Exhibit A, at 21.

Noble's Requests to Place Paid Campaign Ads

Noble ran unsuccessfully for NALC's Presidency in 2014 and 2018.  *See* Am. Compl. ¶7.  Following his 2018 loss, Noble filed a complaint with the DOL, challenging the election results on numerous grounds.  *See* Renfroe Dec., Exhibit B, at 1.  The DOL investigated, but found "no violation of the LMRDA that may have affected the outcome of the election."  *See id*.  In particular, the DOL found in its June 6, 2019, decision letter that NALC had committed "no violation" of Section 401(c) by not allowing Noble to place a campaign ad in issues of the *Postal Record* prior to the September 2018 "election" issue:

> The investigation revealed that the *Postal Record* normally does not accept advertising but that it makes an exception, during election years, to allow campaign advertisements in the August-September issue.  This has been the union's long-standing practice.

> In addition, NALC provided notices to all candidates of this practice in the May 2018 issue of the *Postal Record*.  All candidates were treated equally with respect to the terms and expenses associated with distribution of the campaign advertisements in the *Postal Record*.  You and the incumbent slate both placed advertisements in the August-September issue, and no candidate was allowed to place an advertisement in any other issue.  There was *no violation*.

*See id.* at 7 (emphasis added).[1]

Noble has announced that he is running for NALC's presidency in the 2022 election.  *See* Am. Compl. at ¶8.  On December 18, 2021, Noble sent an email to NALC's President and its outside counsel stating: "I want to begin running ads in the Postal Record beginning in the February issue.  Please tell me the per-page cost and the monthly deadline."  Am. Compl., Exhibit A.  NALC's counsel responded on December 29, 2021, writing that:

> In accordance with longstanding NALC policy, NALC does not run political ads in the *Postal Record*, with the exception of one issue every four years, preceding the NALC national officer elections.  The rates and deadline for political ads for that issue have not yet been determined.  NALC plans to announce the rates and deadline in the June 2022 issue of the *Postal Record*.

*Id.*, Exhibit B.

The February *Postal Record* issued without Noble taking any legal action to vindicate his claimed right to place an ad in it.  So did the March, April, May and June issues.  By the time he filed his preliminary injunction motion in mid-June 2022, the time for adding

---

[1] Noble contends that he has a "legal right to appeal" the DOL's rejection of his Section 401(c) claim and that he plans to file such an appeal in October 2022.  *See* Noble Dec. ¶35.  While courts can review the DOL's rejection of post-election challenges under the arbitrary and capricious standard of review, *Dunlop v. Bachowski*, 421 U.S. 560, 575 (1975) (*overruled on other grounds by Local No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen & Packers v. Crowley*, 467 U.S. 526 (1984)), Noble has inexplicably let the DOL's decision stand for over two years now, until nearly all the 2022 pre-election issues of the *Postal Record* have already appeared.

content to the July issue had already passed.  Between now and the appearance of the September/October 2022 "election" issue, there remains only one issue of the *Postal Record* -- the August 2022 issue -- for which there is still time to add content.  *See* Renfroe Dec. ¶9; *see also* Noble's *Memorandum in Support of Plaintiff's Motion for a Preliminary Injunction* ("Noble Mem.") [ECF No. 5], at 2 (acknowledging that Noble cannot now place ads in the July issue).

Noble alleges that in January 2022, he asked Branch 421 to place in its newsletter a paid advertisement containing his campaign literature.  *See* Am. Compl. ¶15.  He alleges that in May 2022, he made the same request of Branch 9.  *See id.*  Neither Branch has permitted him to place ads in their publications.  *See id.*

Noble's Lawsuit

Even though NALC denied his request to place ads in the *Postal Record* in December 2021, Noble waited to file the instant suit until June 7, 2022.  In his First Amended Complaint, he claims that his requests to place his campaign ads in Defendants' publications constituted a reasonable request under LMRDA Section 401(c) and that their refusal to accede to his request violated that provision.  *See* Am. Compl. ¶¶16-17.  In his preliminary injunction motion, Noble asks the Court to issue an affirmative injunction "compelling" Defendants to publish his campaign ads.  *See* Noble Mem. at 1; *see also* Noble's proposed Preliminary Injunction [ECF No. 5-3], at 2 ([Defendants] "shall accept plaintiff's political ads and run them in the *Postal Record* and their branch publications").

