# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| _____ | ) | |
| | ) | Civil Action No. 1:22-cv-01613-DLF |
| David W. Noble, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| National Association of Letter | ) | |
| Carriers, AFL-CIO, *et al.* | ) | |
| | ) | |
| *Defendants.* | ) | |
| _____ | | |

## <u>DECLARATION OF BRIAN RENFROE</u>

I, Brian Renfroe, under penalty of perjury and in lieu of affidavit as permitted by 28 U.S.C. §1746, declare as follows:

1.      Since 2016, I have served as Executive Vice President of Defendant National Association of Letter Carriers, AFL-CIO ("NALC").  I make this declaration in opposition to the motion of Plaintiff David Noble ("Noble") for a preliminary injunction in the above-captioned case.  I base this declaration on my personal knowledge and on facts provided to me by NALC's staff.

2.      NALC is a national labor union with approximately 280,000 members.  It serves as the collective bargaining representative of city letter carriers employed by the United States Postal Service in every state and territory of the country.

3.      NALC Branches 9 and 421 are local labor organizations affiliated with, but separate from, NALC.  Branch 9 represents city letter carriers in certain areas of Minnesota,

and Branch 421 represents city letter carriers in certain areas of Texas. Neither local union maintains an office in the District of Columbia.

4.      Every four years, NALC holds elections for its national officers, including for its President. The nomination of candidates takes place at NALC's convention in the summer of an election year. In the fall, NALC's membership votes on the candidates by mail ballot. This year, NALC's convention will be in August. Ballots are scheduled to be mailed to NALC's members between September 26 and September 30. The deadline for members to return completed ballots is scheduled for October 21.

5.      NALC's local branches, including Branches 9 and 421, hold their own elections for their own Branch officers. Only members of a Branch are allowed to vote in, and run for office in, a Branch election.

6.      NALC has for many years published a magazine called the *Postal Record*. The *Postal Record*, which is usually about 64 pages long, contains news and information for NALC's members. A copy of the June 2022 *Postal Record* is attached here as Exhibit A. NALC mails copies of the *Postal Record* to its members.

7.      NALC publishes the *Postal Record* monthly, except that sometimes it publishes a combined two-month issue for the two-month period following NALC's biennial convention. In 2022, to date, the *Postal Record* has appeared in January, February, March, April, May and June.

8.      For a normal monthly issue, NALC has a deadline of the 15th day of the preceding month to send the final content of the magazine to the company that does the "pre-print" work of preparing the digital files for the printer. That company, in turn, must get the files to the printer to be printed, bound and mailed in time for delivery to NALC's members the first

week of the month.  The deadline for submissions to the July 2022 issue has now passed.  The August 2022 issue of the *Postal Record* is now the only issue before the September/October "election" issue for which the submission deadline has not yet passed.

9.      NALC pays for the cost of printing and mailing the *Postal Record*.

10.      For decades, NALC has, in general, allowed no paid advertisements in the *Postal Record*.  There are two narrow exceptions.  First, the *Postal Record* has a section called "Mutual Exchanges" which contains paid advertisements by letter carriers seeking to swap jobs with a letter carrier in a different location.

11.      Also, once every four years, NALC allows candidates in its quadrennial national officer election to place paid advertisements in the "election" issue of the *Postal Record* that appears before the ballots are mailed to the membership.  For example, the June 2022 issue of the *Postal Record* announced that, subject to convention action, candidates' paid advertisements would be printed in the combined September/October 2022 issue of the *Postal Record*.  *See* Exhibit A at 21.

12.      NALC takes care to time the mailing of the "election" issue of the *Postal Record* so that it arrives at members' homes before the election ballots.  The printer is scheduled to put the September/October issue of the *Postal Record* in the mail on September 9.  That should leave plenty of time for the Postal Service to deliver it prior to the mailing of the ballots beginning on September 26.

13.      Rates for candidate ads are $2,750 per page.  *See* Exhibit A, at 21.

14.      Attached as Exhibit B is a June 6, 2019, letter to Noble from the U.S. Department of Labor, Office of Labor-Management Standards.

15.     Attached as Exhibit C is an excerpt of the transcript of the Court's July 28, 2017, preliminary injunction hearing in *Noble v. NALC*, Case No. 17-1255.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed at Washington, DC this 22 nd day of June 2022.

_____

Brian Renfroe

# Exhibit A

Volume 135/Number 6      June 2022

# The Postal Record

The monthly journal of the **NATIONAL ASSOCIATION OF LETTER CARRIERS**

**In this issue**

President's Message          1
National Officers           26
Branch Election Notices     42
Branch Items                48



NATIONAL ASSOCIATION OF LETTER CARRIERS

**Stamp Out Hunger**

FOOD DRIVE

# THE FOOD DRIVE RETURNS

—PAGES 11-13



# Install the free
# NALC Member App
## for your iPhone or Android smartphone

As technology increases our ability to communicate, NALC must stay ahead of the curve. We've now taken the next step with the NALC Member App for iPhone and Android smartphones. The app was developed with the needs of letter carriers in mind.

**The app's features include:**

- Workplace resources, including the National Agreement, *JCAM*, MRS and CCA resources
- Interactive Non-Scheduled Days calendar
- Legislative tools, including bill tracker, individualized congressional representatives and PAC information

- Instantaneous NALC news with personalized push notifications and social media access
- Much more

# Go to the App Store or Google Play and search for "NALC Member App" to install for free

# Meeting the moment in Philadelphia



**Fredric V. Rolando**

This month, delegates from our union will join those of 56 other national and international unions in Philadelphia to participate in the 29th quadrennial convention of the American Federation of Labor-Congress of Industrial Organizations (AFL-CIO). Together, AFL-CIO-affiliated unions have 12.5 million members and are fighting to advance the interests of more than 100 million others who work for a living. As we noted in these pages back in March, we find ourselves in a moment of great promise for the labor movement, even as the challenges of the pandemic and inflation pose serious economic threats to us all. Public support for unions is at near-record levels (68 percent, according to Gallup), organizing is exploding among some of the most recognizable companies in the country (Starbucks, Amazon, etc.), and a wave of strikes has helped shift the balance of power in the labor market to workers and their unions. Growing the labor movement to "meet this moment" is the overriding goal of the Philadelphia convention.

Secretary-Treasurer Nicole Rhine and I serve as delegates to the AFL-CIO convention by virtue of our elected offices with NALC, while seven other NALC members were elected to serve as delegates by the NALC convention in 2016: Anita Guzik (Los Angeles Branch 24), Charlie Heege (New York Branch 36), Elise Foster (Chicago Branch 11), Lloyd Doucet (New Orleans Branch 124), Ingrid Armada (Providence, RI Branch 15), Denise Brooks (Medford, OR Branch 1433) and Steve Hanna (York, PA Branch 509). As always, NALC will take an active role at the convention, focusing on issues of importance to the labor movement including union organizing, promoting the AFL-CIO's Workers First Agenda (to advance the PRO Act, rebuild our national infrastructure with union labor, etc.) and strengthening our democracy. We also will host an NALC booth to solicit support for our campaigns to Stamp Out Hunger and to promote voting by mail with the National Vote at Home Institute. And we will offer our solidarity to workers struggling to achieve justice in the workplace (such as the striking mineworkers at Warrior Met in Alabama and the workers at Amazon struggling to unionize over the vehement opposition of their employer), as well as seeking the solidarity of other unions to advance the NALC's workplace and legislative priorities.

I am serving as chairman of the convention's Resolutions Committee. In recent weeks, we successfully offered amendments to strengthen two major resolutions on retirement income security and support for the federal workforce. In the former, which already included support for the Social Security Fairness Act (to repeal the WEP and GPO provisions), we added a commitment to fight for enactment of the Federal Employees Fairness Act, which would give city carriers and other federal workers the ability to "buy back" pension service credit for periods of non-career work for the USPS and other agencies—including both transitional employee and CCA service. In the latter, we seek the labor movement's support for providing "hazard pay" to letter carriers and others whose public-facing work exposes them to dangers during pandemics and other national emergencies.

As we've seen during my years as president, the AFL-CIO provides a powerful way to amplify the NALC's voice in Washington. More than a decade ago, the federation lifted up our successful campaign to save Saturday delivery. For that, I will always be grateful to AFL-CIO President Rich Trumka, our great friend whom we tragically lost last year (see my message from the September 2021 issue). More recently, it provided support for our interests in the two COVID-19 relief bills and the Postal Reform Act of 2021 (H.R. 3076). NALC presented our priorities to each of the AFL-CIO's regional training sessions in 2019, and the federation made the strengthening of the USPS a part of its Five Economic Essentials campaign in 2020 and 2021.

**We will have a full report on the AFL-CIO convention in an up-**coming *Postal Record*. It is my hope that both the Philadelphia convention and the NALC convention in August will help us spur the revival of the U.S. labor movement, which has been so desperately needed for many decades. In the 1950s, when 35 percent of American workers belonged to unions, workers received 64 percent of national income. Today, with 10 percent of workers organized, our share has fallen to just 54 percent. That 10 percent difference translates into more than $17,000 annually in lower income for the average American worker. Wealthy investors and big business have benefited from this long-term trend and inequality has soared. Of course, unions with unions have been protected from this adverse trend—but tens of millions of our fellow workers have not been.

A stronger labor movement will strengthen our country, our democracy and our union. Unions raise living standards, promote equity and fairness at work, and serve as a voice for working families—including at all levels of government. When workers share the benefits of economic growth and living standards are rising, NALC is empowered to deliver more for its members in collective bargaining. In other words, letter carriers do better when all workers do better. That's why we are going to Philadelphia to meet this moment at the AFL-CIO convention.





**National Association
of Letter Carriers, AFL-CIO**

Since 1889, representing city letter
carriers employed by the United States
Postal Service.

**100 Indiana Ave. NW
Washington, DC 20001-2144
202-393-4695 | nalc.org**

### RESIDENT OFFICERS

**FREDRIC V. ROLANDO**
President

**BRIAN RENFROE**
Executive Vice President

**JAMES D. HENRY**
Vice President

**NICOLE RHINE**
Secretary-Treasurer

**PAUL BARNER**
Assistant Secretary-Treasurer

**CHRISTOPHER JACKSON**
Director of City Delivery

**MANUEL L. PERALTA JR.**
Director of Safety and Health

**DAN TOTH**
Director of Retired Members

**JAMES W. "JIM" YATES**
Director of Life Insurance
**Mutual Benefit Association**
202-638-4318

**STEPHANIE M. STEWART**
Director, Health Benefit Plan
**Health Benefit Plan**
888-636-6252

### BOARD OF TRUSTEES

**LAWRENCE D. BROWN JR.**
774 Valencia Street
Los Angeles, CA 90017

**SANDY LAEMMEL**
4979 Indiana Ave.
1400 Trumbull
Detroit, MI 48216-1945

**MACK I. JULION**
3850 S. Wabash Ave.
Chicago, IL 60653

### NATIONAL BUSINESS AGENTS

**Region 1: BRYANT ALMARIO**
*(California, Hawaii, Nevada, Guam)*
3105 E. Guasti Road, Suite 200
Ontario, CA 91761
909-443-7450

**Region 2: NICK VAFIADES**
*(Alaska, Utah, Idaho, Montana,
Oregon, Washington)*
5115 NE 94th Ave., Suite A
Vancouver, WA 98662
360-892-6545

**Region 3: MICHAEL B. CAREF**
*(Illinois)*
4979 Indiana Ave., Suite 203
Lisle, IL 60532-3848
630-743-5320

**Region 4: DAN VERSLUIS**
*(Arizona, Arkansas, Colorado,
Oklahoma, Wyoming)*
12015 E. 46th Ave., Suite 550
Denver, CO 80239
720-828-6840

**Region 5: DAVE TEEGARDEN**
*(Missouri, Iowa, Nebraska, Kansas)*
1828 Craig Road
St. Louis, MO 63146
314-985-8040

**Region 6: DAVID MUDD**
*(Kentucky, Indiana, Michigan)*
43456 Mound Road, Suite 501
Sterling Heights, MI 48314
586-997-9917

**Region 7: TROY D. FREDENBURG**
*(Minnesota, North Dakota, South
Dakota, Wisconsin)*
Broadway Place West
1300 Godward St. NE, Suite 2600
Minneapolis, MN 55413
612-378-3035

**Region 8: STEVE LASSAN**
*(Alabama, Louisiana, Mississippi,
Tennessee)*
160 Commissioner Drive
Meridianville, AL 35759-2038
256-828-8205

**Region 9: LYNNE PENDLETON**
*(Florida, Georgia, North Carolina,
South Carolina)*
1101 Northchase Parkway SE, Suite 3
Marietta, GA 30067
678-942-5295

**Region 10: JAVIER BERNAL**
*(New Mexico, Texas)*
23760 Hwy. 59 North
Kingwood, TX 77339
281-540-5627

**Region 11: MARK CAMILLI**
*(Upstate New York, Ohio)*
5445 Beavercrest Drive, Suite 7
Lorain, OH 44053
440-282-4340

**Region 12: BRIAN THOMPSON**
*(Pennsylvania, South and Central
New Jersey)*
Four Neshaminy Interplex, Suite 111
Trevose, PA 19053
215-824-4826

**Region 13: VADA E. PRESTON**
*(Delaware, Maryland, Virginia, West
Virginia, Washington, DC)*
P.O. Box 2660
Ashburn, VA 20146
703-840-2010

**Region 14: RICHARD J. DICECCA**
*(Connecticut, Maine, Massachu-
setts, New Hampshire, Rhode
Island, Vermont)*
33 Boston Post Road W., Suite 360
Marlborough, MA 01752-1813
617-363-9299

**Region 15: LARRY CIRELLI**
*(Northern New Jersey, New York,
SW Connecticut, Puerto Rico, Virgin
Islands)*
347 W. 41st St., Suite 102
New York, NY 10036-6941
212-868-0284

On the front cover: A Northeastern New York Branch 358 carrier is all smiles (top); carriers and volunteers unload the collections for Garden Grove, CA Branch 1100 (bottom l); and some of the donations for St. Louis, MO Branch 343 (bottom r).

## Contents

Volume 135/Number 6      June 2022

# The Postal Record

The monthly journal of the **NATIONAL ASSOCIATION OF LETTER CARRIERS**



16

### Departments

1 **President's Message**
3 **Letter from the Editor**
4 **News**
23 **Proud to Serve**
26 **Executive Vice President**
27 **Vice President**
28 **Secretary-Treasurer**
29 **Assistant Secretary-Treasurer**
30 **Director of City Delivery**
31 **Director of Safety and Health**
32 **Director of Retired Members**
33 **Director of Life Insurance**
34 **Director, Health Benefit Plan**
35 **Contract Talk**
36 **Staff Reports**
38 **Muscular Dystrophy Association**
39 **Veterans Group**
40 **State Summaries**
41 **Nalcrest Update**
42 **Election Notices**
43 **Retiree Reports**
44 **Honor Roll**
47 **In Memoriam**
48 **Branch Items**
53 **Cost-of-living adjustment**
56 **Auxiliary Update**
58 **Annuity charts**
60 **Mutual Exchange ads**

### Features

4 **News from Washington**
Two nominees confirmed to the
Postal Service Board of Governors;
meanwhile, a House committee
considers bills related to USPS
and federal workers

6 **Opting explained**
We take a look at what opting and
hold-down assignments are and
how they work for city carriers

8 **Delivering the spice**
An Illinois carrier tells us about
his craft hot sauce business and
how its success was decades in
the making

11 **Initial food drive returns**
Early reports about the return of the
Letter Carriers' Stamp Out Hunger
Food Drive are positive as carriers
continue to help the hungry

16 **Things to do in Chicago**
Plan your stay at the NALC na-
tional convention this August,
and figure out what to see and do
in the Windy City

# A letter carrier's courage— and humanity



**Philip Dine**

When the suffering of the Ukrainian people became abundantly clear to the world, a Syracuse, NY, letter carrier named Sergii Vasylevskyi faced a wrenching decision.

He could remain, safely, in the adopted country he has grown to love, with the family he loves, doing the job he loves. Or he could risk everything, by going to help the homeland he loves, assisting its people in their struggle for freedom—a concept he also loves, and one he has learned to appreciate more than ever since becoming an American.

In the end, though, as he watched the devastation in Ukraine, he knew he had no choice.

"There was no peace in my heart," says Sergii, a carrier and Branch 134 member since 2016, and a Ukrainian refugee himself in 2005.

So, he had to go, despite trepidation about the unknown—and unknowable—nature of the risks involved.

**For logistical reasons, for safety, and to maximize the contributions** he could make, Sergii did substantial planning before departing. Among the tasks was to bring a large drone for the Ukrainian military forces, as a former Ukrainian high school classmate had requested in a phone call. Sergii was given the drone by employees of a U.S. information technology company.

In late March, Sergii and a Ukrainian friend from Syracuse flew to Warsaw, where the classmate met them at the airport and drove them—and their bags containing the drone, medical supplies, and gear donated by a military base near Syracuse—to a Polish city bordering Ukraine. The two took a train to Lviv, where they gave the drone to the Ukrainian army. They then bought plane tickets for Kyiv, an all-night trip that Sergii said was the most harrowing part of the three-week journey—with their thoughts on their lack of military experience, beyond limited Ukrainian high school training.

His brother-in-law, stationed at a Virginia naval base, "gave me good soldier-to-soldier advice," Sergii says. "He wrote me a text while I was traveling to Kyiv: Deal with the situations, only what's in front of me. Deal with today. Don't think about the past. Don't think about the future. That helped me to put the feelings aside and do my job."

Once in Kyiv, Sergii says, "It was rock and roll"—the anxious anticipation replaced by a focus on the task at hand. "Once you enter the zone, it's kind of—you're on." While he can't disclose much about the pair's actions in that zone, he says in general, "I've seen things that upset me. I've experienced a lot of things that I can't talk about."

After Kyiv, they went to Sergii's hometown of Ternopil near the Polish border, where he dispersed donations (from friends in Syracuse) to acquaintances who were aiding orphans and widows.

He returned to Syracuse on April 16.

"I wanted to stay and fight, with those guys in the Kyiv region, who I'm telling you are brave guys, fearless, who are fighting for freedom," Sergii says. "I didn't want to leave. But I had to—I have my family and my job."

**The support from those he encountered on his travels still** resonates with Sergii. For example, the economy ticket he'd purchased didn't allow for luggage, yet throughout, he was allowed to bring all his bags at no additional charge. What also resonates is the indomitable spirit he witnessed among Ukrainians fighting for their freedom.

Growing up, Sergii never expected to live in the United States. In his fourth year as a university student studying international business; speaking Ukranian, Russian, German and English; and loving cars, he planned to work at a BMW factory in Germany. But his parents were granted refugee status by the U.S. Embassy, based on religious persecution, and he found himself in Syracuse at age 20. He married a woman from Ukraine, to whom he was introduced in 2009 by the friend who accompanied him on the recent journey, and they have two young daughters.

Being a letter carrier, he says, is his "dream job"—figuratively and literally.

"Three times I had a dream that I am approaching the mailbox where I grew up," he recalls. "I would open it up, find pieces of mail. Nothing important, just random pieces of mail. At that time, I didn't know what it was supposed to mean."

Six months later, he began work as a city carrier assistant and quickly "realized that's what I was meant to do." He made career on March 31, 2018.

"After I got the job, I realized this was God telling me I was going to do this job and love it—and it's true," he says. "I really like to be a mailman. I enjoy being outside—the sun, the rain, the snow. This job is awesome."

EDITORIAL STAFF:
Director of Communications and Media Relations Philip Dine
Designer/Web Editor Mike Shea
Writer/Editor Rick Hodges
Writer/Editor Jenessa Wagner
Editorial Assistant Clare Foley

*The Postal Record* (ISSN 0032-5376) is published monthly by the National Association of Letter Carriers. Periodicals postage paid at Washington, DC, and at additional mailing offices.

POSTMASTER: Send address changes to Membership Department, NALC, 100 Indiana Ave. NW, Washington, DC 20001-2144.

Subscription included in membership dues. First-class subscription available for $20 per year (contact Membership Department).

© 2022 by the National Association of Letter Carriers.

Circulation: 287,000. Union-printed using soy-based inks.

CHANGE of ADDRESS? Contact the Membership Department.

Follow us on Facebook, Twitter, Instagram and YouTube by going to NALC.org.

   



# News from Washington

## Tangherlini and Kan confirmed to USPS Board of Governors

On May 12, the Senate approved by a voice vote the nominations of Dan Tangherlini and Derek Kan to serve on the U.S. Postal Service Board of Governors (BOG). Tangherlini's term will expire on Dec. 8, 2027, and Kan's term will expire on Dec. 8, 2028. President Biden nominated Tangherlini and Kan in November 2021 to replace John Barer and Ron Bloom on the BOG.



**Tangherlini**

Tangherlini, who will serve as a Democratic BOG member, is the managing director of Emerson Collective, a private philanthropic firm. Until 2017, he was the president of SeamlessDocs Federal, a technology firm that focused on simplifying government forms and data collection. His previous government roles include serving as the administrator of the General Services Administration under President Obama and serving as chief financial officer at the Department of the Treasury from 2009 to 2013. From 2006 to 2009, he served the District of Columbia as city administrator and deputy mayor. He also served on the Biden transition team, with responsibility for the Postal Service's Agency Review Team.



**Kan**

Kan, who will serve as a Republican BOG member, is an executive with Deliverr, a California-based e-commerce fulfillment startup company. He was the deputy director of the Office of Management and Budget from July to December 2020. From 2017 to 2019, he served the Department of Transportation's under secretary for policy. He previously served as an Amtrak board member and as a general manager for Lyft. Prior to that, he served as an advisor for Senate Minority Leader Mitch McConnell (R-KY) and as chief economist for the Senate Republican Policy Committee.

"NALC congratulates Dan Tangherlini and Derek Kan on their confirmations," NALC President Fredric Rolando said. "We look forward to working with them and the rest of the BOG to ensure that letter carriers' voices are heard when decisions affecting their interests are made."

### House committee considers bills related to USPS, federal workers

On May 11, the House Committee on Oversight and Reform (COR) held a markup on a series of bills that included two pieces of legislation related to the Postal Service. The Ensuring Oversight Access at the Postal Service Act (H.R. 7674) would provide members of Congress with access to USPS facilities, and the Ensuring an Accurate Postal Fleet Electrification Act (H.R. 7682) would require that USPS conduct a new environmental impact statement with respect to procuring Next Generation Delivery Vehicles (NGDVs). The committee voted 22-14 and 20-15, respectively, to advance these bills.

Rep. Gerry Connolly (D-VA) and three Democratic co-sponsors introduced H.R. 7674. This legislation would prohibit USPS from inhibiting members of Congress from accessing or visiting any Postal Service facilities for any official purposes. This would include any visits around the time of any federal election.

COR Chairwoman Carolyn Maloney (D-NY) and Rep. Connolly introduced H.R. 7682. The introduction of this legislation comes after the committee held a hearing on the electrification of the Postal Service vehicle fleet and after the Postal Service was sued by the United Auto Workers and the Natural Resources Defense Council last month. This lawsuit claims that the Postal Service failed to follow the law when evaluating and finalizing its contract for NGDVs, and that the contract is based on inaccurate environmental analysis. NALC is closely monitoring this lawsuit. Securing new vehicles for letter carriers is a top priority, and we will continue pushing for the prompt delivery of these vehicles, as well as the funding for them that has been proposed by the Biden administration and is currently before Congress. While the committee voted to advance the bill, the legislation is unlikely to move forward in the House.

Also at the markup, Rep. Connolly introduced the Building the Next Generation of Federal Employees Act (H.R. 1604), which would promote federal internships and fellowships to prepare the next generation of the federal workforce. Rep. Jody Hice (R-GA) introduced an amendment to the bill that included attacks on federal workers as well as anti-union provisions. Notably, this amendment would make it easier to fire federal workers and would reinstate Schedule F, an executive order from the Trump administration that removed federal workers from the General Schedule, ultimately stripping them of their civil service protections. President Biden revoked this executive order upon taking office. Fortunately, the amendment did not pass in the committee.

### Looking ahead to the midterms

The midterm elections, which take place midway through a presidential

term, are fast approaching, with five months until Election Day on Nov. 8. Midterm elections, which traditionally are difficult for the party of the sitting president, offer voters a chance to determine the makeup of Congress, cast judgment on a president's first two years and determine the fate of his agenda.

President Biden has ushered the country out of the worst of the pandemic, negotiated an historic bipartisan infrastructure package, signed postal reform into law and promoted unions. However, his approval ratings have been battered by public concerns over such issues as inflation, border security and rising crime.

Complicating the outlook is the congressional redistricting process for the House, which occurs every 10 years following the tabulation of the latest census. As population shifts among the 50 states, some states gain seats and others lose them. That process is nearly complete. Some states are battling over the newly drawn lines, and as this publication was going to print, four states—Kansas, Missouri, New York and New Hampshire—have yet to finalize their new congressional districts. According to *Politico*, in those four states there are 170 "strong Biden" districts, 157 "strong Trump" districts, 68 "competitive" districts and 40 districts that have yet to be categorized.

As is the case in every midterm election, all 435 House seats are up for election. Currently, Democrats control the House with 221 seats to the Republicans' 209. There are five vacancies in the House, and 50 members have announced their retirements or resignations. Of these 50 members, 32 are Democrats and 18 are Republicans. Some of these members are seeking higher office, but most are leaving due to political dysfunction and partisanship, or because of challenges resulting from the newly redistricted maps. The number required for a House

majority is 218 (which, of course, is the "magic" number of votes needed to pass bills). At present, the Democratic margin is narrow.

In the Senate, despite the current 50-50 split, Democrats control the agenda and floor time with the vice president's tie-breaking vote. There are 48 Democrats, 50 Republicans, and two Independents who caucus with the Democrats. This even split makes legislating in the Senate nearly impossible without bipartisanship. With one-third of the Senate up for reelection every two years, this year has 34 seats up for grabs, including 21 currently held by Republicans and 14 by Democrats. Six of these 34 seats are held by senators who have announced their retirements: one Democrat, Patrick Leahy (VT), as well as five Republicans, Roy Blunt (MO), Richard Burr (NC), James Inhofe (OK), Richard Shelby (AL) and Pat Toomey (PA).

Predicting the outcome of political races—let alone control of an entire chamber—is difficult. Regardless, NALC will actively work to protect incumbents and engage with new candidates who support letter carriers and a strong Postal Service. We will engage with candidates who will expand our letter carrier majority in the House and Senate, which enabled the passage of the Postal Service Reform Act (Public Law 117-108), with the support of all Democrats and the majority of Republicans in both the House and the Senate. Primary elections are already underway and will conclude in states with late primaries in mid-September.

To expand our letter carrier majority, NALC will once again continue our investment in the Labor 2022 program, which supports pro-union candidates. The labor program has always prioritized states and races in an effort to elect candidates who support workers' rights, the economy and good jobs, health care, retirement security, education, civil and voting

rights, manufacturing, support for families, and a myriad of other labor priorities, including a strong Postal Service. This year, the AFL-CIO's executive council is focusing on eight states: Arizona, Georgia, Michigan, Nevada, North Carolina, Ohio, Pennsylvania and Wisconsin.



**STATE KICK OFFS**

While plans for those states are in early development, central labor councils and state federations have begun early engagement with labor households to identify key issues to help build a successful program from the ground up. As always, NALC will actively engage where our interests are in alignment with the AFL-CIO and where proper infrastructure is in place to support our members in the field. Because the COVID-19 pandemic continues to evolve and the safety of our members is a top priority, participation in the program might look different than in years past. We will share how you can engage with the program as more information becomes available soon.

"We have long said that letter carrier issues are not partisan issues," President Rolando said. "There is no greater example of this than the bipartisan Postal Service Reform Act being signed into law. I encourage letter carriers to maintain relationships with incumbents and get to know the men and women running for open seats, no matter their party. Learn their views on our issues and build a relationship. And remember, no matter the outcome of primaries or even the general election in November, NALC will be ready no matter who is in charge." **PR**

# Opting (hold-down) assignments explained

**A**s a new carrier, you may have heard the phrase "opting on a vacant route," but not understood what it meant. Or someone may have asked you, "Did you put in a bid for a hold-down?" and you weren't sure what they were asking. These phrases can be confusing if you don't know the definition of an opt or hold-down assignment. Maybe you know what the terms mean but are uncertain about all the applicable rules. This article will help new members understand what opting is and how it works for city carriers.

Article 41, Section 2.B.4 of the 2019-2023 USPS-NALC National Agreement addresses opting or hold-down rights for city carriers. Pages 41-9 through 41-15 of the *USPS-NALC Joint Contract Manual (JCAM)* incorporates language that further explains the national parties' understanding of the opting provisions and the related rules.

The terms "opting" and "hold-down" mean the same thing. Opts are also called "hold-downs" because an employee is said to be "holding down" the assignment until the regular letter carrier returns or a regular letter carrier is assigned. An assignment is a route or other work performed by a full-time regular letter carrier on a daily basis. When a regular assignment is temporarily vacant for five days or more (because the regular letter carrier is on vacation, is ill, the assignment temporarily has no regular letter carrier assigned, or for other reasons), eligible letter carriers may exercise their right in the delivery unit to which they are assigned to opt to work (or hold down) that assignment for the duration of the temporary vacancy. You

do this by submitting a request to the supervisor who oversees the full-time assignment. The request should be submitted in writing, and you should keep a copy of the request.

Full-time reserve (FTR), full-time flexible (FTF), unassigned full-time regular (UAR), part-time flexible (PTF) and city carrier assistant (CCA) letter carriers all have the right to "opt" on temporarily vacant full-time regular assignments. Requests for opt assignments are awarded first to eligible career carriers by seniority. If no eligible career letter carrier has requested to work the assignment, the opt will be awarded to the eligible CCA with the highest relative standing who requested it and who is not already on another opt.

New CCAs with no experience as a career city carrier must fulfill a 60-calendar day waiting period before they can opt on a hold-down assignment. Once the CCA has met this requirement, there is no additional waiting period for applying for/being awarded a hold-down when the employee is converted to career.

The National Agreement does not include specific procedures for announcing vacancies available for hold-downs. However, procedures for announcing vacancies and procedures for opting for hold-down assignments may be governed by local memorandums of understanding (LMOUs) or past practice. The LMOU or past practice may include the method of making known the availability of assignments for opting, the method for submitting requests, a cutoff time for submission, and the duration of hold-down. In the absence of an LMOU provision or mutually agreed-upon local policy, there

is no requirement that management post a vacancy, and carriers who wish to opt must learn of available assignments by word of mouth or by reviewing scheduling documents. For the posting procedures in your office, consult your shop steward or NALC branch officer.

The National Agreement provides that once an available hold-down position is awarded, the opting employee "shall work that duty assignment for its duration." An opt is not necessarily ended by the end of a service week. Rather, it is ended when the regular carrier returns, even if only to perform part of the duties—for example, to case but not carry mail. However, there are some exceptions to this duration clause. These exceptions are for situations in which carriers temporarily vacate hold-down positions for which they have opted—for example, vacation. In those cases, such an employee may reclaim and continue a hold-down upon returning to duty. If the opting employee's absence is expected to include at least five days of work, the vacancy qualifies as a new hold-down within the original hold-down. These openings are filled as regular hold-downs, and the first opting carrier resumes his or her hold-down upon returning to duty—until the regular carrier returns.

Another exception to the duration clause is when CCAs reach their five-day service break between 360-day terms. If the CCA's five-day break in service creates a vacancy of five workdays, an "opt within an opt" can be created. In such cases, the new opt is for the five-day period of the break. The original CCA holding the

opt assignment will reclaim the opt when he or she returns, unless the regular carrier has resumed work on the assignment in the interim.

An opting employee may bid for and obtain a new, permanent full-time assignment during a hold-down. A national pre-arbitration settlement established that in such an instance, the employee must be reassigned to the new assignment. If there are five or more days of work remaining in the hold-down, then the remainder of the hold-down becomes available to be filled by another opting carrier. If a CCA is converted to career while on a hold-down opt, the CCA has the option to remain on the hold-down assignment for its duration or move to the new bid assignment. Management may decide to assign a full-time employee to a residual vacancy at any time, but the opting employee may not be required to work the new assignment until the hold-down ends. However, if this happens the employee may voluntarily choose to end the hold-down at any time and assume the new assignment.

PTFs and CCAs may be "bumped" from their hold-downs to provide sufficient work for full-time employees. Since full-time employees are guaranteed 40 hours of work per service week, they may be assigned work on routes held down by PTF or CCA employees, if there is not sufficient work available for them on a particular day. In these situations, the PTF or CCA's opt is not terminated. Rather, the employee is temporarily "bumped" on a day-to-day basis. In a national Step 4 settlement, the parties agreed that a PTF or CCA temporarily assigned to an opted route

shall work the duty assignment, unless there is no other eight-hour assignment available to which a full-time carrier could be assigned. A regular carrier may be required to work parts, or "relays," of routes to make up a full-time assignment. Additionally, in some cases, the route of the hold-down to which the PTF or CCA has opted may be pivoted if there is insufficient work available to provide a full-time carrier with eight hours of work.

A CCA also may be bumped from a hold-down to provide a PTF assigned to the same work location with 40 hours of straight time work to which he or she is entitled under Article 7.1.C of the National Agreement. The National Agreement clarifies that in this situation, the opt is not terminated. Rather, the CCA is temporarily taken off the assignment as necessary on a day-to-day basis. However, these exceptions do not mean that management can automatically bump a CCA from his or her hold-down to provide work for PTF or full-time regular letter carriers.

Removal from hold-downs should be a last resort, provided that there is no other work available in the delivery unit that the PTF or full-time employees can perform.

Another bumping exception occurs if the LMOU allows the regular carrier on a route to bump the carrier technician to another route when the regular carrier is called in on a non-scheduled day to work on his or her own route. On these occasions, the carrier technician is allowed to displace an employee who has opted on an assignment on the technician's string if none of the other routes on the string are available.

Although a PTF or CCA who obtains a hold-down must be allowed to work an assignment for the duration of the vacancy, he or she does not assume the pay status of the full-time regular carrier being replaced. A PTF or CCA who assumes the duties of a full-time regular by opting still is paid as a PTF or CCA, as appropriate, during the hold-down. While they must be allowed to work the assignment for the duration of the vacancy, PTFs and CCAs are not guaranteed eight hours daily or 40 hours weekly work by virtue of the hold-down alone. Additionally, PTFs and CCAs on a hold-down opt are not entitled to the non-scheduled day of the assignment. PTFs and CCAs still may be scheduled to work, perhaps on another assignment. Because opting employees are entitled to work the scheduled days and hours of an opted assignment, opting in some instances may create a six-day workweek. Management may not swap scheduled workdays with days off in order to shift hours into another service week to avoid overtime or for any other reason. To do so would violate the guarantee to work all of the scheduled days of the hold-down.

If you believe the Postal Service is violating any of your rights related to opting on vacant assignments, be sure to promptly inform your shop steward or an NALC branch officer. For more information on opting, seniority, relative standing and many other topics important to letter carriers, read the *Letter Carrier Resource Guide* available at nalc.org/resourceguide. **PR**



# DELIVERING THE SPICE

"**I t all started before I was** born," **Adam Jakush** says of the family heirloom hot sauce recipe.

Jakush grew up in Evanston, IL, but would frequently visit the family farm in Waterford, WI. "I was a city boy by trade and a farm boy on the weekends," the Wilmette, IL Branch 1107 member said.

His dad, Edward, an MIT graduate who was a chemical engineer and food-science expert, would cook a hot sauce using fresh ingredients, throwing onions, peppers, tomatoes, garlic and seasoning into a pot to experiment, with a young Jakush's help. Over time, Edward refined a hot sauce recipe loved by friends and family.



Adam Jakush shows off the three varieties of his Shady Dan's hot sauce.

At the end of the summer, the carrier's family would pick lots of vegetables and have a party. "Everyone would leave with a trunk full of vegetables and a jar full of hot sauce," Jakush said.

When he got into his 20s, "I kind of forgot about it, but my sister reminded me," he said. She lived in New York City, and she asked their dad to send her and her friends some of the sauce. That renewed his interest.

After attending college in New York City, Jakush spent time trying to figure out his next move, and then it dawned on him.

He contacted his father in 2009 and asked, "Hey, Dad, can I live with you? Can you teach me how to make it?" His father readily agreed, and Jakush spent the summer doing just that.

Jakush planted some vegetables and checked on them every weekend. He then tried out his dad's techniques while concocting the hot sauce. Soon, "I'd perfected what is now Shady Dan's," he said. He started passing out bottles to his family and friends, and it was a big hit.

The carrier has since turned that years-long passion project into his own business selling craft hot sauce using that 50-year-old recipe—but at the time, he wasn't prepared to make anything more of it.

"I didn't have the wherewithal with business and accounting," the carrier explained.

Jakush soon met his wife, and the hot sauce idea went on the back burner as they started a family. He joined the Postal Service in 2015.

That same year, he lost his father to cancer. On his death bed, Jakush told him, "Dad, I promise you...I will take care of my family, and I will commercialize your hot sauce." His father smiled in response.

In 2019, Jakush told his best friend from childhood, Alex, about the hot sauce and cooked some up for him.

Alex's response: "Let's do this."

Jakush says there are "a lot of boxes you have to check off" before launching a food business, but in June 2021, the two friends got it going into distribution. "He was a logistical genius with his military background. We complemented each other nicely," the carrier said.

They found a commercial kitchen belonging to a catering company in a Chicago suburb that they could rent out on Sunday afternoons to make a large batch.

"It's an assembly line," the carrier said, adding that he and Alex—and



occasionally a third friend—will "crank up rock 'n' roll and start cranking out hot sauce."

They start by sorting and weighing their produce (sourced locally, when possible, although the peppers are mostly from Texas and Mexico), and then cleaning and prepping them.

After that, they cook all of the ingredients and blend the produce with the acidifying agents in a large vessel. ("I can almost fit in the pot," Jakush joked.) They heat the mixture to the correct temperature, and sanitize the bottles before putting the sauce in.

Once the sauce is bottled, the containers go into a cooling tank. The final step is applying the shrink bands to label them, and then an expiration date is stamped. They can do everything on site and produce about 500 to 600 bottles in a single day.

"It's a long day," he said, but "we've got our processes down."

The cooking process itself is intense and anxiety-inducing being "in the zone, doing so much at once," Jakush, a self-described "eternal optimist" said, but added that it's cathartic at the same time. "It's almost like my yoga, I guess."

Though it was tough at the beginning to juggle everything, Jakush tries to not let his side hustle interfere with his family life or postal career. Everything is now "totally congru-

ous with the rest of my life," he said, adding that he works on the sales and marketing side of the business after he puts his kids to bed at night, and on his day off.

Shady Dan's produces three hot sauces: the flagship sauce Chili's Last Stand (the carrier's personal favorite), using red chili peppers; Hab Country, its spiciest thanks to the habanero peppers; and Little Shady's, a "starter sauce" with green chiles.

The latter was inspired by his now-7-year-old son, who deemed the original two sauces way too hot. So Jakush went to the kitchen, dialed down the spice level and concocted what he calls "a flavor enhancer." Even the carrier's 1-year-old son loves it and will ask for it by name.

The reason his sauces taste so good, Jakush thinks, is the use of lemon juice, which he says gives it a "unique complexity that's not present in most hot sauces—[there's an] added dimension."

The name of the company itself, Shady Dan's, is a bit of an urban legend created by the two partners. The story goes that while around a campfire on the farm at the end of the day, Shady Dan came wandering in and, while sharing a drink, he imparted the secret recipe. "He didn't talk much, but when he did, you listened," Jakush said. "The legend of Shady Dan must continue—he showed us the way."

**The carrier sells his hot sauce at a farmers' market.**

# *spice*



Jakush spent many weekends and summers of his childhood on the family farm in Wisconsin picking vegetables and helping create hot sauce with his father.

The sauce's tagline, "Food science on fire," is in honor of Jakush's dad.

Shady Dan's is available at seven stores and farmers' markets mainly in the Chicago area, as well as through its website at shadydans.com. A chef at a local brewery loved it so much, they "put it on every table with the ketchup and mustard," the carrier said, which has been helpful with the brand's popularity. They've also been partnering with some local restaurants to have pop-up displays.

Jakush loves his job as a letter carrier and, though he's low-key at work about his side gig, has sought feedback about his condiments from some co-workers. "The only thing I ask is for an honest opinion," he says. "I utilize all the feedback I get to make it better."

Branch 1107 President **Chantay Smith** was gifted some for Christmas.

"My son and I have been enjoying the hot sauce," she said. "Hopefully [Jakush's] product will take off."

Jakush is content with keeping the operation small for the time being, and with trying to grow it slowly and organically. "We're having too much fun doing it ourselves," he said. "We want to work out the kinks and make mistakes when it doesn't cost too much money or time."

The next logical step, he notes, would be to hire a co-packer, who would bottle and label their cooked, blended material for them.

For now, "It makes me happy to get the name and product out there and [be] pouring the foundation," Jakush said.

"I love my hot sauce so much," the carrier continued, adding that his motivation involves simply "trying to share it with the world." **PR**

# James D. Henry appointed NALC vice president

**P**resident Fredric Rolando appointed **James D. Henry** of Garden Grove, CA Branch 1100 as NALC vice president to fill the vacancy created when Lew Drass stepped down from the position on April 30.

A Los Angeles native, Henry began his postal career as a letter carrier in Pomona, CA, in 1988. His path to becoming an NALC activist began the same year when he was unjustly disciplined and his branch came to his aid, resolving the case in his favor.

"Thereafter, I knew I couldn't stand by and see letter carriers treated unfairly," Henry said. "I became a shop steward, and my calling of representing letter carriers began." His appointment as a steward came only six months after he joined the Postal Service.

In 1991, he was appointed as an area steward, and after completing advocate training in 1995, he became an

arbitration advocate for Region 1. In 1998, Henry was appointed to serve as one of NALC's first Step B representatives for the Step B pilot program and again when the program was made permanent. He was elected vice president of Branch 1100 in 1999 and senior vice president in 2008.

President Rolando appointed Henry as a regional administrative assistant (RAA) for Region 1 in 2011. As an RAA, he oversaw six Dispute Resolution Teams, conducted dozens of interventions, represented carriers during multiple unemployment hearings, negotiated thousands of pre-



arbitration settlements and presented more than 150 cases in arbitration. He also negotiated hundreds of local contracts. In 2015, Drass selected him as a facilitator/instructor for the Advanced Formal A and Beyond and arbitration advocate trainings.

Henry is a 22-year Marine Corps veteran. He and his wife, Janice, have three children.

"My guiding philosophy is 'the best ability is dependability,' " Henry said. "Sometimes we must have the courage to do the right thing, even if it is unpopular or difficult. I strive to live up to that in my work for letter carriers." **PR**

# THE FOOD DRIVE RETURNS

NATIONAL ASSOCIATION OF LETTER CARRIERS

Stamp Out Hunger
FOOD DRIVE



**O**n Saturday, May 14, the Letter Carriers' Stamp Out Hunger® Food Drive returned after two years off for safety reasons due to the COVID-19 pandemic. Patrons, letter carriers and especially food banks were all ready for the return.

"Letter carriers see how the communities that they serve are struggling, and it's with great pride that we return to our in-person food drive," NALC President Fredric Rolando said.

Early signs were promising, with the return of the traditional drive on May 14 generating extensive news coverage on that weekend and in the days leading up to the drive by local television and radio stations, as well as in local newspapers.

" 'Stamp Out Hunger' Food Drive Resumes After 2-Year Hiatus For Pandemic," was the headline viewers in Denver, CO, saw on CBS4 four days before the event.

In Florida's Tampa area the day after the drive, Fox 13 showed letter carriers collecting food and ran interviews with carriers touting the traditional generosity of Floridians and especially of local residents in their donations to help feed the hungry.

The Stamp Out Hunger Food Drive, the country's largest one-day food drive, provides residents with an easy way to donate food to those in need. Customers simply leave their donation of non-perishable food items next to their mailbox. Letter carriers collect these donations as they deliver mail along their postal routes, and distribute them to local food banks, pantries, shelters and churches.

The NALC food drive is held annually on the second Saturday in May in 10,000 cities and towns in all 50 states, the District of Columbia, Puerto Rico, the Virgin Islands and Guam. Hunger affects 1 in 8 Americans, including millions of children, senior citizens and veterans.

Montgomery, AL Branch 106; Camden, NJ Merged Branch 540; Tampa, FL Branch 599; and Burkburnett, TX Branch 1227



Top l: Arizona Merged Branch 1902
Top r: Greater East Bay, CA Branch 1111
Above: Van Nuys, CA Branch 2462
Below: Tucson, AZ Branch 704
Bottom: New Jersey Merged Branch 38

In the 30 years since it began, the food drive has collected about 1.82 billion pounds of food for the hungry.

In 2020 and 2021, it was replaced by NALC's Donor Drive, which enabled those wishing to help to make online donations to local food pantries. But the need for direct food donations is as great as ever, given the pandemic-caused economic dislocations of the past two years. With high prices for gasoline, food and other necessities, many families are struggling to make ends meet.

The date of the food drive makes it an especially timely event, since food donations to pantries, homeless shelters and churches typically peak during the winter holidays and are depleted by Memorial Day weekend. Complicating matters: Free or reduced-cost meals for the children of families in need tend to be available only while school is in session, which means that many families face greater hardship once summer begins.

This issue of *The Postal Record* was heading to press just as many branches were filling out their collection result forms to return to NALC Headquarters, even as other branches were simply swamped by the generosity of postal customers. Coordinators in those places were busily calculating just how much food had been donated.

"It's too early to know what the results of this year's drive will be," Assistant to the President for Community Services Christina Vela Davidson said, "but no matter the result, simply being able to return to delivering food to the food banks and pantries that receive these contributions has made this year's drive a monumental success."

None of this would have been possible without the assistance of the Stamp Out Hunger Food Drive's national partners. "These partners provide tangible support that helps to encourage the generous participation of our postal customers," Rolando said. Current national partners are the U.S. Postal Service, the United Food and Commercial Workers International Union, the National Rural Letter Carriers' Association, Vericast, United Way Worldwide, the AFL-CIO, Valpak, the Kellogg Co. and CVS Health.

There were plenty of other helpers, too, from American Postal Workers Union volunteers to local bag sponsors. Every little bit helped.

"It wasn't hard to see the effort underway on Saturday, May 14," Davidson said, "and in plenty of locales across the country, you could easily catch sight of Jeff Keane's 'Family Circus' food drive art in post offices and countless other venues."

As this magazine was being prepared, news media reports about the drive—before, during and after—were still being gathered. But initial reports showed the eagerness of letter carriers and food banks for the return of the in-person drive.

In Sioux City, IA, Food Bank of Siouxland Executive Director Jake Wanderscheid estimated that this year's drive had brought the food bank 10,000 pounds of food. "The letter carriers and the post office do a great job," he said.

"We're really counting on the food that comes in from this drive," Branford (CT) Food Pantry Vice President Jaye Andrews told ZIP06.com. "Our shelves are getting emptier than we've seen them in quite a while."



Andrews said that the number of needy families had grown since 2021, and that it included more than just the unemployed. "There are jobs out there," she said. "The problem is, a lot of these jobs don't provide benefits or they're part time. And I think everybody knows that prices have gone up. People are coming in because gas is more expensive, food is more expensive; everything is more expensive. And if you're trying to feed a family, that's a problem."

"We have been very successful in the past," Las Vegas Branch 2502's **Paul Peterman** told Fox affiliate KVVU-TV. "Unfortunately, with COVID, it's added to the depletion of the food pantries and the food banks. So we're hoping to re-energize and restock our local charities."

Kerri Smayda, associate executive director of Manna Food Pantries in Pensacola, FL, said that the two-year hiatus had taken a hit on her food pantry, estimating that it had lost out on 160,000 pounds of food.

"There are people in our community who are still struggling. They are struggling because of the effects of the pandemic. They continue to struggle because of the effects of the hurricane," Smayda said of 2020's Hurricane Sally. "Folks are faced with rising food costs; they're faced with the challenges of food availability; and all at the same time, some of those benefits that folks who needed assistance over the course of the last two years, those benefits are starting to diminish, are starting to go away like disaster SNAP benefits and things like that. And so, all of those things combined means that there are still a lot of individuals and families in our community who are still struggling."

Naperville, IL, is experiencing the hunger crunch as well. In late April, "Loaves & Fishes served over 5,200 people. This is 60 percent higher than we served in the beginning of 2022," President and CEO of Loaves & Fishes Mike Havala told *Positively Naperville*.

Marshfield (MA) Food Pantry volunteer Arlene Dubrowski told *The Patriot Ledger* that the Stamp Out Hunger Food Drive is so effective because "it's the easiest way you can support the families in need."

"It's an overwhelming joy, for me, personally," Tucson, AZ Branch 704 food drive coordinator **Dan Turrentine** said of his role. "The first year I did it was in 2004, and I was amazed at how the Tucson community supported their fellow constituents."

He's hoping that donations match those from years past, when the donations would fill up an entire postal vehicle. "They do get fairly well full," he told Arizona Public Media. "Some carriers end up having to be relieved of their load a couple of times during the day."

"We love doing this," Ishpeming, MI Branch 386 food drive coordinator **Tina McCorkle** told WLUC-TV, a dual NBC and Fox affiliate. "We just love being there for our community, and we're hoping to get more food than we did three years ago when we did it last."

Branch collection results forms were due at NALC Headquarters by June 1. A final national total for the drive is scheduled to be announced shortly after that; a detailed report on the drive, including branch-by-branch results, will appear in a future issue of this magazine. **PR**



Top l: Pawtucket, RI Branch 55
Top center: Southeast Massachusetts Branch 18
Top r: Central California Branch 231
Above: Las Vegas, NV Branch 2502

Dayton, OH Branch 182



# Letter carriers and the mail on social media

**V**arious news stories and interesting anecdotes that celebrate letter carriers and the mail have been appearing on social media. The following are some that have come to the union's attention. If you come across a story you'd like us to consider featuring, send it to social@nalc.org.

### Virginia neighborhood celebrates beloved carrier's retirement

Customers of **Robert Gillis**, a member of Northern Virginia Branch 3520, celebrated him for his retirement from the Postal Service after 33 years of service and 18 years on the same route.

His customers, who refer to Roberts as "the best mailman ever," came together on Saturday, April 23, to give him a special sendoff that included mail-themed favors and signs.

"Even [on] some of the coldest days or some of the hottest days, my second family out here always looked out for me," the carrier told WRC-TV, the NBC affiliate in Washington, DC, adding, "I made sure all of my family out here knew that my retirement was coming up, so I sent like over 200-something cards."

"He just took his job to heart, you know? Even more than that, he always went above and beyond," a resident told News4. "He wanted to make sure that we always got our mail, that it was delivered correctly. He was just good at what he did, and that was more than just being a mailman.

"Especially [in] this day and age, it's rare to find somebody that goes above and beyond in their job and really cares heart and soul about what they do," the resident added. "And he's just an amazing human. He's already sorely missed in this community."

### Washington retirees thank their carrier for pandemic delivery

Residents at Avamere South Hill, an assisted-living facility, wanted to thank their letter carrier, **Koby Best**, for keeping them connected throughout the pandemic by delivering their medicine, letters from loved ones and packages.

To do so, they threw a surprise party for the Spokane, WA Branch 442 member on April 21. A group of the patrons waited in the lobby for Best's mail truck to pull up.




Top and above: Patrons celebrate Robert Gillis's retirement with a neighborhood party.

As the two-year carrier walked in, residents clapped and cheered for their favorite mail carrier.

"I just thought it was just another day," Best told *The Spokesman-Review*.

During most of the COVID-19 pandemic, no visitors were allowed inside the building except for Best.

John Derrick, president of the resident council committee, told the gathered group that postal carriers faced a variety of obstacles during the pandemic. "At least we still got our mail," Derrick told the newspaper.

"I think it's neat," resident Don Jacobson said of the celebration. "Say thank you to somebody, what could be nicer?"

Best said he was shocked by the show of thanks. The pandemic was difficult for him, he said, with a major increase in packages to be delivered while people were housebound—but seeing people get the items they desperately needed or the medicine




**Washington's *Spokesman-Review* featured the surprise "thank you" party that residents of an assisted-living facility threw for their letter carrier, Koby Best.**

they count on made it all worth it, he added.

He told *The Spokesman-Review* that, on his route, he's closest with residents of the retirement communities, because he gets to go inside and chat with them each day.

"I really do appreciate you," Best told them. "It's awesome seeing your guys' smiling faces."

### Rhode Island carrier helps young writers spread joy through mail

On April 21, Providence, RI Branch 15 member **Courtney Cacchiotti** helped a group of elementary school students she delivers to send some special mail through its annual event called "Messages of Love."

After learning about writing a kind message, the joy of receiving a handwritten letter, and the logistics of delivering mail around the world, the young writers worked with their teachers to create some mail of their own.

Each student thought of a loved one



**Above and right: Courtney Cacchiotti visits some young customers while helping them mail art through a special school project.**

who might enjoy a surprise in his or her mailbox. Each envelope, addressed to friends and family members across the country, included a handmade drawing along with a note, and was carefully decorated.

When Cacchiotti pulled up in her mail truck, the youngsters excitedly greeted her. Lining up, each student came and placed his or her packages into the USPS bucket the carrier was holding for them.

To the students' surprise and delight, Cacchiotti also gifted each student with a USPS coloring book that she had personally made for them. **PR**

# When an active letter carrier dies...

- Notify the employee's immediate supervisor, postmaster and Human Resources Shared Service Center (HRSSC) at 877-477-3273. HRSSC will advise about any benefits payable, and how to apply for them. It will provide and render assistance in completing the application for death benefits under the employee's retirement system, as well as the claim for death benefits—Federal Employees' Group Life Insurance (FEGLI) and claim for unpaid compensation.

- Notify the Thrift Savings Plan (TSP) at 877-968-3778.

- Notify the letter carrier's NALC branch.

- If the employee was a veteran, notify Veterans Affairs at 800-827-1000.

- Call the Social Security Administration at 800-772-1213.

- Notify banks and other financial institutions.

- Notify insurance companies (life, health, home, automobile, etc.). If the employee had a policy with NALC's Mutual Benefit Association (MBA), call 202-638-4318 between 8 a.m.-3:30 p.m. EST, or write to MBA, 100 Indiana Ave. NW, Suite 510, Washington, DC 20001-2144.

- If the employee had health insurance through the NALC Health Benefit Plan, call 888-636-6252. If the employee had health insurance through a different Federal Employees Health Benefits (FEHB) plan, call the number on the back of the insurance card. Health insurance coverage for a surviving spouse and dependent children continues automatically if the employee had family coverage at the time of death and if a monthly survivor annuity is payable.

- Obtain a sufficient number of death certificates for your needs from the mortuary.



NALC | 72ND Biennial Convention

August 8-12, 2022
McCormick Place • Chicago, IL

# Things to do in
# CHICAGO

L etter carriers are finally ready to gather again at an NALC national convention after the COVID-19 pandemic led to the cancellation of the scheduled 2020 convention. Delegates will gather in Chicago's McCormick Place Convention Center Aug. 8-12 to handle the union's business.

Based on the information available at press time, all delegates and guests to the 72nd biennial national convention in Chicago this summer will be required to be fully vaccinated against COVID-19 in order to attend any function at the convention. Currently, the Centers for Disease Control and Prevention (CDC) defines a person as fully vaccinated two weeks after receiving all recommended doses in the primary series of his or her COVID-19 vaccination. (The primary series for Pfizer is two doses, three to eight weeks apart; the primary series for Moderna is two doses, four to eight weeks apart; and the primary series for Johnson & Johnson is one dose). Delegates and guests should be prepared to show proof of vaccination before being allowed to register and enter the NALC convention space.

NALC will continue to monitor the pandemic and will implement any protocols necessary to best protect delegates and guests, which may include a requirement to wear face coverings.

When they aren't attending the general session, workshops and classes, or events such as fundraisers for the Muscular Dystrophy Association, the delegates will have time to see what the Windy City has to offer.

Here, we offer a few highlights of Chicago's attractions—but there are so many things to see and do in Chicago that you could never visit them all in a week. Most are open for business now after closing or limiting access during the pandemic, but because COVID-19 conditions can change, it's a good idea to double-check for any that may be closed or have restrictions such as altered hours or mask or vaccine requirements. Some attractions require advance ticket purchase, sometimes with timed entry.

## Getting around town

Many attractions in downtown Chicago are within walking distance to the convention center and hotels. For others, the Chicago Transit Authority (CTA) trains and buses are a great way to get around the city. Known as the "L" (for "El," short for "elevated"), the subway system connects most of downtown and nearby areas. A CTA visitor pass is a good value for fares—simply buy one for the number of days you want to get around. Just tap your pass at the train station turnstile or bus fare machine, and you're on your way. Check the CTA website, transitchicago.com, for the latest fares, travel alerts and trip planners.

Another option for sightseers is a tourist bus. See the sights and get off and on all day with a pass. Go to bigbustours.com/en/chicago/chicago-bus-tours for more information on one popular tourist bus option.

Tour operators offer several specialty history, cultural and architecture bus tours as well. NALC also will offer several bus tours departing from the convention center. Information on dates, times and ticket sales will be provided at a later date.

As is the case with many other cities, Chicago has a bikeshare system that allows users to rent a bicycle instantly. Go to divvybikes.com for more information on how to find and ride bikes.

Chicago has an extensive bus and rail network.





A river boat tour on the Chicago River

The 18-mile lakefront bike and pedestrian trail runs along Lake Michigan, offering great views of the city skyline, parks and beaches, as well as the lake itself, for foot-powered travelers. Go to chicagoparkdistrict.com/parks-facilities/lakefront-trail for information and a trail map.

## On the water

As a city with an abundance of water, Chicago is a great place to see by boat. On a river boat tour, you're sure to learn about the engineering project that reversed the flow of the Chicago River, or how the tradition of dyeing the water green on St. Patrick's Day came about. Several tour operators offer river or lake tours, including Shoreline Sightseeing—go to shorelinesightseeing.com for more information and tickets.

## The best view in town

Chicago is famous for its impressive architecture, especially in the Loop, the city's skyscraper-filled downtown. If you look up at some of its amazing buildings, you might wonder what it's like to look down instead. For an unparalleled view of the city from its iconic Willis Tower (formerly the Sears Tower), first head to theskydeck.com for advance tickets, then take the elevator 1,353 feet up to the Skydeck, the highest public viewing area from a building in the United States. At 110 stories, the Willis Tower is the third-tallest building in the country (the two tallest are in New York City—One World Trade Center followed by the Central Park Tower), and was the tallest in the world until 1996. If you dare, walk onto the Ledge, a collection of glass-bottom overhangs that lets you stand directly over the street far below. The Skydeck is open seven days a week; advance tickets are strongly advised.

### 'Play ball!'

Chicago is a big baseball town, with two major league teams to choose from. The Cubs play the Florida Marlins in a three-game series on Aug. 5, 6 and 7 at Wrigley Field, the team's home since 1914, followed by the Washington Nationals on Aug. 8, 9 and 10. The White Sox take on the Detroit Tigers on Aug. 12, 13 and 14 at Guaranteed Rate Field. Both parks are located close to downtown—Wrigley Field to the North and Guaranteed Rate Field in Southside Chicago—and accessible by public transit.

Tuesday, Aug. 9, will be letter carrier night at the Cubs versus Nationals game. The first pitch is at 7:05 p.m.; NALC will sell tickets for $48 each. Additional information, including how to buy tickets, will be provided at a later date.

For a behind-the-scenes look at historic Wrigley Field, try a tour. Visitors can visit the press box, indoor batting cage and even step out on the field, learning the history of the century-old park in the process. On non-game days, the tours take visitors into the Cubs' dugout and club houses as well. Go to mlb.com/cubs/ballpark/tours to buy advance tickets.

Don't feel left out, football fans—you can check out Soldier Field, where the Bears play. Go to soldierfield.net/tours for information.

### Improvise for laughs

Chicago is an incubator for comedy, especially improvisation and sketch acts. The most famous and enduring of the city's comedy troupes, The Second City, has been entertaining audiences since 1959, and many talented performers from shows such as "Saturday Night Live" learned their craft there.



The view from Willis Tower



Wrigley Field


**The Second City comedy club**


**Jay Pritzker Pavilion in Millennium Park**


**The Art Institute of Chicago**

The Second City hosts several shows, including the troupe's revue that offers a mix of its latest sketches and on-the-fly improv performances, at seven venues throughout Chicago—including 1616 N. Wells St., its home theater since 1961. Go to secondcity.com for information and advance tickets.

For more comedy adventure, don't be afraid to step out to other clubs in the same neighborhood, such as BATSU!, a sushi-bar-turned-laugh-factory where comedic "warriors" compete for laughs and the losers endure punishment such as electric shocks, paintball shots or eggs smashed on them by a giant chicken, in the Japanese-game-show style. Go to batsulive.com/chicago for more information and tickets.

Hungry comedy fans may want to take a pilgrimage to the Billy Goat Tavern, made famous by "SNL" in the show's early years ("Cheezborger, cheezborger") at 430 N. Michigan Ave. on the lower level. Other iconic food options you must try are a famous Chicago loaded hotdog and deep-dish pizza.

## Get the blues

The streets of Chicago are filled with the sound of its version of blues music—electrified and smoking hot. For a real taste of the city, stop by one of the many blues clubs all over town, including popular places large or small such as Blue Chicago, Kingston Mines, Buddy Guy's Legends, House of Blues and Rosa's Lounge. But any place is sure to have good blues—it's Chicago, after all.

If classical is more your style, head over to the Frank Gehry-designed Jay Pritzker Pavilion in Millennium Park for classical music in a striking outdoor venue. The Grant Park Orchestra will put on several evening performances there during the convention.

Lawn seating is free; reserved seats require tickets. See grantparkmusic-festival.com/music/2022-season for show times and ticket information.

## So many museums

Chicago boasts several world-class museums and many smaller ones about a host of topics. At the top of the list in the downtown area are the Art Institute of Chicago (artic.edu), the Chicago History Museum (chicagohistory.org) and the Field Museum of Natural History (fieldmuseum.org), which is sandwiched between Grant Park and Soldier Field on Lake Michigan. All require paid tickets for admission, which are available in advance through their websites.

The Adler Planetarium and the Shedd Aquarium are both next door to the Field Museum. The planetarium (adlerplanetarium.org), the first in the country, sponsors live telescope viewings and other special events as well as a projected planetarium show and exhibits. The aquarium (sheddaquarium.org) is home to many animals that live in or near water, including beluga whales, dolphins, sea otters, alligators, ducks and numerous fish. Both require paid tickets, available in advance at their websites.

The Chicago Cultural Center building is an attraction in its own right. Opened as the city's first public library in 1897, its two stained-glass domes are works of art. The Center hosts several temporary and permanent exhibits, including "The Chicago Fire in Focus," a collection of restored photos showing the wrath of the fire that devastated most of the city in 1871. Go to chicago.gov/city/en/depts/dca/supp_info/chicago_culturalcenter.html for more information. Admission is free.



Cloud Gate, also known as "the Bean"

## Park yourself

If you just want to relax and soak up the atmosphere of the city whose motto is *urbs in horto* (Latin for "city in a garden"), head over to the many green areas along the lakefront. Among the trees and grass you will find grand sculptures like Cloud Gate in Millennium Park, water features such as the iconic Buckingham Fountain, formal gardens, beaches and recreation trails, all with a fantastic view of the lake and the city's skyscrapers.

Jutting out into the lake north of the Chicago River inlet, the Navy Pier offers a stroll to restaurants, shops, amusement rides and great views.

There is so much to see and do in Chicago in your spare time, so plan wisely. **PR**

# Getting ready for convention

Delegate eligibility lists for the convention have been mailed to all branches. The lists must be completed and returned to Secretary-Treasurer Nicole Rhine's office at NALC Headquarters no later than June 8 for branch representatives to be registered as delegates to the convention.

All proposed amendments to the *NALC Constitution* to be submitted for consideration at the convention must be received by Rhine's office by June 8 as well. That date is 60 days in advance of the convention, as prescribed by the *NALC Constitution*. Proposed amendments will appear in July's *Postal Record* for the membership to review.

Resolutions to be considered by delegates also must be received by the June 8 deadline to be printed in the *Resolutions and Amendments* book provided to delegates. Resolutions received after that date still may be considered at the convention.

Branches wishing to sell items in the designated branch sales area during the convention must contact Rhine's office to secure guidelines and forms. The completed forms must be returned to Headquarters by June 8 as well.

Based on the information available at this time, all delegates and guests to the 72nd biennial national convention in Chicago this summer will be required to be fully vaccinated against COVID-19 in order to attend any function at the convention. Currently, the Centers for Disease Control and Prevention (CDC) defines a person as fully vaccinated two weeks after receiving all recommended doses in the primary series of his or her COVID-19 vaccination. (The primary series for Pfizer is two doses, three to eight weeks apart; the primary series for Moderna is two doses, four to eight weeks apart; and the primary series for Johnson & Johnson is one dose.) Delegates and guests should be prepared to show proof of vaccination before being allowed to register and enter the NALC convention space.

NALC will continue to monitor the pandemic and will implement any protocols necessary to best protect delegates and guests, which may include a requirement to wear face coverings.

## Travel discounts to Chicago

Delta Air Lines is offering special discounts for NALC 72nd Biennial Convention. Discounts vary, depending on the class of tickets. The link for the discount is available at nalc.org/convention.

You also may call Delta Meeting Network® at 800-328-1111 Monday through Friday, 7 a.m. to 7:30 p.m. (Central Time) and refer to Meeting Event Code NMVM6. (Please note that there is not a service fee for reservations booked and ticketed via this reservation number.)

United Airlines also is offering specials discounts. To make flight reservations online, go to united.com/en/us and enter code ZM2N917138. You also can call the United Meeting Reservation Desk at 800-426-1122 Monday through Friday, 8 a.m. to 10 p.m. Eastern Time, and Saturday and Sunday from 8 a.m. to 6 p.m. Eastern Time.

## Scooter and wheelchair rental

Scootaround is the exclusive scooter rental service for the NALC 72nd biennial convention. For reservations or for more information, go to scootaround.com/en/nalc-72nd-biennial-national-convention. It will be located at the Coat Check area in the McCormick Place West Building, nearest to Gate 44.

Go to nalc.org for more convention news. **PR**


# Notice of nominations for NALC national officers

**N**ominations for national officers of NALC will be held on Wednesday, Aug. 10, at the national convention in Chicago. All terms are for four years.

The nominations will be held in accordance with Article 6, Section 2 of the *NALC Constitution,* which provides:

> Every four (4) years, nominations for officers of the Union shall be called by the Chairperson of the Convention on the third day (Wednesday) of the Convention. The Chair shall call for nominations from the floor for each national office separately. Any delegate may nominate any eligible member for any one of the following national offices: President, Executive Vice President, Vice President, Secretary-Treasurer, Assistant Secretary-Treasurer, Director of City Delivery, Director of Safety and Health, Director of Life Insurance, Director of Health Benefits, Director of Retired Members, and a three-member Board of Trustees. Nominations of fifteen (15) National Business Agents shall be separately by NALC Regions, as constituted effective January 1, 1974, or as realigned by the Executive Council. Any realignment of the geographic boundaries of the 15 National Business Agent regions must be announced by the Executive Council, and must be voted on and approved by the delegates, no later than the convention preceding the next convention at which nominations will take place. Only delegates from the appropriate NALC Region may nominate candidates for the position of National Business Agent for such Region. Nomination to the position of National Business Agent in each Region shall be restricted to nominees whose Branch is located in such appropriate NALC Region. No person shall be nominated for any office without his/her written acceptance, on the officially prescribed form, which must include the endorsement from five (5) delegates representing five (5) Branches. The official form shall be handed to the Secretary-Treasurer at the time of nomination, and no person shall be permitted to accept nomination for more than one office at any Convention. These nominating forms shall be made immediately available by the Secretary-Treasurer for review by all candidates at the close of nominations. No second shall be necessary to a nomination, and no nominating speeches will be permitted by the Chair. No nominee who filed acceptance with the Secretary-Treasurer shall be allowed to withdraw his/her name. When there is but one candidate placed in nomination, the Chairperson shall declare the election by consent.

NALC has a combined official nomination and acceptance form for the 2022 convention. Prior to the convention, the form may be obtained from the secretary-treasurer's office or by downloading it from nalc.org in the "Secretary-Treasurer" section. Copies of the form also will be available at the convention.

Prospective candidates for national office not attending the national convention may arrange for a delegate attending the convention to submit the completed form at the time of nomination.

Alternatively, prospective candidates for national office not attending the national convention may submit advance written acceptance of nomination by completing the bottom portion of the form and submitting the partially completed form to the secretary-treasurer prior to the convention. The nomination/acceptance form should be sent by certified mail, return receipt requested, and it must be received by the secretary-treasurer's office at NALC Headquarters no later than July 29. In addition, such prospective candidates not attending the convention must ensure that a second copy of the form containing the remainder of the required information, including the signature of the nominator and the signature endorsements of five delegates representing five branches, is submitted at the convention.

Note: Electronic signatures are not acceptable on the nomination/acceptance form. **PR**

NATIONAL ASSOCIATION OF LETTER CARRIERS

Chicago, Illinois  •  August 8-12, 2022

OFFICIAL NOMINATION/ACCEPTANCE FORM
FOR NATIONAL OFFICE

I, _____  Branch No. _____

City _____  State _____

Nominate _____  Of Branch No. _____

City _____  State _____  for the

for the position of _____ for the
four year term ending in 2026.  This nomination is endorsed by the following delegates representing five
Branches:

ENDORSEMENTS

| | SIGNATURE | BRANCH NO. |
1. NAME _____ SIGNATURE _____ BRANCH NO. _____
2. NAME _____ SIGNATURE _____ BRANCH NO. _____
3. NAME _____ SIGNATURE _____ BRANCH NO. _____
4. NAME _____ SIGNATURE _____ BRANCH NO. _____
5. NAME _____ SIGNATURE _____ BRANCH NO. _____

Signed _____  Nominator  Branch No. _____

Date _____

WRITTEN ACCEPTANCE
*Electronic Signatures Are Not Acceptable*

I, _____  Branch No. _____

City _____  State _____

accept nomination for the position of _____
for the four year term ending in 2026, and authorize my name to appear as a candidate for said position on
the Official Election Ballot.  I certify that I have not served in a supervisory capacity for the 24 months
prior to this nomination.

Signed _____

Date _____

# NALC national office campaign information

The following is information for those campaigning for NALC national office.

## Election banners

The cost to hang an election banner at the national convention is $400 per banner. Checks should be made payable to "Secretary-Treasurer, NALC." All banners must be in the headquarters office at the convention center no later than 3 p.m. on Tuesday, Aug. 9. Banner size is limited to 11 feet by 22 feet.

## Rates for NALC election ads in *The Postal Record*

In accordance with the resolution passed at the 52nd Biennial Convention, the rates for political ads in *The Postal Record* for candidates for national office are calculated at the actual per-page publication cost and the rates are printed at least 60 days prior to the convention. The rates are printed below.

Subject to convention action, such advertisements will be printed in the combined September/October *Postal Record*. Camera-ready ads or the copy for ads, as well as payment by check payable to NALC, must be received at the NALC office during the convention or at NALC Headquarters by Monday, Aug. 22 (*The Postal Record*, 100 Indiana Ave. NW, Washington, DC 20001-2144). Ads may be sent electronically to postalrecord@nalc.org, but payment must be made by check.

Below are the rates for political ads (size shown is width x height):

- Full page (8" x 10-1/2"): $2,750
- Half page (8" x 5-1/4"): $1,375
- One-third page (8" x 2-5/8" or 2" x 10-1/2"): $917

## Distribution of campaign literature by mail

Upon request, candidates may make arrangement for distribution of campaign literature by mail, at the candidate's expense.

Candidates must make a request for the preparation of any mailing lists for their literature in writing to the NALC secretary-treasurer. The written request must include a breakdown of the mailing list identifying the distribution (i.e., all members, partial list, active separate from retirees, etc.). The written request also must include the date of the mailing.

The cost for a mailing list is $50 each. Candidates must pay NALC directly.

The list will not be mailed directly to the candidate. Lists will be given only to NALC's designated printer for campaign literature. Candidates may have their election materials printed at another printer and use NALC's designated printer solely for mailing. If using another printer, all mailings must be pre-packaged, sealed and have adequate postage. NALC's designated printer will affix the address and distribute into the mail stream. There will be a fee for distribution of the literature via mail by the printer. Candidates will be given contact information to discuss the cost for an election mailing. **PR**





# Salute to retiring officers

All retiring national officers will be honored at a reception and dinner on Thursday, Aug. 11, in the Grand Horizon Ballroom of the Marriott Marquis Chicago during the national convention.

The Retiring Officers' Dinner will honor the members of the NALC Executive Council who have retired since the 2018 convention, and those who plan to retire before or upon completion of their current term. NALC regional administrative assistants and National Auxiliary officers who retire during that time frame will be honored as well.

As this issue goes to press, the list so far of those being honored includes former Vice President Lew Drass, former National Trustee Mike Gill, former Region 5 National Business Agent (NBA) Mike Birkett, former Region 6 NBA Troy Clark, former Region 9 NBA Kenneth Gibbs, former Region 12 NBA Dave Napadano, Region 7 NBA Troy Fredenberg, Region 9 NBA Lynne Pendleton, Region 10 NBA Javier Bernal, Region 15 NBA Larry Cirelli, Region 2 RAA Michael Keels, Auxiliary President Cythensis Lang, Auxiliary Treasurer Pam Fore and former Auxiliary Secretary George Anna Myers.

The event will begin with a reception at 5 p.m., with dinner served at 6 p.m. A program honoring the retirees will follow, and the event will continue with dancing until 11 p.m. Tickets are $85 each, sold on a first-come, first-served basis. Regions, branches and individual members must use the Retiring Officers' Dinner order form below to buy tickets. Those planning to attend should buy tickets as soon as possible by sending the order form with full payment to: Retiring Officers' Dinner, NALC Secretary-Treasurer, 100 Indiana Ave. NW, Washington, DC 20001-2144. Checks or money orders payable to "Secretary-Treasurer, NALC" must be received by July 15. Guests wishing to be seated at the same table must submit their ticket orders and payment together in the same envelope. There is a maximum of eight guests per table.

Tickets and table assignments will be held for pickup at the Retiring Officers' Dinner ticket booth located in the convention registration area. **PR**

---

## Retiring Officers' Dinner order form
### Thursday, Aug. 11

I would like to reserve tickets to the NALC Retiring Officers' Dinner on Thursday, Aug. 11, in the Grand Horizon Ballroom of the Marriott Marquis Chicago. Tickets will be held for pickup at the Retiring Officers' Dinner ticket booth located in the convention registration area. Guests wishing to be seated at the same table must submit their ticket orders and payment together in the same envelope. Maximum eight guests per table.

**(Please print clearly)**

Number of tickets: _____ at $85 each = $ _____ (Total enclosed)

Branch #: _____    State: _____

Name of person ordering the tickets: _____

Phone number: _____

Name of individual picking up the ticket(s) at the convention: _____

Phone number of the person picking up the tickets: _____ cell: _____

Please indicate if you or anyone in your party have dietary restrictions: _____

_____

**Mail order form and payment to:**

**Retiring Officers' Dinner, NALC Secretary-Treasurer, 100 Indiana Ave. NW, Washington, DC, 20001-2144**

**Checks or money orders payable to "Secretary-Treasurer, NALC" must be received by July 15.**

Proud to Serve is a semi-regular compilation of heroic stories about letter carriers in their communities. If you know about a hero in your branch, contact us as soon as possible at 202-662-2489 or at postalrecord@nalc.org. We'll follow up with you to obtain news clippings, photos or other information.

# Honoring heroic carriers

**H**eroism, like the mail, comes in many packages—think of police officers or firefighters. But for some citizens in need of assistance, their heroes come in the form of concerned letter carriers.

Letter carriers are members of nearly every community in this nation and know when something is wrong. Spotting fires and injuries, they often are the first to respond. The following stories document their heroism. For them, delivering for America is all in a day's work.

## Carrier's alert saves sleeping family

On March 9, New Iberia, LA Branch 988 member **Noah Pullin** was making his final deliveries of the day at a trailer park. After dropping off the mail, "I got back in the truck, and right in front of me, [I saw] the front-most trailer was on fire," the city carrier assistant recalled.

Pullin immediately rushed from his vehicle to warn the inhabitants. As he ran toward the trailer, he also used his cell phone to call 911.

When the carrier reached the mobile home, a neighbor joined him and told him that she had heard voices coming from the back of the trailer. Pullin and the neighbor began banging on the front door and windows to warn whomever was inside, but they did not receive a response.

Unable to open the door, Pullin looked around for something to help him get inside. "I picked up a piece of wood that was lying on the ground," the carrier said, which he then used to break the windows.

Pullin went around to the other side of the residence, where he spotted the homeowner and his two children escaping the flames. "Two little girls came running toward me, and I told them to get farther away [from the fire]," the carrier said. He went over and helped the man, who was assisting his wife, Gaynelle Robertson, as she climbed out of a window.

Robertson later told local CBS affiliate KLFY that she "was traumatized because I thought I was going to be stuck in there and didn't have [a] way out." As Pullin was later told, the family had been sleeping and was unaware of the fire before

*(continued on next page)*

## Help on the way

**O**n Feb. 2, Cedar Rapids, IA Branch 373 member **Donna Moeller** was delivering on a park-and-loop route when "I heard someone hollering," she said. "But I couldn't make it out." As she walked closer to one of the residences, she could tell that the noise was coming from the customer's garage. "I knocked on the garage and said, 'Is everything OK?' " the 26-year carrier recalled. "He said, 'Hell no—I need an ambulance.' " Moeller raced next door and asked a neighbor to call 911. She then went back to the home; there, the carrier found a garage-door opener inside a truck parked in front of the house. Once she was able to get inside the garage, the carrier found her elderly customer, Perry Lawrence, lying on the floor. Lawrence told her that he had fallen several hours earlier and injured his leg. To make matters worse, "it was pretty cold, and he just had his housecoat on," Moeller said. The carrier stayed with Lawrence and tried to keep him calm until the ambulance arrived. At the hospital, Lawrence was treated for a broken femur and dislocated hip, but has since gone through rehabilitation and returned home. Moeller described the experience as stressful—"I felt like I was going to have a heart attack"—but extremely rewarding, given the fact that she may have saved Lawrence's life. "He lives alone, so he was pretty worried," she said. "He said I was his last hope."

**O**n June 18, 2021, West Palm Beach, FL Branch 1690 member **Thomas Oja Jr.** dropped off a package for one of his elderly customers,



**Thomas Oja Jr.**

Gene Clements. "I usually have to walk up to deliver, so I know the guy fairly well," the six-year carrier said, but he didn't see Clements that day. He was moving on to the next house when Clements's tenant came running outside. "The lady came out screaming my name," Oja recalled, "saying, 'Please hurry,' the guy was on the ground." The carrier rushed back to the house, where he saw Clements lying unconscious on the floor. "He looked like he was already dead," Oja said. "He was purple and red and not responsive at all."

The tenant told Oja that she had already called 911, so the carrier started to do chest compressions on Clements. "It was all I knew what to do, from [classes] when I was a kid," he explained. Together, he and the tenant continued administering CPR until paramedics arrived and took over. Clements was taken to the hospital, where it was later determined that he had had a heart attack. "I saw him a few months later—as far as I know, he's still doing good," Oja said. As for his own actions, the carrier said that he was just thankful he was able to help. "As soon as I knew it was something serious, I just ran in there," he said. "Thankfully [the chest compressions were] enough to keep him alive." **PR**



**Noah Pullin**

his knocking had roused them.

Once Robertson was out of the trailer, "I kept asking over and over to make sure that no one else was in the house," the carrier said. As it turned out, everybody was safe—the fire had been started by a space heater in the older children's bedroom, but they were already at school.

Firefighters arrived a short time later, but by that time, the fire had destroyed the trailer—"it didn't take long to burn through it," Pullin said. They were able to extinguish the blaze before it spread to the neighboring trailers. The family was hospitalized for smoke inhalation, but no other injuries resulted from the fire.

Pullin attributed his ability to keep calm in the face of danger to the six years he spent in the Marine Corps. "Right place, right time. That's what I told anyone who said, 'Good job' yesterday," he told KLFY. "If it was me or my family, I would want somebody to help out."

## No smoke in his eyes

On the afternoon of Feb. 8, "I was dropping off the last package of the day," San Jose, CA Branch 193 member **Ignacio Rosas III** recalled, when he noticed smoke in the air around him. The carrier thought that something might be wrong with his vehicle, so he got out of the LLV to investigate.

"I parked, hopped out and looked to my left, and I saw smoke coming out of this house," the one-year carrier said.

Immediately, Rosas jumped back into his vehicle and drove toward the smoke. Once at the scene, he could tell that the house was definitely on fire. "It was not that big a fire at the moment—[mostly] gray smoke," he said. He quickly called 911.

While on the phone with emergency operators, the carrier decided to report the fire to the neighboring buildings. One house belonged to an elderly couple, whom Rosas urged to evacuate. The other building was a day care. As the carrier saw small children playing

# 🌐 Neighborhood watch

On a summer day in 2021, Dayton, OH Branch 182 member **Nicholas Pierce** was delivering to a retirement community when he noticed a child who looked out of place. "I saw a little girl on a scooter wandering around by herself," the seven-year carrier recalled, "so I asked her if she needed help." The girl told Pierce that she was lost. The carrier asked if she knew the address of the place where she was staying. "She said the right [street] number, but she didn't know the street [name]," Pierce said. Still, using his knowledge of his route, the carrier was able to figure out what street she lived on. As he escorted her there, he let her borrow his cell phone to call her parents. Once they approached the address, it turned out that the girl had remembered the street number wrong as well—however, Pierce was able to figure out the



**Nicholas Pierce**

correct address after asking her a few more questions. As they walked over to the right house, she was met by her parents, who were grateful to the carrier for his help in returning the little girl home. But Pierce was modest about his role. "It's just common courtesy," he said. "It's what anyone would do for anyone, if you see someone in trouble."

The first person to tell him about the missing boy was a police officer, Buffalo-Western New York Branch 3 member **Gregory Samek Jr.** remembered about his eventful day on March 25. When he began his route in the morning, the officer stopped him and showed him a picture of a local boy, who she said had been absent from school that day. The four-year carrier, who knew the kid from his time around the neighborhood, told the officer that he had not seen the 12-year-old. "I said I'd keep my eyes open," Samek recalled. Later that day, he ran into one of the boy's relatives, who happened to be another letter carrier. The other carrier told him that the family had not seen the preteen since the night before. Samek became increasingly worried that the boy may have gotten injured, given the number of open fields and abandoned buildings in the neighborhood. The carrier kept a careful lookout as he continued on his route. "Probably about an hour later, I was walking down the street" when he saw a boy in a familiar gray sweatshirt about 20 houses away, Samek said. "I remembered in the photo [the officer had shown him], he had a gray Under Armour sweatshirt." The carrier didn't want to risk the boy running away from him, so he waited until the kid was much closer before speaking to him. After greeting the boy, Samek told him that his whole family was out looking for him. "He was like, 'What?' " the carrier said with a laugh. As it turned out, the boy had gone to spend the night at a friend's house and had no idea of the panic he'd caused. Samek escorted the boy to his mother's house, which was a short distance away, and let the family know that he was safe. The carrier said that because he knew the boy from his route, he "just kept my eyes peeled a little bit more than usual—God forbid something happened to him." **PR**



**Brandon Airosus**

outside, unaware of the danger they were in, he said that cemented his urge to "act fast" and get everyone a safe distance away from the fire.

Shortly after Rosas's call, police and firefighters arrived on the scene and were able to put out the flames. "The older gentleman [who owned the house] did pass away," Rosas said, though it was unclear whether his death was caused by the fire.

Rosas's actions, meanwhile, have made him a hero to the residents of the cul-de-sac whom he warned. "The neighborhood really embraced me," the carrier said. "They made me a sign, and they're always stopping and thanking me."

### After car accident, carrier rushes to the rescue

Boston, MA Branch 34 member **Brandon Airosus** had just finished his last delivery of the day and was heading back to the post office one afternoon in November 2021 when he stopped at a red light. "The traffic [in his lane] was at a standstill, but there was tons of fast traffic [going the other way]," the 25-year member recalled.

As he waited for the light to turn green, a little girl and her grandmother stepped into the crosswalk. Moments later, "the little girl broke away from the older woman" and ran past Airosus's vehicle into the other lane, the carrier recalled. "A car came from the opposite direction, and she got sideswiped."

Airosus was horrified, but acted swiftly. Immediately putting his LLV in park and switching on his hazard lights, he called 911 as he rushed over to the child.

"She didn't get hit head-on, but she was screaming and crying," the carrier said. He tried to calm her down, as well as her grandmother, but "there was a language barrier," he explained.

Concerned about the girl's danger from oncoming cars, Airosus decided to move her out of harm's way. "I thought, 'I've got to get this poor girl off the middle of the street,' " he said. "So I picked her up carefully."

The carrier brought her over to the sidewalk—"Next thing you know, you've got police and firefighters [at the scene]," Airosus said. The girl was taken to the hospital, where she was treated for a broken leg.

The carrier was modest about the recognition he received for his actions. "I had no choice but to react—she literally ran right across my bumper," he said. "I didn't really do anything. I was in the right place at the right time." **PR**

## 🐾 Eye on the elderly

"I hadn't seen the customer for a couple months," Las Vegas, NV Branch 2502 member **James Desnacido** recalled, but that changed on Jan. 8, when he approached customer Allan Menkin's house and heard his wife calling for help. "His wife waved me in to help," the six-year carrier said—when he went into the house to see what was wrong, he found Menkin lying on the living-room floor. The elderly man had unexpectedly collapsed, and neither he nor his wife could get him back in his chair. "His wife told me he'd been that way for a couple of hours," Desnacido said. The carrier was able to lift Menkin back to his feet, and then placed him back in his recliner. The customer was grateful for his assistance, and later said that "James literally saved my life by rescuing me from a serious fall." The carrier, however, was modest about his actions, saying, "I just do like all carriers—help out when you can, and then get back to delivering when everything's safe." Desnacido was also recognized in a ceremony held at the post office. Menkin was unable to attend the ceremony, but sent the following message: "Give deepest thanks and my best regards to James. He is the representative that the Postal Service should be proud of!"

On April 22, Pittsburgh, PA Branch 84 member **Shaelynn Goodwine** was delivering on her route when she became concerned about one of her elderly customers. "She usually picks up her mail every single day, but the last time I'd seen her [was] Monday," the eight-year carrier recalled. Goodwine had been off work for a few days, but when she returned to find that the woman's mail had been piling up, she thought that something might have happened to her customer. Given that it was close to Easter, the carrier thought that the woman might have been visiting family, but decided to keep a close eye on the situation. When another day passed with no sign of the customer, Goodwine decided that the time had come to act. She called police to request a welfare check. When police investigated, they found the woman on the floor, unable to move. "She may have had a stroke, and she fell and broke her hip," Goodwine said she was later told. "The next day, she probably would not have been [alive]." The carrier said that she was "kind of nervous" about requesting the welfare check, but that she was gratified to know that her call may have helped save the woman's life. Goodwine later received a call from the police officer she had talked to, who let her know that she would be receiving a letter of recognition from the city of Pittsburgh for her actions. **PR**



Las Vegas, NV Branch 2502 member James Desnacido (l) is recognized for his actions by Branch President Glenn Norton.

# Technology Integrated Alternate Route Evaluation and Adjustment Process



**Brian Renfroe**

Shortly before this issue of *The Postal Record* went to press, we reached an agreement with USPS on a new joint route adjustment process for 2022 and 2023. The process is called the Technology Integrated Alternate Route Evaluation and Adjustment Process (TIAREAP) – 2022-2023. You can read the documents in the Materials Reference System (MRS) on our website at nalc.org/mrs. The memorandum of understanding has been assigned MRS number M-01982, and the jointly developed document that explains the process has been assigned MRS number M-01983.

There will be much more information on the process coming soon. The space I have here is not nearly enough to describe all aspects of the process, but I want to give some insight into what has taken place to lead to this agreement.

> **"While the technology provides the joint teams with more information than ever before about each route, the evaluation and adjustment are based on what the letter carrier actually did and his or her input on the route."**

**Upon ratification of the 2019 collective-bargaining** agreement last March, we began exploring a joint process using the technology that was available. We have more information than ever before, such as the location of parcel and accountable deliveries, scan information, GPS data, etc. We assigned joint teams of veterans of route-adjustment processes to explore this technology. Over time, we were able to adapt a program called Digital Street Review (DSR) for use in a joint route adjustment process.

We tested concepts in a few locations. The feedback was positive from both the teams doing the evaluations and adjustments as well as the carriers in those locations. We were eventually able to reach agreement on this new process.

There are some important points to understand about this new process. While the technology provides the joint teams with more information than ever before about each route, the evaluation and adjustment are based on what the letter carrier actually did and his or her input on the route. There are no projections involved. Certain events are flagged for the team to review, but it is completely up to the team using the information they have and the carrier's input to make all decisions about each route.

Second, the new tools we have available will allow the teams to identify and eliminate any data errors or other issues that may affect the actual average time for the route in the evaluation period. The process combines this increased information with more interaction and input with the carriers. Clean data and ample input from each carrier made evolutions of routes straightforward and evident in our test sites.

Another area of improvement is in the adjustment process. In past adjustments, managers would accompany carriers on the route to create a PS Form 3999 that was used to determine the value of territory transferred from one route to the other. The DSR program allows the teams to choose a representative day and generate a PS Form 3999. There is a process that involves the carrier's input and the teams' review to ensure that the file is representative and the data is clean. In most cases, this eliminates the need for managers to go with a carrier on the street for route-adjustment purposes. This new process was very popular with both carriers and managers in the test sites.

We are in the process of setting up training on the process and will begin selecting zones to be evaluated and adjusted in July. We look forward to a productive process over the next two years.

**I want to offer my congratulations to former Vice President** Lew Drass. Lew stepped down as vice president a few weeks ago. As a young second-generation letter carrier, I had an interest in getting involved in the union. I met then-Region 8 National Business Agent Lew Drass when I attended my first state convention in Mississippi. That day changed my life. Lew raised me in NALC, gave me opportunities to help letter carriers, and made sure that I learned through each and every one. It has been my pleasure to have learned from Lew and worked with him for many years, and to have developed a close friendship that will last forever. I am eternally grateful for what Lew has given to our union, to letter carriers and to me personally.

I am also very excited to have my friend and brother James Henry serving as the new vice president. James is a perfect fit for the duties of that position. He is off and running and will do an outstanding job for our members.

# The best ability is dependability



### James D. Henry

I want to thank President Fredric Rolando for placing his trust and confidence in me to represent the National Association of Letter Carriers membership as vice president. I would also like to thank my union brother Lew Drass for his years of mentorship, friendship and service to NALC, and wish him nothing but the best in all his endeavors and retirement. I am humbled, grateful and honored to continue to meet the obligation and have the privilege to serve my union brothers and sisters as the NALC vice president.

I began my career as a letter carrier in Pomona, CA, on Feb. 22, 1988, after completing my initial active-duty enlistment in the U.S. Marine Corps, from which I later retired as a gunnery sergeant after 22 years. I've been a proud dues-paying NALC member for more than 34 years.

My path to becoming an active member in the union started after I was unjustly disciplined. Thanks to the outstanding representation afforded me through Branch 1100, especially by Charlie Miller, my case was resolved to my complete satisfaction. Thereafter, I knew I couldn't stand by and see letter carriers treated unfairly. I became a shop steward in 1988 and my calling of representing began. I've been very fortunate to come from a lineage of great leaders, which has only enhanced my natural desire to serve as our brothers' and sisters' keeper.

I've been blessed to gain extensive experience and represent carriers in an array of positions throughout my career. In 1991, I became an area steward for Branch 1100. In 1995, I completed the NALC arbitration advocate training and became an arbitration advocate for the national business agent (NBA) office. I have been presenting cases in arbitration ever since. In 1998, I was appointed to serve as a NALC Step B representative. In 1999, I became a full-time officer and served as vice president for Branch 1100, and then senior vice president in 2008. In January 2011, I was appointed regional administrative assistant (RAA) by President Rolando. During my tenure as RAA, I oversaw six Dispute Resolution teams, conducted dozens of interventions, negotiated thousands of prearbitration settlements and presented more than 150 cases in arbitration. I have also negotiated hundreds of local contracts (LMOUs). Additionally, in 2015 I was selected by Lew Drass as a facilitator/instructor for the Advanced Formal A and Beyond classes and the arbitration advocate trainings.

I firmly believe that the very essence of a union is to unify: i.e., join together, become one force. To achieve that end, its members must be willing and able to see each other as one in the same cause. This sometimes necessitates validating your convictions by fighting for your rights and for each other. As Theodore Roosevelt said, "The credit belongs to the man who is actually in the arena, whose face is marred by dust and sweat and blood; who strives valiantly; who errs and comes short again and again, who knows the great enthusiasms, the great devotions, and spends himself in a worthy cause; who at best, knows the triumph of achievement; and who at worst, if he fails, at least fails while daring greatly, so that his place shall never be with those cold and timid souls who know neither victory nor defeat."

NALC as an organization has epitomized being the "keepers of its brothers and sisters." Every negotiated contract, political endorsement and executive decision has been made with the fundamental principle of ensuring that there is a worthwhile job not only for past and present letter carriers, but for those yet to be born. It's simple: Because we have been in the "arena" fighting and standing up for one another, we have known victory. If we expect to have a work environment that is aligned with the philosophy of "one for all and all for one" at our worksites, we as individuals must be in the arena. I commit to all of you that I will be in the arena fighting for you and fighting alongside you!

I strongly believe that "the best ability is dependability." The profile of a courageous person is doing the right thing because it is right under an unpopular atmosphere or circumstance. It may be difficult to stand up in an adversarial atmosphere between labor and management, but we must be that profile of courage—trustworthy and reliable. We must be able to depend on each other. I commit to you that, as your vice president, you can depend on me to employ my teachings as a Marine of "esprit de corps," to have your backs like vertebrates!

My desire is not that of advancement for self-aggrandizement, but for the advancement of the NALC agenda and ultimately of the membership. My interest is that of service toward the goal of justice for all. This moment, for me, serves as an opportunity to reach beyond the imagination, an opportunity to offer innovative solutions to challenges and problems. It has provided me an opportunity for further growth and expansion beyond measure. I recognize it not merely as a valued experience but as one of the highest-ranking lifetime achievements. Therefore, I will faithfully continue the work that begun with my predecessor. I look forward to the mission ahead and to being in further service to NALC and the membership.

# Important reminders



**Nicole Rhine**

**W**hether it's filing reports with the Department of Labor and the IRS or just relaying information to NALC Headquarters, certain tasks must be done by branch officers—and in a timely matter. So here are some reminders designed to help ensure that you get it all done:

- **Reporting to the Department of Labor**—Any branch or state association that has a fiscal-year end of Dec. 31 should have filed its labor-management (LM) report by March 31. Additionally, any branch or state association that has a fiscal-year end of March 31 should file its LM report by June 29. If you are not sure what an LM Form is, or which LM form to file, please see my January column. The form is due within 90 days of the end of the organization's fiscal year.

- **Reporting to the IRS**—Any branch or state association that has a fiscal year end of Dec. 31 should have filed its Form 990, 990-EZ or 990N with the IRS by May 15. The form is due by the 15th day of the fifth month after the end of the organization's fiscal year. As a reminder, the IRS now requires that all Form 990 filings be made electronically using software approved by the IRS. In addition, the Internal Revenue Code requires branches with "unrelated business income" (UBI) of $1,000 or more for the year to file Form 990-T, Exempt Organization Business Income Tax Return, and pay any tax due. Generally, UBI is income from a business that is unrelated to the branch's tax-exempt purposes. More information on the above is in my March column.

- **Branch mergers**—Any branch proposing to merge should review Article 2, Section 3 of the *NALC Constitution*, which sets forth the requirements for affecting a merger of branches. Requests for mergers received at NALC Headquarters are often missing two requirements from both branches wishing to merge: 1) a resolution and 2) a statement of reason(s) for merging. To avoid having a request for a merger returned, please ensure that your branch includes all of the necessary documentation. More information can be found on the Secretary-Treasurer's page on the NALC website at nalc.org. The Secretary-Treasurer's page is under the "Union Administration" tab.

- **Service awards**—Article 2, Section 5 of the *NALC Constitution* contains information on the years of service membership pins available. The branch secretary must notify my office either through the new membership pin program in the Members Only portal or in writing that a member will complete the necessary years of service. Should the branch be awarding a 50-year pin and gold card, please allow four to six weeks, as gold cards are a special order and must be engraved by an outside union vendor.

- **Bonding**—Every officer, agent, shop steward, or other representative/employee of a branch or state association who handles funds or other property of the branch or state association must be bonded if the branch or state association has property and annual receipts exceeding $5,000. Branch and state treasurers should ensure that officers and others handling funds are adequately bonded. Trustees should ensure during the constitutionally required audits that an adequate bond is in place. Please see my April column for more information on audits. For more information on bonding requirements, please refer to the *NALC Branch Officer's Guide to Finance and Administration*, which has a separate chapter on bonding requirements (Chapter 4). The guide can be purchased from the NALC Supply Department and an electronic copy is available from the Secretary-Treasurer's page on the NALC website by clicking on the "Resources" link.

- **Dues rosters**—Branch secretaries are reminded to review the biweekly roster and ensure that all dues being deducted are correct. If a change needs to be made, please notify the Membership Department in writing. In addition, members called to active military duty may have their dues suspended upon written request by the branch secretary. When the member returns from active-duty military, please notify the Membership Department so that dues deductions may be resumed.

- **Per-capita tax call**—The six-month per-capita tax call has been mailed out to branches. NALC bills branches semi-annually, in June and December, for the national and state per-capita tax of their direct-paying members. For more information on the six-month per-capita tax call, please refer to the *NALC Branch Officer's Guide to Finance and Administration*, which has a separate chapter on NALC Dues (Chapter 2). Please see pages 2-12 and 2-13.

- **Officer information lists**—Branches and state associations are reminded to provide the NALC Membership Department with any changes to officers that occur. If you have not already done so, please immediately update the Membership Department via letter or a "Branch Information Record" card, which was included with the six-month per-capita tax call. If you didn't receive one, call the Membership Department at 202-393-4695 to request one.

# The process of changing
# or accessing branch/state bylaws



**Paul
Barner**

**A**rticle 15 of the *NALC Constitution* sets forth rules that branches and state associations must follow to approve a change in their bylaws. Branch or state association bylaws may contain additional provisions. After the proposed bylaws have been approved by the branch or state association, the proposed changes must be submitted to the Committee of Laws for approval. The following addresses questions routinely asked by branches and state associations.

**What is the process for addressing the provisions that are found by the Committee of Laws to be in conflict with the *NALC Constitution*; do branches or state associations have to go through the entire process again if the language needs to be changed?**

Any proposed change in a branch's or state association's bylaws, whether involving deletion of old language, addition of new language or both, constitutes an amendment of the bylaws and would be subject to the requirements of Article 15 of the *NALC Constitution*. This would require the branch or state association to go through the entire process again to address those items found to be in conflict by the Committee of Laws.

**The committee also is asked on occasion to interpret** branch or state association bylaws. However, branches and state associations should be aware that the committee is not authorized to interpret branch or state bylaws. Its charter extends only to reviewing proposed bylaws for compliance with the *NALC Constitution*. If the branch or state association is unsure of the meaning of a bylaw, the branch or state association should vote to clarify the meaning of the bylaw. The committee also hopes that branches and state associations will take care in drafting proposed bylaws to make the meaning as clear as possible, recognizing that the bylaw may be in effect long after its author is available to explain it.

**The committee occasionally is asked to provide** branches or state associations with copies of its bylaws. More than a year ago, NALC developed an electronic bylaw submission method accessed through the Members Only portal on the NALC website. This database will also begin the process of creating an electronic library of branch and state association bylaw submissions and the resulting rulings by the Committee of Laws that will be accessible to branches and state associations. Although NALC has entered more recent bylaw submissions in the database, older submissions are still maintained in hard-copy format at NALC Headquarters. If the branch or state association has not submitted changes in recent years, you may need to contact the Committee of Laws to retrieve the latest bylaw submission.

To access the bylaws database, branch and state association presidents, secretaries and treasurers can go to the NALC website at nalc.org and log on to the Members Only portal. Once logged on to Members Only, click the "By-Laws" button, which will access the "Maintain By-Laws" page of the database. From there, bylaws can be created or amended and submitted to the Committee of Laws for action. Bylaw proposal language can be typed directly into the program or copied and pasted. A PDF copy of current bylaws can be submitted by using drag and drop into the database. After the file has been successfully uploaded, a "File Uploaded Complete" verification will appear. Files can be reviewed by clicking the "View Your Uploaded File" tab. Before submitting requests, please ensure that the correct branch information is provided; article and section identifiers are entered for the corresponding bylaw provision or proposed change; and a complete copy of the latest version of bylaws is uploaded into the portal. A detailed PDF tutorial is available for download at every step of the "Maintain By-Laws" application.

Once the Committee of Laws renders its decision, the portal will be updated, allowing for viewing of the decision(s) of the Committee. A hard copy of the Committee's decision will also be mailed to the address of record of the submitting branch or state association.

If a branch cannot locate its bylaws, the committee recommends that the branch prepare a new set of bylaws, which should be submitted to the Committee of Laws for approval after they have been voted on by the branch following the procedures set forth in Article 15 of the *NALC Constitution*. The *Constitution for the Government of Subordinate and Federal Branches*, which is contained in the *NALC Constitution* booklet, is a useful guide for preparing bylaw provisions. State associations should refer to the *Constitution for the Government of State Associations*, also found in the *NALC Constitution*.

# NALC convention preview



**Christopher Jackson**

As previously announced, the 72nd biennial convention of the National Association of Letter Carriers will be held Aug. 8-12 in Chicago. The convention is rapidly approaching, and the City Delivery department has been very busy getting prepared. Since our last convention, there have been a lot of exciting changes in my department, and I am looking forward to sharing information with the convention delegation. While the workshop list has not yet been finalized, I want to use this month's column to give the membership a preview of the information and City Delivery workshops I hope to be offering at the convention.

## City Delivery workshop

At each convention, I provide a workshop that gives me the opportunity to update the delegates on all the changes regarding city delivery. The 2022 workshop will include a summary of my duties as the director of City Delivery, updates on the Postal Service's expanded services, an overview of the activities of the City Delivery and Workplace Improvement Task Force, changes in Mobile Delivery Device (MDD) technology and the newest USPS test initiatives. As always, the workshop will conclude by offering attendees the opportunity to ask questions. If you are at the convention, be sure to attend this workshop to get the latest information on everything City Delivery.

## NGDV workshop

I am sure that the letter carriers are eagerly anticipating the deployment of the Next Generation Delivery Vehicle (NGDV). There has been a lot of information, speculation and media coverage of the long-awaited NGDV, which is intended to replace the aging Long Life Vehicle (LLV). In March, NALC requested that the Postal Service provide a prototype vehicle for our biennial convention. I am happy to report that we will have a prototype NGDV in Chicago. Convention delegates will be able to see and interact with the vehicle and ask questions about the NGDV from USPS Engineering and Fleet representatives. In addition to examining the prototype vehicle, convention delegates will be able to attend a workshop dedicated to the NGDV. During this workshop, we will share the history of NALC's involvement in the development and design of the NGDV, the new features included in the vehicle, and the latest program updates.

## Alternate route evaluation and adjustment process workshop

In the 2019 National Agreement, under the Memorandum of Understanding (MOU) Re: City Delivery and Workplace Improvement Task Force, NALC and USPS committed to work together to modernize delivery methods and processes. One piece of the MOU includes a route evaluation and adjustment task force to jointly explore the use of technology, data and advanced analytics to improve route evaluation and adjustment methods.

Due to the efforts of this joint task force, NALC and USPS have agreed to a new joint route evaluation and adjustment process, which incorporates new, innovative technologies with the traditional joint process. In May, the parties signed the new MOU Re: Technology Integrated Alternate Route Evaluation and Adjustment Process (TIAREAP). Similar to joint adjustment processes of the past, joint route evaluation and adjustment teams will review USPS data from a variety of computer programs and applications. Additionally, as part of the TIAREAP evaluation and adjustment process, the teams will explore using a new USPS technology program, Digital Street Review (DSR), for its application in route evaluation and adjustments.

Since the signing of the MOU, NALC has been hard at work with USPS developing training materials and finalizing all of the details for the process. As part of the convention, City Delivery will be conducting a workshop providing an overview of DSR, the TIAREAP process, and educating delegates on what city carriers can expect from this joint MOU.

## Conversion to career workshop

This workshop will focus on some of the ways city carriers achieve career status. During this workshop, we will explain the MOU Re: Full-time Regular Opportunities – City Letter Carrier Craft, the MOU Re: City Carrier Assistants – Conversion to Career Status and the MOU Re: Reassignment Opportunities (M-01947). We also will discuss the Alternate Dispute Resolution (ADR) process the national parties have used since 2013 to resolve disputes involving conversion issues. This workshop is a must for branch officers and grievance handlers responsible for monitoring compliance with these agreements.

As you can see, there will be a lot of great workshops to attend at this year's convention. This is just a small sample of the information that will be presented at the City Delivery workshops being offered to convention delegates. With so much great information available, delegates should be sure to attend as many workshops as you can. I look forward to seeing all of you in Chicago.

# Improper use of information against you



## Manuel L. Peralta Jr.

In March and November of 2016, and again in June of 2018, my column addressed the Counseling At Risk Employees (CARE) program, sharing some of my concerns that USPS was going to misuse the information collected and use it against employees contrary to the clear commitment by USPS Headquarters to not do so. Many new stewards may not know about that commitment, and many seasoned stewards may not be aware of this, so I encourage you to review those columns to make sure that USPS is not violating the commitments it made regarding the CARE program.

In review of arbitration awards on safety-related discipline issued to letter carriers, I am finding references to stale discipline, and stale records that should not surface at all in harm of a letter carrier. Therefore, I bring the following items to your attention to investigate and address if necessary in your write-up grievance.

## Discipline records

Let's begin with Article 16, Section 10. If an employee has previously been issued discipline for an infraction, and such discipline was not grieved, the employer may cite that discipline in a subsequent action for up to two years, as explained on page 16-11 of the current *Joint Contract Administration Manual (JCAM)*:

> The purpose of Article 16.10 is to protect employees from having their past records considered when they have shown over a two year period that they performed their job without incurring any further disciplinary action.

If a grievance was filed over the above-referenced discipline, then the employer must comply with the terms bargained in the settlement, or the instruction of an arbitrator.

## Discussion records

Next, we address Article 16, Section 2, which provides for a non-disciplinary warning (a discussion) to an employee, putting the employee on notice of a rule. This discussion must take place in private (between the supervisor and the employee) and it may not be shared with other supervisors, nor may a record of the discussion be placed in an Official Personnel Folder (OPF). The last sentence in Article 16.2 provides that:

> While such discussions may not be cited as an element of prior adverse record in any subsequent disciplinary action against an employee, they may be, where relevant and timely, relied upon to establish that employees have been made aware of their obligations and responsibilities.

What does "timely" mean in this context?

The *Administrative Support Manual (ASM)* used to contain a section titled Privacy Act System of Records. This section was moved to the *Handbook AS-353*, retaining the essential references. In Appendix B of the *AS-353*, you will find a listing of the different categories of records and the rules controlling their retention:

**120.190 Supervisors' Personnel Records**

Retention and Disposal

a. Counseling Records—Destroy when 1 year old if there has been no disciplinary action initiated against the employee during that period.

b. Letters of Warning—Destroy when 2 years old if there has been no disciplinary action initiated against the employee during that period.

c. All Other Records—Dispose of immediately on termination of supervisor/employee relationship.

If your supervisor is keeping discussion records (counseling) beyond the time frame referenced in the *AS-353* at 120.090, then we need to raise this as a record retention rule violation. Note: If there is no dispute that the employee knows the rule, then we should not clutter the grievance with this issue.

## Accident records

**120.035 Employee Accident Records**

Retention and Disposal Records are maintained locally for 5 years. Copies are maintained at Headquarters for 5 years following the end of the calendar year to which they relate as required by OSHA.

Many years ago, I was assigned to advocate Case #23951 in San Fernando, CA, where Branch 2902 shop steward James Perryman discovered that management had kept its "secret" records in violation of the USPS requirement to adhere to its Privacy Act System of Records.

On page 17 of that award, Arbitrator Snow writes:

> Enormous potential for harm exists when a supervisor may be influenced by documentary records of stale discipline or other outdated historical information in a file. The risk of this harmful influence outweighs the Employer's asserted interest in this case in maintaining a personal history of employees. Such histories are available in the system, and the Employer offered no substantial and legitimate business justification for maintaining such personal histories in supervisory files. The Union was persuasive in its contention that a review of the supervisory files in this case is necessary in order to validate the Employer's compliance with administrative procedures of the ELM, especially in view of compelling evidence suggesting noncompliance.

So...don't let management poison the well. Do all that you can to prevent the creation of an unfair bias against the grievant you represent.

Keep an eye on each other.

# Planning for retirement upon conversion



**Dan Toth**

I t's vital to think about retirement upon conversion to career status, whether you are 25 or 55 years old. There isn't a lot to plan for when it comes to making contributions toward the Federal Employees Retirement System (FERS) or Social Security, as those will be automatic and there's no option to decline or waive coverage. So that leaves the Thrift Savings Plan (TSP), where employees get to make decisions that will affect their retirement. FERS was designed to have both a defined benefit plan (the FERS basic benefit) and a defined contribution plan that utilizes the TSP. The defined contribution plan provides flexibility to decide how to invest the employee's and employer's contributions to account for individual risk tolerance, and for different needs in retirement.

Deciding how much to save for retirement is a balancing game. On one side, you weigh how much money you'll need in retirement to be comfortable versus how much money you need now to maintain or build the life you want. Although each person should carefully weigh his or her priorities when deciding how much to save for retirement, I've never heard anyone complain that they have too much money in retirement. I certainly think it's safer to overdo your saving than to underdo it and regret not being able to retire when your body is telling you that it's time to hang up the satchel.

**Since Oct. 1, 2020, new participants to the TSP** were automatically enrolled with a 5 percent contribution. The previous default contribution was 3 percent. This was a positive change, as it helps new employees maximize the matching contributions from the Postal Service on Day One. As a FERS employee, the Postal Service will automatically contribute 1 percent. The first 3 percent of pay that you contribute will be matched dollar for dollar; the next 2 percent will be matched at 50 cents on the dollar. Contributions above 5 percent of your pay will not be matched. If you stop making regular employee contributions, your matching contributions will also stop. So an employee who contributes 5 percent of their pay will have a total of 10 percent contributed to the TSP (5 percent

of employee contributions, plus 5 percent employer contributions).

**Given how employees double their money by con-**tributing 5 percent, it concerns me when I see my fellow brothers and sisters decide to cancel or reduce their TSP contributions to less than 5 percent. I hope those who are contributing less than 5 percent continuously consider whether their circumstances have changed such that they can increase their contributions back up to 5 percent. A Table Two Step A full-time regular who elects to make no contributions to their TSP would miss out on more than $2,000 per year in matching contributions from the Postal Service. This lost opportunity continues to increase as the employee moves up the pay scale.

At the end of 2020, more than 14,000 city letter carriers were eligible to but did not make any contributions to their TSP. These carriers who chose to make zero contributions will not receive any matching contributions, and effectively make less money than they are entitled to. Let's take the example earlier, where a full-time regular at Table Two Step A receives an employer match of approximately $2,000 per year contributing at least 5 percent and apply it to these 14,000 carriers who are not making contributions. Collectively, these carriers are leaving a staggering $28 million per year on the table.

Besides instantly doubling your money by maximizing the employer contribution, time and compounding interest can pay huge dividends. Einstein spoke of the power of compounding interest when he stated, "Compound interest is the eighth wonder of the world. He who understands it, earns it…he who doesn't… pays it." We can see some results of compounding interest and time by looking at a list of TSP millionaires. As of June 2021, the TSP had 98,879 millionaires. These are federal employees who have typically spent three decades contributing. Of course there are federal employees who make more money than city letter carriers, but federal employment is not how one would expect to become a millionaire. These federal employees have spent decades contributing and letting compound interest make their money grow.

**Letter carriers should check their TSP contribution** amount through LiteBlue and consider maximizing their employer contributions if they aren't already. Don't leave money on the table. To learn about the different fund options, look up a fund's past performance or manage your allocations, head over to tsp.gov.

# Life insurance definitions



## James W. "Jim" Yates

Life insurance policies can be confusing. It is essential to read the policy carefully and familiarize yourself with its terms and conditions. The policy is a legal contract between an insurance company and the policy owner. A policy owner may read the contract but may not be familiar with the definitions of certain terms. Listed below are definitions of common insurance terms that a policy owner should know:

• **Contract of insurance:** The contract whereby an insurer agrees to indemnify an insured for losses, provide other benefits, or render services to or on behalf of the insured. The contract of insurance is often called an insurance policy, but the policy is merely the evidence of the agreement.

• **Application:** A form supplied by the insurance company, usually completed by the member. The form is signed by the member and is part of the insurance contract if a policy is issued. This form allows the insurance company to determine whether an insurance policy will be issued, and if so, in what classification and at what premium rate.

• **Term insurance:** The type of life insurance that provides protection only for a specified length of time. The policy does not build up any of the nonforfeiture values associated with whole life policies.

• **Whole life insurance:** The type of life insurance that provides protection for the insured's entire lifetime or until the policy's maturity date, provided that the required premiums are paid.

• **Policy owner:** The person who has ownership rights to an insurance policy.

• **Beneficiary:** The person or persons designated by the policy owner to receive the benefits of an insurance policy upon the death of the insured. Also known as the primary beneficiary.

• **Contingent beneficiary:** An alternate beneficiary designated to receive the benefits of an insurance policy in the event the primary beneficiary has died before the insured. Also known as the secondary beneficiary.

• **Payor:** The person who is responsible for paying the premiums on a policy.

• **Face amount:** Also known as the "death benefit." The amount of insurance protection provided under a given policy. The actual amount payable by the company may be decreased by loans or increased by additional benefits payable under specific conditions as stated in a rider.

• **Premium:** The periodic payment required to keep a policy in force.

• **Grace period:** A determined period, usually 30 or 31 days after the premium due date, during which an insurance contract remains in force and the premium may be paid.

• **Participating:** Insurance that pays policy dividends to policy owners.

• **Dividend:** A dividend on participating contracts is the refund of part of the premium that remains at the end of a year after the company has set aside the necessary reserve and made deductions for claims and expenses. The dividend might also include a share in the company's investment, mortality and operating profits.

• **Dividend options:** Alternative ways in which insureds under participating life insurance policies may elect to receive their dividends. (For example: cash, dividends on deposit or paid-up additional life insurance)

• **Loan:** An amount borrowed from the insurance company secured by the value of the borrower's policy.

• **Lapse:** Termination of a policy due to failure to pay the premium.

• **Cash surrender value:** The amount available to the policy owner when a policy is surrendered to the insurance company. During the early policy years, the cash value is normally the reserve less a "surrender charge." In the later policy years, the cash surrender value usually equals or closely approximates the reserve value at time of surrender.

• **Nonforfeiture values or provisions:** Those values in a life insurance policy that by law the policy owner cannot forfeit, even if he or she ceases to pay the premiums. (Nonforfeiture options include reduced paid-up insurance or extended term life insurance.)

• **Reduced paid-up insurance:** A form of insurance available as a nonforfeiture option. It provides that the cash value of the policy be used as a single premium to purchase paid-up insurance in whatever amount the cash value will provide.

• **Extended term insurance:** A provision in most whole life insurance policies that provides the option of continuing the existing amount of insurance as term insurance for as long a time period as the contract's cash value will purchase.

• **Termination:** The time the coverage under an insurance policy ends, either because its term has expired or because it has been canceled by either party. When whole life policies are terminated because of non-payment of premiums, the insured would then receive one of the nonforfeiture values.

• **Reinstatement:** Restoration of a lapsed policy.

When reading the life insurance policy, if any of the terms, language or provisions of the contract are unclear, the policy owner should contact the insurance company for clarification.

Life insurance policies provide a right to cancel (or "free look) provision. This allows the policy owner to cancel the policy within a specified time period, usually within 30 days of receiving the policy, if it does not meet his/her expectations.

Most insurance policies are in force for many decades; therefore, the policy owner should be aware of the contract he/she has with the insurance company, along with its provisions and benefits.

# Wellness Incentive program



**Stephanie M. Stewart**

Over the past few months, the Plan has received numerous inquiries concerning our Wellness Incentive program. Many of the questions that have come up regard how the program works, and specifically, what is this Total Administrative Services Corporation (TASC) card they received that is associated with the program?

Although I have written and spoken on this topic in the past, it is always our intent to thoroughly educate members about new benefits or programs through various approaches. Many times, additional questions may arise and there is a need to repeat topics or discuss additional concerns. In this case, there is still a lot of confusion, so I want to take some time to discuss the benefit again.

I believe that these programs can be essential to our members' well-being. It is my goal to increase awareness, help you earn rewards and, most of all, make sure that each member is comfortable with the program. To do that, I would like to talk about the wellness incentives that you can receive as a member of the NALC Health Benefit Plan, which programs qualify and further explain our use of the TASC card.

**Let's start at the beginning. On Jan. 1, 2021, the** Plan added a Wellness Incentive program to our benefit package. It was a very exciting time for our staff, and we were eager to support each member on their health journey. Primarily, we realized the Plan had an opportunity to encourage our members to adopt healthy lifestyle behaviors in a new way. The Wellness Incentive program allowed us the opportunity to reward these choices by giving you valuable health savings dollars to use toward eligible medical expenses. Everyone likes to have more money in their pocket!

All three of our Plan options include the Wellness Incentive program. However, please keep in mind that the reward amount may vary depending on the Plan you're enrolled in and which incentive program you complete. Programs or preventive benefits included within the program are:

- **Your Health First Disease Management program—** High Option $50; CDHP/Value Option $30.
- **Healthy Pregnancies, Healthy Babies program—** High Option $50; CDHP/Value Option $30.
- **Tobacco Cessation program—** High Option $50; CDHP/Value Option $30.
- **Annual biometric screening—** High Option $50; CDHP/Value Option $30.
- **Health assessment—** High Option $30; CDHP/Value Option $20.
- **Annual influenza vaccine—** High Option $10; CDHP/Value Option $5.
- **Annual pneumococcal vaccine—** High Option $10; CDHP/Value Option $5.
- **COVID-19 vaccine—** $50 for all plans (added to program in July 2021).

**Once you have completed your first activity and the** Plan receives confirmation, we will send TASC notification to issue you a card with your earned reward amount pre-loaded and ready for your use.

Although it may look like a credit card, please be assured that it does not fall into that category, and will not be tied to your credit or personal history.

It also is important to note that the card will be sent directly from the TASC program—you may be slightly confused when it arrives, as the envelope will not have the Plan's name on the outside. Rest assured, although the card is sent from TASC directly, we have not shared your personal health information or the reason you are receiving the card. In addition, as with any vendor of the Plan, they are prohibited from sharing the limited information they receive (name and address) and must protect this information just as the Plan does.

It may take a few weeks after a wellness activity is completed before you receive the TASC card or money is loaded for additional rewards. It also is important to keep the card in a safe place even if you use all your health account dollars; you may be eligible for wellness incentives in subsequent benefit years, and you will not receive a new card each year. If you need to check the available funds on the card, you can contact TASC at 800-422-4661 or visit its website at tasconline.com.

Like a flex spending account, funds can be used to purchase medical items or services not covered by health insurance. Examples include dental treatment, eyeglasses and over-the-counter medication. For more information, the complete list can be found on our website at nalchbp.org.

**As with any new program, there are and have been** bumps in the road, but it is my hope that you found this information helpful and that you take the first step to start earning health rewards today.

**Contract Administration Unit**

Brian Renfroe, Executive Vice President
James D. Henry, Vice President
Christopher Jackson, Director of City Delivery
Manuel L. Peralta Jr., Director of Safety and Health
Dan Toth, Director of Retired Members
Jim Yates, Director of Life Insurance

# Individual retirement counseling

An important benefit letter carriers earn during their career is the right to individual retirement counseling by the Postal Service. Carriers should take advantage of this important benefit as they approach their retirement date. The Office of Personnel Management (OPM) is the government agency that creates the rules and regulations concerning the Federal Employees Retirement System (FERS) and Civil Service Retirement System (CSRS) that federal agencies must follow. Certain articles of our National Agreement incorporate these rules into our contract and therefore oblige the Postal Service to follow them. Article 21.3 of the National Agreement incorporates Title 5 of U.S. Code Chapters 83 (CSRS) and 84 (FERS). Article 5 incorporates management's obligations under the law, and Article 19 incorporates handbooks and manuals.

**OPM places a responsibility on the Postal Service to guide** employees through the retirement process and supply all of the information that employees may need about their retirement. OPM's *CSRS/FERS Handbook*, Chapter 40, Planning and Applying for Retirement, Section A2.1-1.B states in part:

It is the agency's responsibility to guide the employee through the retirement process, supplying all of the information the employee may need about continuing insurance coverage into retirement. The agency is responsible for giving the employee an all-inclusive presentation of the retirement process that the employee needs for successful retirement planning. The agency provides the information an employee needs in planning for retirement, but the agency should not advise or counsel the employee what to do. The purpose of this Chapter is to help agencies assist retiring employees so that they have an uncomplicated transition from their Federal careers to retirement.

Chapter 5 of the Postal Service's *Employee and Labor Relations Manual (ELM)* covers employee benefits. Section 569.14 explains that employees may request individual counseling, and that such counseling sessions are on the clock if the session is during the employee's tour. This section states:

As part of the retirement process, employees may request individual retirement counseling from the Human Resources Shared Services Center (HRSSC). Counseling is provided by a retirement specialist at the HRSSC who can provide detailed information on retirement health benefits, life insurance, and other retirement-related benefits programs. These counseling sessions are conducted via telephone primarily, and they may involve use of a computer and/or electronic media, as appropriate. The retirement specialist may also direct the employee to other sources to obtain information specific to certain topics, including TSP and Social Security. The sessions are on the clock if the retirement specialist is available to provide such counseling during the same tour as the employee.

The provisions governing retirement under CSRS are explained in Section 560 of the *ELM*, while rules pertaining to FERS are covered in Section 580.

Section 569.142 of the *ELM* details the content that should be covered during a counseling session. Prior to the counseling session, the retirement specialist should mail an annuity estimate based on the retirement effective date and type of retirement requested by the employee. During the session, the retirement specialist should review the employee's retirement application and verify that all appropriate documents are signed and dated; review the annuity estimate and answer any questions raised by the employee; clarify the employee's work and leave status up to the date of retirement; and identify the need for any additional documents as necessary. The retirement specialist also should verify civilian and military service history and the advantages, if any, of deposits or redeposits, and finally, address other retirement-related benefits and payments, including (but not limited to) health benefits, life insurance, terminal leave, Thrift Savings Plan accounts and flexible benefits.

A national-level settlement dated Sept. 11, 2009, (M-01708 in NALC's Materials Reference System) explains counseling in further detail:

If an employee who is eligible for and has requested individual retirement counseling wishes to have this counseling on the clock, local management will arrange reasonably private space for this purpose and will permit the employee's spouse and or advisor to be with the employee during this process. If the employee's spouse or advisor is a Postal Service employee only the employee receiving the requested retirement counseling will be on the clock.

If such an employee is not able to call the Human Resources Shared Services Center to begin or complete the individual retirement counseling process without assistance, local management will offer assistance to facilitate completion of the individual retirement counseling. The District Manager, Human Resources will be contacted and will determine who will provide such assistance. Such assistance will include but not be limited to completion of Standard Form 2801 and any other forms related to Life/Health/TSP/Beneficiary and any Military or civilian service deposit selection issues. Whether an employee who requests individual retirement counseling is unable to start or complete the retirement counseling will be determined jointly by management and union at the local level on a case-by-case fact circumstance basis. This will include employees who have started and request assistance during the individual retirement counseling process.

**Letter carriers should ensure a smooth transition to retirement** by using the provided counseling. If necessary, the provisions above can be enforced via Articles 5, 19 and 21 of the National Agreement. Carriers planning for retirement who feel that these provisions are not being honored should contact their shop steward or branch officer.

# National convention updates



**Assistant to the President for Community Services Christina Vela Davidson**

The national convention will be held in Chicago Aug. 8-12. Below are a few updates for convention attendees.

## Donate to Disaster Relief Fund

**NALC has a new way to donate** to the Disaster Relief Foundation. Come August, we will be able to take your credit card donations. Your donation goes to support fellow NALC members who have suffered due to a fire, hurricane or other disaster. Come by the booth and make a donation!

**NALC Disaster Relief Foundation**

NATIONAL ASSOCIATION OF LETTER CARRIERS

**Make a donation by**
• credit card
• check
• money order
• cash

WE ACCEPT ALL MAJOR CREDIT CARDS  MasterCard  VISA  DISCOVER

The foundation is a 501(c)(3). Your contribution to the NALC Disaster Relief Foundation may be eligible for a tax deduction. It is recommended you seek further advice from your tax advisor.

**Help your NALC family affected by natural disasters**

## MDA Hawaiian fundraiser

**NALC will be hosting a Muscular Dystrophy Associ-**



ation (MDA) fundraiser, "A Hawaiian Night to Remember," Aug. 8 from 7 to 10 p.m. Please join us—we will have a Hawaiian theme with loads of fun, food, entertainment and raffles!

There are only 1,500 tickets/spots available, for $100 each. You can buy your tickets at the following link, or by check or money order: mda.donordrive.com/participant/convention.

NALC has helped lead the search for a cure for neuromuscular diseases for more than half a century for MDA, raising about a million dollars annually. We continue to go the extra mile on the frontlines for MDA—even throughout the pandemic, we continued to work to deliver the cure. The money we raise will help children and adults in our community, and also will help support innovative research to change the future for people with neuromuscular disease.



The front and back view of the memorial T-shirt for the Ruck March/Walk. All proceeds from the march will go to Chicago Veterans.

## March for veterans

**The NALC Veterans Group is hosting a 2.6-mile** Ruck March/Walk at NALC's 72nd biennial convention in Chicago on Wednesday, Aug. 10, from 6:30 p.m. until the last person crosses the finish line.

Register for the Ruck March/Walk for $40 and receive a memorial T-shirt (see above). Proceeds will support Chicago Veterans, a nonprofit organization that empowers veterans to take control of their transitions throughout life. You also can donate to Chicago Veterans through the same link. Sign up or donate now at fundraise.chicagovets.org/event/nalc-veterans-helping-veterans/e404242.

# Claim denied?
# Don't despair. Appeal!



**Assistant to the President for Workers' Compensation Kevin Card**

**L**etter carriers file a total of about 24,000 injury claims yearly with the Office of Workers' Compensation Programs (OWCP). Approximately 90 percent are for traumatic injuries—the rest are for occupational diseases. OWCP generally attempts to adjudicate traumatic injury claims in 45 days. Occupational disease claims take about 90 days.

During the adjudication process, OWCP accepts many traumatic injuries as short-form closures. These are claims where the injured worker is expected to incur less than $1,500 in medical expenses and have his or her lost time covered by Continuation of Pay (COP).

Injured workers will get a letter explaining the short-form closure that advises them to file a CA-7 for wage-loss compensation if they exceed the 45 days of COP. Once the CA-7 is filed, OWCP will notify the worker by letter that the claim will be formally adjudicated.

If the OWCP claims examiner does not think the claim has sufficient factual or medical evidence for acceptance, a development letter will be issued, giving the worker 30 days to provide the necessary evidence for formal adjudication.

Some workers get the formal adjudication notice or development letter and incorrectly think that their claim has been denied. Every letter from OWCP should be thoroughly examined. Many claims are denied because the worker did not respond to the development letter.

Injured workers can avoid this by checking their ECOMP dashboard daily. Development letters are found under the "Letter" tab, labeled as Response Required, allowing the worker to respond to the letter immediately.

Most development letters will ask for a medical report where a doctor provides an explanation of how the injury was caused by the work event. Workers need to read the entire letter, as there may be specific questions for them to answer at the end of the letter. Despite having sufficient medical evidence to get the claim accepted, the claim will be denied if the worker fails to answer the questions at the end of the letter.

OWCP will issue a Notice of Decision when a claim is accepted or denied. An acceptance letter will list the accepted conditions and include important information regarding claims for compensation and OWCP billing procedures. Injured workers should carefully read the accepted conditions, as OWCP will generally accept the claim for the least-impairing condition.

For example, a knee injury may be accepted as a sprain even when there is evidence in the file indicating a torn meniscus or ligament. When that happens, the worker needs to contact his or her doctor and get an additional medical report that links the tears to the original injury.

Getting additional medical conditions accepted at the beginning of your claim is essential in getting further treatments authorized.

## When your claim is denied

**When you receive a Notice of Decision denying your** claim, don't despair!

Carefully read the denial letter and look for the explanation provided in the Basis for Denial section. There, you will find the exact reason or reasons why the claim was denied. In most cases, the denial is based on the lack of a rationalized medical report providing the causal relationship between the injury and specific work factors.

The Basis for Denial section of the denial letter should be given to your doctor immediately so that additional medical evidence can be provided as soon as possible.

OWCP will include an appeal form with every decision. If your claim is denied and you want to present your factual and medical evidence directly to an OWCP employee, check off the box for an oral hearing with the branch of hearings and review. Carefully fill out the bottom of the form, making sure that you list the date of the decision you are appealing. You can upload the completed form via ECOMP, choosing "Branch of Hearings and Review" in the drop-down menu.

Oral hearings are preferable when there are questions regarding the fact of injury. It gives the worker the opportunity to explain the facts surrounding the injury and allows the hearing's representative to ask questions that can further clear up any misinformation regarding the injury, including letters or challenges provided by the Postal Service.

The only downside of requesting an oral hearing is that it can take three to six months to get the hearing scheduled, and then up to 75 days to get a decision.

However, if you get sufficient evidence into the file prior to the hearing, the hearings representative can accept the case without it ever going to hearing. Oral hearings must be requested within 30 days of the date of the decision.

Whatever appeal route you may choose, don't despair! Contact your national business agent's office and ask for a referral to a regional workers' compensation assistant who can offer expert guidance on your appeal.

# MDA reminders and updates



**Christina Vela Davidson**



**I**n early February, the Muscular Dystrophy Association (MDA) shared the list of in-person camp locations for this summer. MDA Summer Camp registration opened to both campers and volunteers on Feb. 15. More details are available and can be shared through email, on social media and on the MDA Summer Camp website.

It is MDA's wish to help families and volunteers evaluate their desired level of participation and determine which MDA Summer Camp location they plan to apply for. For more information, please visit mda.org/summer-camp, or contact MDA at 800-572-1717 or camp@mdausa.org. We are all excited about the return to in-person MDA Summer Camp!

## Registering with MDA

**We are committed to making sure that every NALC** branch is registered on the MDA/NALC website. MDA has created a page for most branches, so please check that your branch is registered and that we have the correct contact information for the MDA coordinator at your branch.

If you are participating in the July Branch Challenge, please register your branch, if it is not already registered, at mda.donordrive.com/event/nalc2022. If you need help, please call Dana Nolan at 312-392-1100, or email her at nalc@mdausa.org.

## MDA mailing address

**When sending in checks, please be sure to use the** MDA Donation Allocation Card (see right) and address your mail to MDA's new address: Muscular Dystrophy Association Inc., Attn: NALC, P.O. Box 7410354, Chicago, IL 60674-0354.

Also, please send a copy of the form and donation to NALC Headquarters.

## NALC/MDA virtual campaigns

**Below are the links for the 2022 NALC/MDA national** campaigns. If you join, donate or buy, the monetary amount is credited to your branch for its yearly numbers.

- Tough Mudder 5K (Oct. 15): mda.donordrive.com/participant/ToughMudder
- NALC/MDA gift bags ($100 each): mda.donordrive.com/participant/NALCMDAgiftbags

## Convention fundraiser

**Don't forget, if you are going to the national conven-**tion in Chicago:

> **A Hawaiian Night to Remember**
> Aug. 8
> 7 to 10 p.m.
> Only 1,500 tickets/spots available, $100 each
> You can buy your tickets at the link below, or by check or money order:
> mda.donordrive.com/participant/convention

## Other reminders

**If you would like any of your MDA branch fundraising** events to be shared, please forward the information about the event to mda@nalc.org or cdavidson@nalc.org to be posted on social media.

Please remember to send me copies of all items sent to MDA so I can give your branch the correct credit for 2022.

## Correction

**Elyria, OH Branch 196 raised $3,700 for MDA in** 2021; *The Postal Record* apologizes for the omission from the April issue's MDA donor list. Thank you for your participation!

---

**NALC MDA Donation Allocation Form**

- ❑ NALC Branch Number_____
- ❑ State Association_____
- ❑ Auxiliary_____

MDA District/City_____

MDA Contact/Staff_____

MDA Event Name/Event Type_____

MDA Event Date_____ Donation Amount_____

Donor Name_____

Please fill out and mail along with your MDA donation check to:

MDA
Attn: NALC
161 N. Clark Suite 3550
Chicago, IL 60601



# Find out what's offered in the NALC *Veterans Guide*

**A**lmost a quarter of the active and retired members of the National Association of Letter Carriers are military veterans. Having exchanged military uniforms for letter carrier uniforms, veterans continue to serve their communities and this great nation. NALC strives to recognize and honor our military veteran members in a variety of ways.

The NALC Veterans Group was created in 2015 to provide access to information and tools specific to veterans' rights and benefits within the Postal Service. The group provides all NALC military veterans—active as well as retired letter carriers—with resources, information and a sense of camaraderie.

**As part of this goal, NALC developed** the *Veterans Guide* as a quick reference for valuable information relating to military service and the Postal Service. The guide contains various topics of interest to veterans and union representatives who represent letter carrier veterans. Some of the topics covered in the guide include the Uniformed Services Employment and Reemployment Rights Act (USERRA), Wounded Warriors Leave (WWL) and

the Veterans' Preference Act of 1944. Members of the NALC Veterans Group are provided a copy of the guide upon enrolling with the group.

As explained in the guide, USERRA deals with employment rights of postal employees who leave their jobs to perform military service. If you weren't already aware, this law prohibits employers, including the Postal Service, from discriminating against past and present members of the uniformed services.

The guide explains the rules and regulations pertaining to WWL, which is a benefit provided to eligible veterans who need time off to undergo medical treatment for a service-connected disability. Prior to 2016, many veterans were often forced to take sick leave, annual leave or leave without pay to attend medical appointments and undergo treatment.

The Veterans' Preference Act of 1944 benefits veterans both before and after they start their civilian career with the Postal Service. The Act gives preference to eligible veterans during the hiring process and also grants additional rights regarding job security

once employed. NALC military veterans should be sure to read the *Veterans Guide* for a more comprehensive discussion of the Act and the benefits it provides. These three topics are just a sample of the information covered in the *Veterans Guide*. The guide also discusses several National Agreement provisions and memorandums of understanding (MOUs) that apply specifically to military veterans.

**As previously announced, the 72nd** biennial convention will be held Aug. 8-12 in Chicago, IL. As part of each convention, NALC conducts a variety of workshops to educate convention participants.

This year, one of these workshops will focus exclusively on resources, rights and benefits for NALC members who are military veterans. The workshop will offer an overview of the information contained in the *Veterans Guide* so that all NALC convention participants will have an opportunity to become familiar with the publication and information offered. As the convention approaches, be sure to review the convention schedule and plan to attend this important workshop.

## Join the NALC Veterans Group

The NALC Veterans Group is designed to provide NALC members—both active and retired letter carriers—who are also military veterans the ability to connect with fellow NALC veterans and stay informed on issues of importance to letter carrier veterans. It is free to join.

Members receive a pin as a symbol of gratitude for your military service and membership in NALC.

If you are interested in joining the group, complete the sign-up card at right and mail it to the address included. A fillable version is also available at nalc.org/veterans.

**You continue to serve your country—**
**THANK YOU!**

**Free** to join

## NALC Veterans Group

Complete this form and mail it to:
NALC Veterans Group, c/o NALC,
100 Indiana Ave., N.W., Washington, DC 20001-2144

NAME:_____
ADDRESS:_____
CITY, STATE, ZIP:_____
NALC BRANCH NUMBER:_____ BRANCH OF SERVICE:_____

I BELONG TO THE FOLLOWING VETERAN GROUP(S):
❑ AMERICAN LEGION  ❑ DISABLED AMERICAN VETERANS  ❑ VETERANS OF FOREIGN WARS
❑ OTHER:_____



**At the Califoria State Association convention, 29 years of Garden Grove, CA Branch 1100 presidents came together. Pictured (front, l to r) are Dwain Young, Charlie Miller and Art Turner, and (standing, l to r) Barbara Stickler and Keisha Lewis.**

## California

We've seen this movie before!
A Democrat in the White House during midterm elections. Republicans take control of the House and/or the Senate. Why does this happen?

Well, in Fresno, we just saw why. We had two special elections, one to fill a vacant school board trustee position and another to fill the remainder of Rep. Devin Nunes's term. Anyone care to guess what the turnout was for both elections? Less than 25 percent!

Yes, less than a quarter of registered voters, all of whom received a ballot in the mail, cared to vote. In the midterms coming up, does anyone really think that pro-labor candidates are going to win and maintain control of Congress? When 1 in 4 registered voters turn out to vote in any election, do our allies win? *Hell no!*

Please vote. Get others to vote. Why is it that politicians are afraid to mess with Social Security and Medicare? Because senior citizens vote! And more power to them!

Does anyone out there believe that the Rick Scotts and Ron Johnsons of the world want to maintain the status quo in regard to your pay and benefit package? *Hell no!*

For us to maintain control of Congress, we need to fight like hell. Sitting on the sidelines is not an option when your benefits are on the line.

Remember the one article of our National Agreement that we will never use in a grievance: Article 43. Any part of our contract can be done away with a stroke of a pen. Never forget that.

*Eric Ellis*

## Colorado

The 119th Colorado State Association of Letter Carriers (COSALC) convention was a huge success last month in Colorado Springs. Thank you to Branch 204 for hosting the convention.

NALC Executive Vice President Brian Renfroe updated delegates on several of the recent changes, as well as some that are still being discussed and will be implemented in the near future.

Legislative and Political Organizer Anna Mudd attended the convention and educated delegates on the importance of the Letter Carrier Political Fund. She was able to encourage several of those in attendance to get signed up after they learned about the importance and joined the fight to protect their fellow letter carriers.

COSALC President Danielle Fake-Moorman said her farewell to the delegates after accepting a position at NALC Headquarters. She will now fight for letter carriers throughout the country.

COSALC Vice President Doug Jaynes will take over the reins of the COSALC and will fill the necessary vacancies to keep the strength of the association moving forward.

*Richard Byrne*

## Florida

The FSALC is gearing up for the annual Letter Carriers' Food Drive. On Sunday, April 24, President Friedman, along with myself, District 2 Chair Joanne Cannon, Branch 599 President Tony Diaz, carriers from Branches 599, 1477, 1753, 1779 and 2008, and approximately 35 volunteers from some of the food pantries who will be recipients of donated food, met at the Tampa distribution office to sort 3 million cards and 2.5 million bags. These were sorted to be sent to the various offices of the Suncoast District for delivery to residential addresses. Valpak of St. Petersburg is providing 160 million printed food drive cards for delivery to all residential addresses nationwide. It's notable that since the food drive had to be canceled the past two years, approximately one-third of our carriers have never participated in the food drive.

Our food pantries are particularly excited about this year's drive, as they've encountered difficulty meeting the needs of the community during the COVID-19 pandemic. They are hoping for a successful food drive, since our communities are in desperate need of food donations.

Most of the branches throughout Florida have begun to hold live attendance meetings once again. However, many of the larger branches are still incorporating Zoom with the live attendance to accommodate those carriers who cannot attend due to their work schedules and distance from their union halls.

Like most state associations and branches, we are looking forward to the upcoming NALC convention in Chicago. We are looking forward to once again being able to listen to and debate about matters of concern to letter carriers.

Our NBA, Lynne Pendleton, just completed the fifth Boot Camp for new Stewards. Forty-four new Florida stewards attended. They represented the following branches: 53, 321, 1071, 1172, 2008, 2689, 4559, 1477, 2072, 2148 and 4716.

*O.D. Elliott*

## Kentucky

The *NALC Bulletin* that pictures President Biden signing the Postal Reform Act into law was joyfully received across the commonwealth. Bluegrass State letter carriers also appreciated the valuable information we received as our delegates prepare for the national convention in Chicago Aug. 8-12. COVID-19 and the resulting protocols must remain in our psyche. NALC has given us the facts throughout this process.

Speaking of delegates, we recently learned that Bill "Frenchy" Lafrana, one of our longtime retirees, has died. Bill worked tirelessly for our union members at all levels. He shared camaraderie, and always worked to improve the lives of our members across the state and his beloved Branch 361. He will be missed.

Thanks again to letter carriers in all congressional districts and our allies who helped pass postal reform. Our next legislative battles will be to enact the Federal Retirement Fairness Act, the Social Security Fairness Act, Building a Better America, and hazard pay for letter carriers.

Thanks again for all you do in this noble profession. Our customers get great service from their letter carriers, six and seven days a week!

*Bob McNulty*

## Texas

Greetings, everyone.
The summer heat seems to arrive early here in Texas. Down south it has been extremely humid, and it's only going to get better. Please make sure you drink plenty of water and take plenty of rest breaks. Aside from your normal two 10-minute breaks and your 30-minute lunch break, cool down in an air-conditioned area for a few minutes. Your safety and health are more important than the mail.

On the legislative front, Rep. Derek Kilmer (WA-6) introduced the Federal Retirement Fairness Act on June 21. Taken directly from congress.gov, this bill modifies the federal civilian service that is creditable service under the Federal Employees Retirement System (FERS). Specifically, it expands the non-deduction service that may be creditable under FERS. Non-deduction service is federal service where an employee's pay is not subject to retirement deductions (e.g., service under a temporary appointment). Currently, non-deduction service performed before Jan. 1, 1989, is creditable under FERS so long as a deposit is made into the retirement fund to cover the period of non-deduction service. This bill allows non-deduction service performed on or after Jan. 1, 1989, to be creditable under FERS so long as a deposit is made into the retirement fund.

What this boils down to is, if this bill gets passed and signed into law, all postal employees who have casual, transitional employee, city carrier assistant or any other non-career time will be given the opportunity to buy back that time and get credit for it. Like the veterans who bought their military time back.

You want the credit, I want the credit; let's contact our representatives and ask them to support H.R. 4268, the Federal Retirement Fairness Act.

I'm looking forward to seeing our delegation representing Texas in Chicago at the convention.

In solidarity—

*Carlos Rodriguez Jr.*



## From the Trustees

Having been a trustee of Nalcrest over the last 19 years, I have seen a lot of changes—not only in what we have done to improve the community, but in the people themselves. Improving things has taken some time, as we are limited to what funds are available through our rental sources. The pandemic set things back considerably, but we managed to keep things going while keeping things safe for residents.

I mentioned that I have actually seen changes in the residents, too. While we still have to deal with a few negative types of residents, the majority are all-in! I believe that we can attribute their demeanor to the staff we have assembled. Property manager Lisa Senecal takes a hands-on approach with everyone, no matter how pleasant or how difficult they are!

The result was obvious at the "going away" barbecue that Nalcrest hosted for all residents recently. There were plenty of volunteers and smiles aplenty! It kind of reminded me of one big union meeting.

Some photos of the barbecue are at right, and I'm wishing our snowbirds safe travels! See you in the fall.

In solidarity—

*Don Southern*



### Apply to live at Nalcrest

For an application to live at Nalcrest, visit nalc.org/nalcrest, call 863-696-1121 or fax 863-696-3333.

## Nalcrest Trustees

**NALC President Fredric Rolando**

**NALC Secretary-Treasurer Nicole Rhine**

**NALC Director of Retired Members Dan Toth**

**NALC Trustee Mack Julion**

**Nalcrest Trustees President Matty Rose**

**Nalcrest Trustees Vice President Tom Young**

**Nalcrest Trustees Vice President Don Southern**









Nalcrest hosted a "going away" party before the snowbirds retreated to the North for the summer. Residents played games, danced and sang while spending time with friends.

## Alliance, Ohio

This is to serve as notice to all members of Branch 297 that nominations for the offices of president, vice president, secretary, treasurer, health benefits coordinator and the three trustee positions will take place at the regular meeting to be held on Tuesday, Nov. 1, at 6 p.m. Those who wish to be nominated must be present at the virtual meeting (see information below) or should give the secretary a written letter prior to the meeting stating his or her acceptance of nomination. The term of office will be for the 2022-2023 election cycle. The election will be conducted by mail-in ballot.

Zoom meetings: Tuesday, June 7; Tuesday, July 5; Tuesday, Aug. 2; Tuesday, Sept. 6; Tuesday, Oct. 4; Tuesday, Nov. 1; and Tuesday, Dec. 6, from 6 to 7 p.m. You can join the Zoom meetings by going to zoom.us and typing in the Meeting ID: 846 1417 2153. You will then be prompted for a passcode; the passcode is 297. Another way to access Zoom is through a one-tap mobile line (1-929-205-6099); you will be prompted for the Meeting ID and passcode here as well.

*Joshua Lily, Pres., Br. 297*

## Arlington Heights, Illinois

This is the official notice to the members of Branch 2810 for nominations for delegates to the 2023 Illinois State Association convention and the following board positions: president, vice president, treasurer, secretary, sergeant-at-arms, health benefit representative and three trustee positions. Nominations shall be held at the regular branch meeting on Sept. 1 at 600 Landmeier Road, Elk Grove Village. Any member in good standing is eligible for nomination. A member need not be present at the meeting to be nominated; however, they must submit to the branch secretary, prior to the branch meeting, a written notice indicating a desire to accept a specific nomination.

*Patrick McDonough, Sec., Br. 2810*

## Gadsden, Alabama

This is a notice to all members of

## Election Notices

**Election Notices** must be submitted to *The Postal Record*, not to other offices at NALC. *The Constitution for Government of Federal and Subordinate Branches* requires that notice be mailed to members no fewer than **45 days before the election** (Article 5, Section 4). Branch secretaries must remember the time difference between deadline for submission of notices—the 10th of the month—and publication of the subsequent issue of the magazine, e.g., June's deadline is for the July publication.

Branch 1047 that nominations for the next two-year term for the following offices will be accepted at the Nov. 8 meeting at 7 p.m. at the Main Post Office Swing Room, located at 700 Chestnut St., Gadsden: president, vice president, secretary/treasurer, sergeant-at-arms, three board of trustees members and a health benefits representative. The election will be held on Dec. 13 at 7 p.m. at the Main Post Office's union office, located at 700 Chestnut St., Gadsden. Voting will be by secret ballot. Requests for absentee ballots after the nominations are complete must be made in writing to: NALC Branch No. 1047, Attn: Branch Election Committee, P.O. Box 104, Gadsden, AL 35902. Completed absentee ballots must be received by the branch election committee no later than Dec. 6.

*Keith Mitchell, Sec., Br. 1047*

## Greenville, South Carolina

This will serve as official notice to all active and retired members of Branch 439 that nominations for president, vice president, secretary, treasurer, director of retirees and three trustees, as well as delegates to the state convention, will take place on Oct. 6 at the regular branch meeting held at 4003 Old Buncombe Road, Greenville. The election will be at the same location on Nov. 3. The officers will serve a two-year term from 2023 to 2024.

Every regular member shall have the right to nominate a candidate for any office. The candidates for office or convention delegates must either be present at the meeting when nominated or signify in writing prior to the meeting their willingness to serve if elected. If unavoidably detained, candidates must notify the election committee by telephone and follow up with written acceptance. The ballot will show that the president, vice president, secretary, treasurer and director of retirees are automatic delegates to state and national conventions. They shall be the first five delegates.

In the event that more than one member is nominated for an officer position or more than three trustees are nominated, ballots will be sent within one week to the address on record of all members. To be counted, ballots must be in the hands of the chairman of the election committee at the November meeting. An election committee of three will be appointed to handle election procedures and count the ballots.

*Michelle Splawn, Sec., Br. 439*

## Laredo, Texas

This is the official notice to all members of Branch 354 of nominations and elections for state convention delegates and one trustee. Nominations will be taken at the regular branch meeting on Oct. 11. The meeting starts at 7 p.m. at the union hall, located at 3220 E. Locust. Nominees must accept nomination at the time made or, if absent, in writing. The term for trustee is for three years. Secret ballots will be mailed out and replies must be received at the P.O. box no later than 12:01 a.m. on Nov. 8. Tally of ballots will be at the union hall during our monthly meeting on Nov. 10 at 7 p.m.

*Rafael G. Carranza, Sec., Br. 354*

## Massachusetts Northeast Mgd.

Nominations for delegates to the Massachusetts state convention in 2023 shall be held at the October regular monthly meeting for Branch 25, to be held at 8 p.m. at the Knights of Columbus in Wilmington.

Election for delegates will be held by secret ballot at the November regular monthly meeting, also to be held at 8 p.m. at the Knights of Columbus in Wilmington. Expenses for elected delegates shall be voted on at the November meeting.

All elected delegates must have attended 60 percent of the regular monthly meetings, held from the previous state convention election meeting through and including current year's state convention nomination meeting, to be a paid delegate.

Any member who has not been a member for the prior two years will have their attendance prorated from the date of membership.

In addition to the provisions of Article 5 of the Branch 25 bylaws, which designates the president and executive vice president as automatic delegates for these functions, Article 5 of the *NALC Constitution* shall prevail.

*Anthony P. Bossi, Sec., Br. 25*

## Nashua, New Hampshire

The office of director of retirees has become vacant. Nominations will be held at the regular monthly meeting on June 15. Election will be at the July 20 meeting. Any interested member must be present at the June meeting or submit, in writing, their intention to run for the position and mail it to the branch before the June meeting at: NALC Br. 230, P.O. Box 1, Nashua, NH 03061.

*Henry Gorman, Sec., Br. 230*

## Philadelphia, Pennsylvania

This is official notice to all members of Branch 157 that nominations for elective officers of the branch shall take place at the general membership meeting on Oct. 18. At that October meeting, the president shall appoint a nominating committee. The names of candidates shall be presented to this committee in writing between 8 p.m. and 9 p.m. All candidates for office must be present at the time of the nominations, or have signified by that time their assent in writing to the secretary of the branch.

The officers of the branch are president, vice president, recording secretary, financial secretary, treasurer, assistant recording secretary, sergeant-at-arms, MBA representative, health benefits representative, safety officer, legislative liaison, Office of Workers' Compensation Programs (OWCP) officer and seven members of the board of trustees.

The branch also shall elect the officers of the Retirement and Death Benefit Fund: director, assistant director secretary, five trustees, a community service officer, a branch correspondent and a branch chaplain. All regular members, except those who have applied for, held, accepted or acted in a supervisory position for any period, whether one day or a fraction thereof, either detailed, probationary or permanently, shall be eligible to hold office in the branch. The period of ineligibility is two years. Nominations will be conducted in accordance with Article 5 of the *NALC Constitution* and Article 3 of the Branch 157 bylaws.

*Joe Rodgers, Pres., Br. 157*

## Reading, Pennsylvania

This is official notice to members of Branch 258 that nominations for the positions of president, vice president, secretary, treasurer, one trustee (three-year term), sergeant-at-arms, health plan representative, labor council representative and director of communications will take place at the regular branch meeting, to be held Oct. 12 at 7:30 p.m. at the United Steelworkers union hall, located at 1251 N. Front St., Reading.

Those who wish to be nominated must be present for the meeting or submit a letter of nomination acceptance to the branch secretary prior to the October regular meeting. In the event that an election is necessary, such election will take place at the regular branch meeting on Nov. 9 at 7:30 p.m. at the United Steelworkers hall.

*Paul Purcell, Sec., Br. 258*

## Santa Ana, California

This is official notice to all Branch 737 members of nominations and elections for the following positions: president, executive vice president, vice president, financial secretary/treasurer, sergeant-at-arms, recording secretary, trustee/health benefit representative, trustee/Mutual Benefit Association representative and trustee.

Term of office will be for three years, from January 2023 through January 2026. Nominations will be held at the union office at 702 S. Broadway in Santa Ana during the regular branch meeting that commences at 6:30 p.m. on Sept. 13. Nominations may also be made in writing, but must be received by the branch recording secretary no later than Sept. 1. All regular members in good standing shall be eligible to hold any office or position in the branch except as provided under Article 5, Section 2 (subordinate branches) of our *NALC Constitution*. Every regular member shall have the right to nominate a candidate(s). Candidates must accept nominations at the time made or, if absent, in writing.

The election will be held by mail. A ballot, a secret ballot envelope and a postage prepaid envelope addressed to the election committee shall be mailed to each eligible member of the branch at their last known mailing address at least 20 days prior to tabulation. A sealed post office box shall be rented by the branch to receive the ballots; jurisdiction of said box shall be in the hands of the election committee. If there are two or more candidates for any office, the plurality of all votes cast for such office shall be necessary to elect. There shall be no write-in votes for candidates not officially on the ballot. Ballots must be received no later than 12 p.m. on Oct. 11.

By virtue of his elected position, the president shall be the chief delegate of this branch at the state and national conventions or duly called conferences.

Adequate safeguards to ensure a fair election shall be provided.

*Cheryl Stoffel, Rec. Sec., Br. 737*

## Snohomish Co., Washington

Nominations for all Branch 791 officers shall be conducted at the September and October meetings. Nominations will be accepted for president, vice president, secretary, treasurer, MBA/health benefits representative, sergeant-at-arms, director of retired members and one trustee. An election, if necessary, will be conducted via mail in accordance with Branch 791 bylaws. Trustee election shall be conducted by secret ballot by those attending the Nov. 10 meeting.

Meetings are held at the Everett Labor Temple, located at 2812 Lombard Ave., Everett, on the first Thursday of each month at 7 p.m. (except July and August). The November meeting will be held on the second Thursday, Nov. 10. All nominees must indicate their acceptance of the nomination as required in Article 4, Section 6.

Nominations for the state convention delegates will be conducted at the branch meeting on Sept. 1 and Oct. 6. Nominations for branch trustee will be conducted at the September and October meetings. Election of delegates to the state convention shall be conducted by secret ballot at the Nov. 10 meeting by those present. All nominees must indicate their acceptance of the nomination as required in Article 4, Section 6.

The president, vice president and secretary, by virtue of their office, shall be automatic delegates to the national and state conventions.

*Michelle Decker, Pres., Br. 791*

## Willoughby, Ohio

This article serves as official notice to all members of Branch 3688 that nominations for president, vice president, secretary, treasurer and three board of trustee positions (with one alternate) will take place at the regular branch meeting scheduled for 5:30 p.m. on Wednesday, Oct. 19, at the Eastlake VFW, Eastlake. Members willing to serve must be present to be nominated, unless they signify their intentions in writing to the branch secretary prior to the meeting. All positions are for two-year terms.

If an election is warranted, such election will take place by secret ballot at our regularly scheduled union meeting on Nov. 16.

*Michael Ramacciatti, Sec., Br. 3688*

## Retiree Reports

### Anchorage, Alaska

I visited a website that has the salaries of all postal employees. I wanted to see how much money is being stolen by supervisors and managers when they get their paychecks. I looked at some of the salaries of the postmasters in the offices that I worked in, and it's a shame that they actually have the guts to cash their paychecks.

I would have to say that one of the most incompetent management teams has to be the Soldotna Post Office. And if you don't believe me, just do a search for comments on management in Soldotna. I'm on a Facebook page where residents in that area comment on the interactions they have had with the postmaster. The things the residents write will make you blush.

The postmaster has never been a carrier and is clueless when it comes to the delivery of the mail. She has a supervisor who she uses as her pit bull and allows him to bully the employees. Grievances have been filed, and in a recent arbitration where the supervisor was testifying, even the arbitrator stated that his testimony was contradictory. So much for his credibility, although the bar he set was already very low.

The Soldotna Post Office has an office solely for the use of the Alaska district manager (DM). This is the only associate office I'm aware of that has an office for the DM. Why would there be an office for the DM that is 145 miles from his Alaska District office in Anchorage? Might it be that his wife is the postmaster in Sterling just 11 miles up the road? Or could it be for the fishing in the famous Kenai River that runs through both towns?

More to come next month.

*Jim Raymond, Branch 4319*

### Centennial, Colorado

I n the early '90s, automation of mail delivery had begun. The Postal Service began hiring non-career carriers called transitional employees (TEs).

Stuck in a dead-end job, I decided to apply—after all, my father retired from the P.O. with benefits and a pension. I started in an office of mostly door-to-door delivery to small older homes in a suburb of Denver. We were laid off every year with the understanding that we would be permanently removed once automation was fully implemented.

After my second year, NALC realized it was now representing employees who were not receiving benefits, and rollout of the technology was slow. TEs (like the current CCAs) were overworked and not properly trained. Red books, barcoded letters, Delivery Point Sequence (DPS)—all words surrounding a new way to deliver mail. So, it was with interest when I read Lew Drass's article in April's *Record* regarding DPS.

Once I was hired as a permanent employee, I found that I was not a fan of walking for six to 10 hours a day. And new carriers coming into the system were struggling with learning all of the lingo, along with trying to figure out how to carry three bundles of mail. But I also noticed that carriers in our small office avoided apartment deliveries. Being the low-seniority TE, I took the advice of a seasoned carrier and got good at one aspect of the job.

As an on-the-job instructor, teaching new employees how to deliver DPS (along with residual and parcels) was a nightmare when DPS was not in sequence. Asking a CCA to be proficient as a regular when all the tools are not available could be the reason people give up on a good career. Fix the DPS!

In unity—

*Barb Larson, Branch 5996*

### Hartford, Connecticut

I stepped down as president of Branch 86 on April 9—a position I had held since Nov. 8, 1988! I had been the president, in whole or in part, covering a span of five decades, and I will be eternally grateful for this honor bestowed upon me for the past 33.5 years! Branch 86 represents approximately 1,700 active and retired letter carriers in 42 different pay locations, ranging from a couple of members to more than 150. Many branch mergers occurred to constitute our branch's profile, and I am grateful for every one of them.

I want to thank the Branch 86 membership for the many kindnesses they bestowed upon me over the years, and for always having my back as much as I strived every day to do for them. Being a union representative in today's Post Office is no bargain, and those who are committed—and doing it for the right reasons—are among the hardest-working individuals on the workroom floor. Because of the 300-word limit of these articles, I could not possibly thank everyone over the years who made my job a little easier. I have already begun reaching out personally to thank everyone, but it will take some time.

Having not had a retirement banquet for three years due to the pandemic, Branch 86 recently held two such events (April 2 and April 9) to try to catch up. Many thanks to President Rolando for assigning Director of Retired Members Dan Toth to attend both events, and our national business agent, Rick DiCecca, also made both trips. Both dinners hosted a combined 460 people, and they all appeared to enjoy themselves.

In closing, I wish to thank Branch 86 President George Laham for appointing me to write columns for *The Postal Record*'s Retiree Reports.

*Michael L. Willadsen, Branch 86*

### Paterson, New Jersey

W ith the passage of the Postal Reform Act, H.R. 3076, a congratulatory message is appropriate at this time to our union leaders who spent countless hours, days, months and years to finally achieve this task.

We are sure that at the time of passage of this original law (almost 20 years ago), it had to have a positive effect on the Postal Service and retirees, but times, conditions and financial situations do change over a course of years, which may have made it difficult to maintain this law the way it was originally written.

It is difficult to pass a perfect law—someone will always have to pay more for something. The benefits of this law outweigh the negatives, even though it may be hard to see for some of our members. The politics of the situation are that you have to give something in order to get a return. We are glad we were able to accomplish this in an era with a labor-friendly Congress, Senate and president.

*Joseph Murone, Branch 120*

## NALC recognizes its brothers and sisters for their long-term membership



NALC members who have completed 50 years of membership in NALC are awarded a Life Membership Gold Card that entitles them to all privileges of membership in NALC without payment of dues. To receive a gold card and 50-year lapel pin, the branch secretary must write to the NALC secretary-treasurer and request the award for the member. This is in accordance with Article 2, Section 5 (a) of the *NALC Constitution*.

Additionally, the national secretary-treasurer's office handles



branch requests for lapel pins. Accordingly, the secretary-treasurer's office can only provide suitable lapel pins "when receiving proper notification by the Branch Secretary" in the year when a member is to complete the following number of years as a member: 25 years, 30 years, 35 years, 40 years, 45 years, 50 years, 55 years, 60 years and 65 years. Special plaques are available for members who complete 70 years and 75 years. This is also per Article 2 of the *NALC Constitution*.

**All requests must come from the branch secretary.** Longtime members are encouraged to inform their branches when they reach a longevity benchmark.

## Below is a list of those NALC members who have received an award in the past month:

### 75-year pins

| | | |
|---|---|---|
| Thomas E. Harman | St. Louis, MO | Br. 343 |

### 70-year pins

| | | |
|---|---|---|
| Andrew L. Johnson | Washington, DC | Br. 142 |
| Wayne B. Wheeler Sr. | Central Florida | Br. 1091 |
| Bernard P. Laplante | Pittsfield, MA | Br. 286 |
| Edward C. Stagman | Mid-Michigan | Br. 256 |
| Glennon J. Ameis | St. Louis, MO | Br. 343 |
| Louis J. Baroli | St. Louis, MO | Br. 343 |
| Walter C. Clark | St. Louis, MO | Br. 343 |
| Arthur C. Hessler | St. Louis, MO | Br. 343 |
| Charles D. Scanlon | St. Louis, MO | Br. 343 |
| Jimmie D. Sutherland | St. Louis, MO | Br. 343 |
| Julius J. Watkins | St. Louis, MO | Br. 343 |
| Richard E. Zimmerman | St. Louis, MO | Br. 343 |
| C S. Dorton Jr. | Charlotte, NC | Br. 545 |
| Joseph A. Geiger | Scranton, PA | Br. 17 |
| R. B. Reynolds | Houston, TX | Br. 283 |
| William W. Scott | Houston, TX | Br. 283 |
| Paul N. Vargas | San Antonio, TX | Br. 421 |

### 65-year pins

| | | |
|---|---|---|
| Russell B. Springstroh | Spacecoast Florida | Br. 2689 |
| Amos L. Smith Sr. | Atlanta, GA | Br. 73 |
| Duane J. Brunkow | Topeka, KS | Br. 10 |
| Jack E. Connell | Topeka, KS | Br. 10 |
| James W. Gravenstein | Topeka, KS | Br. 10 |
| Eldon W. Rokey | Topeka, KS | Br. 10 |
| Roger G. Theroux | Fall River, MA | Br. 51 |
| Theophil J. Malinowski | Pittsfield, MA | Br. 286 |
| Alfred D. Waterson | Mid-Michigan | Br. 256 |
| Oliver J. Walker Sr. | St. Charles, MO | Br. 984 |
| Earl W. Armstrong Sr. | St. Louis, MO | Br. 343 |
| Robert F. Avery | St. Louis, MO | Br. 343 |
| Lucian E. Bird | St. Louis, MO | Br. 343 |
| John R. Buchheit | St. Louis, MO | Br. 343 |
| Percy L. Cox | St. Louis, MO | Br. 343 |
| Charles P. Dalton | St. Louis, MO | Br. 343 |
| Henry Deibel | St. Louis, MO | Br. 343 |
| Robert E. Flaherty | St. Louis, MO | Br. 343 |
| August W. Frank | St. Louis, MO | Br. 343 |
| J B. Graham | St. Louis, MO | Br. 343 |
| Robert A. Hacker | St. Louis, MO | Br. 343 |
| Wilbert L. Hubbard | St. Louis, MO | Br. 343 |
| Anthony L. Immken | St. Louis, MO | Br. 343 |
| Willim Johnson | St. Louis, MO | Br. 343 |
| Rogers H. King | St. Louis, MO | Br. 343 |
| Charles N. Moss | St. Louis, MO | Br. 343 |
| Narvel J. Murrell | St. Louis, MO | Br. 343 |
| James M. Oday | St. Louis, MO | Br. 343 |
| James S. Powell | St. Louis, MO | Br. 343 |
| Willim H. Rowland | St. Louis, MO | Br. 343 |

| | | |
|---|---|---|
| John J. Samuelson Jr. | St. Louis, MO | Br. 343 |
| Jimmie D. Sutherland | St. Louis, MO | Br. 343 |
| Benjmn F. Trice | St. Louis, MO | Br. 343 |
| Louis P. Venegoni | St. Louis, MO | Br. 343 |
| James M. Wilkes | St. Louis, MO | Br. 343 |
| James G. Munro | Medford, OR | Br. 1433 |
| Edward C. Cirillo | Philadelphia, PA | Br. 157 |
| Lawrence J. Concio | Philadelphia, PA | Br. 157 |
| Joseph P. Donnelly Jr. | Philadelphia, PA | Br. 157 |
| Roy L. Gilliam Jr. | Philadelphia, PA | Br. 157 |
| Albert W. Gremmel | Philadelphia, PA | Br. 157 |
| William J. Hess | Philadelphia, PA | Br. 157 |
| Eugene M. Howley | Philadelphia, PA | Br. 157 |
| Richard J. Kalwasinski | Philadelphia, PA | Br. 157 |
| Donald Kenny | Philadelphia, PA | Br. 157 |
| Robert H. Killian | Philadelphia, PA | Br. 157 |
| William P. Longacre Jr. | Philadelphia, PA | Br. 157 |
| James A. McFadden | Philadelphia, PA | Br. 157 |
| Albert V. Mercadante | Philadelphia, PA | Br. 157 |
| Donald M. Reid | Philadelphia, PA | Br. 157 |
| William S. Simpson | Philadelphia, PA | Br. 157 |
| Charles R. Sola Jr. | Philadelphia, PA | Br. 157 |
| Joseph F. Twardowski | Philadelphia, PA | Br. 157 |
| Paul H. Zauflik | Philadelphia, PA | Br. 157 |
| James E. Harness Jr. | Knoxville, TN | Br. 419 |
| George W. Waggoner | Knoxville, TN | Br. 419 |
| Earl E. Brown | Houston, TX | Br. 283 |
| Ivory J. Johnson | Houston, TX | Br. 283 |
| Lorenzo C. Montgomery | Houston, TX | Br. 283 |
| Clarence G. Prevost | Houston, TX | Br. 283 |
| D. B. Radican Sr. | Houston, TX | Br. 283 |
| R. B. Reynolds | Houston, TX | Br. 283 |
| William W. Scott | Houston, TX | Br. 283 |
| Ricardo D. Felan | San Antonio, TX | Br. 421 |
| Delbert R. Gonzalez | San Antonio, TX | Br. 421 |
| Herbert A. Kellner | San Antonio, TX | Br. 421 |
| Jaime L. Martinez | San Antonio, TX | Br. 421 |
| Donald P. McGlynn | San Antonio, TX | Br. 421 |
| Willie B. Miller | San Antonio, TX | Br. 421 |
| Steve H. Sanchez III | San Antonio, TX | Br. 421 |
| Joseph A. Webb | San Antonio, TX | Br. 421 |
| Robert I. McBerry | Seattle, WA | Br. 79 |
| Jimmy M. Terada | Seattle, WA | Br. 79 |

### 60-year pins

| | | |
|---|---|---|
| Ralph T. Davis | Washington, DC | Br. 142 |
| Frederick R. Lyles | Washington, DC | Br. 142 |
| James D. Joyner | Fort Lauderdale, FL | Br. 2550 |
| Paul U. Perrault | Fort Lauderdale, FL | Br. 2550 |
| William M. Zimmerman | Fort Lauderdale, FL | Br. 2550 |
| Robert D. Howe | Spacecoast Florida | Br. 2689 |
| Ralph A. Holbrooks | Atlanta, GA | Br. 73 |
| Robert Virkstis | Atlanta, GA | Br. 73 |

| | | |
|---|---|---|
| Charles A. Preston | Idaho Falls, ID | Br. 1364 |
| Merle E. Holliday | Topeka, KS | Br. 10 |
| Leroy E. Lister | Topeka, KS | Br. 10 |
| John A. Punzo | Topeka, KS | Br. 10 |
| Norman E. Levesque | Fall River, MA | Br. 51 |
| Ceasar J. Rodrigues | Fall River, MA | Br. 51 |
| Frank R. Scalise | Pittsfield, MA | Br. 286 |
| Dennis L. Barnack | Alexandria, MN | Br. 2120 |
| Wayne H. Fraser | St. Charles, MO | Br. 984 |
| Randolph H. Meyer | St. Charles, MO | Br. 984 |
| Fred W. Bargmann | St. Louis, MO | Br. 343 |
| Mildred U. Breeden | St. Louis, MO | Br. 343 |
| Donald J. Deves | St. Louis, MO | Br. 343 |
| John H. Haake | St. Louis, MO | Br. 343 |
| Melvin D. Kratzer | St. Louis, MO | Br. 343 |
| Lois M. Laird | St. Louis, MO | Br. 343 |
| James D. Moody | St. Louis, MO | Br. 343 |
| Charles B. Moskowitz | St. Louis, MO | Br. 343 |
| Julian R. Najbar | St. Louis, MO | Br. 343 |
| Howard J. Neels | St. Louis, MO | Br. 343 |
| Richard G. Preusser | St. Louis, MO | Br. 343 |
| Thomas A. Reynolds | St. Louis, MO | Br. 343 |
| Raymond E. Schlereth | St. Louis, MO | Br. 343 |
| Jimmie D. Sutherland | St. Louis, MO | Br. 343 |
| David L. Wohlstadter | St. Louis, MO | Br. 343 |
| Donald J. Wurtz | St. Louis, MO | Br. 343 |
| Santo R. Iurato | Bergen Co. Mgd., NJ | Br. 425 |
| Kenneth E. Allen | Albuquerque, NM | Br. 504 |
| Louis M. Cucuzza | New York, NY | Br. 36 |
| Franklin W. Capps Jr. | Charlotte, NC | Br. 545 |
| Robert L. Graham | Charlotte, NC | Br. 545 |
| Charlie R. Kerr | Charlotte, NC | Br. 545 |
| Maurice L. Moser | Winston-Salem, NC | Br. 461 |
| Gary E. Goins | Hamilton, OH | Br. 426 |
| Gerald E. Pater | Hamilton, OH | Br. 426 |
| Clayton C. Rizor | Hamilton, OH | Br. 426 |
| Lanny J. Bogenoff | Medford, OR | Br. 1433 |
| Terry L. Foster | Medford, OR | Br. 1433 |
| James L. Kelley | Medford, OR | Br. 1433 |
| James A. Rowlett | Medford, OR | Br. 1433 |
| Louis P. Austin | Philadelphia, PA | Br. 157 |
| Albert E. Herrmann Jr. | Philadelphia, PA | Br. 157 |
| Anthony Lapkiewicz | Philadelphia, PA | Br. 157 |
| George M. Maclaren | Philadelphia, PA | Br. 157 |
| William C. McGarvey | Philadelphia, PA | Br. 157 |
| Thomas J. Nicholas | Philadelphia, PA | Br. 157 |
| Raymond B. Rubin | Philadelphia, PA | Br. 157 |
| Richard G. Shultz Jr. | Philadelphia, PA | Br. 157 |
| James C. Snaith | Philadelphia, PA | Br. 157 |
| Carl R. Sunderland | Philadelphia, PA | Br. 157 |
| Peter Tagliavia | Philadelphia, PA | Br. 157 |
| Lewis G. Walsh | Philadelphia, PA | Br. 157 |
| Vincent J. Curmaci | Scranton, PA | Br. 17 |
| Eugene A. Korjeski | Scranton, PA | Br. 17 |

## Below is a list of those NALC members who have received an award in the past month:

| Name | Location | Branch |
|---|---|---|
| Francis J. Malinoski Sr. | Scranton, PA | Br. 17 |
| Thomas W. King | Knoxville, TN | Br. 419 |
| James M. Vasser | Knoxville, TN | Br. 419 |
| Paul K. Arceneaux | Houston, TX | Br. 283 |
| Earl E. Brown | Houston, TX | Br. 283 |
| Manuel V. Esparza | Houston, TX | Br. 283 |
| Robert H. Fleming | Houston, TX | Br. 283 |
| Richard M. Gutierrez | Houston, TX | Br. 283 |
| T. C. Koester Jr. | Houston, TX | Br. 283 |
| Lloyd K. Lambert | Houston, TX | Br. 283 |
| Sidney J. Matchette | Houston, TX | Br. 283 |
| Wylie E. Maxfield | Houston, TX | Br. 283 |
| William R. May | Houston, TX | Br. 283 |
| Herbert T. Molina | Houston, TX | Br. 283 |
| Lorenzo C. Montgomery | Houston, TX | Br. 283 |
| Clarence G. Prevost | Houston, TX | Br. 283 |
| Fred L. Psencik | Houston, TX | Br. 283 |
| Nelson H. Psencik | Houston, TX | Br. 283 |
| D. B. Radican Sr. | Houston, TX | Br. 283 |
| James L. Taylor | Houston, TX | Br. 283 |
| Adolph Trejo | Houston, TX | Br. 283 |
| Alton W. Welborn | Houston, TX | Br. 283 |
| Harvey J. West | Houston, TX | Br. 283 |
| D. C. Westmoreland Jr. | Houston, TX | Br. 283 |
| Lloyd Williams | Houston, TX | Br. 283 |
| Eugene L. Boike | Pasadena, TX | Br. 3867 |
| Thomas E. Elmer | Pasadena, TX | Br. 3867 |
| Macedonio G. Martinez | San Antonio, TX | Br. 421 |
| Joe A. Rios | San Antonio, TX | Br. 421 |
| Delbert E. Rose | San Antonio, TX | Br. 421 |
| Dominic M. Van Ness | San Antonio, TX | Br. 421 |
| Louis L. Virden Jr. | San Antonio, TX | Br. 421 |
| Leroy H. Ward | Ogden, UT | Br. 68 |
| Eugene J. Dell Jr. | Seattle, WA | Br. 79 |
| Ronald M. Henry | Seattle, WA | Br. 79 |
| Kenneth P. Johnston | Seattle, WA | Br. 79 |
| Lafayette A. Moore Jr. | Seattle, WA | Br. 79 |
| Don K. Sanders | Seattle, WA | Br. 79 |
| Anthony A. Dabel | Waukesha, WI | Br. 397 |

## 55-year pins

| Name | Location | Branch |
|---|---|---|
| Rowell K. Bolling | Washington, DC | Br. 142 |
| William F. Gladden Jr. | Washington, DC | Br. 142 |
| Robert Harlan Jr. | Washington, DC | Br. 142 |
| James A. Jewett | Washington, DC | Br. 142 |
| John W. Muse | Washington, DC | Br. 142 |
| Henry K. Dudley | Fort Lauderdale, FL | Br. 2550 |
| Robert W. Haberland | Fort Lauderdale, FL | Br. 2550 |
| William K. Katterfield | Fort Lauderdale, FL | Br. 2550 |
| Birnett Gee | Northeast Florida | Br. 53 |
| Thomas F. Rose | Spacecoast Florida | Br. 2689 |
| Ricky H. Brown | Atlanta, GA | Br. 73 |
| Steven W. Goodwin | Atlanta, GA | Br. 73 |
| Richard P. Gumz | Atlanta, GA | Br. 73 |
| Jerald D. Hesterlee | Atlanta, GA | Br. 73 |
| Ronnie L. Mikell | Atlanta, GA | Br. 73 |
| Jerry M. Parham | Atlanta, GA | Br. 73 |
| Marvin C. Swift | Atlanta, GA | Br. 73 |
| George Jackson | Savannah, GA | Br. 578 |
| William L. Mosley | Savannah, GA | Br. 578 |
| Thomas C. Allen | Topeka, KS | Br. 10 |
| Wendell D. Monaghan | Topeka, KS | Br. 10 |
| Lyle F. Stebbins | Topeka, KS | Br. 10 |
| Joseph S. Batten | Fall River, MA | Br. 51 |
| Gerald E. Hannafin | Fall River, MA | Br. 51 |
| Albert E. Pontes | Fall River, MA | Br. 51 |
| Robert G. Cavicchio | Lynn, MA | Br. 7 |
| Edward E. Pierce | Lynn, MA | Br. 7 |
| Louis J. Gardella | Pittsfield, MA | Br. 286 |

| Name | Location | Branch |
|---|---|---|
| Jack L. Irish | Mid-Michigan | Br. 256 |
| Vera E. Thornton | Mid-Michigan | Br. 256 |
| Lela M. Toner | Mid-Michigan | Br. 256 |
| Geraldine Turner | Mid-Michigan | Br. 256 |
| Harold W. Benne | St. Charles, MO | Br. 984 |
| Paul A. Dunnermann | St. Charles, MO | Br. 984 |
| Gilbert W. Kuhn | St. Charles, MO | Br. 984 |
| Randolph H. Meyer | St. Charles, MO | Br. 984 |
| James L. Pettig | St. Charles, MO | Br. 984 |
| Walter J. Sensmeyer | St. Charles, MO | Br. 984 |
| Palmer C. Ash | St. Louis, MO | Br. 343 |
| Joseph A. Badalamenti | St. Louis, MO | Br. 343 |
| George R. Bauer | St. Louis, MO | Br. 343 |
| Raymond J. Blase | St. Louis, MO | Br. 343 |
| Charles A. Brabec | St. Louis, MO | Br. 343 |
| Lawrence E. Brackett | St. Louis, MO | Br. 343 |
| Raymond E. Breakfield | St. Louis, MO | Br. 343 |
| Walter L. Breville Jr. | St. Louis, MO | Br. 343 |
| Dale B. Cannon | St. Louis, MO | Br. 343 |
| Willie F. Canterberry | St. Louis, MO | Br. 343 |
| Richard E. Davidson | St. Louis, MO | Br. 343 |
| Ronald E. Fromm | St. Louis, MO | Br. 343 |
| Daniel W. Gangloff | St. Louis, MO | Br. 343 |
| Robert W. Gerdes | St. Louis, MO | Br. 343 |
| Thomas H. Glass | St. Louis, MO | Br. 343 |
| Chas M. Heppe | St. Louis, MO | Br. 343 |
| Paul A. Hertel Jr. | St. Louis, MO | Br. 343 |
| Curtis G. Hill | St. Louis, MO | Br. 343 |
| Vernon E. Isenman | St. Louis, MO | Br. 343 |
| Joe L. Lamarque | St. Louis, MO | Br. 343 |
| Richard R. Luechtefeld | St. Louis, MO | Br. 343 |
| Peter A. Maniscalco | St. Louis, MO | Br. 343 |
| Lowell D. McClune | St. Louis, MO | Br. 343 |
| Howard J. Neels | St. Louis, MO | Br. 343 |
| Ermon M. Puckett | St. Louis, MO | Br. 343 |
| James W. Reitz | St. Louis, MO | Br. 343 |
| Thomas R. Richards | St. Louis, MO | Br. 343 |
| John R. Rickhoff Jr. | St. Louis, MO | Br. 343 |
| Joseph B. Shadduck Jr. | St. Louis, MO | Br. 343 |
| Larry A. Streib | St. Louis, MO | Br. 343 |
| Jimmie D. Sutherland | St. Louis, MO | Br. 343 |
| Leonard Turner | St. Louis, MO | Br. 343 |
| Wilson H. Vault Jr. | St. Louis, MO | Br. 343 |
| Harold White Jr. | St. Louis, MO | Br. 343 |
| Warren W. Harrach | North Platte, NE | Br. 1258 |
| Santo R. Iurato | Bergen Co. Mgd., NJ | Br. 425 |
| Charles L. Margulies | Bergen Co. Mgd., NJ | Br. 425 |
| David J. Foley | New Jersey Mgd. | Br. 38 |
| Joseph S. Moore | Charlotte, NC | Br. 545 |
| Larry W. Hauser | Winston-Salem, NC | Br. 461 |
| Robert P. Jarrett | Winston-Salem, NC | Br. 461 |
| Anthony R. Mayberry | Winston-Salem, NC | Br. 461 |
| Roy L. Money | Winston-Salem, NC | Br. 461 |
| Owen S. Shelton | Winston-Salem, NC | Br. 461 |
| Jackie L. Winfree | Winston-Salem, NC | Br. 461 |
| Richard G. Abner | Hamilton, OH | Br. 426 |
| Ervin D. Carter | Hamilton, OH | Br. 426 |
| Kenneth L. Lipphardt | Hamilton, OH | Br. 426 |
| Todd D. Luedtke | Hamilton, OH | Br. 426 |
| Floyd H. Pillion | Hamilton, OH | Br. 426 |
| David E. Russell | Hamilton, OH | Br. 426 |
| Jack Karan | Medford, OR | Br. 1433 |
| Douglas B. Larson | Medford, OR | Br. 1433 |
| Jerry V. Lassen | Medford, OR | Br. 1433 |
| William H. Lucas | Medford, OR | Br. 1433 |
| Larry J. Tauriainen | Medford, OR | Br. 1433 |
| Rosaro J. Bonacci | Philadelphia, PA | Br. 157 |
| Thomas J. Bowers | Philadelphia, PA | Br. 157 |
| James F. Brannigan | Philadelphia, PA | Br. 157 |
| John G. Brill | Philadelphia, PA | Br. 157 |

| Name | Location | Branch |
|---|---|---|
| Thomas J. Burns | Philadelphia, PA | Br. 157 |
| Edward W. Byers | Philadelphia, PA | Br. 157 |
| Patrick F. Corbett | Philadelphia, PA | Br. 157 |
| David A. Dever | Philadelphia, PA | Br. 157 |
| Gladys T. Ferrell | Philadelphia, PA | Br. 157 |
| Pasquale G. Feudale | Philadelphia, PA | Br. 157 |
| Kenneth F. Fisher | Philadelphia, PA | Br. 157 |
| Anthony D. Fleming | Philadelphia, PA | Br. 157 |
| Kenneth Foulks | Philadelphia, PA | Br. 157 |
| George W. Gray | Philadelphia, PA | Br. 157 |
| Charles L. Howell | Philadelphia, PA | Br. 157 |
| George H. Hughes | Philadelphia, PA | Br. 157 |
| David A. James | Philadelphia, PA | Br. 157 |
| C A. Johnson | Philadelphia, PA | Br. 157 |
| Willie J. Johnson | Philadelphia, PA | Br. 157 |
| John E. Kulak | Philadelphia, PA | Br. 157 |
| Marshall S. Leibovitz | Philadelphia, PA | Br. 157 |
| James C. Leith | Philadelphia, PA | Br. 157 |
| John F. Murray Jr. | Philadelphia, PA | Br. 157 |
| Edward D. Piskorski | Philadelphia, PA | Br. 157 |
| Joseph A. Ricchezza | Philadelphia, PA | Br. 157 |
| James R. Rowe Jr. | Philadelphia, PA | Br. 157 |
| Edwin J. Sandone | Philadelphia, PA | Br. 157 |
| Michael J. Shattuck | Philadelphia, PA | Br. 157 |
| Woodrow J. Short Jr. | Philadelphia, PA | Br. 157 |
| Ronald J. Spillman | Philadelphia, PA | Br. 157 |
| Joseph L. Suermann | Philadelphia, PA | Br. 157 |
| Fiore L. Tursi | Philadelphia, PA | Br. 157 |
| Robert J. Vanrell | Philadelphia, PA | Br. 157 |
| David Wiley | Philadelphia, PA | Br. 157 |
| Robert A. Windle | Philadelphia, PA | Br. 157 |
| Thomas D. Bisignani | Scranton, PA | Br. 17 |
| P. A. Cacciamani | Scranton, PA | Br. 17 |
| James P. Corby | Scranton, PA | Br. 17 |
| Vince Gatto | Scranton, PA | Br. 17 |
| Thomas J. Mancuso | Scranton, PA | Br. 17 |
| William P. Neary | Scranton, PA | Br. 17 |
| Eugene J. Patrick | Scranton, PA | Br. 17 |
| Robert J. Ryan | Scranton, PA | Br. 17 |
| John M. Saville | Scranton, PA | Br. 17 |
| James J. Talerico | Scranton, PA | Br. 17 |
| Robert F. Wiorkowski | Scranton, PA | Br. 17 |
| Michael Yarem Jr. | Scranton, PA | Br. 17 |
| R. C. Houtz | State College, PA | Br. 1495 |
| Michael J. McChesney | State College, PA | Br. 1495 |
| David A. Meyer | State College, PA | Br. 1495 |
| Ralph G. Davis | Knoxville, TN | Br. 419 |
| Albert P. Holder | Knoxville, TN | Br. 419 |
| Doyle E. Owsley | Knoxville, TN | Br. 419 |
| Thomas E. Pressley | Knoxville, TN | Br. 419 |
| Robert H. Roberts | Knoxville, TN | Br. 419 |
| Michael S. Smith | Knoxville, TN | Br. 419 |
| Paul K. Arceneaux | Houston, TX | Br. 283 |
| Robert B. Blair | Houston, TX | Br. 283 |
| William P. Davis | Houston, TX | Br. 283 |
| Manuel V. Esparza | Houston, TX | Br. 283 |
| Robert H. Fleming | Houston, TX | Br. 283 |
| Don M. Gann | Houston, TX | Br. 283 |
| Robert C. Garrett | Houston, TX | Br. 283 |
| Holland R. Gibson Jr. | Houston, TX | Br. 283 |
| Richard M. Gutierrez | Houston, TX | Br. 283 |
| David H. Hock | Houston, TX | Br. 283 |
| Roscoe E. Hopwood | Houston, TX | Br. 283 |
| Jon E. Justice | Houston, TX | Br. 283 |
| T C. Koester Jr. | Houston, TX | Br. 283 |
| Eugene C. Koher | Houston, TX | Br. 283 |
| Lloyd K. Lambert | Houston, TX | Br. 283 |
| Delbert G. Luedke | Houston, TX | Br. 283 |
| Jesse G. Martinez | Houston, TX | Br. 283 |
| Sidney J. Matchette | Houston, TX | Br. 283 |

## Below is a list of those NALC members who have received an award in the past month:

| Name | Location | Branch |
|---|---|---|
| Wylie E. Maxfield | Houston, TX | Br. 283 |
| William R. May | Houston, TX | Br. 283 |
| Daniel Mendoza | Houston, TX | Br. 283 |
| Raymond E. Mican | Houston, TX | Br. 283 |
| Herbert T. Molina | Houston, TX | Br. 283 |
| Jose J. Pina | Houston, TX | Br. 283 |
| Fred L. Psencik | Houston, TX | Br. 283 |
| Nelson H. Psencik | Houston, TX | Br. 283 |
| Hector R. Salinas | Houston, TX | Br. 283 |
| James L. Taylor | Houston, TX | Br. 283 |
| Richard S. Taylor | Houston, TX | Br. 283 |
| Adolph Trejo | Houston, TX | Br. 283 |
| Charles Vasquez | Houston, TX | Br. 283 |
| Alton W. Welborn | Houston, TX | Br. 283 |
| Harvey J. West | Houston, TX | Br. 283 |
| D C. WestmorInd Jr. | Houston, TX | Br. 283 |
| Lloyd Williams | Houston, TX | Br. 283 |
| Helen R. Montanes | Pasadena, TX | Br. 3867 |
| Anthony E. Pennison | Pasadena, TX | Br. 3867 |
| Jimmy F. Wiggins | Pasadena, TX | Br. 3867 |
| Jesus Yanes | Pasadena, TX | Br. 3867 |
| Joe L. Carvajal Jr. | San Antonio, TX | Br. 421 |
| Paul A. Davila | San Antonio, TX | Br. 421 |
| Robert C. De la Cruz | San Antonio, TX | Br. 421 |
| Joe H. Delarosa | San Antonio, TX | Br. 421 |
| James W. Ferguson | San Antonio, TX | Br. 421 |
| Francis C. Fisher | San Antonio, TX | Br. 421 |
| Raul A. Hernandez | San Antonio, TX | Br. 421 |
| Donald E. Lauer | San Antonio, TX | Br. 421 |
| Bonifacio Lopez Jr. | San Antonio, TX | Br. 421 |
| Edward Martinez | San Antonio, TX | Br. 421 |
| Enrique Martinez | San Antonio, TX | Br. 421 |
| Gilbert G. Mazuca | San Antonio, TX | Br. 421 |
| Jesse T. Muniz | San Antonio, TX | Br. 421 |
| John L. Nickler | San Antonio, TX | Br. 421 |
| Carlos Nino | San Antonio, TX | Br. 421 |
| Juan Ortiz | San Antonio, TX | Br. 421 |
| Porfirio Rodriguez Jr. | San Antonio, TX | Br. 421 |
| Alejandro Saenz Jr. | San Antonio, TX | Br. 421 |
| Fernando D. Salas | San Antonio, TX | Br. 421 |
| William F. Salzman II | San Antonio, TX | Br. 421 |
| William T. Skinner Jr. | San Antonio, TX | Br. 421 |
| Willfloyd P. Strey | San Antonio, TX | Br. 421 |
| Reynaldo Tellez | San Antonio, TX | Br. 421 |
| Rudolfo Trevino Jr. | San Antonio, TX | Br. 421 |
| Wilbert A. Ullmann | San Antonio, TX | Br. 421 |
| Benito Vela | San Antonio, TX | Br. 421 |
| Warren H. Wood | San Antonio, TX | Br. 421 |
| Alex M. Zapata | San Antonio, TX | Br. 421 |
| Victor M. Zavala | San Antonio, TX | Br. 421 |
| Gary W. Elfving | Seattle, WA | Br. 79 |
| David K. Erickson | Seattle, WA | Br. 79 |
| Robert L. Geiger | Seattle, WA | Br. 79 |
| Kenneth P. Johnston | Seattle, WA | Br. 79 |
| Kenneth B. Miner | Seattle, WA | Br. 79 |
| Charles F. Owens | Seattle, WA | Br. 79 |
| Richard A. Thiel | Tacoma, WA | Br. 130 |
| Louis Grubich | Waukesha, WI | Br. 397 |
| Jerome A. Heilberger | Waukesha, WI | Br. 397 |

### 50-year pins and gold cards

| Name | Location | Branch |
|---|---|---|
| Wesley H. Parker | Greater E. Bay, CA | Br. 1111 |
| Victor A. Quarello | Greater E. Bay, CA | Br. 1111 |
| Bradford S. Browne | Napa, CA | Br. 627 |
| William J. Kent | Napa, CA | Br. 627 |
| Leonard E. Rabe | Napa, CA | Br. 627 |
| Richard K. Smith | Napa, CA | Br. 627 |
| Donald V. Tostenson | Napa, CA | Br. 627 |

| Name | Location | Branch |
|---|---|---|
| Glen A. Boyette | Pasadena, CA | Br. 2200 |
| Ellwood W. Haines | Centennial, CO | Br. 5996 |
| David R. Maez | Centennial, CO | Br. 5996 |
| Thomas A. Inglima | Central Florida | Br. 1091 |
| Mario Rivera Jr. | Central Florida | Br. 1091 |
| Edward N. Sedawie | Fort Lauderdale, FL | Br. 2550 |
| Robert Stokes | Fort Lauderdale, FL | Br. 2550 |
| Wynn R. Sullivan | Fort Lauderdale, FL | Br. 2550 |
| Robert J. Brunke | Northeast Florida | Br. 53 |
| David P. Gray | Northeast Florida | Br. 53 |
| Dave Schafler | South Florida | Br. 1071 |
| Gerardo Sainz Jr. | Tampa, FL | Br. 599 |
| William Brelinsky | Atlanta, GA | Br. 73 |
| Johnny L. Cutchins | Atlanta, GA | Br. 73 |
| J. R. Fraga | Atlanta, GA | Br. 73 |
| Wayman F. Waldon Jr. | Atlanta, GA | Br. 73 |
| James D. Washington | Savannah, GA | Br. 578 |
| Travis L. Bush | Warner Robins, GA | Br. 4057 |
| William H. Allen | Topeka, KS | Br. 10 |
| William H. Bevan | Topeka, KS | Br. 10 |
| Edgar J. Boos | Topeka, KS | Br. 10 |
| Randy R. Lyden | Topeka, KS | Br. 10 |
| Michael J. Maloney | Topeka, KS | Br. 10 |
| Gilbert Moreno Jr. | Topeka, KS | Br. 10 |
| Ron D. Neis | Topeka, KS | Br. 10 |
| Rodney J. Root | Topeka, KS | Br. 10 |
| Monroe Clark | New Orleans, LA | Br. 124 |
| Ras M. Cooley | New Orleans, LA | Br. 124 |
| Ernest M. Harding | New Orleans, LA | Br. 124 |
| Lloyd P. Lear Jr. | New Orleans, LA | Br. 124 |
| Isaac Richardson | New Orleans, LA | Br. 124 |
| Edward Russell Jr. | New Orleans, LA | Br. 124 |
| Arthur Simon Sr. | New Orleans, LA | Br. 124 |
| Malcolm Thompson | New Orleans, LA | Br. 124 |
| Winston Tuckerson | New Orleans, LA | Br. 124 |
| Lloyd J. Watts | New Orleans, LA | Br. 124 |
| Gerald C. Goyette | Fall River, MA | Br. 51 |
| Paul E. Vaillancourt | Fall River, MA | Br. 51 |
| W J. Healey | Mass. NE Mgd. | Br. 25 |
| Mario G. Alcaro | Pittsfield, MA | Br. 286 |
| James D. Hajec | Mid-Michigan | Br. 256 |
| James E. Hall II | Mid-Michigan | Br. 256 |
| Izola Human | Mid-Michigan | Br. 256 |
| Joseph K. Lundy | Mid-Michigan | Br. 256 |
| Dan G. Morse | Mid-Michigan | Br. 256 |
| Linda K. Snyder | Mid-Michigan | Br. 256 |
| Timothy J. Welker | Mid-Michigan | Br. 256 |
| William A. Rosner | St. Charles, MO | Br. 984 |
| Gary D. Troup | St. Charles, MO | Br. 984 |
| Gary L. Willbrand | St. Charles, MO | Br. 984 |
| Kenneth M. Barket | St. Louis, MO | Br. 343 |
| Arthur W. Buck | St. Louis, MO | Br. 343 |
| Andrew J. Garamella | St. Louis, MO | Br. 343 |
| Mark W. Hazen | St. Louis, MO | Br. 343 |
| Larry W. Lefler | St. Louis, MO | Br. 343 |
| Lawrence C. Martin | St. Louis, MO | Br. 343 |
| Melvin McNair | St. Louis, MO | Br. 343 |
| Evelyn M. Park | St. Louis, MO | Br. 343 |
| Donald R. Stegmann | St. Louis, MO | Br. 343 |
| Richard R. Werner | St. Louis, MO | Br. 343 |
| Michael E. Baptiste | Hudson Valley Mgd., NY | Br. 137 |
| Max Alinkofsky | New York, NY | Br. 36 |
| Conrad L. Brown | New York, NY | Br. 36 |
| Frank L. Caggiano | New York, NY | Br. 36 |
| Pat R. Cocozza | New York, NY | Br. 36 |
| Joseph A. Cofresi | New York, NY | Br. 36 |
| A. R. Collet | New York, NY | Br. 36 |
| Murry D. Corito | New York, NY | Br. 36 |
| J. H. Deandrea | New York, NY | Br. 36 |
| James V. Delgreco | New York, NY | Br. 36 |

| Name | Location | Branch |
|---|---|---|
| Pasquale Demartino | New York, NY | Br. 36 |
| William E. English | New York, NY | Br. 36 |
| Bernard Feinberg | New York, NY | Br. 36 |
| Antonio E. Ferguson | New York, NY | Br. 36 |
| Jose A. Fuentes | New York, NY | Br. 36 |
| George G. Grandy | New York, NY | Br. 36 |
| Joseph P. Grillo | New York, NY | Br. 36 |
| Teddy Gutherz | New York, NY | Br. 36 |
| Eddie B. Harris | New York, NY | Br. 36 |
| Robert E. Hicks | New York, NY | Br. 36 |
| Louis J. Huertas | New York, NY | Br. 36 |
| Barry M. Kaplan | New York, NY | Br. 36 |
| Calixta Khan | New York, NY | Br. 36 |
| Simon I. Lee | New York, NY | Br. 36 |
| Onell Lopez | New York, NY | Br. 36 |
| Joseph J. Manzo | New York, NY | Br. 36 |
| Meola V. McDonald | New York, NY | Br. 36 |
| Jose Nunez | New York, NY | Br. 36 |
| Vincent Pallarino | New York, NY | Br. 36 |
| Vito R. Pizzano | New York, NY | Br. 36 |
| Michael Quero | New York, NY | Br. 36 |
| Pedro Quintana | New York, NY | Br. 36 |
| Philip Ramirez | New York, NY | Br. 36 |
| Julio J. Rivera | New York, NY | Br. 36 |
| Charles E. Sergeant | New York, NY | Br. 36 |
| Verdie Skinner | New York, NY | Br. 36 |
| Pedro J. Valentin | New York, NY | Br. 36 |
| Melvin F. White | New York, NY | Br. 36 |
| Tony W. Baggett | Charlotte, NC | Br. 545 |
| Allen R. Blakely | Charlotte, NC | Br. 545 |
| Joseph Blakeney | Charlotte, NC | Br. 545 |
| Clarence V. Boggan Jr. | Charlotte, NC | Br. 545 |
| Jerry D. Bradshaw | Charlotte, NC | Br. 545 |
| King S. Brevard Jr. | Charlotte, NC | Br. 545 |
| Fred W. Brower | Charlotte, NC | Br. 545 |
| Oscar D. Caldwell Jr. | Charlotte, NC | Br. 545 |
| Larry M. Carpenter | Charlotte, NC | Br. 545 |
| Woodrow Clifton | Charlotte, NC | Br. 545 |
| Jerry L. Cook | Charlotte, NC | Br. 545 |
| William D. Craig | Charlotte, NC | Br. 545 |
| James L. Cureton | Charlotte, NC | Br. 545 |
| Paul Devalle | Charlotte, NC | Br. 545 |
| Stephen J. Fulcher | Charlotte, NC | Br. 545 |
| William H. Goodwin | Charlotte, NC | Br. 545 |
| Jack M. Guy | Charlotte, NC | Br. 545 |
| William E. Hager | Charlotte, NC | Br. 545 |
| Earl L. Hamilton | Charlotte, NC | Br. 545 |
| Rondal S. Hamilton | Charlotte, NC | Br. 545 |
| Roy B. Hartsell | Charlotte, NC | Br. 545 |
| O. D. Hestikind | Charlotte, NC | Br. 545 |
| Jack P. Hinson | Charlotte, NC | Br. 545 |
| Ernest C. Hord | Charlotte, NC | Br. 545 |
| Robert L. Kelley | Charlotte, NC | Br. 545 |
| Archie T. Kennedy | Charlotte, NC | Br. 545 |
| Arthur E. King | Charlotte, NC | Br. 545 |
| Flay S. Kiser | Charlotte, NC | Br. 545 |
| Robert L. Lowe | Charlotte, NC | Br. 545 |
| James E. Lowery | Charlotte, NC | Br. 545 |
| James I. Malone | Charlotte, NC | Br. 545 |
| Jackson D. Miller | Charlotte, NC | Br. 545 |
| Stanley S. Mills | Charlotte, NC | Br. 545 |
| Charls J. Parker | Charlotte, NC | Br. 545 |
| Linville H. Plexico Jr. | Charlotte, NC | Br. 545 |
| Robert W. Rentz | Charlotte, NC | Br. 545 |
| J N. Richardson | Charlotte, NC | Br. 545 |
| Theodore H. Shonts | Charlotte, NC | Br. 545 |
| Felder L. Smith Jr. | Charlotte, NC | Br. 545 |
| Robert W. Straub | Charlotte, NC | Br. 545 |
| Royce L. Talley | Charlotte, NC | Br. 545 |
| Malcolm A. Tanner | Charlotte, NC | Br. 545 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Kenneth U. Watson | Charlotte, NC | Br. 545 | Robert D. Price | Knoxville, TN | Br. 419 | Harry F. Scott | Houston, TX | Br. 283 |
| Frank M. Williams | Charlotte, NC | Br. 545 | Andrew Svoboda | Denton, TX | Br. 1367 | James R. Smith | Houston, TX | Br. 283 |
| Robert L. Wright | Charlotte, NC | Br. 545 | Carl J. Bellotti Jr. | Houston, TX | Br. 283 | Rodney E. Thorne | Houston, TX | Br. 283 |
| Darrell L. Beane | Winston-Salem, NC | Br. 461 | Harrell R. Berry | Houston, TX | Br. 283 | Stephen C. Tobleman | Houston, TX | Br. 283 |
| Ronald L. Davis | Winston-Salem, NC | Br. 461 | Vivian J. Blaha | Houston, TX | Br. 283 | Wade R. Vancleave | Houston, TX | Br. 283 |
| Dermont O. Morris | Winston-Salem, NC | Br. 461 | Mcknly E. Bland | Houston, TX | Br. 283 | Salvador S. Vela | Houston, TX | Br. 283 |
| James L. Yarbrough | Winston-Salem, NC | Br. 461 | Raymond R. Buenteo | Houston, TX | Br. 283 | Milton W. Wachsmann | Houston, TX | Br. 283 |
| William G. Bader | Hamilton, OH | Br. 426 | Cecil M. Davis Jr. | Houston, TX | Br. 283 | Jerry W. Williams | Houston, TX | Br. 283 |
| Philip R. Brown | Hamilton, OH | Br. 426 | Leonard B. Edwards | Houston, TX | Br. 283 | Patricia C. Williamson | Houston, TX | Br. 283 |
| Chris V. Ernst Jr. | Hamilton, OH | Br. 426 | Ernest M. Escamilla | Houston, TX | Br. 283 | Wade J. Gillard Jr. | Pasadena, TX | Br. 3867 |
| William C. Gardiner | Hamilton, OH | Br. 426 | William R. Greer Jr. | Houston, TX | Br. 283 | Gerald W. Stone | Pasadena, TX | Br. 3867 |
| Robert W. Gill | Hamilton, OH | Br. 426 | Jonathan Grogan Jr. | Houston, TX | Br. 283 | Janice P. Wiseman | Pasadena, TX | Br. 3867 |
| Fred S. Ponder | Hamilton, OH | Br. 426 | Carolyn S. Jones | Houston, TX | Br. 283 | Ernesto Rodriguez | San Antonio, TX | Br. 421 |
| Louis F. Ruffin | Hamilton, OH | Br. 426 | Clement J. Lazard | Houston, TX | Br. 283 | Joe F. Vargas | San Antonio, TX | Br. 421 |
| John R. Schuerfranz | Hamilton, OH | Br. 426 | Wesley A. Lorenz | Houston, TX | Br. 283 | Terry L. Bozarth | Seattle, WA | Br. 79 |
| Jerome B. Swegert | Hamilton, OH | Br. 426 | Patricia I. Lyssy | Houston, TX | Br. 283 | J. M. Budmats | Seattle, WA | Br. 79 |
| Bobby J. Dearman | Shawnee, OK | Br. 883 | David Martinez | Houston, TX | Br. 283 | Steven A. Carman | Seattle, WA | Br. 79 |
| David J. Gall | Medford, OR | Br. 1433 | Robert J. Maura | Houston, TX | Br. 283 | Wiley E. Duckett | Seattle, WA | Br. 79 |
| Robert C. Gilkey | Medford, OR | Br. 1433 | Thomas D. Messa | Houston, TX | Br. 283 | Paul A. Hartman | Seattle, WA | Br. 79 |
| Michael W. Hoffmeister | Medford, OR | Br. 1433 | Andres Ortiz | Houston, TX | Br. 283 | Phillip D. Hill | Seattle, WA | Br. 79 |
| Thomas L. Koland | Medford, OR | Br. 1433 | Barbara A. Pecore | Houston, TX | Br. 283 | Rose M. Lahey | Seattle, WA | Br. 79 |
| Jeffery C. Werlich | Medford, OR | Br. 1433 | Cyril M. Pesl Jr. | Houston, TX | Br. 283 | Raymond J. Mattern | Seattle, WA | Br. 79 |
| Robert B. Bickta | Reading, PA | Br. 258 | Andrew Ramirez Jr. | Houston, TX | Br. 283 | Mary A. Mayo | Seattle, WA | Br. 79 |
| G. J. Mack | Reading, PA | Br. 258 | Richard Rodriguez Jr. | Houston, TX | Br. 283 | Charles E. Kinzner | Tacoma, WA | Br. 130 |
| Blaine M. Martin | Reading, PA | Br. 258 | Henry Sanchez | Houston, TX | Br. 283 | Steven G. Christiansen | Beloit, WI | Br. 715 |
| James J. Bonner Sr. | Scranton, PA | Br. 17 | | | | George M. Vermillion Jr. | Fond du Lac, WI | Br. 125 |

# In Memoriam

## NALC offers deepest sympathies to the families and friends of departed brothers and sisters

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Cha Lee | Br. 4319 | Anchorage, AK | Jesse J. Whited | Br. 201 | Wichita, KS | Roy L. Money | Br. 461 | Winston-Salem, NC |
| David W. Cox | Br. 1592 | Conway, AR | Alex Domino Jr. | Br. 129 | Baton Rouge, LA | W. H. Shouse | Br. 461 | Winston-Salem, NC |
| Timothy K. Foster | Br. 5141 | Dumas, AR | Aneissa R. Elliott | Br. 176 | Baltimore, MD | Kevin P. Cosgrove | Br. 43 | Cincinnati, OH |
| Riley B. Owens | Br. 4006 | Canoga Park, CA | Rozena R. Green | Br. 2611 | Silver Spring, MD | Marcellus A. Alsop | Br. 182 | Dayton, OH |
| Manuel M. Calderon | Br. 231 | Central California | William A. Cericola | Br. 34 | Boston, MA | Gilbert L. Fitzgerald | Br. 182 | Dayton, OH |
| Burton E. Gray | Br. 1100 | Garden Grove, CA | Primo A. Lombardi Jr. | Br. 25 | MA Northeast Mgd. | William J. Fitzgerald | Br. 182 | Dayton, OH |
| Victor Beltran | Br. 1111 | Greater E. Bay, CA | Robert F. Dinser | Br. 434 | Ann Arbor, MI | Robert W. Longnecker | Br. 182 | Dayton, OH |
| John K. Dupuis | Br. 2901 | Hemet, CA | Lynn P. Johnson | Br. 262 | Battle Creek, MI | Roger L. Loy | Br. 182 | Dayton, OH |
| Leslie A. Shaw | Br. 70 | San Diego, CA | Salvatore Castiglione | Br. 1 | Detroit, MI | John H. Millhoan | Br. 182 | Dayton, OH |
| Ronald A. Cantimbuhan | Br. 193 | San Jose, CA | Charles P. McCormick Jr. | Br. 1 | Detroit, MI | Ronald L. Alexander | Br. 426 | Hamilton, OH |
| Joyce G. Cudanes | Br. 2207 | Torrance, CA | Shariva Mcgrew | Br. 1 | Detroit, MI | Daniel J. Biondo | Br. 426 | Hamilton, OH |
| David L. Lambert | Br. 47 | Denver, CO | Kasson L. Pecore | Br. 1 | Detroit, MI | Gerald H. Hodapp | Br. 426 | Hamilton, OH |
| Robert M. Tomko | Br. 109 | Derby, CT | Joyce L. Pike | Br. 1 | Detroit, MI | Charles H. Rogers | Br. 426 | Hamilton, OH |
| James J. Jamele | Br. 19 | New Haven, CT | Jack A. Rasey | Br. 1 | Detroit, MI | Thomas A. Thieman | Br. 426 | Hamilton, OH |
| Adrienne T. Broadus | Br. 142 | Washington, DC | Fredrick Scott Jr. | Br. 1 | Detroit, MI | Rebecca J. Robinson | Br. 1358 | Tulsa, OK |
| Vernah E. Berry | Br. 2550 | Ft. Lauderdale, FL | Dale C. Troupe | Br. 1 | Detroit, MI | John W. Manney | Br. 920 | Bux-Mont, PA |
| Jessica Berry-Siegrist | Br. 53 | Northeast Florida | Andro Hiben | Br. 9 | Minneapolis, MN | Donald E. Camut | Br. 451 | Johnstown, PA |
| Danielle J. Kelly | Br. 53 | Northeast Florida | Dave A. Barclay | Br. 28 | St. Paul, MN | Luther E. Ochs | Br. 274 | Lehigh Valley, PA |
| Thomas E. Idoyaga | Br. 1071 | South Florida | William T. Howard | Br. 1374 | Gulf Coast Mgd., MS | Edward D. Cuthbert | Br. 157 | Philadelphia, PA |
| Fred A. Nelson | Br. 1071 | South Florida | Anthony S. Lepoma | Br. 1374 | Gulf Coast Mgd., MS | Roberto D. Roche-Flores | Br. 869 | San Juan, PR |
| Dennis B. Llano | Br. 1477 | West Coast Florida | Clifford J. Lake Jr. | Br. 425 | Bergen Co. Mgd., NJ | Edward C. Senna Sr. | Br. 15 | Providence, RI |
| Kathryn A. Warner | Br. 1477 | West Coast Florida | John R. Troast | Br. 38 | New Jersey Mgd. | Ronald L. Erland | Br. 4 | Nashville, TN |
| John Roman | Br. 1690 | West Palm Beach, FL | Merdic Green Jr. | Br. 380 | Trenton, NJ | Gary P. Branch | Br. 1037 | Amarillo, TX |
| Donald J. Staley | Br. 1690 | West Palm Beach, FL | Charles V. Brooks | Br. 29 | Albany, NY | Paul A. Fleming | Br. 1037 | Amarillo, TX |
| Harvey L. Smithers | Br. 73 | Atlanta, GA | Thomas R. Hodge | Br. 3 | Buffalo-Western NY | Emmanuel Marquez | Br. 505 | El Paso, TX |
| Edward W. Davies | Br. 313 | Brunswick, GA | George A. Ross | Br. 3 | Buffalo-Western NY | E. A. Jurek | Br. 283 | Houston, TX |
| Norman K. Strickland Sr. | Br. 313 | Brunswick, GA | Luis A. Afanador | Br. 294 | Flushing, NY | Gary Gavlik | Br. 404 | Waco, TX |
| James A. Pollock | Br. 927 | Pocatello, ID | Thomas J. Bonaccorso | Br. 6000 | Long Island Mgd., NY | George Uptmor | Br. 404 | Waco, TX |
| Loraine Chapman | Br. 11 | Chicago, IL | Seymour H. Wenowsky | Br. 6000 | Long Island Mgd., NY | Guy D. Hawes | Br. 450 | North Sound, WA |
| Silvia Espinosa | Br. 11 | Chicago, IL | Eddie J. Brown | Br. 36 | New York, NY | Ronald A. Engen | Br. 79 | Seattle, WA |
| Letoia T. Fleming | Br. 11 | Chicago, IL | Kenneth Ellsworth | Br. 358 | Northeastern NY | Kenneth L. Hicks | Br. 79 | Seattle, WA |
| John E. Slechter Jr. | Br. 11 | Chicago, IL | Williard H. Stearns | Br. 358 | Northeastern NY | Richard L. McFadden | Br. 79 | Seattle, WA |
| Joseph S. Urban | Br. 11 | Chicago, IL | Peter A. Savage | Br. 693 | Westchester Mgd., NY | Ernest I. Turner | Br. 442 | Spokane, WA |
| William E. Wade | Br. 317 | Decatur, IL | Bartee W. Scott Jr. | Br. 693 | Westchester Mgd., NY | Paul K. Peters | Br. 5354 | Prescott, WI |
| Willis B. Cline | Br. 245 | Rockford, IL | Keith A. Vrooman | Br. 934 | Salisbury, NC | Anthony Jaros | Br. 337 | Superior, WI |
| Aaron J. Loder | Br. 201 | Wichita, KS | James M. Wright | Br. 934 | Salisbury, NC | | | |

# Branch Items

## Albany, New York

I would like to thank past president of Branch 29 Jay Jackson and current Branch 29 President Tony Naclerio for their support in my quest to be a certified member of the Dispute Resolution Team. Both of them recommended me to the national business agent as someone who has the necessary qualities to pass the certification course and be a successful B Team advocate.

If you had told me years ago when I first became a steward that I would have the opportunity to apply for this position, I would not have believed you. Step B decisions are a fundamental part of the grievance procedure and can change the course of your installation for your members. We have always had excellent NALC advocates on the Step B team that hears cases from Branch 29. Dave Grosskopf out of Buffalo and Monique Mate from Rochester were instrumental in our success at the B Team level over the years, protecting our members' rights as outlined in the contract.

It was a grueling two weeks of intense training and studying to be able to pass the final exam with a score higher than 80, and I can tell you people dropped out or were told they weren't going to make it before we even sat down to take the final. Personally, I don't know if I would have had the knowledge just a few years ago to make it myself. Luckily all those hours spent researching grievances and reading the *JCAM* paid off, as I am now a certified DRT member.

*Norris Beswick, Branch 29*

## Camden, New Jersey Merged

Last month, I wrote about Branch 540's first retiree brunch in a couple years. I did not have enough space to list all of the honorees, as we had three years' worth of names to list. Without further ado, here are the members of the graduating (retiring) classes of 2021 and 2022.

From the class of 2021: Richard Rahmel, Steven Fox, Gary Chambers, Craig View, Thomas "Scott" Hill, Vicki Elcess and Al Gramenzi.

From the class of 2022: Joseph Buzzelli, Warren Brown, Keith Peterson, Thomas Hale, Marvin Coleman, Barry Brady, Denise Scott, John Hibbs and Albelardo "Bobby" Avila.

This event runs like a tight ship every year. Thanks go out to Director of Retirees Russ Olive and (his committee) Rich Coniglio. My biggest thanks go out to our branch secretary, Karen Sweerus. Karen does all the heavy lifting for this event, from the invitational letters and other correspondence, to communicating with National for the pins, gold cards and other awards. Karen then has all the names, pins, etc. organized and easy to understand. It's so easy, even I am able to get up to the podium and look like I know what I'm doing.

We are also now gearing up for the food drive. This will be the first one for many of our newer members. It's been such a long time for all of us, but I know our veteran carriers will be more than happy to show the new kids how it's done. It's a good opportunity for our retirees to come out to their old stomping grounds and see old friends. The best part is, they don't have to listen to the supervisor.

*Chuck Goushian, Branch 540*



**Anchorage, AK Br. 4319 honored two former branch officers with 50-year gold cards. Pictured (l to r) are Harland Grower and Charles "Chuck" Armstrong.**

## Carmel, Indiana

We have had some big changes lately in Branch 888. We would like to congratulate our former president, Ronnie Roush, for accepting a detail in the NBA office, a position well deserved. This left us with no president and in a position to vote to merge with Branch 39 in Indianapolis. At our March meeting, the merger was turned down and we had to come up with a plan moving forward. Thankfully, our retired officers stayed on. Mike Coy remains as treasurer, and Tom Kingsley and Don Dwigans remain as trustees, with veteran carriers Margaret Ward remaining as HBR and Crystal Parish replacing me as our third trustee. Relatively new carriers Alex Doolin and Ben Hartstock stepped up as secretary and vice president, respectively.

I've only had five or so years of experience with NALC, but I worked the previous 20 years with no union. I saw people get hours cut and hourly pay reduced with no recourse. I saw mothers have to work on Christmas Day just to keep a job with next to no benefits that paid a pathetic wage. I saw so many good, hardworking people get taken advantage of—it was depressing. That all changed when I joined NALC and that is what motivates me; I'm not doing this to move up the ladder or to inflate my ego. I felt that in the short term, the merger may have been better, but in the long run as president, I believe I can help our branch be stronger and more united than before. Branch 888 has been around since the 1950s and I plan on being a member in the 2050s. We're not going anywhere.

*Josh Armacost, Branch 888*

## Charlotte, North Carolina

Branch 545 offers a hearty happy Father's Day to all the fathers of every type in our branch and across the nation. We appreciate all of the time and energy you spend at work, away from your families, to provide a better life for them. We thank you for all your hard work and dedication, and applaud and celebrate the great role models that you are to your families and to the communities that you serve.

We as a branch would like to congratulate two of our carriers on their retirements. Jian Wu and Steve Burton, thank you so much for your dedication to the Postal Service and NALC. We wish you both the best in the next chapters of your lives.

The union leadership would like to let all of our members know that we are continuing with our in-person local union meetings. We are holding our meetings the third Tuesday of every month for anyone who is interested in attending, and we are continuing to work within the parameters established by our local government leaders in regard to COVID-19. We look forward to seeing all of our members who are able to make it out.

*Justin Fraley, Branch 545*

## East Lansing, Michigan

Ever wonder why labor and workplace protection laws are so weak these days? It's us and our roll-over attitudes. We've been conditioned to believe that some of our rights are less worthy than other rights.

My wife, who works at a nursing home and who is regularly tested for COVID-19, reports that some (unvaccinated) workers at the facility have contracted COVID-19 two and three times already. This tells me that immunity acquired after catching COVID-19 is largely a myth, and that even after three bouts of COVID-19, most antivaxxers will still stubbornly refuse vaccination! The vaccination rate has been stuck at 67 percent. Not enough for herd immunity. One repeater woman has six unvaccinated kids and called in sick over the course of a two-week period to tend to them as they one after another caught the virus; meanwhile, she's still working occasionally and lying about her recent exposures to COVID-19.

I heard recently that COVID-19 kills brain cells and that testing after severe COVID-19 reveals an average 10-point drop in IQ score. Can't say I'm surprised. That would explain a lot.

OSHA to me says that we have a right to work in a safe and healthy work environment—it's right there in the name: Occupational Safety and Health Administration. And it doesn't look like COVID-19 is going away any time soon. How can it be healthy to have people in your workforce who continually harbor disease? But certain conservative judges have said our right to work in safety is not equal to other people's right to act stupidly and selfishly. And I've noticed that people of a certain political persuasion have rights that exceed ours; this allows certain people to evade responsibility and consequences for their bad actions. It's past time for that foolishness to stop.

*Mark Woodbury, Branch 2555*

## Emerald Coast, Florida

Recently I read that the Postal Service was recruiting to fill 2,800 managers/supervisor positions nationwide. Wasn't there just a RIF within the Postal Service again nationwide? I am a 24-year military veteran (retiree) and have been here for a while. I was told when I first started not to ask questions; well, I am going to break that rule today. I must ask what we are doing within the Service. It seems no one knows what they are doing. For years, we have been in

the red. Now that the president has signed the postal reform bill to help stabilize our financial situation, I *now* read that the USPS is "Promising More Severe Price Hikes Even as Revenues Grow by Nearly $1B." Another article is headlined "Rate Increases About to Get Uncomfortable."

To me, this is crazy. Instead of enjoying fresh air from not having to always be underwater, we are about to drive customers away due to the increases that are about to take place; I guess this is trickling down to the local level. Every morning when I come into the office, I see a supervisor looking at the board, trying to figure out how to plan the day. It takes sometimes two or three of them to make it happen and they still get it wrong. They won't train the CCAs to learn all of the routes, they violate the contract to accommodate the CCAs because they have reached 60 hours. The union is filing for violations of Article 7, 8, 15, 17, 31 and 41 of the National Agreement. Instead of us enjoying the fruits of our labor for more than 10 years of trying to get the postal reform bill passed, this is what we get. No thanks.

*Percy Smith Jr., Branch 4559*

## Fargo-West Fargo, North Dakota

In a bit of a surprise, our branch president, Rich Kilen, has accepted a transfer to Detroit Lakes to be closer to home. Thank you, Rich, for all your years as president and active member of Branch 205; you will be missed. With his resignation, Vice President Cory Carter steps in to finish the term as president. Congratulations and good luck to Cory.

Recently, our district manager, Tony Williams, visited the Fargo area for the first time. He appears to be a stand-up guy who is willing to listen. During his visit, he said he would talk with our business agent about finally solving our route-adjustment issues here at Prairiewood. He agreed that management messed up the original adjustments and, to avoid any future inspection problems, local management and the union should work together to fix the routes that need adjustments. It appears that the district and our business agent came to an agreement, as we are in the process of working things out locally. Hopefully, after five months, the mess created by management can be corrected through a joint process with both sides satisfied with the outcome.

At the end of April, longtime Prairiewood carrier Joe Cusher retired. Joe was a great carrier who always did the job the right way and was always professional. He was the one management would ask to step up whenever the local media was doing a story on the Postal Service. Best of luck, Joe, and enjoy your retirement.

Congratulations to Becca Anderson on converting to regular after two years as a CCA.

This year's picnic will be on June 30 from 4:30 to 8 p.m. at the main shelter in Lindenwood Park. We hope to see everyone there. It is a great opportunity to get together with your fellow carriers outside of work.

*Brian Prisinzano, Branch 205*

## Fresno, California

The CSALC 56th state convention was held in San Diego April 29-30. There were a couple of postponements, but it happened. I was lucky enough to represent Branch 231 as one of 14 delegates. Being a paid delegate should not be taken lightly. You are representing your membership. The Postal Reform Act of 2022 (H.R. 3076) and filing OWCP claims on ECOMP were heavily talked about. I am sure both of these subjects will be talked about during the



**Central Florida Br. 1091 recognized past Branch President Wayne Wheeler Sr. for 70 years of membership. Pictured (l to r) are Branch Vice President Lissette Rivera, Branch Executive Vice President Bruce Hamilton, Wheeler and Branch President Byron Shelton.**

national convention in Chicago. It is disappointing how both of these are not understood with all the time and hard work that has gone into them. Only 25 percent of OWCP claims are filed by ECOMP. Filing by paper puts your claim at the mercy of corrupt, lying, uneducated management. Filing by ECOMP puts the power at the tips of your fingertips. Nearly half of the OWCP claims filed are from postal employees. The Postal Service was the last agency to agree to filing claims with ECOMP. The same OWCP class taught in San Diego will be taught in Chicago. I urge you to attend it. Management often lies to you; ECOMP does not.

I look forward to attending our national convention in Chicago. Be ready to attend, learn, represent and report back to your local members. That is why they voted for you to go.

*Jesse Dominguez, Branch 231*

## Greensboro, North Carolina

On April 1, the 8,300 workers at the Amazon fulfillment center in Staten Island, NY, achieved an historic victory over billionaire Jeff Bezos and his corporate behemoth. The majority of the workers' votes were to join their independent union, the Amazon Labor Union (ALU), unaffiliated with any national union. Previously, several established unions had tried and failed at Amazon. Pro-labor Sen. Bernie Sanders, chair of the Senate Budget Committee, invited Chris Smalls, acting president of the ALU, to testify at Sanders's May 5 committee hearing on ALU experience that make new laws necessary prohibiting union-busting corporations from receiving federal contracts.

Reminiscent of dedicated CIO unionists of the 1930s, Brother Smalls's testimony directly took on reactionary South Carolina Sen. Lindsey Graham: "This is not a left or right thing, not a Democrat or Republican thing. This is a working-class issue. And the workers at the bottom are the ones who make these corporations go, not vice versa." Indeed, the excellent labor article in our May 2022 *Postal Record* ("They formed a union; now comes the hard part") backs Smalls up.

The U.S. labor movement became drastically weaker between 1954 (35 percent union membership) and now (10.3 percent). One key point: "many manufacturing jobs…moved overseas, with international trade agreements promoted by both political parties making the process easier." Yet, "facing the bleak consequences of union declines—workers want their unions back." A recent Gallup poll found that 68 percent of Americans approve labor unions, "the highest since 1965."

President Rolando concludes NALC's article: "Convincing the Senate to pass the PRO Act continues to be one of NALC's high legislative priorities." But we're reminded that "the PRO Act is successor to EFCA … that received insufficient support from lawmakers and administrations of both political parties." Out of such conditions, the working class becomes revived!

*Richard A. Koritz, Branch 630*

## Hagerstown, Maryland

To start, I would like to send a belated congratulations to Brooke Leizear for converting to part-time flexible. I cannot fathom starting at the Post Office at the beginning of the COVID-19 pandemic and trying to learn how to be a letter carrier. To have successfully made it through an immensely confusing time is quite the accomplishment. Only a little bit longer and you will have your own full-time assignment and have made regular.

As we head into the summer months, it is vital that we as carriers are taking precautions to properly handle the heat. While we will undoubtedly hear numerous stand-up talks regarding heat safety, I implore everybody to take these warnings seriously. During the extreme heat that the summer will hit us with, it is extraordinarily important to be hydrating before, during and after work. If, at any point, you feel as though the heat has induced heat illness, do not hesitate to take a break and find a way to cool off. It is entirely within your rights and if any supervisor were to take issue with that, please inform a steward immediately. Article 14 of our National Agreement puts the onus entirely on management to provide safe working conditions, so if you need to take a break to cool yourself down and prevent the onset of heat illness, please listen to what your body tells you. The heat is nothing to take lightly, and if you take it lightly, it can do major harm to you.

In solidarity—

*Jeremy Kessel, Branch 443*

## Hartford, Connecticut

At the conclusion of our second retirement banquet on April 9, longtime Branch 86 President Michael Willadsen stunned everyone in attendance by tendering his resignation, thus ending 33.5 years as our president. After providing a discussion on why he chose that evening to resign, Mike called NALC Director of Retired Members Daniel Toth and me to the podium and asked Dan to swear me in as president.

Mike had not told anyone that this was going to occur and caught almost everyone off guard—me included! I had been the executive vice president for six years and was completely happy to continue in this capacity. However, one of the primary reasons for the No. 2 is to take over if the president steps away, and I accept this challenge. Mike has made himself completely available to assist in any way he can, and I intend on taking him up on it when necessary.

This past New Year's Eve, one of our stewards in Hartford lost all of his possessions in a raging house fire. He got out with only what he wore on his back. Mike sent out a mailing to all Branch 86 members explaining the situation and asking for donations to help our brother get back on his feet. Almost $14,000 was collected and presented to him, and I thank those members who took a minute to get involved.

NBA Rick DiCecca and his staff conducted a training/rap session at the end of April, and 25 Branch 86 officers, stewards and alternate stewards attended. It was a thorough, well-prepared presentation, and we got to hear from President Rolando and Executive Vice President Renfroe. Time well spent for all.

I have been making the rounds at Branch 86 offices and transitioning into the president's role as aggressively as I can. I can be reached at 203-312-9984.

*George G. Laham, Branch 86*

## Jackson, Michigan

In the Jackson hub, we have 70ish city carriers and 60ish rural carriers. We each have our own union and we are in our separated case areas during the morning. When I first arrived, I just knew that the area on the west end was the rurals' side, and they basically do their own thing. But then I became a safety captain and things started to change.

I would do my skits and talks to the city side weekly, and then I was approached by the rural supervisor about calling over the rural carriers during my talks. I had no issue and said, "The more the merrier." I thought "no big deal" until the next step was to involve the rural safety captains in safety issues and talks. I did not know there were rural safety captains, but found out quickly that they didn't like what I was doing and that we had a communication problem.

We decided to have a meeting to get everyone on the same page, but at the beginning I thought it was an intervention on me because the rural side did not appreciate how we didn't communicate with them and thought my way of spreading the word was basically stupid. But we settled down and got to the very important issues of safety and how city and rural would work together to continue having great results in the safety category.

I was skeptical at first, but we have joined forces and meet monthly to discuss the previous week and the upcoming week. It has become a great thing and both sides are joining in on activities in other ways. For example, Leslie has donated gifts for our Soar like an Eagle program. Rural carriers are taking part in skits, and as of now, things are running smoothly!

*Mark Raczkowski, Branch 232*

## Knoxville, Tennessee

Hello, brothers and sisters.

You wake up one morning and feel like the Army has marched over you! A trip to the walk-in clinic or the emergency room, and *voilà*, you have CO-VID-19. After listening to the supervisor complain about having to force other carriers to carry your route when, instead, he should be giving you instructions on how to apply for work-



**Denton, TX Br. 1367 honored Andy Svoboda with a 50-year gold card.**

ers' compensation (OWCP) using ECOMP, and he should also be informing you of your right to Continuation of Pay (COP). Right? Nah! They are thinking that most carriers will not apply for OWCP because they do not want to deal with the paperwork. There are many horror stories on how hard it is to submit an OWCP claim. A COVID-19 ECOMP claim is not as complicated as a regular claim. A carrier's thinking is, "Just let me heal so I can get back to work and make that overtime money."

Management is not going to take the time to inform you of this procedure. So why do this? Well, for one, COVID-19 can leave one with residual issues (e.g., loss of taste or smell), which might require additional medical treatment. By applying for ECOMP, it is a security blanket for you and your family in the event that you continue to have lingering issues. You are entitled to COP if you submit your claim within 30 days of the day of your positive test and prove management with evidence of your disability. If this has not occurred, then see your shop steward.

*Tony Rodriguez, Branch 419*

## Lilburn, Georgia

She wasn't very big in stature, but, boy, could she let you know who the boss was. Her full name was Betty Kelley Brothers, but to us, she was Mama Betty, because in her heart we knew she cared for us like a mother. And like a mother, she wasn't hesitant to offer love, advice, and yes, an occasional scolding when it was warranted.

On April 10, we lost Mama Betty to God—ironically, on Palm Sunday. Her career as a letter carrier began in 1978 until she retired in 2013. To say Betty was active in a lot of things is an understatement. Not only was she an avid churchgoer, she was also Branch 1537 treasurer for many years, participated in the American Cancer Society Relay for Life, and drove a postal truck in Lilburn's annual Christmas parade (with permission, of course), to name a few. But her greatest passion was to organize and run the NALC food drive every year for many years.

She was never one to be intimidated by management and often would let them know it. In fact, one might even think that she was the postmaster, given that she would tell management what she was and wasn't going to do. As she got older, she politely told management that she wasn't going to deliver mail in the rain anymore. Later on, she informed them that she would no longer do apartments or businesses. And finally, she advised them that she would no longer deliver packages. And yet she was never disciplined for any of that. Why, you ask? Perhaps out of respect for her age and health. Perhaps out of fear. But either way. Whether they liked it or not, Mama Betty was the boss.

Rest in peace, Mama. You're already missed.

*Melanie Busbee, Branch 1537*

## Louisville, Kentucky

Time is flying here in Louisville. We survived our retirees' dinner, the Derby, and the food drive back to back! Being consumed with COVID-19, we've missed out on so many activities. It was good to enjoy and celebrate with our members again.

Although we're less restricted by masks, we're still short-handed on carriers. Several full-time carriers have quit and CCAs won't stay. It's hard to narrow down exactly where the issue is, but the carriers who are working are suffering. They're getting the brunt of the 12-hour day and more than 60 hours a week. They're even forcing carriers to work Sunday! We went from CCAs rotating Sundays to full-time carriers forced in for needs of service, thus leading to several grievances.

The question on everyone's mind is, what is the Post Office going to do about this shortage? What is the *plan?* Carriers are tired, retiring early and just downright quitting. There must be something that we can do. Although things are going back to normal outside the postal doors, we're finding it hard to enjoy all of it when you can't have off due to "needs of service." We're all just looking for things to get better and stay consistent.

*Adriane Shanklin, Branch 14*

## Minneapolis, Minnesota

Spring is in the air! The grass is starting to green up, the flowers are starting to bloom and the trees are starting to bud. Spring is a wonderful time of the year for us Minnesotans. Springtime in Minnesota can also be described as a relief. A relief from harsh below-zero winds and icy roads and trudging through snow to deliver the mail can be difficult, to say the least.

I think that I speak for most Minnesotans by saying that everyone, in Minnesota at least, is breathing a sigh of relief because the winter that we just went through was a very difficult one.

Here at the Branch 9 office, we are all breathing a sigh of relief because the move to our new building is complete. We are very grateful to everyone who volunteered and the executive board for their hard work and dedication to the branch. Everyone really pulled together to pack up everything at the temporary office and unpack it all at the new office. Everyone also pitched in to help clean the new office, set up computers and everything else that goes along with the move. Overall, everything went very well, and the branch experienced very little downtime.

By the time this article is being read, the open house for the branch will already be over. If you are a current or retired member of Branch 9 and you were not able to make it to the open house, please don't hesitate to contact the office at 612-781-9858 to set up a time to come see our new permanent home. Everyone here will be happy to see you and would love to give you a tour of the building. I hope you enjoy the spring, and I look forward to connecting with you through this article again this summer.

In solidarity—

*Scott Bultena, Branch 9*

## Monterey, California

Are you a runner or a rules carrier? When I started my career with the Postal Service in 1973, I was young and excited to be delivering the nation's mail. Some of the "old timers" took me under their wing and told me, "Remember, you've got to do this for at least 30 years." They told me to set a pace that was fair, follow the rules and do your route maintenance every week. I took those words to heart and was able to take care of my family and am now enjoying retirement. Those guys knew what they were talking about.

If another inspection happens and routes are eliminated, those on the bottom will be the ones left without an assignment. Article 41.30 is in our contract, which means that for any route that is eliminated, all routes junior to that carrier go up for bid. Think about it—the job you save could be your own.

Our arbitration is coming soon—hold on to your seats!

To all who participated in the food drive, a great big thank you. You all work extra hard to help so many who wonder where their next meal might come from.

United we bargain; divided we beg.

*Patty Cramer, Branch 1310*

## New Orleans, Louisiana

Greetings. As we gather and prepare for this upcoming national convention to be held in Chicago Aug. 8-12, we vigorously await the lineup. We have not been in convention mode since the pandemic. What does the Windy City have in store for us delegates? Such an exciting time to be a delegate to this upcoming

conference! Convention-goers, do your utmost to enjoy the city and all the amenities it offers. For those who happen to attend, whether your first or many, remember: Fortune favors the brave. There will be baseball games, blues clubs, cruise dinners and many other venues for a price.

In the meantime between time, maintain COVID-19 protocols. COVID-19 is still with us. It's not going anywhere. Be prepared, keep safe, maintain social distancing and hand-washing, and by and by all means, mask up. It could be lifesaving. We want all to have an enjoyable and most memorable experience during the conven-



**NALC Director of Safety and Health Manuel L. Peralta Jr. (r) and St. Paul, MN Br. 28 President Joel Malkush (l) presented Eugene Lindstrom with a 50-year gold card.**

tion. OK, convention-goers, enjoy! Enjoy! Enjoy! Always practice safety. Be aware of your surroundings. Don't travel alone. There is safety in numbers.

Before embarking, there are still a couple more meetings to be made. Let's continue to be active in attendance and participation at the branch meeting. We can do this. Remember to be regular in attendance; give to LCPF.

As always, yours in unionism—

*Marshall Wayne Smith, Branch 124*

## Norristown, Pennsylvania

I'm tired...I've had four days off and come back to work and worked more than 10 hours and remembered why I have to savor my time off. We did have 20 CCAs, but at last count we had nine left. It's not the job I hate coming back to, it's the long hours. I got off the list, but it means nothing (as I said before, we work more now than when we were on the list).

The power is now to the prospective employees. They don't want to work long hours and Sundays when they can go to another place and get paid a little less but have a life outside of work. We are all getting tired and I hear, "Why isn't the union doing something about it?" If ya came to a meeting, ya might know...go ahead, I dare ya...show up to a meeting...what, ya scared? Ya talk a big game in the office but wait, ya never come to a meeting...I *triple-dog dare* ya! A union is not one person or a few; it's a whole lot of people with a common goal. In case ya don't know when it is...it's the last Wednesday of the month, other

than the few summer months. You have questions (hopefully); we have answers—some you might not like and some you might.

At this point, I'd like to congratulate a few new retirees, Mr. Tom Donahey and Mr. Carl Bates. They have hung up their satchels and dog spray. Good luck with whatever adventures are coming your way.

I'm starting to get tired again...gotta go to bed and get ready for another long day tomorrow! Remember, your family comes first, not the P.O. It doesn't care.

*Joel Stimmler, Branch 542*

## Northeast Florida

As of this writing, the food drive is days away. On Sunday, April 30, Branch 53 members, President Jim Thigpenn and his wife Sarah, food drive coordinator Lonnie Guillory, EVP Bob Broecker, shop steward Al Johnson and Chris Harris and me distributed 1.6 million food drive postcards to stations and offices in six ZIP code areas. You are all to be commended for helping out on your own time for a worthy cause. After two years without a food drive and the way the current economy is, we have seen the need for food steadily increase. On a weekly basis, our main food drive partner, Farm Share of Florida, does food giveaways to those in need. Lonnie has been a participant working closely with them in distributing food to those in need.

NALC has a long history of members volunteering to help others in need or to just do something satisfactory. Try it sometime and see if it doesn't make you feel better.

Congratulations to National Vice President Lew Drass on his retirement. Lew has served NALC in many positions, from local branch offices all the way up. We wish you the best for your future endeavors and you have definitely earned it. Thank you.

*Bob Henning, Branch 53*

## Northeastern New York

I wanted to express my appreciation for an unsung hero. Dave Kohler, a former Branch 358 officer and steward, recently stepped up and assisted a retired member's widow. Dave heard through informal contacts that a retiree passed on, and he decided to see if his wife needed assistance. He went over to the widow's house, and discovered that she was overwhelmed by how to proceed. Dave contacted me, and we went over to assist her. She did not have access to a computer or cell phone. We called our NALC office in Washington, and they sent the information to OPM.

We went back to help her complete the paperwork, and Dave went to the veteran's organization to inquire about a military insurance policy. He even loaned her his cell phone because of a power outage. Without Dave's help, I don't know what this individual would have done, since she does not have a vehicle and did not know who to contact.

I am proud that Branch 358 has members like Dave who always steps up and does not look for recognition.

# Branch Items

I recently presented a 70-year plaque to Phil Santangelo. He was a carrier in the Johnstown Post Office. Phil served our country in World War II in Europe. At the presentation was Phil's son. He told me that the union that represented him does not allow retirees to continue to be members.

I am proud to be an NALC member. We serve active *and* retired members.

*Frank P. Maresca, Branch 358*

## Oklahoma City, Oklahoma

Now that we have postal reform, we need to address the CCA issue. There should be no temporary employees. Those who apply for the USPS are vetted and a large majority are veterans. Veterans tend to have a good solid work ethic, so why do we need a probationary period? Here in Oklahoma, we see 10 to 16 new hires every other week, but within a few short weeks or a couple of months, a large majority of them are gone. And it isn't that they don't get good training, because they do. And it isn't because they aren't hard workers—the vast majority of our CCAs are stable and hardworking.

No, it's often the fact that supervisors tend to treat new hires more like pack mules than hardworking human beings. Even pack mules deserve to have fair and humane treatment that should also apply to CCAs. My dad was 4F during World War II due to injuries from rodeoing, so he went to work for the U.S. Calvary taming mules and horses. He loved animals and he wouldn't stand for their mistreatment. Both human and animal workers deserve humane treatment, especially in the workforce.

Training CCAs is costly—it makes no sense to not try to retain as many as is possible. The Postal Service needs to look at ways to mentor CCAs using experienced letter carriers so that we can have a more stable and productive workforce and a work environment that looks to the human equation, not just the cost. A stable and productive workforce makes for a stable and productive business. Treating people as the humans they are only makes good sense.

*Bob Bearden, Branch 458*

## Pittsburgh, Pennsylvania

Be advised: COVID-19-related memorandums have expired as of May 6. Some new employees know nothing different and the rest of us have become a bit lax, so consider this a refresher.

The Liberal Leave Policy has expired, along with the use of Sick Leave Dependent Care (SLDC) for childcare. SLDC now returns solely to "give care or otherwise attend to a family member... that... would justify the use of sick leave" for up to 80 hours each leave year.

Absences under the Liberal Leave Policy were labeled "approved" as to not count toward discipline. This is no longer the case. Remember: For absences over three days, you are *required* to submit "incapacitated for duty" documentation with a return date. It's probably good practice even if it's less than that. If you encounter a long-term issue, request Family and Medical Leave Act (FLMA) leave. This will generate paperwork for your physician to complete and it must be returned within the stated time limit. Protect yourself and check *ELM 513* for more information.

While we're anxiously awaiting making clock rings on our scanners, I can't help but hope that my dream of "punch for lunch" finally comes true. USPS has gotten an amazing amount of voluntary work off the clock over the years. Take your breaks. All of them. The excuse for automatic lunch deduction was that we didn't have



Westfield, NJ Br. 1492 President Mark Jazwinski (l) and Branch Treasurer Jerry Cocola (r) presented Frank Wanca with a 50-year gold card.

access to a time clock, but no more. *This is the entire cornerstone of why our craft fails itself each and every day.* If this does *not* change, we need a national strategy to make every clock ring manually because, obviously, the honor system never worked. Then, along with DMS breadcrumbs and scanner records, it'll be the final piece of the puzzle to get employees paid for the work they've performed.

*John Conger II, Branch 84*

## Plainfield, New Jersey

Welcome to the "I quit" generation. The boss is nasty to me, I quit. I have to work in bad weather, I quit. I have to work every day, I quit. The job is boring, I quit. There are plenty of other jobs available, I quit, and I will quit those also. I have to wear a uniform, I quit. The pay is too low, I really quit. But consider this.

The Post Office is no ordinary job. It is a government uniformed service, part of the U.S. Constitution; thank you, Ben Franklin. The nasty boss was a letter carrier so become a not-nasty boss. Every day is not bad weather and jobs that work in weather pay more. On becoming a regular (a maximum of two years; thank you, President Fred), there are more holidays off with pay than anyone. Also, there is sick leave and annual leave—double other jobs. If the job is boring, a seasoned employee will show how to un-bore it. There is no job like this one: unionized, protected and respected, and early retired. Want other job? Get it when retired at 57, not 62 like everybody else. The uniform is government, like the military, and paid for every year. Also, we have an office filled with used ones. The pay is low, granted, but not the union's fault. The amount was not negotiated, rather decided by an arbitrator, and with every contract, the union, and Post Office, which realized its mistake, have enhanced the salary. Also, we have cost-of-living increases so no one has to beg for a raise.

Still not convinced? This is now, with some overtime, a six-figure job so renounce the "I quit" generation—your future depends on it.

*Michael Breslin, Branch 396*

## Portland, Oregon

When last we met, Portland was about to get an unusual April snowstorm. That event brought down power lines and so many trees. Some are still cleaning up from it. Portland's April then went on to become the wettest on record, with only six dry days with no rain. We need all the precipitation, and we're grateful for it, but wow! Our boot dryers have been working hard. Management comes around with their computer-generated numbers and clipboards asking why we're taking so long. Meanwhile, we are collecting the many uniform pieces that we had strewn out all over the case in hopes for them to dry, and we get set for another long day with an extra pair of waterproof socks and a change of shoes.

I recently attended a memorial for a retired carrier who I never knew. April showers have given way to May hailstorms, but we lucked out with a break in the weather, and we gathered at a local watering hole to share stories and pictures of Tom Brown. By the end of the event, I had no doubt that Tom was loved by his friends and co-workers. It was lovely for these folks to sneak out from COVID-19 and get together to honor their beloved friend. I have said it before, and it was mentioned again at the memorial—we are bound together through our experiences as letter carriers. Whether you've just met a fellow carrier at a memorial, or maybe you worked together for 20 years, we have a unique shared experience that is truly bonding.

As noted in many of the Branch Items, that shared experience continues to be a very challenging one as we crawl out of COVID-19 and try to regain adequate staffing.

*Suzanne Miller, Branch 82*

## Providence, Rhode Island

Last month, I was able to attend the NALC rap session here in Providence and was privileged to hear from President Rolando, Executive Vice President Brian Renfroe and more from national and regional. They covered a vast array of topics, from new letter carrier uniform options to the recently passed postal reform bill to the new postal vehicles, and to an alternative to the route evaluation and adjustment process that you can read about more in-depth on the NALC website. The new uniforms I'm sure will be welcomed by most; dri-fit shirts and cargo shorts will make working in the hot weather a little more bearable.

President Rolando also talked about COVID-19-related absence numbers being down from 24,000 per day last January to now having about 1,000 a day, a good sign for our ability to not only recover from the virus but from staffing issues that have been felt nationwide. Also, a big emphasis on innovation and growth, when

it comes to our parcel volume specifically—currently, parcels account for 5 percent of our volume but 40 percent of our revenue.

On behalf of Branch 15, I want to congratulate Johnny Montalvo on his retirement. We're thankful for your 34 years of service, all of which were in the 02904. We wish you the best in your retirement.

*Anthony Turcotte, Branch 15*

## Racine, Wisconsin

You know you're getting older when you make a shopping list and then forget the list. It's getting a little testy here at the 4 Mile Station. While the USPS fiddles around with staffing issues, tired and exhausted carriers and the few clerks we have left continue to man the fort with perpetual six-day weeks. This is not a carrier-made problem. This is upper management's failure to manage and properly staff a station. We saw staffing issues take root well before the holidays. A recent service talk mildly suggested carriers need to kick it up a notch.

Our sister station, on the other hand, is managed with a much higher level of efficiency, possessing all the riches and spoils we're denied. Maybe we're more like stepsisters from another mother. Our station manager recently detailed elsewhere, anywhere and far away is better, so we traded up in the first round and got a TASM (Temporary Acting Station Manager).

Things will get better, right? Sure, after you bring in the heavy equipment to fill in the crater of frustration. With transition comes change and disruption to our version of an ordinary world. While local upper management stood by and watched, 4 Mile Station was allowed to be run straight into the ground by the very people who were supposed to give a rip. Now carriers are tasked with fixing it. How about a little upper management accountability? Although, as long as we have a "best friend" at work, we cool. We maintain our positivity and sense of humor with a certain vibe of mutual respect for each other as we spend most of our day together. We're all ready for some warm sunshine and days off.

*Chris Paige, Branch 436*

## Rockville, Maryland

Steve Klein, Miryam Peralta, Kevin Abernathy and Chuck Clark have won approximately $20,000 due to our CCAs being improperly moved to other installations to carry mail and other violations of M-01915. Recently, Alton Branson won three pre-arbs, paying, our CCAs $1,200, $1,000, $300 and $200 respectively. This was out of our Damascus and Burtonsville offices. Before these wins, we won big money out of our Gaithersburg office, at Step B, for violations of M-01915. One CCA won a lump sum of $500 and another CCA won a lump sum of $2,000 for violations of M-01915. And, right before that, we won a pre-arb out of the Pike Annex for $12,200 due to a violation of M-01915. Incredible work for the five union reps mentioned above!

I would like to point out that we are not just trying to win money from management. We are trying to find a remedy that will force manage-

ment to comply with the spirit and intent of M-01915 and stop forcing our CCAs to travel to other cities to carry mail against their wishes. We still have many more grievances on this issue at all levels of the grievance procedure. Now that M-01915 has expired, we will have to go back to filing on violations of M-01827 when management forces our CCAs to work in other installations.

We are in the process of escalating our remedies when management violates the maximum hour rules of our contract. We are using four recent arbitration victories to bolster our cases. See our website for these arbs at nalc3825.com. Also, check out a fantastic arbitration win out of Chicago Branch 11 that forces management to let the local union know the names of positive COVID-19 cases. Great work, Mack Julion, and everyone who worked on this important arbitration!

In the struggle—

*Kenneth Lerch, Branch 3825*

## St. Louis, Missouri

As the transition from cool temperatures to the blistering heat of the summer approaches, it's none too early to remember the benefits of staying hydrated.

It might surprise you to learn that water makes up about 60 percent of our body weight. Drinking water regularly can help you maintain body temperature, think better, stay in a better mood and more. The benefits of drinking water are many: Water acts as a building block, a solvent for chemical reactions, and a transport material for nutrients. Water also helps regulate blood volume and allows proper circulation in our bodies.

Thirst isn't always a reliable indicator of the body's need for water. Many people, particularly older adults, don't feel thirsty until they're already dehydrated.

Six signs of dehydration include extreme thirst, less frequent urination, dark-colored urine, fatigue, dizziness, and confusion. For older adults, your body-fluid reserve becomes



**Houma-Thibodaux-Lockport, LA Branch 2464 held a crawfish boil for its veterans.**

smaller, your ability to conserve water is reduced, and your thirst sense becomes less acute.

Working outside, in the heat and humidity increases your risk of dehydration and can result in heat related illnesses. That's because when the air is humid, sweat can't evaporate and cool you as quickly as it normally can, which leads to increases in your body temperature.

As you work outside, drink often. Cool water is your best bet. Remember, cola. as well as caffeine drinks like tea and coffee, are diuretics which could result in more frequent urination and a greater increase in bodily fluid loss.

Before you leave for the route, drink plenty of water and continue to do so throughout the day. Stay out of the direct sun if possible. Always wear a hat and keep a cool, damp cloth around your neck. Dehydration can be deadly. Be prepared to take care of yourself.

*Tom Schulte, Branch 343*

## St. Paul, Minnesota

It's been a very busy end of the month here at Branch 28. We've been able to enjoy the world opening back up a bit by having a couple events that we've all been missing. The first one was our retirees' banquet, and by all accounts, the turnout was phenomenal! Retirees and active carriers alike were able to share an afternoon of drinks, dinner and camaraderie. Thanks to everyone who helped put it on and those who attended. We look forward to another fantastic banquet next year.

# COLA: Cost-of-living adjustment

▶ Following the release of the April consumer price index (CPI), the sixth cost-of-living adjustment (COLA) under the 2019-2023 National Agreement is projected to be **$1,269 annually.** This COLA is based on the change in the CPI from the base index month to July 2022, with the previous COLAs subtracted.

▶ The 2023 projected COLAs for the Civil Service Retirement System (CSRS) and the Federal Employees Retirement System (FERS), which are based on

the CPI's increase between the third quarter of 2021 and third quarter of 2022, is **6.0 percent** and will be finalized with the publication of the September 2022 CPI in October 2022.

▶ The 2023 projected COLA under the Federal Employees' Compensation Act (FECA) is **3.9 percent** following the release of the April CPI. This COLA is based on the change in the CPI between December 2021 and December 2022.

Visit nalc.org for the latest updates.

The other big event was the return of our CCA and new conversions meetings. It's been at least two years since our last meeting, and this was the first one I've been able to attend. The meeting started by opening the floor to questions or concerns, and for the next couple of hours, everyone present was able to speak. It was really interesting to hear all of the concerns of our newest members, and by far the two biggest topics were the way they're being treated by management and the brutal working hours dumped upon them. A lot of great info about our contractual rights was shared that night, but the biggest and best takeaway was the support shown between the all of the carriers. For every question asked, one of the other attendees would chime in with some advice about what worked for them or at least offer a bit of commiseration. Much like our local and national conventions, these meetings are where the future of all our branches are formed, and in that case, Branch 28 will be in good hands for a very long time. Hopefully, these same carriers will bring their unique insight and perspectives to our next general membership meeting too. Solidarity forever!

*Kaylee Valerius, Branch 28*

## Salt Lake City, Utah

Greetings from Salt Lake City, where we go directly from winter to summer, no spring required (at least that's how it feels most years).

Extremely sad news this month. On May 3, at 10:45 a.m., the unthinkable happened, and it's the worst thing we have dealt with in a quarter-century. Five-year-old Kate Peterson of Sandy, UT, was struck and killed by a postal vehicle. Referred to as a "miracle child," Kate was born with Dyrk1a Syndrome, which is characterized by "intellectual disability including impaired speech development, autism spectrum disorder with anxious and/or stereotypic behavior problems, and microcephaly" (according to the National Institutes of Health). She was on her scooter in the road when the accident occurred.

The police reported that speed and impairment were not factors in the accident.

I cannot express the grief and trauma that have surrounded this terrible event, both for the family of this little girl, and for our family (our brothers and sisters at the Sandy Post Office). The letter carrier involved in the accident has been referred to as "the nicest guy in the office" and "absolutely the best carrier." He is devastated. Everyone out here has been sad, reflective and somber. Sometimes you can do everything right and accidents still happen.

Lt. Carriger of the Sandy Police Department said, "We just want our drivers out there to be mindful as they're navigating neighborhoods, especially as [with] spring and summer approaching and more children are going to be out, but if you are out in the roadway be cognizant of vehicles as well." That is good advice for us all. A GoFundMe fundraiser has been started in Kate Peterson's name. Be safe and well, and may this kind of tragedy never come your way.

*Michael Wahlquist, Branch 111*

## Seattle, Washington

Believe me: Carriers have enough to carry without being burdened with fictitious street times. If a letter carrier has put in a decade of delivery on the same route, it's not a "retirement route." It's most likely a route you can deliver in a safe and sane manner. There's no need to burn it up, and there's certainly no need to come back and tell tales about its fabled length and breadth—save your breath.

A long while back I had a person assure me that anyone could do my route in four-and-a-half hours, and consequently, "How can you sleep at night?" I called her "Goth Girl," as she was heavy into black lipstick, black nails, and smoky black eye shadow. She also expected me to file a grievance for her, as she wanted to exchange her Christmas holiday for Halloween. Truth!

So, sleep? All I had to do was find the pillow. My conscience was clear. More truth...she got attacked by a flock of crows out on my route. They gave her a nasty gash across the eyebrow. No lie. (Karma's a bitch. Bitch.) Final truth, she didn't even last a year as a letter carrier.

It's up to you who you want to listen to. If you need a good read on how long an assignment may or may not be, ask the regular, the shop steward or the T-6. Some things, like street times, can't be taken at face value, as some folks are simply Janus-faced, and that's the truth.

*Don Nokes, Branch 79*

## South Jersey, New Jersey

As we get ready for our national convention, our branch is submitting a general resolution that we believe could help many of our branches in regard to carriers who are collecting workers' compensation benefits but are not paying dues back to their branch. We have had a hard time getting members who are receiving compensation to pay their dues, so there needs to be a way for branches to put members on the spot to make it easier for us to collect their dues. We don't want to remove them from our rosters if they wish to continue their membership, we just want them to commit to staying in the union so we can make it easier for us to collect their dues. The National and the state association continue to collect their dues from us, but we have no way to collect the dues from carriers who are no longer in a pay status.

We are asking our national leaders to get the Biden administration to negotiate with OWCP to add another box on the forms to give the members an option to stay in the union. At least if we get a commitment from them, we can formally contact them to have them live up to their duty as a union member. We continue to represent all of those who are out, and it is only fair they continue to support the local by paying their dues. We are not asking for those who are not receiving any sort of compensation to pay, only those who are getting paid from OWCP. We have had a hard time over the years catching

# How to submit items

Branches may submit items for publication in *The Postal Record* by standard mail or by e-mail. **But please note the important information below.** Due to production requirements, items that do not comply with the styles specified cannot be published. Call *The Postal Record* office at **202-662-2851** if you have questions.

**Who can submit:** Branch presidents must send *The Postal Record* a letter designating authorized scribes, especially if the branch scribe has changed. If items will be submitted by e-mail, the president also must list the e-mail address(es) that will be used.

**Deadline:** The deadline is the 10th of the month preceding the month of publication, or if it falls on a weekend or holiday, 9 a.m. E.T. the first business day after. For the July issue, the deadline is Friday, June 10. Items

received after the deadline will be held for the next issue.

**Word limit:** The *NALC Constitution* (Article 9, Section 1.b) limits items to **300 words**. Submissions that are too long or violate the prohibition on defamatory or unlawful matter (such as electioneering) cannot be printed.

**To submit items by mail:** Use upper and lower case letters (not all capitals) on one sheet of 8.5 x 11" paper. Use an easy-to-read font (no scripts) and print in black. Mail to *The Postal Record,* 100 Indiana Ave. NW, Washington, DC 20001-2144. Include the following information: type of item (Branch Item, State Summary, Retiree Report, Election Notice, etc.); where it comes from; the person sending it; and how to contact the sender.

**To submit items by e-mail:** Send to **postalrecord@nalc.org** with the branch city

and state as the subject. The item can be in the body of the e-mail or as an attachment in either Corel WordPerfect or Microsoft Word (not Microsoft Works). Do not type in all-capital letters. Include the same information as listed above for items sent by mail. If you do not receive an acknowledgment that your e-mail was received, please call *The Postal Record* at 202-662-2851.

**Photos:** Branches may submit in-focus, professionally processed photos or e-mail digital image files of at least 300 dpi resolution as attachments. Include caption information **identifying all individuals** and the event. Do not send photos printed on a desktop printer. Due to space limitations, *The Postal Record* does not guarantee publication of photos. Photos may be posted online at nalc.org or in one of NALC's social media accounts.

up to those who are in arrears, and have never dropped anyone from our membership, so giving us another option could possibly help.

*Gary DiGiacomo, Branch 908*

## Southeast Pennsylvania Merged

All of the protective MOUs relating to the pandemic have officially expired. Hats off to NALC for being there for us when it counted the most! Thanks to all of the stewards and Branch 725 President Les Dillman for facilitating our rights under those MOUs. Remember, though, if you caught COVID-19 as a result of your workday, please fill out a CA-1. The rule for CA-1s was modified to make for easier consideration regarding COVID-19. Congress set aside millions to allow for future medical expenses. We do not know what future effects COVID-19 will have on our bodies. Let's put our health first.

Thanks to our union carriers working down at the Carrier Academy, the flow of carriers has increased. This is the No. 1 problem we have had (staffing). But we need your help. Many people don't know about West Chester and Tri-county as choices to pick for work (call the union office for information about these two choices). These are not only good places to carry mail, but CCAs will make regular in these places almost instantly. Pass the word.

We will soon have a new route adjustment process. Let's be mindful to protect our routes. This is even more important given that many more carriers will be retiring. All of our newer carriers will soon learn what we have been talking about for two-and-a-half years concerning route protection.

Our branch stewards have embarked on an intensive training schedule to meet the anticipated onslaught of discipline that will be forthcoming from postal management. Birdies have heard many high-level postal officials extolling the virtues of discipline.

Their mentality is fruitless. Don't take us for granted. Manage us, dammit!

The primetime choice period is here. You have earned it. Enjoy your time with your loved ones.

#ManagmentTakesOneStepForward10StepsBackward   #YouCanHitUsButYouCan'tKnockUs Out

*Eric Jackson, Branch 725*

## Springfield, Ohio

I retired April 1, and the April Fool's joke on myself was realizing I should have retired sooner because I don't understand many of today's letter carriers.

When I started, union membership was about 99 percent. We still had numerous active carriers who remembered the wildcat strike of 1970, where union letter carriers learned the lesson, "United we bargain; divided we beg."

Letter carriers supported their union even when they did not agree with the union. Carriers knew that the union always had the best interests of every letter carrier at heart.

Now, letter carriers get out of the union because they don't want to do the food drive. Or the branch president talked mean to them by

telling them the truth, rather than what the carrier wanted to hear. Or the stupidest reason of all: "The union doesn't do anything for me."

A lot of carriers seem to think only of themselves, with no regard for their fellow workers. Yes, all the overtime sucks. Forced overtime really sucks. Ordered in on your day off really, really sucks. Been there. I get it.

But how is resigning from the union going to fix anything? Whether you realize it or not, we are damn lucky to have local branch officers who enforce the contract. Every carrier in Springfield has benefited from the efforts of President DeWell and Vice President Green. These efforts include saved jobs, admin leave, contract enforcement and many more things.

Think Springfield is bad? Imagine if we didn't have your union and branch officers guarding the fort, and we had to depend on the postmaster to treat us fairly.

Branch meetings are the second Thursday of each month in Room 221. Pizza at 6:15 p.m. Meeting at 6:30. Show up. Listen. Ask questions. Knowledge is power.

*Brian Gourilis, Branch 45*

## Toledo, Ohio

There has been progress on the thousand-plus grievances I wrote about previously. Negotiations at the area level resulted in a decision to have two union and two management personnel meet for 30 days, daily, to address the 828 unresolved grievances. The 300 grievances held in abeyance were settled with an agreement paying each carrier affected three times the original amount requested. Go on, management, keep on denying your personnel the ability to settle grievances at the lowest possible level!

With two of our Formal A representatives committed to daily meetings on the 828 grievances, our remaining Formal A reps are tackling the 970 grievances filed so far this year. With our discontinuation of requesting union compensation in grievance settlements, the results have been favorable for numerous grievants. The branch spent thousands of dollars on paper and printer overages. I believe our compensation would be warranted.

Active carriers just received a COLA raise of 6 percent, substantially more than is received from a contract raise. There are few unions that have been able to maintain a cost-of-living provision in their contracts. Our leadership should be congratulated for this accomplishment.

But...I see a problem with National's requirement of a vaccination card for participation at the national convention. Our employer, one of the largest in the country, has no such requirement, yet the organization that represents its employees would think it fair to restrict the privilege of membership. "Wrong no member and see no member wronged"—I think that's in our Constitution. Don't get me wrong, I'm fully (four shots) vaccinated. It just doesn't seem right to me with the overstep decision to require proof of vaccination to attend the national convention.

I wonder who I pissed off this time?

*Ray Bricker, Branch 100*

## Tri-Valley, California

One of the many major casualties of the COVID-19 pandemic was the cancellation of our annual food drive. Thankfully, the food drive is back and was scheduled for May 14. Branch 2902's longtime food drive coordinator, Sandy Dearborn, has passed the baton to our new coordinator, Mary



**Members of the Tri-Valley, CA Br. 2902 food drive committee gathered to prepare for this year's in-person food drive.**

Stanley. A million thanks to Sandy and her husband Jim for going way above and beyond the call of duty during our past food drives; we really appreciate all you have done for the branch.

This year's food drive was announced late due to the uncertainty of the continuing pandemic. The late announcement caused a rush for us to make the proper arrangements. Our branch represents 16 postal installations with 22 carrier stations, and there are several food banks that collect our food. After the three-year food drive hiatus, some of our contacts at the food banks have moved on and there are new players involved. Mary Stanley swiftly organized the mess, in spite of the late notice.

Special thanks are also in order to Alex Lopez, Matthew Hill, Jeff Ross, Sue Degenhardt, Mary Stanley, Louis Rodriguez, Janette Dolabson and John Burton for helping with distribution of the food drive cards that were sent to the Van Nuys Post Office. Distribution of 2902's cards was simple with Sue Degenhardt's invaluable assistance, telling the rest of us how many cards were needed for each installation. I worked with Sue for many years at the branch office and had forgotten just how good she was at taking the bull by the horn to get s**t done. Branch 2462's Janette Dolabson and John Burton were tasked with packing cards in priority boxes to ship to offices all over the west. These selfless volunteers inspire me and remind me that solidarity lives!

*Ray Hill, Branch 2902*

## Notice

Article 9, Section 1(b) of the *NALC Constitution* provides that: "All articles submitted by authorized scribes pertaining to Branch, District, State Association, or Retiree items of interest will be published as written, unless such article is defamatory or unlawful." The statements and opinions contained in any branch, state association or retiree item do not necessarily reflect the views of NALC or NALC policy.



# National Auxiliary Board
### News and updates from the officers





Cythensis Lang
President

Cynthia Martinez
Vice President

Crystal Bragg
Secretary

Linda Davis
Asst. Secretary

Pam Fore
Treasurer

## From the President

Reminders for the convention:
1. We will have a Country Store. All items must be mailed to Crystal Bragg by Aug. 1. Please price your items.
2. Convention registration fees will be paid at the convention. Registration fee is $35.
3. Optional luncheon activity fee will be paid at convention. Have you contacted Crystal to let her know if you are attending?
4. Based on the information at this time, all delegates and guests will be required to be fully vaccinated against COVID-19 in order to attend any function at the convention.

Any suggestions, questions or concerns? Contact a board member.

Hope to see you in August.

*C. Lang*

The Auxiliary will have a Country Store at the national convention in Chicago. Send all items to:

Crystal Bragg
834 Westland Drive
Mt. Zion, IL 62549

These items should arrive by Aug. 1 or you can bring them to the convention.

## AUXILIARY OFFICERS

**Cythensis Lang**, President
319 Chelsea Court
Satsuma, AL 36572
251-679-4052
cslang54@gmail.com

**Cynthia Martinez**, Vice President
3532 W. Mauna Loa Lane
Phoenix, AZ 85053
602-505-2215
camslm@yahoo.com

**Crystal Bragg**, Secretary
835 Westland Drive
Mt. Zion IL 62549
217-864-4684
cbragg5414@comcast.net

**Linda Davis**, Assistant Secretary
620 S. 70th Ave.
Yakima, WA 98908
509-969-1334
lindadyakima@gmail.com

**Pam Fore**, Treasurer
3618 Hileman Drive S
Lakeland, FL 33810
863-853-2113
sdprfore@aol.com

### Election notice

This is an election year for the Auxiliary. All positions are up for reelection. The president and the treasurer position will be vacant.

According to Article VI, Section 3: Eligibility:

(a) In order to be considered as a qualified candidate for election to a national office, the following criteria must be met. Candidates must be a delegate at the current convention, must be endorsed by a local or state auxiliaries. A state may have more than one (1) candidate to run for national office, but not more than two (2).



# NALC Member App

**Available for free in the Apple App Store and the Google Play Store**



## NALCA 72nd biennial convention in Chicago
### Aug. 8-12, 2022

Name_____ Auxiliary#_____

Contact # (_____)_____

I plan on attending the convention and I am *interested* / *not interested* (circle one) in attending a luncheon.

Luncheon suggestions:_____

_____

Return form by mail to:
NALC Auxiliary
Crystal Bragg, Secretary
835 Westland Drive
Mt. Zion, IL 62549

Questions? Contact Secretary Bragg at the address at left, by phone at 217-864-4684 (home) or 217-620-9193 (cell), or by email at cbragg5414@comcast.net.

 



– Chelsea T.
Free College student

# Free college for union members and their families

Earn your degree for free online. The Free College Benefit helps union families continue their college education without piling on thousands of dollars in student debt.

## Free associate degree for you and your family

Union Plus Free College offers working families a debt-free and convenient higher education opportunity. Current and retired union members, their spouses, domestic partners, children (including stepchildren and children-in-law), financial dependents, grandchildren, siblings and parents can all take advantage of this exciting opportunity! Family members do NOT need to be financial dependents or living with the member to be eligible.

## Zero out-of-pocket costs

Union members and their families can earn an Associate Degree online, with no out-of-pocket costs. A last-dollar scholarship covers the difference between any federal grants and your tuition, fees and e-books at Eastern Gateway Community College (EGCC).

## Eastern Gateway credits are transferable

Eastern Gateway Community College is a public, non-profit school in the University System of Ohio and is regionally accredited by the Higher Learning Commission. Credits you earn can transfer to other schools, saving you as much as $15,000 on your education!

### Higher Education in Just 4 Steps

1. **APPLY** to Eastern Gateway. Go to freecollege.unionplus.org and select the Get Started Today button.
2. **COMPLETE** the FAFSA. Complete the form online at FAFSA.ed.gov (school code: 007275)
3. **SUBMIT** proof of high school graduation or GED completion
4. **ENROLL** in classes. Work with an enrollment advisor to register for classes.

## Enroll anytime. Classes start every 8 weeks.

**Enroll Today!**

## 1-888-590-9009
### freecollege.unionplus.org

The Free College benefit covers the cost of tuition, fees and books after any PELL or other federal grant, or employer reimbursement is applied. The remaining amount will be cleared with the Free College scholarship. As long as your financial aid file is complete, there is no cost to the student and students are never asked to take out any loans.

*Free College* is possible thanks to the early support and enthusiasm of AFSCME, who entered into a collaboration with Eastern Gateway Community College in 2016.

# Monthly CSRS annuity payments
## for letter carriers who retire on Sept. 1, 2022

The table below provides monthly basic annuity, survivor reduction and reduced annuity amount estimates for letter carriers covered by the Civil Service Retirement System (CSRS) who plan to take optional retirement on Sept. 1, 2022.

Estimates are computed by using the given high-3 averages, which are based on the basic pay earned by full-time Step O carriers and vary by length of postal/federal/military service.

Reduced annuity amounts reflect the difference between the given basic annuity and survivor reduction figures.

### CC Grade 1 / High-3 Average[1]: $67,693    CC Grade 2 / High-3 Average[1]: $69,115

| Years of Service[2] | Basic Annuity | Max. Survivor Deduction[3] | Max. Survivor Reduced Annuity[4] | Basic Annuity | Max. Survivor Deduction[3] | Max. Survivor Reduced Annuity[4] |
|---|---|---|---|---|---|---|
| 20 | $2,045 | $182 | $1,863 | $2,088 | $186 | $1,902 |
| 21 | 2,158 | 193 | 1,964 | 2,203 | 198 | 2,005 |
| 22 | 2,271 | 205 | 2,066 | 2,318 | 209 | 2,109 |
| 23 | 2,383 | 216 | 2,168 | 2,433 | 221 | 2,213 |
| 24 | 2,496 | 227 | 2,269 | 2,549 | 232 | 2,316 |
| 25 | 2,609 | 238 | 2,371 | 2,664 | 244 | 2,420 |
| 26 | 2,722 | 250 | 2,472 | 2,779 | 255 | 2,524 |
| 27 | 2,835 | 261 | 2,574 | 2,894 | 267 | 2,627 |
| 28 | 2,947 | 272 | 2,675 | 3,009 | 278 | 2,731 |
| 29 | 3,060 | 284 | 2,777 | 3,125 | 290 | 2,835 |
| 30 | 3,173 | 295 | 2,878 | 3,240 | 301 | 2,938 |
| 31 | 3,286 | 306 | 2,980 | 3,355 | 313 | 3,042 |
| 32 | 3,399 | 317 | 3,081 | 3,470 | 325 | 3,146 |
| 33 | 3,512 | 329 | 3,183 | 3,585 | 336 | 3,249 |
| 34 | 3,624 | 340 | 3,284 | 3,701 | 348 | 3,353 |
| 35 | 3,737 | 351 | 3,386 | 3,816 | 359 | 3,457 |
| 36 | 3,850 | 363 | 3,488 | 3,931 | 371 | 3,560 |
| 37 | 3,963 | 374 | 3,589 | 4,046 | 382 | 3,664 |
| 38 | 4,076 | 385 | 3,691 | 4,161 | 394 | 3,768 |
| 39 | 4,189 | 396 | 3,792 | 4,276 | 405 | 3,871 |
| 40 | 4,301 | 408 | 3,894 | 4,392 | 417 | 3,975 |
| 41 | 4,414 | 419 | 3,995 | 4,507 | 428 | 4,079 |
| 41+11 months & over[5] | 4,513 | 429 | 4,084 | 4,608 | 438 | 4,169 |

1. High-3 averages for both grades (formerly levels) are for carriers who have worked full-time on a continuous basis between Sept. 1, 2019, and Aug. 31, 2022, at Step O (formerly Step 12).
2. Years of service includes any unused sick leave.
3. The reduction for a survivor's annuity is the amount necessary to provide maximum benefits (55% of basic annuity) to a surviving spouse.
4. If covered by the NALC Health Benefit Plan, a further deduction of either $491.06 per month if for self plus one (code 323), $430.49 if for self and family (code 322), or $205.47 if self only (code 321) will be made. In addition, premiums for any coverage under the Federal Employees' Group Life Insurance Program will reduce the net annuity further.
5. Under CSRS rules, the maximum allowable yearly annuity cannot exceed 80 percent of an annuitants high-three average. This limit is reached when an annuitant's years of service amount to 41 years and 11 months. Individuals with more than 41 years and 11 months of service will not get a higher annuity based on additional service, but may get slightly more than 80 percent of their high-three average on the basis of unused sick leave accumulated under CSRS.

*Clip and save—may not be printed every month. Always available at nalc.org.*

# Monthly FERS annuity payments
## for letter carriers who retire on Sept. 1, 2022

The **Federal Employees Retirement System (FERS) covers** federal and postal employees hired on or after Jan. 1, 1984. FERS employees earn retirement benefits from three sources: the FERS Basic Annuity, Social Security and the Thrift Savings Plan.

An additional Special Annuity Supplement is paid to FERS annuitants who retire at Minimum Retirement Age (MRA) plus 30 years or more, or at age 60 plus 20 years or more. It is approximately calculated by taking an individual's Social Security age 62 benefit estimate, multiplied by the number of years of FERS coverage, divided by 40. It is payable to age 62 and then ends. Social Security benefits are payable beginning at age 62.

The table below provides monthly basic annuity, survivor deduction and net annuity amount estimates for letter carriers who plan to take optional retirement on Sept. 1, 2022. Estimates are computed by using the given high-3 averages, which are based on the basic pay earned by full-time Step O carriers and vary by length of postal/military/federal service. Reduced annuity amounts reflect the difference between the given basic annuity and survivor reduction figures.

| | CC Grade 1 / High-3 Average[1]: $67,693 | | | CC Grade 2 / High-3 Average[1]: $69,115 | | |
|---|---|---|---|---|---|---|
| Years of Service[2] | Basic Annuity | Max. Survivor Deduction[3] | Max. Survivor Reduced Annuity[4] | Basic Annuity | Max. Survivor Deduction[3] | Max. Survivor Reduced Annuity[4] |
| 20 | $1,128 | $113 | $1,015 | $1,152 | $115 | $1,037 |
| 21 | 1,185 | 118 | 1,066 | 1,210 | 121 | 1,089 |
| 22 | 1,241 | 124 | 1,117 | 1,267 | 127 | 1,140 |
| 23 | 1,297 | 130 | 1,168 | 1,325 | 132 | 1,192 |
| 24 | 1,354 | 135 | 1,218 | 1,382 | 138 | 1,244 |
| 25 | 1,410 | 141 | 1,269 | 1,440 | 144 | 1,296 |
| 26 | 1,467 | 147 | 1,320 | 1,497 | 150 | 1,348 |
| 27 | 1,523 | 152 | 1,371 | 1,555 | 156 | 1,400 |
| 28 | 1,580 | 158 | 1,422 | 1,613 | 161 | 1,451 |
| 29 | 1,636 | 164 | 1,472 | 1,670 | 167 | 1,503 |
| 30 | 1,692 | 169 | 1,523 | 1,728 | 173 | 1,555 |
| 31 | 1,749 | 175 | 1,574 | 1,785 | 179 | 1,607 |
| 32 | 1,805 | 181 | 1,625 | 1,843 | 184 | 1,659 |
| 33 | 1,862 | 186 | 1,675 | 1,901 | 190 | 1,711 |
| 34 | 1,918 | 192 | 1,726 | 1,958 | 196 | 1,762 |
| 35 | 1,974 | 197 | 1,777 | 2,016 | 202 | 1,814 |
| 36 | 2,031 | 203 | 1,828 | 2,073 | 207 | 1,866 |
| 37 | 2,087 | 209 | 1,878 | 2,131 | 213 | 1,918 |
| 38 | 2,144 | 214 | 1,929 | 2,189 | 219 | 1,970 |
| 39 | 2,200 | 220 | 1,980 | 2,246 | 225 | 2,022 |
| 40 | 2,256 | 226 | 2,031 | 2,304 | 230 | 2,073 |
| Each additional year[5] | 56.41 | 5.64 | 50.77 | 57.60 | 5.76 | 51.84 |

1. High-three averages for both grades (formerly levels) are for carriers who have worked full-time on a continuous basis between Sept. 1, 2019, and Aug. 31, 2022, at Step O (formerly Step 12).

2. Years of service includes any unused sick leave.

3. The reduction for survivor's annuity is the amount necessary to provide maximum benefits (50% of basic annuity) to a surviving spouse.

4. If covered by the NALC Health Benefit Plan, a further deduction of either $491.06 per month if for self plus one (code 323), $430.49 if for self and family (code 322), or $205.47 if for self only (code 321) will be made. In addition, premiums for any coverage under the Federal Employees' Group Life Insurance Program will reduce the net annuity further.

5. Under FERS rules, there is no maxiuumm allowable yearly annuity. However, given the FERS formula of 1% per year, it is highly unlikely that any FERS employee will ever exceed the 80% maximum limit under CSRS.

6. FERS employees who retire at age 62 or later with at least 20 years of service receive an additional 10% - their annuities are calculated at 1.1% times years of service times high-three average salary.

# Mutual Exchanges

**FL: Jacksonville (11/16) to Daytona Beach, FL or surrounding areas.** Sixteen bidding offices, a large metro office with OT and close to beaches. John, 904-806-1841 (call) or jxholling@gmail.com.

**FL: Palm Harbor (6/14) to Cidra, Guaynabo, Arecibo, Aguada, Aguadilla, Isabela, Ricon or Mayaguez, PR.** Post office has about 19 curbside routes. Many activities; beaches, boating, fishing, jet skiing, Busch Gardens. Really nice. Carlos, 727-488-0539 or dreamon2008@gmail.com.

**FL: Pompano (5/21) to Mount Dora/Leesburg/Eustis, FL area.** Large office with overtime, near beaches and everything south Florida has to offer. Chris, 954-328-2186 (call or text) or cblake84530@yahoo.com.

**IL: Chicago (9/94) to Brentwood, Murfreesboro, Columbia, TN or nearby areas.** 90/10 percent single-family/business route. Nineteen-route station. Strong local union; laid-back, friendly atmosphere. Anthony, 312-316-7846 or anthonyquinn53@yahoo.com.

**IL: Chicago (9/93) to Las Vegas, NV** or surrounding areas, or any of the following states: TX, FL, GA. Regular carriers only. Large office with lots of overtime, if wanted. North Side of Chicago. 15 minutes from downtown. Great routes. Tanny, 773-742-1197 (text or call) or reenae2@hotmail.com.

**MN: St. Paul (7/03) to Punta Gorda, Ft. Myers, Port Charlotte, Cape Coral or Sarasota, FL or surrounding areas.** OT available. Tim, 612-267-1143 or t4trpt@aol.com.

**NV: Las Vegas (8/00) to Spokane, Spokane Valley or Northeast WA.** No state income tax. Keep all or most of your seniority. Fourteen bidding stations, lots of OT. Mike, 702-499-5577 or mzahm1701@cox.net.

**OR: Portland (1/16) to Arizona.** Regular city carriers only. Very good office. Great routes. Transferring for family reasons. Dimi, 623-206-5164 or dimitartutev@yahoo.com.

**OR: Portland (11/18) to Ft. Myers, FL, or anywhere in southwest Florida.** Indoor apartment route, small station. Dan, 503-799-1704 or dan.deinhart@gmail.com.

## How to place a Mutual Exchange ad

The cost of Mutual Exchange ads is $15 for up to 30 words and $25 for 31-50 words per month.

Ads must be received by the 5th of the month preceding the month in which the ad will appear, e.g., June's deadline is for the July publication. Mail ad with check (payable to NALC) to: Mutual Exchange Ads, *Postal Record*, 100 Indiana Ave. NW, Washington, DC 20001-2144.

Ads are published for NALC members only. A branch officer or steward must endorse the ad to certify membership. Ads without endorsements will be returned.

Include your name, address and branch number. Ads must be received in the same format and wording as they will appear in the magazine. Begin each ad with your state abbreviation, city and seniority date.

Ads should be typed in upper/lower case (or, if this is not possible, printed clearly) on a full sheet of 8.5 x 11" paper. Make certain the numerals 0 (zero) and 1 (one) can be distinguished from the letters O and l in e-mail addresses.

**Note:** Specific route information or mention of three-way transfers will not be published, nor any wording that offers cash or property to facilitate an exchange. Mutual exchanges must be approved by both postmasters involved. Seniority of carriers involved shall be governed by Article 41, Sec. 2E of the National Agreement. Carriers may not exchange assignments, since vacated positions must be posted for bids in accordance with local and national agreements.



## MISSING
### HELP BRING ME HOME
NCMEC: 1449871

**Lucas Lopez- Hernandez**

Missing Since: Apr 24, 2022
Missing From: Dayton, OH
DOB: Sep 22, 2010
Age Now: 11
Sex: Male
Race: Hispanic
Hair Color: Black
Eye Color: Brown
Height: 3'7"
Weight: 72 lbs

Lucas may be in the company of an adult male.

## DON'T HESITATE!
ANYONE HAVING INFORMATION SHOULD CONTACT

### CALL 911 OR
1-800-843-5678 (1-800-THE-LOST®)
Montgomery County Sheriff's Office (Ohio) 1-937-225-4357

Extra Photo


## MISSING
### HELP BRING ME HOME
NCMEC: 1444959

**Rainah Smith**

Missing Since: Mar 2, 2022
Missing From: Fayette, AL
DOB: Oct 19, 2006
Age Now: 15
Sex: Female
Race: White
Hair Color: Brown
Eye Color: Blue
Height: 5'5"
Weight: 150 lbs

Both photos are of Rainah. She was last seen on March 2, 2022.

## DON'T HESITATE!
ANYONE HAVING INFORMATION SHOULD CONTACT

### CALL 911 OR
1-800-843-5678 (1-800-THE-LOST®)
Fayette County Sheriff's Office (Alabama) 1-205-932-3205



# social media



*@nalc.national*



*@NALC_National*



*@lettercarriers*



*National
Association of
Letter Carriers
(NALC)*



*@ThePostalRecord*



*NALC Member App
(iTunes, Google Play)*

## Join the conversation!

Follow NALC HQ's social media accounts to get the latest letter carrier news and updates straight from the source. Follow our pages; interact with us by liking, commenting and sharing content and encourage others to do the same. For suggestions and photo/video submissions, please use social@nalc.org.

# Help your NALC family affected by natural disasters

The **NALC Disaster Relief Foundation** provides hands-on relief for carriers affected by natural disasters, such as wildfires, hurricanes, floods and tornados. It receives donations to be used to assist regular NALC members affected by natural disasters.

NALC response teams throughout the country are activated to go to disaster locations and offer assistance to NALC members and their families who live in the same household. Basic supplies, including uniforms and food, are available for those who need assistance.

Financial support may be available depending on the availability of funding and qualifying criterias. Any regular member of NALC who has faced hardship as a result of a natural disaster will be able to apply for assistance.



## Make a donation by sending a check or money order to:

NALC Disaster Relief Foundation
100 Indiana Ave. NW
Washington, DC 20001-2144

*The foundation is a 501(c)(3). Your contribution to the NALC Disaster Relief Foundation may be eligible for a tax deduction. It is recommended you seek further advice from your tax advisor.*





**NALC Disaster Relief Foundation**



# Exhibit B

**U.S. Department of Labor**          Office of Labor-Management Standards
                                      Division of Enforcement
                                      Washington, DC  20210
                                      (202) 693-0143  Fax: (202) 693-1343





RECEIVED
JUN 1 0 2019
OFFICE OF THE PRESIDENT
NALC HQ
WASHINGTON, DC

June 6, 2019

Mr. David Noble
1 Fenceline Drive
Gaithersburg, Maryland 20878

Dear Mr. Noble:

This Statement of Reasons is in response to the complaint you filed with the
Department of Labor on January 3, 2019, alleging that violations of Title IV of the Labor-
Management Reporting and Disclosure Act (LMRDA) occurred in connection with the
October 2018 election of union officers conducted by the National Association of Letter
Carriers (NALC).

The Department conducted an investigation of your allegations.  As a result of the
investigation, the Department has concluded, with respect to the specific allegations,
that there was no violation of the LMRDA that may have affected the outcome of the
election.

You raised several allegations related to restrictions on observers, which are grouped
into the five sets of allegations addressed below.  Section 401(c) of the LMRDA requires
a union to provide adequate safeguards to ensure a fair election, including the right of
any candidate to have an observer at the polls and at the counting of the ballots. 29
U.S.C. § 481(c).  Department of Labor regulations provide that this right encompasses
every phase and level of the counting and tallying process, including the counting and
tallying of the ballots and the totaling, recording, and reporting of the tally sheets. 29
C.F.R. § 452.107.

First, you alleged that you were not permitted to count the number of ballot envelopes
returned to the Post Office box.  You also alleged that members of the election
committee, balloting company representative Tom Patterson, and postal management
refused to tell you what the postal service's count was.

You and your observers observed the collection of the voted ballots from the box
section at the post office on October 4, 2018.  The investigation established that no voted
ballots were picked up from the post office prior to that date.  The investigation

determined that at the ballot tally location, approximately twenty-eight election officials sat at multiple tables to count the return ballot envelopes, resulting in a total count of 60,709. The postal service did not provide a count of the return ballot envelopes. The investigation determined that NALC properly did not allow you or any observer to count or handle the return ballot envelopes or ballots. You were present to observe but did not have enough observers to observe the entire counting process. You and your observers were permitted to walk around the room and watch the returned ballot count. The investigation established that you did not ask the election committee chairperson how many people you would need to observe the count, and you were not prohibited from bringing additional observers. You and your observers were also present when the election committee reported the number of ballots returned. Furthermore, the Department's examination of the election records did not reveal any signs of ballot tampering or fraud. There was no violation.

Second, you alleged that you were not permitted to note the names of voters. You alleged that the election committee chairperson and a representative of the Hartfield Group, the private dispute resolution group hired to oversee the election, informed you on October 4, 2018, that you could sit at one of the tables at which ballots were being counted and one of the counters would hold up the envelope being counted so you could note the name. You alleged that if you had been notified prior to October 4 of this procedure, you would have attempted to bring thirty or more people as observers to make the proposed procedure meaningful.

During the investigation, you acknowledged that you were given the opportunity to sit at one of the tables set up for counting the unopened ballots and that the names would be read to you from the return ballot envelopes. You declined to participate in that process because that would have allowed you to observe only a fraction of the voters' names. You also acknowledged that you did not have the names of any voters whose ballots you wished to challenge.

The investigation revealed that the NALC information technology department created the eligibility list used to mail the ballots in the October 2018 officer election under Secretary-Treasurer Nicole Rhine's direction. The list contained only the names and addresses of members who were eligible to vote as of June 1, 2018, the cut-off date established by article 6 section 8 of the NALC constitution. Rhine reviewed the list to ensure that supervisors and members who joined after the cut-off date were not on the list. There was no violation.

Third, you alleged that no observation of the tallying process was permitted. You alleged that you tried to observe the tallying process beginning on October 5, 2018, but were blocked by the election committee, the Hartfield Group, and Patterson and his workers.

The investigation established that some ballots — primarily the ballots from branches with fewer than twenty-five members — were counted by hand, but most ballots were counted by scanner. The investigation determined that observers were able to see the marks on the ballots that were hand counted. However, the investigation established that observers were not able to see the votes on ballots that were fed through the scanner, and the ballots were not projected onto a screen. The union acknowledged that observers were not able to observe the marks on the ballots that were counted by the scanner. The LMRDA's adequate safeguards provision was violated when observers were denied the right to observe the votes on ballots that were fed through the scanner.

However, the observers' inability to see the marks on the scanned ballots did not affect the outcome of the election. As part of its investigation, the Department conducted a partial recount of ballots. The recount of 15,502 ballots in the president's race, which was approximately 25 percent of the total ballots cast, revealed only minor differences with the union's count. The Department's count resulted in 51 additional votes for your opponent, Fredric Rolando, and 3 fewer votes for you. Rolando's margin of victory was 37,878. Department investigators also recounted all of the ballots in the race with the smallest margin, the Region 2 national business agent (NBA) race, which resulted in 14 additional votes for Nick Vafiades and 3 additional votes for Michael Wahlquist. Vafiades's margin of victory, per the Department's recount, was 227. The differences in the counts appeared to be caused by the ballot scanner's failure to read the votes when a member incorrectly marked the ballot. The margins in every race were too large for these small differences to affect the outcome of the election.

With regard to the tally sheets, the investigation revealed that observers were able to see the tally sheets after they were taped to the envelopes and waiting to be entered into the master tally sheet. The investigation further established that observers were allowed to listen as the results were entered into the master tally sheet and confirm that the numbers entered were the numbers that appeared on the tally sheets. With regard to this aspect of your allegation, there was no violation.

Fourth, you alleged that the union refused your request to allow you to observe the sorting of ballots and the daily withdrawal of ballots in the box section of the post office where voted and undeliverable ballots were received. This allegation is within the scope of Title IV of the LMRDA only to the extent that it involves alleged action by the union (as opposed to the post office) to limit your right to observe.

The investigation established that only undeliverable ballot packages, not voted ballots, were retrieved from the post office prior to the day of the tally. The investigation revealed that, once you requested to observe the pickup, the election committee chairperson informed you of the time the representative from the Hartfield Group

regularly picked up the undeliverable ballot packages from the post office. There was conflicting evidence as to how you and the Hartfield Group representative missed each other on September 21, 2018. You claimed that you were there at the time recommended by the local election committee chairperson, but the union advised that you left the post office prior to the stated time. There is no evidence that you attempted to go to the post office to observe the pickup of undeliverable ballot packages on any other day. You were not denied the opportunity to observe the returned undeliverable ballot pickup. Furthermore, there was no evidence of ballot tampering or ballot fraud. There was no evidence that anyone removed voted ballots prior to the day of the election or attempted to use extra ballots to vote. There was no violation.

Fifth, you alleged that the election committee chairperson refused your request to observe the ballots from 10 p.m. to 8 a.m. every day. You also alleged that the safeguards used to protect the ballots at night were inadequate. You further alleged that the election committee arrived at implausible totals. You argued that it was implausible that you got only 11,000 votes, several thousand votes fewer than your opponent, based on your blog following and on the number of votes that other members of your opponent's slate and your slate received.

The investigation established that the union employed adequate safeguards to secure the ballots overnight. The Hartfield Group, the election committee, and election vendor Mosaic set up motion-activated cameras in the tally room overnight. They locked the doors each evening, and a Hartfield Group representative kept the key. The election committee also taped across the door frames and members signed the tape. No one stayed with the ballots in the room overnight. Any observer, including you, was allowed to keep watch on the tally room overnight from the hotel parking lot. There was no evidence that anyone entered the room overnight. In addition, safeguards were used in the printing process — including non-standard-size paper, tic marks along the side of each ballot, and red ink that could not be copied exactly using a color copier — that would have made it very difficult to create fraudulent ballots. Department investigators examined 25 percent of the voted ballots and found no evidence of fraud, tampering, or other irregularities. There was no violation.

Next, you alleged that essentially no verification of ballots was performed by those conducting the election. You stated that on October 4, 2018, the election committee chairperson told you that only ballots from which the voter had removed all identifying information would be verified. During the investigation, you alleged that there was no process in place to ensure that someone did not vote the original ballot and a duplicate ballot. As noted above, section 401(c) of the LMRDA requires a union to provide adequate safeguards to ensure a fair election. 29 U.S.C. § 481(c). In addition, section 401(e) provides that each member in good standing is entitled to one vote. 29 U.S.C. § 481(e).

As explained above, the eligibility list used to mail the ballots in the October 2018 officer election contained only the names and addresses of members who were eligible to vote. Therefore, the union was not required to check voter eligibility at the ballot tally. There was no violation with regard to this aspect of your allegation.

With regard to duplicate ballots, the investigation established that the election committee had a process in place to ensure that members did not vote twice. Duplicate ballots were identified by purple return ballot envelopes that were returned to a separate post office box. The election committee compared the purple envelopes to the other ballots from that branch. If a member returned both ballots, only the duplicate ballot was counted. The Department's review of election records showed that 88 duplicate ballots were returned. Department investigators conducted a review of 20 purple return ballot envelopes from five large branches. The review found that one member returned a duplicate ballot and an original ballot and both were counted. This was a violation of the LMRDA. The other 19 members who returned duplicate ballots that the Department reviewed did not return their original ballots. The maximum number of votes that could have been affected if both the original and the duplicate were returned and counted (in both that instance and the other instances that Department investigators did not review) was 69. As noted above, the smallest margin in this election was 227. Therefore, this violation could not have affected the outcome of any race.

Next, you alleged that the union unfairly delayed your requests to distribute campaign material by email. You alleged that you requested distribution of your campaign emails beginning in August 2017. You stated that you wanted to send campaign emails once a month from then until the election to give you better exposure and contact with the members about the issues you were running on. You acknowledged that you were able to send emails beginning in June or July 2018 and that you ultimately sent three campaign emails.

Section 401(c) of the LMRDA requires the union to comply with a candidate's reasonable request for the distribution of his or her campaign material. 29 U.S.C. § 481(c). The Department's interpretive regulations state that unions must provide candidates and their supporters a reasonable period of time to campaign prior to the election. What is a reasonable campaign period depends on the circumstances, including the method of nominations and the union's size, in terms of both membership and geographic area. 29 C.F.R. § 452.79.

The investigation revealed that, prior to requesting distribution of your campaign emails beginning in August 2017, you had filed a lawsuit against NALC in federal district court seeking relief related to a collective bargaining agreement (CBA)

ratification vote, including permission to use NALC's list of members' email addresses to contact the membership. You advised the court in that case that the literature you wanted to send was not directly related to your candidacy for NALC president but was intended to influence the ratification vote. In denying your request for a preliminary injunction on July 28, 2017, the court ruled that it was "manifestly unreasonable" to request to distribute such literature, aimed not at any candidacy but at the contents of the proposed CBA, more than a year prior to the election.

The investigation established that you subsequently requested that NALC distribute emails specifically in aid of your candidacy but that the union continued to deny your requests based on the court's ruling in July 2017. In August 2017, the union informed you that it would not comply with requests until "sometime in 2018." The investigation established that NALC did not have a campaign email vendor in place for candidates to use until April 2018. After you learned the prices that the selected vendor would charge, you amended your federal district court complaint against NALC to object to the high cost of sending emails through that vendor. NALC ultimately arranged to use a different vendor with a lower cost. The lower-cost option was made available to candidates beginning on June 15, 2018. Nominations took place at the NALC national convention on July 18, 2018; ballots were mailed September 11–14, 2018; and ballots were due on October 4, 2018.

The investigation established that NALC initially denied your reasonable requests to distribute your campaign literature by email. Under the circumstances, including that NALC is a national union with approximately 291,000 members, NALC should have been responsive to your request to distribute campaign literature beginning in August 2017, when you requested that NALC distribute emails in aid of your candidacy, instead of putting off any preparations until 2018. Your reasonable request should have been the catalyst for NALC to secure an email vendor and establish procedures for you and other bona fide candidates to distribute campaign literature by email. It was not until April 2018 that NALC announced a vendor for candidates to contact for distribution of their campaign literature by email. This initial denial of your reasonable requests for campaign email distribution violated the LMRDA.

However, the investigation established that you were able to send campaign emails to members on July 30, August 21, and September 13, 2018. Therefore, at least two of your campaign emails were distributed before the ballots were mailed. Under these circumstances, the effect of the violation was mitigated, and therefore this violation did not affect the outcome of the election.

You also alleged that NALC President Fredric Rolando unfairly delayed your request to place campaign advertisements in the union's monthly magazine, the *Postal Record*. You stated that you requested to buy advertising space in the magazine several months

before the mailing of the ballots.  You alleged that NALC did not allow a *Postal Record* campaign advertisement until the September 2018 issue, which came out only days before the ballots were mailed.  You alleged that this was unfair because Rolando and the other incumbents are in continuous contact with the entire membership through the *Postal Record* and other publications.

Section 401(c) of the LMRDA prohibits disparate candidate treatment. 29 U.S.C. § 481(c). When a union or its officers authorize distribution of campaign literature on behalf of any candidate, similar distribution under the same conditions must be made for any other candidate who requests it. 29 C.F.R. § 452.67.

The investigation revealed that the *Postal Record* normally does not accept advertising but that it makes an exception, during election years, to allow campaign advertisements in the August-September issue.  This has been the union's long-standing practice.  In addition, NALC provided notice to all candidates of this practice in the May 2018 issue of the *Postal Record*.  All candidates were treated equally with respect to the terms and expenses associated with distribution of the campaign advertisements in the *Postal Record*.  You and the incumbent slate both placed advertisements in the August-September issue, and no candidate was allowed to place an advertisement in any other issue.  There was no violation.

Next, you alleged that Rolando unfairly refused to recognize you at the NALC national convention held in Detroit in July 2018, where you were a delegate.  You alleged that Rolando recognized members Matty Rose and Barry Weiner, both of whom made campaign-like speeches against you.  You alleged that Rolando did not call on you at the microphone and therefore you were denied the opportunity to reply to Rose's and Weiner's remarks.

As noted above, section 401(c) of the LMRDA prohibits disparate candidate treatment. 29 U.S.C. § 481(c).  In addition, section 401(g) prohibits the use of union resources to promote any candidate for union office. 29 U.S.C. § 481(g).

The investigation established that Rose's and Weiner's comments did not constitute campaigning.  The investigation revealed that Rose and Weiner spoke on July 19, 2018, concerning an appeals court decision issued two days prior in a lawsuit you had filed against the former NALC leadership.  They spoke during a break in business when delegates had the opportunity to address the convention about any topic they wished. Rose spoke first and talked about the lawsuit for less than two minutes.  Rose did not mention your name or identify you in any way as connected to the lawsuit.  More than half an hour later, Weiner spoke and thanked Rose for bringing up the news about the lawsuit.  Weiner mentioned your name as one of the parties to the lawsuit.  Weiner spoke for approximately three minutes.  Neither delegate personally attacked you or

disparaged your candidacy. They discussed timely news regarding the union. The investigation did not establish whether Rolando would not allow you the opportunity to respond to Rose and Weiner. However, Rolando was permitted to choose which delegates were allotted time to address the convention, and he was not required by the LMRDA to allow you to respond to Rose's and Weiner's comments because their statements were not campaigning. There was no violation.

Finally, you raised other allegations that, even if true, would not constitute violations of Title IV of the LMRDA.

For the reasons set forth above, the Department of Labor concludes that there was no violation of the LMRDA that may have affected the outcome of the election. Accordingly, I have closed the file on this matter.

Sincerely,

*Brian A. Pifer*

Brian A. Pifer
Chief, Division of Enforcement

cc:     Fredric V. Rolando, President
        National Association of Letter Carriers
        100 Indiana Avenue NW
        Washington, DC 20001-2144

        Beverly Dankowitz, Associate Solicitor for Civil Rights and Labor-Management

Exhibit C

1

```
 1              UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF COLUMBIA

 3

 4

 5    THOMAS HOUFF, et al.,              :
                                         :
 6                  Plaintiff,           :
                                         :   CA NO. 17-1255
 7    v.                                 :
                                         :
 8    NATIONAL ASSOCIATION OF LETTER     :
      CARRIERS, AFL-CIO,                 :
 9                                       :
                    Defendants.          :
10    -------------------------------------------------------

11

12              TRANSCRIPT OF MOTIONS HEARING

13       BEFORE THE HONORABLE KETANJI BROWN JACKSON

14              UNITED STATES DISTRICT JUDGE

15              Friday, July 28, 2017

16    APPEARANCES:

17     For the Plaintiffs: Thomas Houff, Pro Se
                         : 3912 Teakwood Avenue.
18                         Richmond, VA 23227

19                         David W. Noble, Jr., Pro Se
                           1 Fenceline Drive
20                         Gaithersburg, MD 20878

21     For the Defendant:  Peter D. DeChiara, Esq.
                           COHEN, WEISS AND SIMON, LLP
22                         330 West 42nd Street
                           New York, NY 10036
23

24    Proceedings reported by machine shorthand, transcript
      produced by computer-aided transcription.
25
```

114

1    whatever?

2         MR. NOBLE:  There is nothing in the case law

3    or in the Department of Labor regulations that gives the

4    union the right to censor a candidate's campaign

5    material or even to view it in advance.

6         THE COURT:  Can the union limit the period of

7    bona fide candidacy?  So fine, they can't limit the

8    material of people they've recognized to be candidate,

9    but can they say we're only going to consider someone to

10   be a candidate from the date of our convention on?

11        MR. NOBLE:  That's the precise issue that the

12   Supreme Court cited in *International Masters v. Brown*,

13   and the Supreme Court said that such a rule would not be

14   reasonable.

15        THE COURT:  All right.  I will take a look at

16   it.  Here is what I'm going to do.  I don't know what

17   your schedule is this afternoon, but I would like to

18   come back at 2:30.  I think that gives me enough time to

19   decide whether or not I can decide this matter and if

20   so, tell you how.  All right?

21        MR. NOBLE:  Thank you, Your Honor.

22        THE COURT:  Thank you.

23             (Recess)

24        THE COURT:  Good afternoon.  We all have

25   returned as ordered.  Let me start by saying that this

115

1    Court has been left in a somewhat difficult position,

2    because it has to consider the issues in this case under

3    considerable time pressure.

4            As I mentioned at the outset, NALC was not

5    willing to hold the ratification ballots that it has

6    collected and that it is scheduled to start counting

7    this weekend.  The Court was surprised by this, frankly,

8    and in order to make sure that its own expectations were

9    not out of whack, it did a little research and it noted

10   that unions in similar cases in this District have

11   offered this accommodation.

12           By way of example, there's the case of *Bauman*

13   *v. Presser*, which is Civil Action No. 84-2699.  It's at

14   1984 WL 3255.  And the minor delay in the balloting

15   process would have permitted this Court to consider the

16   parties' arguments and to draft an opinion that

17   addresses them.  Be that as it may, the Court believes

18   that it is able to rule on the pending motion for a

19   preliminary injunction, and I will do my best to convey

20   orally the reasons for my decision.

21           In doing so, I'll start by briefly describing

22   the facts that are alleged in the complaint and laying

23   out the claims that the plaintiffs have made before

24   discussing the applicable legal standards and explaining

25   this Court's reasoning with respect to the motion for

116

1    emergency relief.

2           Starting with the basic facts.  As alleged in

3    the plaintiffs' complaint, Thomas Houff and David Noble

4    are members of the defendant National Association of

5    Letter Carriers.  I'll call it NALC.  I don't know

6    whether the association goes by that acronym, but that's

7    what I'm choosing to do in the context of this oral

8    recitation.

9           This organization is the exclusive collective

10   bargaining agent for city letter carriers that the

11   United States Postal Service employs.  Plaintiff Houff

12   is one of the approximately 199,000 active USPS mail

13   carriers who are members of NALC.  Mr. Noble is one of

14   the approximately 80,000 retired members of that

15   organization.

16          NALC and the USPS have been parties to

17   successive CBAs, that is collective bargaining

18   agreement, since 1971.  By its terms, the latest such

19   agreement, which I'll refer to as the 2011 national

20   agreement or the 2011 CBA, was set to expire on May 20,

21   2016, but the parties agreed to keep that agreement in

22   effect while they negotiated a successor agreement.

23          Because the parties have been functioning

24   under an expired agreement to date, letter carriers,

25   active letter carriers have not received raises since

117

1    2015.

2          On May 12, 2017, NALC and the postal service

3    announced that they had reached an agreement on the

4    proposed successor to the 2011 CBA, which would be

5    retroactive to May 20, 2016, which was the date that the

6    2011 CBA was set to expire.  I will refer to the 2017

7    agreement as the proposed agreement.

8          Under the terms of NALC's constitution, NALC

9    membership must ratify any such agreement by mail-in

10   ballot before it takes effect.  In late June of 2017,

11   NALC mailed a copy of the proposed agreement in its

12   entirety, including all of the attachments, along with

13   ballots to those NALC members whom the union has deemed

14   eligible to vote.

15         The union made clear that members must return

16   the ballots to NALC by July 29, 2017, which is tomorrow.

17   NALC is scheduled to begin counting the ballots this

18   Sunday, July 30, 2017.

19         Plaintiff Noble has been a vocal component of

20   ratification of the proposed agreement, and he and Houff

21   filed this lawsuit on June 27, 2017, challenging

22   particular aspects of NALC's conduct in conjunction with

23   the ratification proceedings.  Plaintiffs invoke the

24   Labor Management Reporting and Disclosure Act, the

25   LMRDA, which is 29 U.S.C. Sections 401 through 531, and

118

1    they accuse NALC of having violated the statute in five

2    respects.

3              First, by not disclosing to the membership the

4    number of non-career city carrier assistants, known as

5    CCAs that USPS will be able to employ pursuant to the

6    proposed agreement.

7              Second, by refusing to let Noble's son

8    livestream a rap session that took place on June 22,

9    2017, at which NALC members made a presentation about

10   the proposed agreement to local branch leaders.

11             Third, by stating in the materials that were

12   circulated to the members that the proposed agreement

13   narrows the compensation gap between CCAs and career

14   letter carriers.

15             Fourth, by refusing to allow retired members

16   to participate in the ratification referendum.

17             And fifth, by refusing to allow Noble to send

18   a blast email to NALC's membership list regarding his

19   opposition to ratification of the proposed agreement.

20             As the legal basis for these claims of

21   wrongdoing, Plaintiffs allege that NALC has violated the

22   prescriptions contained in Section 411(a)(1) of

23   Title XXIX of the United States Code.  These provisions

24   guard against discriminatory application of union rules

25   in the context of a referendum vote and protect members'

119

1    free speech and assembly rights.

2           Plaintiffs also allege that by refusing

3    Noble's request to send an email blast regarding his

4    opposition to the proposed agreement, NALC has refused

5    to distribute literature in aid of Noble's campaign for

6    union president in violation of 29 U.S.C. 481(c).

7           As relief, Plaintiffs seek an order that

8    declares that NALC has violated the LMRDA, cancels the

9    current ratification vote and requires NALC to allow

10   Noble to send a blast email to the NALC's membership

11   list in connection with the renewed ratification

12   proceeding.

13          Plaintiffs filed the instant motion for a

14   temporary restraining order or preliminary injunction

15   which seeks to bar NALC from opening the ballots pending

16   resolution of this lawsuit.  The plaintiffs filed this

17   motion on July 10, 2017.

18          Plaintiffs argue that they are substantially

19   likely to succeed on the merits of their claims that

20   NALC has violated the LMRDA in connection with the

21   ratification referendum; that they will suffer

22   irreparable harm in the absence of an injunction; and

23   that the balance of the equities and public interest

24   weigh in favor of enjoining the ballot count while the

25   parties litigate this case.

120

1        Notably, Plaintiffs are not pursuing

2   preliminary injunction relief with respect to their

3   claim that NALC improperly prohibited Noble's son from

4   livestreaming the NALC session.

5        NALC opposes Plaintiffs' motion, arguing that

6   the union did not violate any provision of the LMRDA in

7   connection with the ratification referendum; that

8   Plaintiffs have no likelihood of success on their

9   claims; the plaintiffs are not at risk of any harm if

10  NALC proceeds with opening the ballots; that NALC and

11  its members would be injured by delay of the contract

12  ratification for any period of time and that the public

13  interest weighs against interfering in the ratification

14  vote.

15       Those are the facts and the claims.  I will

16  now state the legal standards that govern this Court's

17  consideration of Plaintiffs' request for preliminary

18  injunctive relief prior to explaining how I applied them

19  to reach my conclusions in this matter.

20       I'll begin with the standards for issuing

21  emergency relief in the form of a TRO, temporary

22  restraining order, or a PI, preliminary injunction.  And

23  then I will discuss the substantive legal standards that

24  apply to claims brought under the LMRDA.

25       It is well established that temporary

121

1    injunctive relief in the form of either a temporary

2    restraining order or a preliminary injunction is an

3    extraordinary remedy that may only be awarded upon a

4    clear showing that the plaintiff is entitled to such

5    relief.  The purpose of such relief is to maintain the

6    status quo of a case until the Court has an opportunity

7    to consider a request for fuller relief.  And a TRO in

8    particular may issue when a movant is faced with the

9    possibility that irreparable injury will occur even

10   before the hearing for a preliminary injunction required

11   by Federal Rule of Civil Procedure 65(a) can be held.

12        Because we have now in this case had both

13   parties submit briefs in regard to Plaintiffs' emergency

14   motion and because we've just conducted a full hearing

15   on Plaintiffs' request for emergency relief, this Court

16   will deem these proceedings as related solely to

17   Plaintiffs' request for a preliminary injunction and

18   treat the motion as such for the purposes of today's

19   ruling.

20        The party seeking a preliminary injunction

21   must establish that it is likely to succeed on the

22   merits; that it is likely to suffer irreparable harm in

23   the absence of preliminary relief; that the balance of

24   equities tips in its favor; and that an injunction is in

25   the public interest.  Historically in this jurisdiction

122

1    these factors have been considered to be on the sliding

2    scale; that is, in conducting an inquiry into these four

3    factors courts consider the relative strengths of

4    plaintiffs' legal arguments regarding each of the four

5    prongs such that even if the showing on multiple prongs

6    is weak, the Court may still issue an injunction if the

7    showing in one area is particularly strong.

8         However, based on D.C. Circuit case law in the

9    wake of the Supreme Court's decision in *Winter v.*

10   *Natural Resources Defense Council*, which is

11   555 U.S. 7 from 2008, there is a question regarding

12   whether the sliding scale approach is still good law or

13   whether a more strident test applies when a plaintiff

14   requests preliminary relief.

15        In any event, even under the more lenient

16   sliding scale approach, it is well established that a

17   movant must demonstrate at least some injury for a

18   temporary restraining order or preliminary injunction to

19   issue.

20        Two of the prongs of the four-factor

21   injunctive relief for a PI, likelihood of success and

22   irreparable injury, are the most significant aspects of

23   the Court's inquiry, because they relate directly to the

24   purpose of a preliminary injunction.  It is particularly

25   important for the movant to demonstrate a substantial

1    likelihood of success on the merits because absent a

2    substantial indication of likely success on the merits

3    there would be no justification for the Court's

4    intrusion into the ordinary processes of administration

5    and judicial review.  And that was a quote from one of

6    my colleagues in a 2011 case.

7              Furthermore, the basis of injunctive relief in

8    the federal courts has always been irreparable harm in

9    the inadequacy of legal remedies.  Indeed, a PI entitles

10   the movant to emergency action before a judgment on the

11   merits precisely because the applicant is likely to

12   suffer irreparable harm before a decision on the merits

13   can be rendered.

14             Turning now to the substantive legal standards

15   that govern the instant case.  As mentioned, Plaintiffs

16   allege that NALC's concealment and misrepresentation of

17   information regarding the CCA caps and compensation and

18   also its refusal to permit retired members to

19   participate in the ratification referendum violate

20   Title I and Title IV of the LMRDA, 29 U.S.C. 411(a)(1)

21   and -- excuse me -- not Title IV.  They violate Title I

22   of the LMRDA.

23             Section 411(a)(1) states that every member of

24   a labor organization shall have equal rights and

25   privileges within such organization to vote in elections

124

1    or referendums of the labor organization subject to

2    reasonable rules and regulation in such organization's

3    constitution and bylaws.

4            And while certain other jurisdictions consider

5    this provision only to relate to discrimination in the

6    provision of voting rights, the D.C. Circuit has

7    interpreted this provision to guarantee not only an

8    equal right to vote but also a meaningful opportunity to

9    vote.  One circumstance where a union can deny members a

10   meaningful right to vote even if all members are

11   permitted to cast votes is where union officials

12   circulate inadequate or misleading information about

13   matters to be voted upon.

14           Another is where the ratification process does

15   not afford members with equal time for consideration of

16   the issues that are being presented for a vote.  And, of

17   course, a union obviously violates the equal right to

18   vote principles of Section 411(a)(1) when per its rules

19   or otherwise it unreasonably excludes certain members

20   from receiving ballots or takes steps to dilute their

21   voting power.

22           In determining whether a union has

23   discriminated against some of its members or robbed

24   their votes of meaning, the Court will consider whether

25   the union has flouted its own rules; the egregiousness

125

1    of the violation, if any; the bad faith in which the

2    violation occurred; and the impact of the violation on

3    the election's outcome.  And in evaluating whether a

4    union rule that infringes on protected voting rights is

5    reasonable, courts balance the undemocratic effect of

6    the challenged rule against the union interest urged in

7    support of that rule and consider whether the employee

8    was excluded from voting on matters in which he had a

9    vital interest or whether, instead, the vote pertains to

10   matters primarily of concern to those who were permitted

11   to vote.

12          In addition to claiming that NALC violated its

13   members' equal right to vote, Plaintiffs allege that

14   NALC has also violated a right protected by Title IV of

15   the LMRDA, 29 U.S.C. Section 481(c) because the union

16   refused, says Plaintiffs, Noble's request to send the

17   NALC membership by email and at its own expense,

18   information opposing ratification of the proposed

19   agreement.

20          Noble predicates this claim on his assertion

21   that he is a candidate for the 2018 NALC presidential

22   election and that these materials, the materials he

23   wanted to circulate, are campaign materials.  Section

24   481(c) provides that "Every national or international

25   labor organization shall be under a duty to comply with

126

1    all reasonable requests of any candidate to distribute

2    by mail or otherwise at the candidate's expense campaign

3    literature in aid of such person's candidacy to all

4    members in good standing of such labor organization and

5    to refrain from discrimination in favor of or against

6    any candidate with respect to the use of lists of

7    members."

8           The statute proceeds to state specifically

9    that "whenever such labor organizations or its officers

10   authorize the distribution to members of campaign

11   literature on behalf of any candidate or the labor

12   organization itself with reference to such election,

13   similar distribution at the request of any other

14   bona fide candidate shall be made by such labor

15   organization and its officers."

16          The Supreme Court has recognized that

17   Section 481 rights enure even before a candidate is

18   officially nominated.  It has emphasized that the

19   appropriate question when a candidate seeks to circulate

20   campaign literature is whether the request is

21   reasonable.  With respect to rights to circulate

22   materials that oppose a ratification referendum, the

23   D.C. Circuit has specifically held that "there is

24   nothing in 29 U.S.C. 481(c) to indicate that Congress

25   embraced the broad proposition that any union member

127

1    must be granted access to his union's mailing list

2    whenever he asserts an interest in commenting on a

3    contract submitted to the national membership for

4    ratification.  Had Congress meant to achieve this

5    result," says the D.C. Circuit, "it obviously knew how

6    to do so."

7              The parties here have not cited any cases that

8    deal with the intersection of these doctrines and the

9    facts before this Court.  That is, the Court is unaware

10   of any precedence that address the rights of proclaimed

11   candidate for union office where the material he seeks

12   to circulate pertains to his opposition to a CBA

13   ratification, which is allegedly part of his platform,

14   but the officer election is more than a year away.

15             These are the basic principles that this Court

16   has applied to reach its conclusion in this case.  This

17   Court has reviewed the complaint and the parties'

18   submissions, and it has taken into account the arguments

19   made and the testimony offered at today's hearing.  For

20   the reasons I will explain now, the Court has concluded

21   that Plaintiffs have not established a likelihood of

22   success on the merits of their claims, nor have they

23   demonstrated that the balance of the harms to the

24   membership from ratification of the proposed agreement

25   outweighs the harm to Plaintiffs -- excuse me.  Nor have

128

1    they demonstrated that the balance of the harm to the

2    membership is less than the harm to Plaintiffs or that

3    it's in the public interest for the Court to enjoin the

4    counting of the ratification vote.

5         And while it does appear that there is

6    irreparable harm to the rights of the plaintiffs if the

7    Court permits the ratification of a CBA that was reached

8    pursuant to a vote that violated the LMRDA in the sense

9    that there can't be a do-over, the Court concludes that

10   this concern does not outweigh the other preliminary

11   injunction factors which all weigh in favor of the

12   union.

13        Therefore, Plaintiffs' motion for a

14   preliminary injunction will be denied.  As a general

15   matter, here are my reasons for reaching this

16   conclusion:

17        The plaintiffs' likelihood of success on the

18   merits turns entirely on whether or not they have

19   brought valid claims.  Thus, the Court will discuss each

20   of their claims in turn.

21        In Counts I and III, Plaintiffs accuse NALC of

22   having concealed the number of CCAs and effectively the

23   percentage as well that are authorized in the proposed

24   agreement and of misrepresenting whether the

25   compensation gap between the CCAs and letter carriers

129

1    has narrowed as a result of the new agreement.

2              With respect to Plaintiffs' concealment

3    contentions, this Court finds that Plaintiffs'

4    considerable concerns are justified and that its

5    assertions are not at all frivolous.  As the Court reads

6    the record, the union has decided to adopt a proposed

7    agreement that purports to contain caps on the

8    percentages of CCAs that are permitted, which it does in

9    the body of the contract.  But in the attached MOUs, the

10   parties to the proposed agreement have essentially

11   included provisions that appear to eliminate the caps

12   under certain circumstances and broad circumstances

13   whenever "additional CCAs may be needed in order to

14   perform Sunday partial delivery in a cost-effective

15   manner or to expand and maintain the delivery of

16   competitive products," and that's a quote from the

17   Sunday delivery MOU that is attached to the proposed

18   agreement.

19             At the very least, this proposed MOU regarding

20   CCA staffing appears to authorize the permanent hiring

21   of a certain percentage of additional CCAs without union

22   consent, and the MOU draft attached to the proposed

23   agreement differs in significant ways from the MOU that

24   was previously entered into regarding the 2011 CCA

25   covering the same subject matter.  And yet the bulletins

130

1    that NALC circulated and that describe all this seem to

2    suggest that no changes were made to the caps from one

3    agreement to the other.

4         The problem with Plaintiffs' theory that these

5    alleged misrepresentations about the percentages and

6    numbers of CCAs that could be hired under the proposed

7    agreement amounts to a violation of the LMRDA is that as

8    a general matter, courts have only deemed certain kinds

9    of problems with referendum materials to be significant

10   enough to threaten the meaningful right to vote and

11   count as a statutory violation.

12        This threshold was captured succinctly in a

13   case called *Gilliam*, G-i-l-l-i-a-m, *v. Independent Steel*

14   *Workers Union*, which is 552 F. Supp. 168, and this is

15   the Northern District of West Virginia in 1983.

16        The District Court in that case was handling

17   an equal vote challenge under Section 411(a) and stated

18   a test that appears to capture the law in regard to

19   411(a) claims.  It says, "The Court is of the opinion

20   that an appropriate test when a union's denial of a

21   meaningful and informed vote is suggested would be, one,

22   whether the members were given proper and adequate

23   notice of the vote as to date, time and scope or subject

24   matter of the vote;

25             "Two:  Whether the information releases of the

131

1    union together with any meetings conducted were adequate

2    to inform the membership of the issues to be decided;

3              "Three:  Whether there was enough time given

4    for adequate reflection on the merits by the members";

5              And 4, "Whether there was enough time and

6    opportunity to mount effective support or opposition to

7    the leadership's position."

8              The Court said the need for more information

9    and time would vary with the complexity and quantity of

10   the issues to be decided.  In the instant case this

11   Court is of the view that whatever Plaintiffs might

12   think about the union's true motivations and calculated

13   intentions regarding the numbers of CCAs employed, the

14   fact of the matter is that the entire proposed

15   agreement, including all of the attachments, were

16   included in the materials that were circulated to the

17   membership, unlike other cases in which the terms or

18   text of a proposed CBA was not disclosed.

19             And I will note that it is those kinds of

20   cases where the material terms of the agreement are not

21   disclosed that tend to arise under the prong of the test

22   that I just mentioned about whether information releases

23   of the union were adequate to inform the membership.

24             And Plaintiffs have not demonstrated that the

25   allegedly omitted information about the actual numbers

132

1   of CCAs that were previously hired is a material

2   omission or misrepresentation, as would be necessary to

3   give rise to a claim that the votes cast without this

4   information were not meaningful because there's no

5   evidence in the record that knowing these figures would

6   have caused members who voted for the proposed agreement

7   to change their votes.

8         This last defect -- and by that I mean the

9   materiality defect -- is also the primary problem with

10  Plaintiffs' contention that the union misrepresented the

11  compensation gap.  In fact, the plaintiffs say that the

12  gap is actually increasing when the union represented

13  that it was decreasing.

14        Plaintiffs argue that this was a

15  misrepresentation and the bulk of the parties' briefs

16  engage at that level, whether or not the statements are

17  true.

18        But even if, even if this was a

19  misrepresentation, Plaintiffs have not shown that it is

20  a material misrepresentation of the facts such that if

21  the member voters had known it, they would have voted

22  differently.  In fact, one of the points that Plaintiffs

23  emphasized here today in the discussion has made me

24  question the materiality of the representations about

25  the pay gap even more, because to the extent that the

133

1    CCAs' primary goal is to be converted to career

2    carriers, which is what Plaintiffs represent, then it's

3    not at all clear that whether the pay for continuing

4    CCAs and whether the pay increases or decrease with

5    respect to that status category is anywhere near as

6    important to the CCAs who are impacted by the proposed

7    agreement as the provisions in the CBA about the

8    conversion opportunities.

9             Materiality is crucial because in this Court's

10   view only material omissions and misrepresentations can

11   even conceivably be the basis for a claim that the

12   union's alleged malfeasance has denied its members equal

13   rights to cast a meaningful ballot.

14            Put another way, if the misrepresentation or

15   omission is about a small matter that would not have

16   made any difference with respect to the votes that were

17   cast, then there really is no basis for claiming that

18   such omission or misrepresentation violated the members'

19   rights to vote.

20            It is also clear that, as Mr. DeChiara

21   emphasizes, the figures related to CCA compensation were

22   fully disclosed to the members, just as were the terms

23   of the agreement that relate to the percentages of

24   additional CCAs, however confusing they might be.

25            Thus in the end, this Court is persuaded that

134

1    NALC's information releases were adequate to inform the

2    membership of the issues to be decided in the words of

3    the *Gilliam* case.

4            In Count IV Plaintiffs contend that retirees

5    were improperly disenfranchised with respect to the

6    ratification vote and that NALC's decision not to

7    distribute ballots to retired members violates

8    Section 411 of the LMRDA as well.

9            As I suggested during the questioning,

10   Plaintiffs' claim in this regard actually raises two

11   issues.  First, whether the NALC constitution is

12   properly read as actually excluding retirees.  Plaintiff

13   says no, and, of course, the union says yes.

14           The second issue is whether a union policy

15   that undeniably excludes retirees from CBA ratification

16   referenda is a reasonable restriction to the right to

17   vote as LMRDA's Section 411(a) requires.

18           On the first aspect of this Plaintiffs point

19   to Article 16 and Article 2 of the NALC constitution and

20   assert that these simply cannot be read to establish

21   that retirees be excluded.  The Court sees and

22   understands Plaintiffs' argument.  Article 16 says

23   ratification ballots are to be mailed to "regular

24   members as defined by Article 2" and that Article 2

25   defines regular members to include retirees.

135

1          But Article 2 also plainly provides in

2   relevant part that "retirees, OWC departees, and

3   non-letter carrier regular members shall have no voice

4   or vote in the branch in any matter pertaining to the

5   ratification of a national work agreement."

6          And to the extent that Plaintiffs maintain

7   that this language cannot support a reading that

8   retirees shall be excluded from voting on the

9   ratification of a national work agreement, this Court

10  disagrees.

11         The crux of Plaintiffs' argument is the

12  assertion that the phrase "in the branch" must be given

13  meaning and that it must mean that the retirees are only

14  excluded from discussions or votes that actually take

15  place in the branch.  There's no record evidence that

16  suggests that any such "in the branch" discussion or

17  vote regarding national referenda related to the

18  ratification of a national work agreement have ever

19  taken place.

20         Nor does the record establish that the union

21  itself has ever read its constitution in this fashion.

22  To the contrary, NALC has provided documentation of the

23  fact that the delegates who first enacted the

24  retiree-related provision intended that it exclude

25  retirees from participating in national referendum

136

1    votes, and NALC has shown that in the entire history of

2    the CBAs that this union has ratified, retirees have

3    never voted.

4            Thus, there is evidence that the union has

5    consistently interpreted the language of Article 2 as to

6    exclude retirees from ratification votes without regard

7    to the phrase "in the branch."  At the very least then,

8    Article 2's provision is ambiguous, which means that

9    this Court must determine whether NALC's construction of

10   its own constitution is a reasonable one and whether

11   there are any indicia of bad faith.

12           The record evidence supports both a finding of

13   reasonableness of this interpretation, given that

14   excluding retirees from voting on national work

15   agreements was discussed, debated and appears to have

16   been the purpose for which this language was offered.

17   And there's also an absence of bad faith or evidence

18   related to bad faith, as NALC has consistently espoused

19   this construction for over 40 years.

20           That means that this construction predates the

21   current acrimony between Noble and NALC, and so

22   arguments that bad faith should be inferred from that

23   current acrimony are not properly supported.

24           Plaintiffs have also failed to establish any

25   likelihood of success on their contention that even if

137

1   the NALC constitution plainly excludes retirees that

2   that voting restriction is unreasonable.  Mr. Noble

3   asserts that it's irrational to permit retirees to serve

4   in the front office of the union but not to be able to

5   cast votes regarding CBAs.  But whether or not the

6   union's rules make sense or whether the Court agrees

7   with the policy is not the test for reasonableness under

8   this circumstance.  Instead, when evaluating this

9   question the Court must balance the democratic effects

10  of the challenged rule against the union's interests

11  urged in support of the rule and consider whether the

12  employee was excluded from voting on matters in which he

13  had a vital interest or whether, instead, the vote

14  pertained to matters primarily of concern to those who

15  were permitted to vote.

16          I'm quoting from a case called *Sergeant* at

17  346 F.3d at 1201.  And courts have long recognized that

18  retirees have interests that are different from those of

19  working union members.  The D.C. Circuit recognized as

20  much in a case called *Shelley v. Brock*, 793 F2d 1368,

21  D.C. Circuit 1986.

22          Indeed, in the *Shelley* case the D.C. Circuit

23  observed that no less an authority than the Supreme

24  Court has recognized that retirees are not employees for

25  all labor law purposes and that allowing the unions to

138

1    exclude nonemployee members from elections can be

2    perfectly sensible and proper.

3            In addition, the Department of Labor has

4    enacted a regulation that expressly permits unions to

5    restrict the right of retirees to vote to the extent

6    provided by the constitution and bylaws of the labor

7    organization.

8            Here the only direct interest of retirees in

9    the CBA ratification vote the plaintiffs have identified

10   with respect to the terms of the proposed agreement is

11   the right of some small set of retirees to receive

12   compensation for retroactive pay raises and associated

13   annuity increases.

14           The two CBAs that have been pointed to in this

15   case, the 2011 CBA and the proposed agreement, are the

16   only record evidence of what a collective bargaining

17   agreement between NALC and the postal service covers.

18   In those contracts, any interests of the retirees are

19   plainly dwarfed by the interests that active employees

20   have in the terms of those agreements, which primarily

21   cover wages, benefits, promotions, grievances and work

22   assignments, among other things.

23           If that balance changes in the future, then

24   there might well be an argument that there is no

25   reasonable basis for excluding retirees from voting on

139

1   the CBA anymore.  But that is not the case today.

2           And all things considered, this Court believes

3   that Plaintiffs are unlikely to be successful in

4   establishing that NALC's retiree restriction is

5   unreasonable and therefore violates Section 411(a) of

6   the LMRDA.

7           Turning finally to Plaintiffs' distribution of

8   campaign materials claim under 29 U.S.C. 481(c).  The

9   parties vigorously dispute whether Noble is a "bona fide

10  candidate for office" and whether the materials he

11  wanted to circulate to the membership constitute

12  "campaign literature in aid of his candidacy."

13          It is true, as Mr. Noble argues, that the

14  Supreme Court has recognized that a union member need

15  not wait until the nominating convention in order to

16  invoke Section 481(c).  But the parties have not cited

17  and this Court has not found any decision that analyzes

18  how far in advance of the election this right attaches.

19          The parties also disagree about whether the

20  material Noble sought to distribute is, in fact,

21  campaign literature in aid of his candidacy, and this is

22  especially so given that Noble in his own declaration

23  stated that the purpose of the literature he sought to

24  distribute was to influence the ratification vote.  And

25  the only connection between this literature and his

140

1    campaign for NALC presidency is the fact that the

2    opposition to the proposed agreement is a plank of his

3    platform.

4            This Court concludes that Plaintiffs have not

5    established the likelihood of success on the merits of

6    his claim, because in order to make a successful claim

7    in this regard Plaintiffs would have to demonstrate that

8    NALC rejected a reasonable request for distribution of

9    campaign material.  The reasonableness is in the

10   statutory provision, and on the facts presented here

11   that is not a showing that Plaintiffs can make.

12           First of all, as defense counsel points out,

13   the material to be circulated was not included in the

14   record.  So Plaintiffs have failed to show as a

15   threshold matter that the material qualifies as campaign

16   material within the meaning of the statute.

17           What is more, in this Court's view it is

18   manifestly unreasonable to request the circulation of

19   campaign literature more than a year prior to a union

20   election and under circumstances in which it is clear

21   that what is being discussed among the membership is not

22   the candidacy of any current or potential officers but

23   the content of a proposed CBA.

24           As I mentioned, the D.C. Circuit in a case

25   called *Carothers v. Presser* held that there's nothing in

141

1    Section 481(c) to indicate that Congress embrace the

2    broad proposition that any union member must be granted

3    access to his union's mailing list whenever he asserts

4    an interest in commenting on a contract submitted to the

5    national membership for ratification.  And in this

6    Court's view, as Defendants argue, that holding governs

7    the outcome of the distribution claim that Plaintiffs

8    are making here today.

9          The Court also notes that even if there was a

10   legal basis upon which to conclude that Plaintiffs'

11   distribution rights were violated under the

12   circumstances presented here, defense counsel is correct

13   that the remedy would be ordering distribution of

14   Mr. Noble's materials and not invalidation of the vote

15   that has already taken place regarding the matter that

16   Mr. Noble wanted to discuss.

17         Therefore, this Court concludes the plaintiffs

18   do not have a likelihood of success on the merits of the

19   claim that they have brought in their complaint, any of

20   the three claims, and I will now focus on the other

21   aspects of the PI test.

22         As explained, in addition to likelihood of

23   success on the merits, the Court has to consider three

24   other factors:  irreparable harm, balancing of the

25   harms and the public interest.  Defendants have stated

142

1     both in their briefs and again here today that a

2     ratification determination cannot be undone once a CBA

3     is ratified.  And if that is so, then it is clear to

4     this Court that Plaintiffs have established irreparable

5     harm if the injunction does not issue.

6           As I explained in the colloquy with

7     Mr. DeChiara, the irreparable harm inquiry focuses on

8     the need for the plaintiff to get the interim relief he

9     seeks in order to preserve the status quo so that his

10    case won't be mooted before it runs its course.  As

11    *Wright & Miller* puts it, "perhaps the single most

12    important prerequisite for the issuance of a preliminary

13    injunction is a demonstration that if it is not granted

14    the applicant is likely to suffer irreparable harm

15    before a decision on the merits can be rendered,"

16    because only when the threatened harm would impair the

17    Court's ability to grant an effective remedy is there

18    really a need for temporary relief.

19          In the instant case, this important

20    consideration, irreparable harm, favors Plaintiffs

21    because the Court assumes, along with the parties, that

22    the challenged ratification vote on the proposed

23    agreement complainant be undone if the instant case

24    proceeds on the merits and if Plaintiff were to win in

25    the end.

143

1      But irreparable harm is the only PI

2  consideration that weighs in Plaintiffs' favor because

3  the balancing of the equities and the public interest

4  also cut in favor of allowing the ratification vote to

5  proceed.

6      It is well established that when balancing the

7  competing claims of injury, the Court must consider the

8  effect on each party of the granting or withholding of

9  the requested relief.  Additionally, courts of equity

10  should have particular regard for the public

11  consequences of employing the extraordinary remedy of

12  injunction.

13      This Court finds that Plaintiffs have not

14  demonstrated that they would personally be substantially

15  harmed if the ratification vote moves forward for the

16  reasons that defense counsel stated.

17      Furthermore, the balance of the equities when

18  comparing the harms caused by issuing or not issuing the

19  injunction ultimately tips in Defendants' favor.  This

20  is because, although maintaining the pre-ratification

21  status quo through the course of this litigation would

22  not necessarily impose significant costs on the union

23  itself.  That is, the immediate monetary costs to NALC

24  would only be those associated withholding the ballots

25  and delaying the ballot community's travel to D.C., but

144

1    NALC's members would suffer harm from this PI, assuming

2    the membership voted to approve the proposed

3    disagreement, because members would have to wait longer

4    for their pay raises in addition to other benefits such

5    as health insurance contributions and holiday pay for

6    CCAs which the NALC obtained through negotiations.

7            And there is also an overarching public

8    interest in courts not interfering in union matters and

9    elections by imposing those democratic conditions that

10   the Court deems necessary.

11           And it is this last point that this Court

12   would like to emphasize as it concludes its analysis in

13   this case.  Plaintiffs are entirely correct that federal

14   law protects union members from the anti-democratic

15   tendencies of union leadership and that the fundamental

16   principles or premise of the LMRDA is, as the

17   Tenth Circuit held, to assure union members a basically

18   democratic union organization with concomitant

19   protections against arbitrary and despotic control by

20   union leaders.

21           However, it is equally well established that

22   the provisions of the LMRDA were not intended to

23   constitute an open invitation to the courts to intervene

24   in the internal affairs of unions, as one of my

25   colleagues pointed out in the case of *Bauman v. Presser*.

145

1    There is no question that ratification referenda are

2    internal union affairs.  And thus, this Court's

3    authority to intervene or interfere is very limited.

4    This is especially so with the judgment, when the

5    judgment of the union's leadership appears to be fair

6    and reasonable.  And that last part comes from a quote

7    of a case.

8            Based on the facts in the record provided here

9    and the arguments made by these parties, this Court

10   cannot say that NALC's referendum-related materials and

11   procedures were unfair or unreasonable, and there's

12   really nothing in the record that would indicate that

13   Plaintiffs would be successful on the merits of a case

14   that attempts to establish otherwise.

15           Therefore, it is this Court's conclusion that

16   Plaintiffs' motion for a temporary restraining order or

17   preliminary injunction must be denied.  That is the

18   Court's oral ruling on the motion that was pending in

19   this matter.

20           Before we proceed any further, let me just

21   hear from the parties about what they think needs to be

22   done in terms of preserving Plaintiffs' rights, or is

23   this case over at this point.

24           Mr. DeChiara, what do you think?  At one point

25   in the argument you mentioned that if the preliminary