In the United States District Court
for the District of Columbia

| | |
|---|---|
| David W. Noble<br>2707 Ridge Road<br>Windsor Mill, Maryland 21244<br>240-477-7256 § § § § § § Plaintiff § § v. § § National Association of Letters Carriers, AFL-CIO § § and § § Alamo Branch 421 § § and § § Branch 9 NALC § § Defendants | Case No. 22-01613 (DLF) |

**PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

Table of Authorities....................................................................................................................1

PreliminaryStatement.................................................................................................................2

**ARGUMENT**

A.  The cases defendants cite are distinguishable.  Knox County Local v. National Rural Letter Carriers Association supports plaintiff's position............................................................................2

B. Branches 9 and 421 are not separate from NALC.......................................................................4

C.  The department of labor's discussion of distribution of literature is not persuasive................5

D.  Defendants' description of plaintiff's litigation history is inaccurate and incomplete............7

E.  Absent an injunction, plaintiff has shown that he will suffer irreparable harm........................9

Conclusion....... ...............................................................................................................11

## TABLE OF AUTHORITIES

*Helton v. NLRB,* 658 F.2d 883, (DC Cir. 1981)...............................................................3

*Herman v. Local 305*, 214 F.3d 475, 480 (4th Cir.2000) ..............................................5

*International Organization of Masters, Mates & Pilots v. Brown*, 498 U.S. 466, 476 (1991)....3,4

*Knox County Local v. National Rural Letter Carriers' Association, et al.,* 720 F.2d 936 (6th Cir. 1983).....................................................................................................................2, 3, 4

*Noble v. Dunn*, 895 F.3d 807 (D.C. Cir. 2018)..............................................................7

*Noble v. NALC*, 285 F. Supp. 3d 128 (D.D.C. 2018).....................................................7

*Police Department v. Mosely,* 408 U.S. 92, 95-96 (1972)..............................................3

*Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944).........................5

*Vance v. Ball State University*, 133 S.Ct. 2434, 2443 n. 4, 186 L.Ed.2d 565 (2013) ..................6

## STATUTES, LEGISLATIVE MATERIALS, AND RULES

Labor Management Reporting and Disclosure Act of 1959
        29 U.S.C. §§ 401 et seq................................................................................. 11

## Preliminary Statement

In the 134-year history of NALC only once has an incumbent president been defeated by an outside challenger.  That happened in 1978.  NALC's electorate consists of 280,000 members, employed in 13,000 facilities across the country.  In quadrennial national mail-in

elections 28 national officers are elected to conduct the day-to-day business of the union.  The 28 incumbents customarily run for election as a group and pool their considerable resources.

Plaintiff ran for president in 2014 against the incumbent, Fred Rolando.  At the national convention one month before the election, Rolando summoned a retired national officer, Dale Hart, to the stage.  Hart spent several minutes referring to plaintiff as an "internet asshole." Plaintiff asked Rolando to allow him to respond to Hart, but Rolando refused.

Plaintiff again ran for president in 2018.  At the convention one month before the election Rolando called on two retired national officers, Matty Rose and Barry Weiner, who both made critical statements about plaintiff.  Plaintiff went to a microphone to respond to Rose and Weiner, but Rolando refused to recognize plaintiff.

In 2018 plaintiff was forced to use litigation to compel Rolando to allow him to use NALC's library of 80,000 email addresses to send his campaign materials to a portion of NALC's electorate.  After the election Rolando destroyed the email address library, thus preventing plaintiff from sending emails this year.

In 2014, 2018, and 2022 plaintiff challenged Rolando to debate, but Rolando ignored plaintiff's challenges.

Plaintiff campaigns on the internet, but estimates that he is able to reach only about 10% of NALC's electorate that way.

No NALC challenger has ever been able to raise enough money to mail campaign material to NALC's 280.000 members.  Plaintiff has been unable to raise enough money to make a nation-wide mailing.

Placing ads in the union's monthly magazine costs 1/100 of the cost of sending mailings.