## **ARGUMENT**

## I.     **APPLICABLE PRELIMINARY INJUNCTION STANDARD**

As this Court recognized in *Dimondstein v. Am. Postal Workers Union*, 964 F.Supp.2d 37, 41 (D.D.C. 2013), a plaintiff seeking a preliminary injunction under LMRDA Section 401(c) must satisfy the traditional equitable criteria for injunctive relief.  A preliminary

injunction is "'an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original) (citation omitted); *accord Church v. Biden*, No. CV 21-2815 (CKK), 2021 WL 5179215, at *7 (D.D.C. Nov. 8, 2021).  A plaintiff seeking preliminary injunctive relief must establish (1) that the plaintiff "is likely to succeed on the merits," (2) that the plaintiff "is likely to suffer irreparable harm in the absence of preliminary relief," (3) that "the balance of equities" tips in plaintiff's favor, and (4) that "an injunction is in the public interest." *Church,* 2021 WL 5179215, at *7 (citation omitted).

The plaintiff bears an especially high burden where, as here, the preliminary injunction would not just restrain the defendant, but would require the defendant to take an affirmative action. *See Dallas Safari Club v. Bernhardt*, 453 F. Supp. 3d 391, 398 (D.D.C. 2020); *see also Singh v. Carter*, 185 F.Supp.3d 11, 17 (D.D.C. 2016); *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005).  Moreover, courts are particularly hesitant to issue preliminary relief where, as here, the preliminary relief would be the same as the ultimate relief the plaintiff seeks in the lawsuit. *See Newdow*, 355 F. Supp. 2d at 292; *see also Singh*, 185 F. Supp. 3d at 17.

We show below that Noble cannot meet this stringent standard.

## II.  NOBLE FAILS TO SHOW THAT HE IS LIKELY TO SUCCEED ON THE MERITS

### A.  Noble's Section 401(c) Claims Fail Against the Branches

The Court can quickly dispose of Noble's Section 401(c) claims against Branch 9 and Branch 421.  Those claims fail because Noble is not, and does not claim to be, a member of either local union, or a candidate for office in an election in either local union.  Section 401(c) only allows suit against a labor organization by a "candidate for office *in such labor organization*." 29 U.S.C. § 481(c) (emphasis added).  Because Noble is only a candidate for

office in NALC's officer election, not in a Branch election, *see* Am. Compl. ¶8, his Section

401(c) claims against Branch 9 and Branch 421 fail.

Noble's claims against the two Branches also fail because the claims are beyond

this Court's jurisdiction.  Section 401(c) only allows suit against a labor organization "in the

district court of the United States in which such labor organization maintains its principal

office."  29 U.S.C. § 481(c).  Neither Branch 9, a local union in Minnesota, nor Branch 421, a

local union in Texas, maintains an office in this District.  *See* Renfroe Dec. ¶3.  Accordingly,

Noble's claims against the two Branches fail for that reason as well.

### B.   Noble's Section 401(c) Claims Fail Because the Statute Does Not Require a Union to Publish Candidate Campaign Ads

#### 1.   Section 401(c) Contains No Publication Requirement

Noble's request for a preliminary injunction fails against all the Defendants

because Section 401(c) does not require a union to publish a candidate's campaign ads.  If

Congress intended to impose such a publication obligation on unions, it could have easily said so

in the statute.  It did not.  Nor, as far as our research shows, has any court in the 63 years since

the LMRDA's enactment ever read Section 401(c) as requiring a union to publish a candidate's

campaign ads.  Certainly, Noble cites no such case.

Indeed, this Court has held on two prior occasions that Section 401(c) does *not*

require a union to include a candidate's material in its publication.  In *Yablonski v. United Mine*

*Workers of Am.*, 305 F. Supp. 868, 872 (D.D.C. 1969), this Court held that Section 401(c) "does

not authorize this type of relief" and so "is beyond our statutory authority to grant."  The Court

repeated that conclusion in *Camarata v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen &*

*Helpers of Am.*, 478 F. Supp. 321, 331 (D.D.C. 1979), finding that requiring inclusion of the

candidates' material in the union's publication "is beyond the authority of this court to grant."