Rolando wants to restrict plaintiff's access to the magazine to one issue.  Rolando has many

alternatives to ads in the magazine.  Plaintiff has only the internet, which reaches only about

10% of the membership..

**ARGUMENT**

**A.  The Cases Defendants Cite are Distinguishable.  Knox County Local v. National Rural
Letter Carrier Supports Plaintiff's Position.**

The instant case involves the claim of a co-owner of a union publication that accepts

advertisements that it may refuse to publish the advertisement of another co-owner based on the

content of the proposed advertisement.

None of the cases cited by defendants concerns the co-owner of a union publication  that

accepts advertisements, and that claims that it may suppress the advertisement of another co-

owner based on the content of the proposed advertisement.  All of defendants' cases, therefore,

are distinguishable from the instant case.

There is a case that involves a claim almost identical to the claim in the instant case, but

defendants have not disclosed that case.  The case is *Knox County Local v. National Rural Letter

Carriers' Association, et al.,* 720 F.2d 936 (6th Cir. 1983).

In that case, defendant National Rural Letter Carriers' Association (NRLCA) negotiated

a collective bargaining agreement.  Plaintiff Knox County opposed the agreement.  Plaintiff tried

to place an advertisement opposing the agreement in the national union magazine.  NRLCA

refused to accept the advertisement, saying it would create "internal union strife."

The district court granted summary judgment to NRLCA ruling, "Neither § 411 of the

LMRDA nor the First Amendment guarantees advertising space in the defendants' publication . .

. without their consent."

The circuit reversed.

The circuit found that: "Title I [of the LMRDA] requires the NRLCA to publish the paid advertisement submitted by the Knox County Local.  Not only is the 'speech' in this case of the kind that is "protected" by the first amendment, such "speech" goes to the core of First Amendment values.

\* \* \*

"The NLRCA desires to prevent the publication of the local's ad because of its message.  In *Police Department v. Mosely,* 408 U.S. 92, 95-96 (1972), the Supreme Court resoundingly prohibited any content-based restrictions upon expression: 'Above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'

\* \* \*

"When the NRLCA opened its magazine to its members [by accepting advertising] . . . it effectively opened the forum to the public.  Having done so, the national union cannot unreasonably preclude ads submitted by members based on their content.  *See also Helton [v. NLRB,* 658 F.2d 883, (DC Cir. 1981)].

\* \* \*

"In the present case . . .the NRLCA's magazine is the only economically feasible channel capable of communication capable of reaching the [entire] union community.  As the Knox County Local members are relatively small, the cost of a bulk mailing would have been impracticable.  By refusing to allow those members access to its union-wide publication, the

NLRCA foreclosed the only reasonable avenue for effective communication . . .."

As in *Knox County* the plaintiff's proffered advertisements are protected speech.  As in *Knox County* the incumbent officers who animate the union want to prevent publication of plaintiff's advertisements because of their content.  As in *Knox County* the union magazine accepts advertising.  As in *Knox County* publication of plaintiff's advertisements in the union magazine is the only economically feasible channel capable of reaching the entire union community, and the incumbent officers are trying to foreclose the only reasonable avenue for effective communication.

**B. Branches 9 and 421 are not separate from NALC.**

Brian Renfroe's declaration says that it is based in part on statements made by to him by NALC staff members and based in part on personal knowledge.  Renfroe does not state which part is based on inadmissible hearsay.  Therefore Renfroe's complete declaration should be disregarded.

At page 4 defendants state that "Branches 9 and 421 are local labor organizations affiliated with, but separate from, NALC."  In fact, however, NALC branches are integral parts of NALC.  If they were separate from NALC, branches could not exist.  Branches depend on NALC to provide them with the money they need to operate.  Branches also depend on NALC and its national officers to negotiate a national collective bargaining agreement that sets wages, hours, and conditions of employment for all letter carriers in all branches.  Branches act as NALC's designee in the first two steps of the multi-step grievance-arbitration established by the nation-wide collective bargaining agreement.  Without NALC, branches would have nothing to do.