The DOL, too, has held that a union has no obligation under Section 401(c) to publish candidate ads.  Specifically, in rejecting Noble's post-election challenges to NALC's 2018 elections, the DOL's Office of Labor-Management Standards concluded that it was "no violation" of Section 401(c) for NALC to refuse Noble's request to place campaign ads in issues of the *Postal Record* that preceded the "election" issue.  *See* Renfroe Dec., Exhibit B, at 6-7. That ruling, by the agency charged with administering the LMRDA, provides expert guidance on the meaning of the statute.  *See Dimondstein*, 964 F. Supp. 2d at 42-43 (this Court relying on DOL for guidance on interpretation of Section 401(c)); *see generally Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (rulings, interpretations and opinions by agency that administers statute "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance").  The DOL's ruling is particularly persuasive here since it aligns with this Court's own Section 401(c) decisions cited above.

That Section 401(c) does not impose a publication obligation is clear.  But if there were any doubt about the matter, the provision would have to be read as not requiring a union to publish candidate campaign material.  As this Court has explained, the provisions of Section 401(c) "are to be narrowly construed in accordance with the congressional intent to minimize judicial interference in union elections."  *Camarata*, 478 F. Supp. at 330; *see generally Shelley v. Am. Postal Workers Union*, 775 F. Supp. 2d 197, 207 (D.D.C. 2011) ("Federal courts have applied a long-standing policy of avoiding judicial interference in a union's self-governance and internal affairs.").

Reading Section 401(c) as imposing a publication requirement would also be contrary to the statute's purpose.  As this Court recognized, "elected union officials are entitled to use union publications to express their views and to have their union activities reported in said

11

publications." *Camarata*, 478 F. Supp. at 330.  Section 401(c)'s purpose was to promote union democracy by giving candidates a means to communicate with the union's membership *other* than through the union-controlled publication -- indeed a means of "commenting on the positions advocated in the union press."  *Int'l Org. of Masters, Mates & Pilots v. Brown*, 498 U.S. 466, 476 (1991).  Section 401(c) was thus meant to provide candidates a counterweight to the union's publication, not a means to access the publication.  The passage of the Fourth Circuit's *Brown* decision that Noble quotes makes clear that by guaranteeing candidates a means of distributing their literature via the union's mailing list, the statute aimed to help level the playing field: "By requiring unions to comply with all reasonable requests of candidates for *access to the union lists* these advantages of incumbency are reasonably moderated."  *Brown v. Lowen*, 857 F.2d 216, 218 (4th Cir. 1988) (emphasis added) (cited at Noble Mem. at 3).

The LMRDA's drafters had the foresight to realize that mail might not be the only means of distributing a candidates' campaign literature to the membership, and so included the phrase "by mail *or otherwise*."  29 U.S.C. § 481(c) (emphasis added).  Indeed, this Court has held that candidates may, in certain circumstances, have a Section 401(c) right to distribute their campaign literature to the membership by email.  *See Dimondstein*, 964 F. Supp. 2d at 37.  But never has this Court, or any court, read Section 401(c) as requiring a union to publish a candidate's campaign ad.

Noble argues that NALC has a Section 401(c) obligation to publish his campaign ads because, he contends, his request is reasonable.  *See* Noble Mem. at 4.  But Section 401(c) only requires a union to comply with reasonable requests by a candidate "to distribute by mail or otherwise at the candidate's expense literature in aid of such person's candidacy."  29 U.S.C. §

481(c).  The statue imposes no obligation to publish a candidate's campaign ad, whether that request is deemed reasonable or not.

*Brown*, 498 U.S. 466 (cited at Noble Mem. 3), is not to the contrary.  There, the Supreme Court held that a union violated Section 401(c) by failing to comply with a candidate's request that the union provide him with mailing labels containing the names and addresses of the union's members, so that he could send a mailing to them at his own expense.  *See id*. at 469, 478.  The case says nothing about requiring a union to publish the candidate's campaign ad in its publication.