Defendants argue that Noble is not, and does not claim to be a member of [Branch 9 or Branch 421], or a candidate for office in either local union.  As to his branch membership, that is plainly not relevant.  Defendants point to no branch membership requirement to qualify to make a Section 401(c) request to distribute literature.   Defendants also argue that Section 401(c) only allows suits against a labor organization by a "candidate for office in such labor organization." But Noble is a candidate for national president in an election in which Branch 9 and Branch 421 members will participate.  It would be a harsh, absurd, and nonsensical reading of the statute to conclude that Branch 9 and Branch 421 members may vote for national president, but a candidate for that office may be left without a mechanism to put  her or his platform before the voters.  Moreover, even if a strained and tight reading of Section 401(c) were made, Section 411 would allow placements of ads in both branches' publications because both publications accept advertisements.  *See Knox County Local, supra*.

Defendants close on this issue by arguing that plaintiff is bringing suit in the wrong place.  They contend that suits to enforce Section 401(c) may only be brought "in the district court of the United States in which such labor organization maintains its principal office." Washington, D.C., however, is where NALC maintains its principal office.  Branch 9 and Branch 421 are integral parts of NALC, which provides Branch 9 and Branch 421 with the money they use to maintain secondary offices in Minnesota and Texas.

**C.  The Department of Labor's Discussion of Distribution of Literature is Not Persuasive.**

"[T]he rulings, interpretations, and opinions of [the Administrator of a statute], while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore v.*

*Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). *See also Herman v. Local 305*, 214 F.3d 475, 480 (4th Cir.2000) (noting that the Secretary of Labor has the "statutory duty to administer those provisions of the LMRDA pertaining to the enforcement of § 481"). When an agency issues guidance or an opinion on a statute under its purview, the agency's interpretation is entitled to respect by the courts to the extent that it is persuasive. *Skidmore*, 323 U.S. at 140, 65 S.Ct. 161. The persuasive power of agency guidance "depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements." *See Vance v. Ball State University*, 133 S.Ct. 2434, 2443 n. 4, 186 L.Ed.2d 565 (2013) (quoting *Skidmore*, 323 U.S. at 140, 65 S.Ct. 161).

In response to an appeal of the 2018 election filed by plaintiff the department of labor (DOL) stated: "The investigation revealed that the Postal Record normally does not accept advertising but that it makes an exception, during election years, to allow campaign advertisements in the August-September issue. This has been the union's long-standing practice. In addition, NALC provided notices to all candidates of this practice in the May 2018 issue of the Postal Record. All candidates were treated equally with respect to the terms and expenses associated with distribution of the campaign advertisements in the Postal Record. You and the incumbent slate both placed advertisements in the August-September issue, and no candidate was allowed to place an advertisement in any other issue. There was no violation."

DOL's statement is not persuasive.  First, it finds that the Postal Record does not accept advertising.  That is false. The Postal Record accepts advertising in every issue.  Second, it finds that NALC has a long-standing practice.  That is false.  NALC contends only that it has a policy of limiting political advertising to one issue of the Postal Record every four years.  Third, DOL

does not state a rule which would govern plaintiff's objection, but seems to accept that NALC may establish a practice. Fourth, DOL fails to analyze plaintiff's objection according to the rules set forth by the Supreme Court in *International Organization of Masters, Mates & Pilots v. Brown*, 498 U.S. 466, 476 (1991).

Plaintiff intends to file suit concerning DOL's rejection of his election appeal in about three months. Plaintiff estimates that it will take that long to save enough money to secure an attorney. If plaintiff prevails in that suit, the result may be a new election conducted by DOL, rather than by NALC's incumbent officers.