### 2.    Reading a Publication Requirement into Section 401(c) Would Violate the First Amendment

Even if Section 401(c) had language that could be interpreted as requiring a union to publish a candidate's campaign ads, the Court should refrain from adopting such an interpretation because it would violate the First Amendment.  *See Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (when possible, courts will construe a statute to avoid "serious constitutional problems").  This Court has twice held that an injunction compelling a union to publish a candidate's material would violate the union's First Amendment rights.  In *Camarata*, 478 F. Supp. 321, candidates for union office requested, as a remedy for the union's alleged Section 401(c) violation, the publication of their campaign material in the union's publication.  This Court held that such relief "would infringe upon the union's First Amendment rights." *Id*. at 331.  Similarly, in *Yablonski*, 307 F. Supp. 868, this Court denied a preliminary injunction sought by a candidate for union office to the extent the candidate sought under Section 401(c) to require union officials to print certain material in the union's publication.  The Court explained that "to tell the [union publication]

what it can and cannot print," *id.* at 872, would be "in clear violation of the First Amendment's guarantee of freedom of the press." *Id.* at 874.

This Court's decisions in *Camarata* and *Yablonski* are fully consistent with current First Amendment jurisprudence on the "right against compelled speech." *Nat'l Ass'n of Mfgs. v. NLRB*, 717 F.3d 947, 957 (D.C. Cir. 2013). Under the First Amendment, a speaker not only has the right to refrain from speaking, *see Janus v. Am. Fed'n of State, Cty. & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018), but also the right not to disseminate messages created by others. *See, e.g.*, *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Calif.*, 475 U.S. 1, 12 (1986) (violation of First Amendment to order private utility company to include in its newsletter content prepared by third party); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (statute requiring newspaper to print content by political candidate violates First Amendment); *Nat'l Ass'n of Mfgs.* 717 F.3d at 956 (employers have right not to post notice created by NLRB.) Accordingly, NALC can no more be enjoined to carry an advertisement in the *Postal Record* than it can be enjoined to write particular content for the *Postal Record. See Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 570 (1995) ("[E]ven the simple selection of a paid noncommercial advertisement for inclusion in a daily paper… fall[s] squarely within the core of First Amendment security…") (citing *Miami Herald*, 418 U.S. at 258; *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 265–266 (1964)). That NALC allows candidate ads in one quadrennial issue in no way changes that conclusion, since a private entity has the fundamental right to decide "to what extent" to disseminate third-party-created content. *NetChoice, LLC v. Att'y Gen. Fla.,* 34 F.4th 1196, 1218 (11th Cir. 2022).

Because Section 401(c) does not require NALC to publish Noble's campaign ads, and because a preliminary injunction requiring NALC to do so would violate the First Amendment, Noble fails to demonstrate a likelihood of success on the merits.

## III.    NOBLE FAILS TO SHOW A LIKELIHOOD OF IRREPARABLE HARM

Noble also fails to demonstrate that he will suffer irreparable harm absent the preliminary injunction he seeks.  *See generally Maldonado v. Dist. of Columbia*, No. CV 10-1511 (RJL), 2019 WL 6877913, at *3 (D.D.C. Dec. 16, 2019) (noting this Circuit's "'high standard for irreparable harm'") (citation omitted).  Noble will suffer no irreparable harm because, even without the preliminary injunction, he has the opportunity to disseminate his campaign message to NALC's membership.  Like all other candidates, Noble will have the opportunity to place a campaign ad in the September/October "election" issue of the *Postal Record*.

Noble claims that being denied the opportunity to place his ads in earlier issues of the *Postal Record* causes him irreparable harm.  The best measure of that argument is Noble's own conduct.  If Noble truly faced irreparable harm by not having the opportunity to place ads in earlier issues of the *Postal Record*, he would have moved for injunctive relief promptly after NALC denied his request in December 2021.  Instead, he did nothing, letting the February and March and April and May and June issues of magazine come and go.  By the time he moved for a preliminary injunction, even the time to add content to the July issue had passed.  *See* Renfroe Dec. ¶9.  Noble's inaction belies his claim that he will suffer irreparable harm by not having his ads placed in earlier issues.  *See W. Watersheds Project v. Bernhardt*, 468 F. Supp. 3d 29, 50 (D.D.C. 2020) (plaintiffs' delay seeking emergency relief "undermine[s] their contention that they will be irreparably harmed"); *see also Newdow*, 355 F. Supp. 2d at 292 (delay in seeking injunctive relief "implies a lack of urgency and irreparable harm"); *accord Lewis v. Becerra*,

Civ. Action No. 18-2929 (RBW), 2022 WL 123909, at *8 (D.D.C. Jan. 13, 2022) (noting that delay as short as two months militates against a finding of irreparable harm); *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1976) (delay of 44 days in seeking preliminary injunctive relief "inexcusable"); *Maldonado*, 2019 WL 6877913, at *3 ("delay in seeking a preliminary injunction weighs heavily against a finding of irreparable harm").