**D. Defendants' Description of Plaintiff's Litigation History is Incomplete and Inaccurate.**

At page 3 of their memorandum defendants state, "That Noble has filed a baseless lawsuit against NALC is not a surprise, given that Noble is no stranger to baseless litigation against NALC. In *Noble v. Dunn*, 895 F.3d 807 (D.C. Cir. 2018), he tried for years to tar NALC and its national officers with corruption charges, but in the end the Court of Appeals found that "[o]ver the 23 years (sic) of this litigation, Noble has failed to adduce any evidence of wrong-doing by defendants." Omitted from this description is that the trial court in 2003 denied defendants' motion for summary judgement,[1] and in 2008 the circuit court reversed in part and remanded the case to the trial court for further proceedings.[2] Thus, both the trial court and the 2008 circuit court panel found some evidence of wrong-doing, and the 2018 panel does not explain why it thinks the trial court and the 2008 panel were wrong. Other errors committed by the 2018 panel are described in Plaintiff's June 30 Decl. at 17--20.

------

[1]260 F. Supp. 2d 132 (D.D.C. 2003)

[2]525 F. 3d 1230 (D,C. Cir. 2008)

Defendants also state, "In *Noble v. NALC*, 285 F. Supp. 3d 128 (D.D.C. 2018), Noble

tried to block NALC's membership from voting from voting on its newly negotiated collective

bargaining agreement.  Judge Ketanji Brown Jackson found no basis for the preliminary

injunction he requested.  *See* June 22, 2022, Declaration of Brian Renfroe ("Renfroe Dec.") filed

herewith, at Exhibit C, at 114-45 (July 28, 2017, hearing transcript in Case No. 17-1255; see also

Noble, 285 F. Supp. 3d at 131.  Once freed from Noble's efforts to interfere, NALC's

membership went on to overwhelmingly approve the contract, with a vote of 78,935 to 4,732.

*See Noble*, 285 F. Supp. 3d at 131.  Even after that, Noble tried to continue to press his claims of

wrongdoing against, but Judge Dabney Friedrich dismissed them.  *See id.* At 135.  We mention

these earlier suits to put in context Noble's current foray into federal court to advance his

political ambitions."

The above paragraph includes many false statements:

*Plaintiff did not try to block a ratification vote.  Plaintiff tried to delay the ratification

vote until plaintiff had the opportunity to correct false statements made by the incumbent

officers about the contents of the proposed agreement.

*Judge Jackson found some basis for plaintiff's motion.  She ruled that he had

established irreparable harm.  She permitted the vote to proceed on the narrow ground that

plaintiff had failed to produce a witness to testify that s/he voted for ratification but would have

voted against it if s/he had known of the officers' deception.

*Defendants claim to have provided a complete transcript of the hearing, but provided

only a partial transcript, trimmed to omit the discussion of the officers' deception.

*Nobody was ever freed from anything plaintiff had done, because plaintiff had never

restrained anyone.

*Before 2017 NALC had always allowed observers at the counting and tallying of ratification votes.  The Putinesque vote of 78,935 to 4,732 was accomplished by a count and tally from which observers were excluded.

*Judge Friedrich did not reach the merits of plaintiff's remaining claims, but dismissed five of six counts without prejudice as being moot.  The sixth count, which concerned the amount of money NALC would charge to email blast plaintiff's campaign materials, settled when NALC lowered its price and agreed to pay plaintiff's attorneys' fees.

Omitted from defendant's litany of plaintiff's litigation is a suit for defamation plaintiff brought in state court in Maryland.  During the 2014 campaign for president, ex-NALC president Bill Young made a video supporting Fred Rolando that Young posted on YouTube.  In the video Young said that plaintiff had been fired from his HQ position because plaintiff "failed to perform the duties of his position."  The jury found that Young's statement was false and made with actual malice.  Although plaintiff did not ask the jury for money, the jury awarded both compensatory and punitive damages.  While NALC was not a party to the suit, Rolando and his executive council used about $100,000 of the members' dues to pay for Young's unsuccessful defense.