Now, the August 2022 issue of the *Postal Record* is the only issue before the September/October "election" issue for which the time to add content has not yet passed.  *See* Renfroe Dec. ¶9.  Whether Noble's election chances would suffer by not having his ad in the August issue, but having it in the next issue, is entirely speculative and thus cannot support a finding of irreparable harm.  *See Newdow*, 355 F. Supp. 2d at 291 (for showing of irreparable harm, "speculative injury will not suffice"); *Wemhoff v. Bush*, 31 Fed. Appx. 204, 204 (D.C. Cir. 2002) (plaintiff fails to satisfy irreparable harm requirement when harm is speculative); *Maldonado*, 2019 WL 6877913, at *3 (irreparable harm must be "'certain'") (citation omitted).

In an attempt to show why getting his ad into the earlier issue matters, Noble tries to cast doubt that the September/October issue would arrive in time for members to see his ad before they cast their ballots.  *See* Declaration of David Noble ("Noble Dec."), ¶28 [ECF No. 5-2].  That concern is unfounded.  The September/October issue will be mailed September 9, weeks before the ballots are even sent to the members.  *See* Renfroe Dec. ¶12.  The ballots are not due back until October 21.  *See id*. ¶4.

Moreover, Noble faces no irreparable harm because he has the opportunity *now* to exercise his Section 401(c) right to send his campaign literature to NALC's membership.  *See* Renfroe Dec., Exhibit A at 21 (informing candidates of their right to send campaign literature to NALC's membership via NALC's mailing list).  Noble claims that he cannot afford the cost of a

Section 401(c) mailing to NALC's entire membership.  *See* Noble Dec. ¶21.  Even if that were

true, Noble's lack of funds to pay for a mailing does not constitute irreparable harm.  Congress

knew when it enacted the statute that some unions have large memberships, and that mailings

could be expensive.  Indeed, Section 401(c) expressly applies to "national or international labor

organization[s]."  29 U.S.C. § 481(c).  Nonetheless, Congress made clear that such mailings were

to be "at the candidate's expense."  *Id.*  Politicking on a national stage can be an expensive

business, and some candidates may lack the appeal to generate sufficient fundraising.  That

reality, however, does not equate with irreparable harm.  *See also* 29 C.F.R. § 452.68 (DOL

recognizing that a candidate's ability to exercise Section 401(c) rights may be limited by their

"resources").[2]

   In support of his irreparable harm argument, Noble cites *Dimondstein*, 964 F.

Supp. 2d 37 (cited at Noble Mem. 5).  *Dimondstein*, however, held only that candidates suffered

irreparable harm when a union denied their Section 401(c) request to distribute their campaign

literature, via email, to the union's membership.  *See id*. at 49-50.  The case provides no support

for the proposition that a candidate suffers irreparable harm when denied the right to place a

campaign ad in the union's magazine, particularly where the candidate will have the right to

place an ad in the "election" issue of the magazine, and also has the right, whenever he wishes,

to send Section 401(c) campaign mailings to whatever portion of the union membership he

chooses.

---

[2] While not relevant to the Section 401(c) analysis, we question Noble's claim that a Section
401(c) mailing to all NALC members would cost $350,000.  *See* Noble Dec. ¶21.  NALC has
280,000 members and a first-class stamp costs 60 cents.  Also, even if Noble cannot himself
personally afford the cost of a national mailing, we note that he claims to be running as part of a
slate of candidates, *see* Noble Dec. ¶17, and also claims that he has tens of thousands of
followers on social media, *see id.* ¶20.  Presumably, the other members of his slate, as well as his
online supporters, could contribute to the cost of a mailing.

For all these reasons, Noble fails to demonstrate irreparable harm.