**E.  Absent an Injunction, Plaintiff has Shown that he Will Suffer Irreparable Harm.**

NALC argues that plaintiff's failure to swiftly bring a motion for a preliminary injunction undermines his contention that he will suffer irreparable harm.

Plaintiff received NALC's refusal of his request to place ads in the union's magazine on December 29, 2021.  As soon as plaintiff received the refusal he began searching for a lawyer to

initiate a preliminary injunction.  Plaintiff  first tried to persuade Matthew Bennett to take his

case.  Bennett represents plaintiff in a false arrest and false imprisonment suit stemming from

the forcible removal of plaintiff from his attempt to observe the counting and tallying of ballots

in the 2018 election.

NALC has been represented by the NYC law firm of Cohen, Weiss, and Simon (CWS)

since 1978.  Plaintiff has been involved with them over that whole 44 years.  During the thirteen

years plaintiff worked at NALC HQ plaintiff worked with CWS lawyers daily on negotiations

and arbitrations.  Plaintiff was almost always the witness through whom they presented cases in

arbitration.  For the 24 years after plaintiff left NALC plaintiff pursued a suit called Noble v.

Sombrotto and CWS represented the defendants.  According to salary.com CWS lawyers are

paid about $2,000 per hour.  Plaintiff asked a CWS lawyer to confirm that, but he did not reply.

CWS is backed by NALC's $800 million in assets, and has a reputation as being a firm that is

unpleasant to litigate against.  CWS would rather fight to the bitter end than settle.

Matthew Bennett decided that he was not qualified to oppose CWS in an area of the law

in which he had no experience.  There are a handful of "union democracy" lawyers in the

country who are sometimes up to a fight with CWS.  On January 30, 2022 plaintiff contacted one

of those, Arthur Z. Schwartz, and Schwartz agreed to take plaintiff's case.  Over the next four

months plaintiff and Schwartz emailed and talked weekly or more often about when Schwartz

would file a motion for a preliminary injunction.  Schwartz strung plaintiff along with excuses

about cracking his vertebrae, having covid, being busy with other cases, and so forth.  In May,

after giving Schwartz an ultimatum, plaintiff gave up and began preparing the motion for a

preliminary injunction himself.  In June plaintiff filed the motion.

Defendants argue that it is "speculative" whether plaintiff would be harmed by being denied the opportunity to advertise in two issues of the magazine and being forced to accept only one.  That is wrong.  More advertising generates a greater response.  That is the basic premise of advertising.  The grant of plaintiff's motion would double plaintiff's opportunity to advertise.

Defendants also argue that plaintiff will not be harmed by being prevented from advertising in the magazine because plaintiff has the opportunity to send mailings instead.  Defendants question whether a mailing to all members would cost $350,000, noting that first class postage costs 60 cents.

While first class postage is 60 cents, that is not the only cost a mailing entails.  The company defendants have chosen to apply address labels to plaintiff's envelopes will charge from 32 cents per letter to $2.74, depending on volume.  Even taking the 32 cents figure brings the cost up to almost a dollar per letter.  On top of that it is necessary to add the cost of printing 280,000 letters, folding them, stuffing them into 280,000 envelopes, and sealing the envelopes.  The total costs of those materials and operations would bring the cost of a nation-wide mailing to at least $500,000 or $600,000.  No NALC challenger has ever been able to raise enough money to make a nation-wide mailing.

**CONCLUSION**

Defendants seek to re-write Section 401(c) so that instead of reading "by mail or otherwise," it would read "by mail, or maybe email, but that's it."  Defendants have been unable to find even a single case in which an incumbent president has been permitted to prevent his

opponent from placing paid campaign ads in the union's magazine.  The purpose of the LMRDA

is to promote union democracy.  Denying plaintiff's motion would be a stunning blow to union

democracy.  Therefore, plaintiff's motion for a preliminary injunction should be granted.

Respectfully submitted,

/s/David W. Noble

David W, Noble
2707 Ridge Road
Windsor Mill, Maryland 21244
240-477-7256
dwnoble@gmail.com

July 3, 2022