## IV.   THE BALANCE OF EQUITIES DOES NOT TIP IN NOBLE'S FAVOR

Nor does the balance of equities tip in Noble's favor.  As a democratically governed membership organization, NALC has chosen to have a magazine that is free of political propaganda and partisan rancor -- except for once every four years, at election time, when all candidates share the same right to put their campaign messages in the *Postal Record*. Absent a clear congressional mandate to the contrary, the federal judiciary should respect the organization's choice as to how it wants to conduct its affairs, including the tone and content it wants for its publication.  *See* Renfroe Dec., Exhibit C, at 144 (Judge Brown, in denying Noble's preliminary injunction request, noting the "overarching public interest in courts not interfering in union matters"); *see also Bauman v. Presser*, No. CIV.A. 84-2699, 1984 WL 3255, at *6 (D.D.C. Sept. 19, 1984) ("the provisions of the LMRDA were not intended to constitute an open invitation to the courts to intervene in the internal affairs of unions"); *Shelley*, 775 F. Supp. 2d at 207 (noting "long-standing policy of avoiding judicial interference in a union's self-governance").  For that reason alone, the equities favor NALC.

Indeed, were this Court to rule for Noble, the ruling would not just apply to him, but to all candidates for office in NALC elections.  It would force the union to open its journal each month to a potentially unlimited number of political messages from members aspiring for union office.  The infusion of partisan content would completely change the tone that NALC has chosen for its magazine, thus infringing the protection that the First Amendment gives to a private entity to "shape its expression."  *Hurley*, 515 U.S. at 574 (First Amendment gives parade organizer right to exclude third party's participation); *NetChoice*, 34 F.4th at 1210 (First Amendment protects "a private entity's decision about whether, to what extent, and in what manner to disseminate third-party-created content").

18

Noble argues that because he will pay for his campaign ads, "there is no possibility of any injury" to NALC.  Noble Mem. 5-6.  That statement ignores the blow to its autonomy that NALC will suffer if forced by a court to open the pages of its magazine to unlimited and unwanted political content.  It also ignores the critical First Amendment injury that NALC will suffer from being compelled to publish content against its will.

## V.     AN INJUNCTION VIOLATING DEFENDANTS' FIRST AMENDMENT RIGHTS WOULD NOT BE IN THE PUBLIC INTEREST

The First Amendment allows Americans to assemble into organizations, like labor unions, and, through those organizations, to freely say -- and *not* say -- what they choose.  Such free speech is "essential to our democratic form of government."  *Janus*, 138 S. Ct. at 2464.   The relief sought here would compel NALC to publish speech against its will, in violation of that core constitutional protection.  It is thus contrary to the public interest.

Noble quotes *Yablonski*, 305 F. Supp. 868, for the proposition that "'fair union elections'" are in the public interest.  Noble Mem. 6.  In *Yablonski*, however, this Court held that Section 401(c) does *not* require publication of a candidate's material by the union, and that requiring such publication would violate the First Amendment.  *See* 305 F. Supp. at 872.  In the LMRDA, Congress established certain standards intended to guarantee fair and democratic union elections.  Requiring a union to publish candidates' campaign ads was not among them.[3]

---

[3] None of the other cases cited by Noble, *see* Noble Mem. 6, concern Section 401(c) or have any relevance to the issue before the Court.

## CONCLUSION

For the foregoing reasons, the Court should deny Noble's request for a preliminary injunction.

Dated: New York, New York
   June 28, 2022

        Respectfully submitted,

        /s/ *Peter D. DeChiara*_____
        Peter D. DeChiara (admitted *pro hac vice*)
        Kate M. Swearengen (admitted *pro hac vice*)
        Matthew E. Stolz (admitted *pro hac vice*)
        COHEN, WEISS AND SIMON LLP
        900 Third Avenue, Suite 2100
        New York, New York 10022-4869
        (212) 356-0216

        /s/ *Lucas R. Aubrey*_____
        Lucas R. Aubrey (D.C. Bar No. 982849)
        SHERMAN DUNN P.C.
        900 Seventh Avenue, N.W., Suite 1000
        Washington, D.C. 20001
        (202) 785-9300

        *Attorneys for Defendants National Association of Letter Carriers, AFL-CIO and NALC Branches 9 and 421*